FILED BY _____ D.C.

NOV 04 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Paul King
Plaintiff, Pro-Se
801 S. Miami Ave #1401
Miami, Fl 33130
Pablopicassojustice@gmail.com
571-623-2876

## SOUTHERN DISTRICT COURT OF FLORIDA

PAUL KING, AN INDIVIDUAL,

Plaintiff,

vs.

MICHAEL KING, AN INDIVIDUAL;

LAURI KIBBY, AN INDIVIDUAL;

CHARLES KIELEY, AN INDIVIDUAL;

SOPHIA KING, AN INDIVIDUAL;

DIMITRY ROMANTSOV, AN INDIVIDUAL;

KINGS GARDEN, INC, A NEVADA
CORPORATION;

KINGS GARDEN, LLC, A CALIFORNIA
CORPORATION;


DOES 1-20, INDIVIDUALS OR CORPORATIONS

COMPLAINT FOR:

1. **FRAUD, INTENTIONAL
   MISREPRESENTATION;**
2. **MONEY LAUNDERING;**
3. **BRIBERY;**
4. **EMBEZZLEMENT;**
5. SELF-DEALING;
6. SECURITIES FRAUD;
7. THEFT
8. RACKETEERING

**CLAIM AND PRAYER FOR RELIEF**

**CLAIM:** Michael King ("King") fraudulently induced Plaintiff Paul King ("Plaintiff") to move from Florida to California to be founders of Kings Garden ("KG") repeating "50/50, whatever I have you have. We split everything." The complaint will show King never intended to keep that promise and instead tried and is still trying ferociously to bankrupt Plaintiff to make sure he is not able to have a fair fight for his rightful ownership.

**PRAYER FOR RELIEF:** Plaintiff seeks remedy for the promise made upon which he relied, to be made whole, and for Defendants to be held responsible for their immoral and corruptive actions.

**Part I: KINGS GARDEN**

**A-F**

**COUNTS 1-19**

**EXHIBITS 1-36**

A.      KINGS GARDEN BACKGROUND

B.      KINGS GARDEN REAL ESTATE

C.      MCLANE AGREEMENT

D.      PPP LOAN FRAUD

E.      SELF-DEALING VIA RELATED ENTITIES

F.      IDENTITY THEFT AND FORGERY

**A: KINGS GARDEN BACKGROUND**

1. On or about August 2015 the two brothers moved to San Diego with King moving a week prior and putting a deposit for Plaintiff in the same building despite Plaintiff wanting to check things out before deciding where to live.

2. King already knew the business would be in Palm Springs and planned in advance a way to keep Plaintiff at a distance from the business, inconveniencing himself and his family in order to do so. According to the 2019 Proposed Merger Documents ("Merger Docs", attached as last exhibit due to it being 300+ pages), King has been CEO of related entities since 2014 (**Exhibit 1,** p100 of Merger Docs).

3. Plaintiff and King agreed they would each invest whatever they had available to get the business started. Plaintiff invested $200,000 and King promised to invest once his Fort Lauderdale townhouse sold.

4. Plaintiff began working on the real estate plan, which was: **a)** getting options on buildings where cannabis will be approved, **b)** getting the buildings approved and **c)** refinancing when market allowed, putting the cash back into KG and generating enough cash for KG to be self-sustaining.

5. Prior to seeing the plan through, Plaintiff was pushed out by King with the assistance of several co-Defendants.

6. The first time Plaintiff received any communications from Defendant Lauri Kibby ("Kibby") was August 16, 2019 when King forwarded an email from Kibby requesting signatures on the Merger Docs (**Exhibit 2**).

7. According to the Merger Docs, post-Merger King owns 1365.69 Class B shares and 18.76 Class A shares (**Exhibit 3**, page 195 of Merger Docs).

9. According to the Merger Docs, Plaintiff owns 50 Class B shares (**Exhibit 4**, Page 197 of Merger Docs).

10. Plaintiff did not sign the merger docs but the merger docs were sent back to KG signed from Plaintiff's email address on September 4, 2019. Plaintiff asserts his signature was forged by an accomplice of King (**Exhibit 5**) and will point to a history a forgery and identity theft by King in this complaint.

**Count 1: Fraud: Intentional misrepresentation by King**

***The promise to be 50/50 partners***

Plaintiff restates and reaffirms the claims alleged in A: 1-10 and affirms his belief that King knew that Plaintiff would rely on the promise of a 50/50 partnership, that King never intended to honor that promise, and that Plaintiff suffered damages as a result.

**Count 2: Fraud: Intentional misrepresentation by King and Kibby**

***Withholding shareholder information and updates from Plaintiff***

Plaintiff restates and reaffirms the claims alleged in A: 1-10 and affirms his belief that King and Kibby, while sending shareholder updates to other shareholders, acted together to purposely withhold these updates from Plaintiff. King knew Plaintiffs' email and Kibby as CFO should have made sure she knew who the shareholders were and that they were all added.

**Count 3: Fraud: Forgery by King**

***Arranging forgery of the merger agreement***

Plaintiff restates and reaffirms the claims alleged in A: 1-10 and believes King caused P's signature to be forged through an accomplice on the Merger Docs. King has a history of forging Plaintiffs signature as will be proven in this complaint.

**B. KINGS GARDEN REAL ESTATE**

1. According to publicly available information, 6 KG buildings are sold for approximately $69.9M between 2019 and 2020 (**Exhibit 6).**

2. According to the Merger docs, KG facilities include 11 buildings, 4 in Cathedral City (**Exhibit 7**) and 7 in Palm Springs (**Exhibit 8**) all of which are now leased by KG.

3. It is unclear what happened to the other 5 buildings.

4. According to the Merger Docs, King has held a salary of $290,000 in 2017, $664,461 in 2018 (**Exhibit 9**) and signed a 5-year employment agreement for 2019-2023 of $600,00 annually (**Exhibit 10).**

5. A Trump application for Michael and Marianna king ("Marianna") in December 2020 shows King makes $400k annually (**Exhibit 11**).

6. Prior to moving to California in 2015, upon information available to Plaintiff, King held most of his net worth in 3 real estate properties collectively worth not less than 1.5M and not more than $2.5M.

7. According to public records, King now has personal real estate in his name worth no less than $20m (**Exhibit 12**) and these holdings include a West Hollywood home purchased for $12.875M between December 2018 and June 2019 (Several public records vary on dates, **Exhibit 13** shows Feb 2019).

8. According to the merger docs, King also gave KG a loan of 8.5m (**Exhibit 14**).

9. P believes and asserts King used the sale of KG real estate assets to embezzle rather than putting proceeds back into KG.

**Count 4: Embezzlement by King**

***The Embezzlement of Real Estate Sales Proceeds of KG Real Estate***

Plaintiff reaffirms the statements made in B: 1-9 and believes that King embezzled funds from the sale of either a) The 5 Buildings currently leased where the sale of the buildings are unaccounted for, or b) from the $69.9m sale of the 6 buildings, or the most likely scenario, both.

**Count 5: Fraud by King**

***Misrepresenting salary in the Trump application is a pattern that is repeated***

Plaintiff claims the Trump application is indicative of King's pattern of creating multiple sets of documents, disclosing information as it helps him, with no regard for accuracy, honesty, or integrity.

**C: MCLANE AGREEMENT**

1.  According to Exhibit 8 mentioned above, 19533 Mclane ("Mclane") is the 7th listed building for KG in Palm Springs.

2.  On February 14, 2018, King sends an email to Dimitry Romantsoff ("Dimitry") with subject line 'Re: Revised Final PS IV 4 Operating Agreement - CMCI McLane Group LLC' (**Exhibit 15**)

3.  In the email, King offers Dimitry 25% for a $3M investment.

4.  On April 30, 2018 King sends an email with subject line 'O.A., GIA, signed by Meade' with an operating agreement attached (**Exhibit 16**)

5.  While Chairman and Ceo of KG, King offers to Dimitry a deal where Dimitry will receive

6.  25% equity, King 37.5% and Michael Meade ("Meade") will receive 37.5% equity in Mclane (**Exhibit 17**).

7.  KG is not mentioned in this agreement.

8.  P believes and asserts that King breaches his fiduciary duty to KG.

9.  P believes that Kibby as CFO particularly and Charles Kieley ("Kieley") as COO are likely either taking payouts to look the other way or are complicit in structuring the deals.

**Count 6: Self-Dealing by King**

*__Dealing KG assets as it benefits King__*

Plaintiff reaffirms the statements made in C: 1-9 and alleges self-dealing by King of KG operating entities. Plaintiff sees no other possible explanation for the chain of offers and emails.

**Count 7: Aiding and abetting by Kiely and Kibby**

*__Assisting King to self-deal__*

Plaintiff reaffirms the statements made in C: 1-9 and alleges Kibby and Kieley as CFO and COO respectively, and especially Kibby being a seasoned entrepreneur and the one in charge of the books, must know what is going on.

**D: PPP LOAN FRAUD**

1.  According to Merger Docs, King and Kibby own Desert Payroll Solutions ("DPS", **Exhibit 18**).

2.  On Jan 14, 2021 KG accountant Greg Barton CPA associate Shauna Watkins files an updated document for DPS with the secretary of state (**Exhibit 19**)

3.  In 2016, Greg Barton is agent on record for DPS with a different address than any of the KG addresses (**Exhibit 20**).

4.  According to the SBA, whether tier 1 (direct, plant-touching) or tier 2 (indirect, non-plant touching), since marijuana is federally illegal these businesses are not eligible to obtain government loans (**Exhibit 21**).

5.  According to federalpay.org, DPS receives approximately $1.37M (**Exhibit 22**).

6.  In addition to the immediate complications inherent with defrauding the US Government, King and Kibby show a pattern of disregard for the law in favor of self-interest.

7.  Further troubling, KG's accountant aiding and abetting in the fraud shows King is able to manipulate professionals as it helps his cause.

**Count 8: Fraud by Intentional misrepresentation by King and Kibby**

Plaintiff reaffirms the statements in D: 1-7 and alleges that King and Kibby committed fraud by intentionally misrepresenting to the Government that DPS is not related to a cannabis company and signing off on that claim in order to secure funds.

**Count 9:  Embezzlement of PPP funds by King and Kibby**

Plaintiff reaffirms the statements in D: 1-7 and alleges that King and Kibby embezzled the funds.

**Count 10: Bribery by King and Kibby**

Plaintiff reaffirms the statements in D:1-7 and alleges that King and Kibby bribed Greg Barton CPA in order to have Barton conceal the company being a cannabis company through an innocuous name and address and caused them to filed the paperwork with the government.

**E: Kings Garden Non-Arms Length Transactions**

1. According to page 33 of the KG Merger Docs, several non-arms length transactions are noted including (**Exhibit 23**):

    - DPS, owned and managed by King and Kibby to provide payroll services to KG;

    - Duard Ventures ("DV"), owned and managed by Kibby and Kibby to provide services to KG, and;

    - C K Endeavors ("CKE"), a company owned and managed by Kieley.

2. King, Kibby and Kieley each receive salaries through KG as executives of KG and as detailed in the Executive Compensation chart (**Exhibit 24**) as well as options and bonuses based on performance.

3. King, Kibby and Kieley also signed employment agreements going forward for a 5 year period where they are each to receive annual salaries of $600,000 (**Exhibit 25**).

**Count 11: Embezzlement and self-dealing by Defendants King, Kiely, and Kibby**

*Through affiliated entities of KG and paid by KG for no value-added services in entities owned by executives that are employed by KG*

Plaintiff reaffirms the statements in E: 1-3 and alleges that the entities DV, CKE, and DPS are vehicles devised to self-deal and embezzle since no value is added by Kibby, Kiely, and King's participation in those entities. Further, for a company like DPS to exist, which simply writes checks to employees, and to charge 10% of the gross paycheck amount is the definition of self-dealing.

**F: Identity Theft by King and Sophia King**

    1.  Plaintiff alleges that King and Sophia King ("S. King") orchestrated a plan to be able to use Plaintiffs' identity to forge documents and open and close accounts.

    2.  Plaintiff's full name was Paul King, until one day Sophia suggested adding "Michael" as a middle name. Sophia pleaded that she misses her father very much and it will make her happy and bring Plaintiff good luck.

    3.  Plaintiff now believes this was a scheme so Michael King is able to use Plaintiff's identity when it benefits him and then to set Plaintiff up when it benefits them.

    4.  In an email from King to Plaintiff on March 5, 2018, King tells Plaintiff that he may want to update his email for an account "KannaKing LLC", an entity owned and controlled 100% by Plaintiff (**Exhibit 26**) that Plaintiff never authorized King to receive statements for.

    5.  In an email from King to Plaintiff on June 30, 2018, King sends American Express ("Amex") Text alert screenshots writing to Plaintiff "You may want to call Amex to take my number off your cc Alerts. Just started showing up." (**Exhibit 27**)

    6.  In an email from King to Plaintiff on April 14, 2018, King sends Plaintiff the new username

and password for an Amex under Plaintiffs name and social (**Exhibit 28**). These emails make sense much later when Plaintiff sees that Cannafornia, which was not related to King, through Dimitry, was paying for King's and wife Marianna's (**Exhibit 29**) American Express bills and then recognizing the payments as loans to Plaintiff and for which Roman and Dimitry would later sue Plaintiff for an alleged loan that they gave Plaintiff on a note that King signed forging Plaintiffs signature.

7. As the evidence shows

a.    **Exhibit 30-** Michael King shops using Amex

b.    **Exhibit 31-** American express bills include Marianna King

c.    **Exhibit 32-** Now they are classified as loans made to Kanna King from Cannafornia, Plaintiffs new company

d.    **Exhibit 33-** Canadian CPA Brian King (no relation) to Dimitry discussing same

e.    **Exhibit 34-** Greenspoon Marder ("Greenspoon") is later bribed to help cover it up by accessing Dimitry's email and deletes damaging emails from or to Dimitry, such as the responses to Brian's email.

8. Dimitry later tells Brian the funds were investments from his company GIA investments, using it as leverage to acquire shares in Cannafornia, essentially triple dipping along with King.

9. Further, 3540 N Anza Road, a KG building, shows up on a current credit report for Plaintiff (**Exhibit 35**).

10. 1401 Investments, a company owned by Plaintiff, recently has its mailing address changed to S King's home address (**Exhibit 36**).

**Counts 12-19: Racketeering, money laundering, Bribery, Embezzlement, Theft, Forgery, Identity theft, Hacking, Securities Fraud**

*Plaintiff reaffirms and realleges the dizzying amount of fraudulent activity in F: 1-10 and asserts specifically these counts against the following individuals:*

      *12) Launder money via Amex by King, S King, Dimitry;*

      *13) Bribery of Greenspoon Marder's Attorney by King, S King, Dimitry;*

      *14) Embezzlement of company funds by Dimitry;*

      *15) Theft by King, S King;*

      *16) Forgery by King, S. King;*

      *17) Identity theft by King;*

      *18) Hacking by King and S King, and;*

      *19) Securities fraud by King, and Dimitry*


**Part II: RACKETEERING SPREADS TO CANNAFORNIA**

      A)  CANNAFORNIA BACKGROUND

      B)  OPENING/CLOSING ACCOUNTS, FORGERY, COVERING UP

      C)  EMBEZZLEMENT THROUGH PG&E

      D)  EMBEZZLEMENT THROUGH DAMA FINANCIAL

**A-D**

**COUNTS 20-24**

**EXHIBITS 37-49**

**A: Cannafornia Background**

1.  Plaintiff claims that King, through S. King and friends Dimitry and Roman set up a full-blown scheme specifically to leave Plaintiff bankrupt and unable to fight for his rightful ownership of KG.

2.  In Dec 2017, Sophia introduced Plaintiff to Dimitry and Roman. Sophia claims they are her friends and she is the godmother of Dimitry's son. Sophia claims she helped Dimitry's wife Anastasia Bukharova ("Anastasia") through a life-threatening cancer by sitting bedside for many months with her.

3.  According to recent discoveries, Plaintiff is now under the belief that Dimitry and Roman are King's friends, not Sophia's, and the entire story was fabricated to set up their next embezzlement scheme.

4.  Dimitry, S. King, King, and other family members and friends, all of Russian backgrounds and collectively called "The Russians" use Cannafornia to steal from and set Plaintiff up.

5.  The Russians, instead of investing in Plaintiffs greenhouse cultivation company, always intended to set Plaintiff up.

**B: Opening / Closing Bank Accounts, Forgery, Covering Up**

1.  Checks are written to Sophia (**Exhibit 37**), Plaintiffs' signature is forged

2.  Checks are written to employees (**Exhibit 38**), Plaintiffs' signature is forged

3. On March 1st Plaintiff went to the farm to fire Dimitry and his family, S. King supported Plaintiff to his face and behind his back helped Dimitry close bank accounts in time, with an email on Feb 28th (**Exhibit 39).**

4. Plaintiff asks S. King for bank statements and S. King replies there were no bank accounts (**Exhibit 40)**

**C. Embezzlement through PG&E**

1. Typical PG&E bills on the farm are between $2,000 and $6,000 a month and there is only one meter (**Exhibit 41)**

2. Suddenly bills start appearing for multiple meters for multiple accounts for hundreds of thousands of dollars, which Dimitry and Sophia set up and pay through Cannafornia accounts (**Exhibit 42, Exhibit 43**)

**D. Embezzlement through Dama Financial**

1. In August 2019 King introduced Plaintiff to Dama Financial as a cannabis banking solution. Plaintiff puts a safeguard in place that every wire goes to his email and he approves it (**Exhibit 44**).

2. S. King manipulates Plaintiff to open a payroll account and then opens a second payroll account for no reason other than to embezzle (**Exhibit 45, Exhibit 46**) and does so via A2A transactions which bypass the approval.

3. S. King misdirecting Dama Financial statements as TD Bank statements (**Exhibit 47**)

4.   Plaintiff looks into it with Dama Financial and the Account Rep, Jason, seems nervous (**Exhibit 48**) asking who it is for, and then a few hours later lies (**Exhibit 49**) in an attempt to cover it up since there are no interest-bearing accounts.

**Counts 20-24: Racketeering: Money laundering, Bribery, Embezzlement, Theft, Forgery by King, S. King, Dimitry, and Others**

Plaintiff reaffirms Part II B-D and asserts a continued effort by King and cohorts to engage in racketeering activity against Plaintiff, bribing bank officials, PG&E employees, dozens of farm laborers, and making a concentrated effort to cover their tracks.

**Part III. FRAUD, DECEPTION, COVER-UPS BY ATTORNEYS**

       A: BACKGROUND

       B: CANNAFORNIA IS SOLD

       C: PLAINTIFF'S CONDO TRANSFERRED TO KING BY S KING

       D: ATTORNEYS BROUGHT IN TO COVER UP CRIMES/ SET UP PLAINTIFF

       E: BRIBERY AND CORRUPTION

       F: KING ATTEMPTS TO BUY PLAINTIFFS SHARES FOR $100K

**A-F**

**Counts 25-TBD**

**EXHIBITS 50-81**

## A.    Background

1.  Plaintiff and King were not on speaking terms from the time Plaintiff was pushed out around

Until July/August 2019 as Youngest brother Daniel Buyanovsky was set to get married on August 17th,

2019 in Los Angeles.

2.  Plaintiff and King got together a few days earlier in Los Angeles along with other family

members and worked on reuniting their friendship.

3.  While Plaintiff thought the efforts were genuine, King, S. King and Dimitry had nefarious plans

for the weekend.

4.  Throughout the weekend, everyone seemed to be very polite, friendly, cordial, and Plaintiff was

seated next to Dimitry while King and parents sat together nearby at the 'family table' closest to the

bride and groom.


## B: Cannafornia is Sold

1.  On September 24, 2021 Plaintiff received an email regarding a change of ownership in the

licenses that have always been in his name for Cannafornia entities.

2.  An email from an attorney Kieran Rittenburg asking the Bureau of Cannabis Control to

change the license owner name and the response, cc'ing Plaintiff, rejecting Rittenburg's request

(**Exhibit 50**)

3.  Plaintiffs emails response alleging fraud (**Exhibit 51**)

4.  Up until that email, Plaintiff believed he owned 33% of Cannafornia plus bonus stock

options and capital reimbursement he was owed

5.   After receiving the email, Plaintiff went through thousands of emails to figure out why they were trying to wrestle control from Plaintiff. As a result, Plaintiff uncovered a chain of emails between Dimitry and Canadian bankers and lawyers where they obscurely sell Cannafornia and Plaintiffs shares to Canadians'.

6.   On August 14, 2019 through an obscure Form D with one sentence in the middle of the document regarding a share conversion, the Company is sold for $6.4M without the Founder and CEO's knowledge or consent (**Exhibit 52, Exhibit 52A**).

7.   Despite having shares worth $3.2M, Plaintiff never receives anything.

8.   For two years no one tells Plaintiff most likely waiting for the right moment to fire him for wrongdoing, which is offered relentlessly via get rich quick schemes, bribes, weekends with prostitutes, Yacht excursions, black market deals, and so on, by various Canadians and Russians.

**C: Plaintiffs condo is transferred to King by S King**

1.   December 22, 2020 King and S. King forge Plaintiffs signature, notarize it, and transfer ownership of Plaintiffs $750,000 Trump condo of 11 years to King and wife, Marianna.

2.   Quit Claim Deed with Plaintiffs signature, notarized, transferring the condo (**Exhibit 53**)

3.   A second quit claim deed is created by Barton CPA's Watkins for $700k (**Exhibit 54**)

4.   The Trump application is filled out several days earlier showing Kings 400k salary (**Exhibit 55**)

5.   Notary Carmen Jones is deposed, claiming S King signed it, not Plaintiff (**Exhibit 56**)

**D: Attorneys are brought in to cover up the crimes / Set up Plaintiff**

1. Despite bribing Plaintiff not working, Defendants conspired with Cannafornia landlord to "fake evict" Plaintiff and set the stage for Canadians to take over.

2. Once the pandemic came and halted evictions, Defendants needed a new plan to keep Plaintiff strapped financially and cover up the sale and the embezzlement.

3. To that end, King asks for Plaintiffs help to "sue" Roman and Dimitry in March 2020. S. King encourages Plaintiff to help his brother. Plaintiff is hesitant. King offers a 50/50 deal where once Plaintiff wins, King just wants his money back and Plaintiff keeps the rest (**Exhibit 57**)

4. Attorney Stephen Boren ("Boren") is hired by Plaintiff to sue Roman and Dimitry and charges Plaintiff over $250,000 ($500,000 if King's portion was charged for or paid). Meanwhile, Boren carries out Kings' mission instead, which includes:

   - Covering up up the sale of the company and Plaintiffs shares (**Exhibit 58**)

   - S King, Matt Stevens and Boren cover up the embezzlement committed by the Russians, including a $496k wire and deleting emails regarding sales of shares between July and August 14 (**Exhibit 59, 59A**)

   - includes none of the evidence in the lawsuit

   - manages to wrangle the lawsuit down to Los Angeles so Plaintiff has no visibility

   - requests lots of information from Plaintiff, tags in "criminal attorney" Mark Byrne ("Byrne") and "FBI accomplice" Fred, though Fred is most likely a made up character as a way for Byrne and Boren to steal more money from Plaintiff

5. Soon, Plaintiff is investigated by the SEC and new lawsuits keep popping up (**Exhibit 60**)

6. At the right time, Boren tags in Greenspoon Marder to take over, who do more of the same for Kings benefit despite being paid solely by Plaintiff (**Exhibit 61**).

**E: Bribery and Corruption**

1. Now, Greenspoon Marder has multiple attorneys in the case and the Canadians are helping Plaintiff negotiate a deal with Roman and Dimitry for their 33% ownership, so he believes.

2. After many months and several day-long mediations, the Canadians offer to buy Roman and Dimitry's supposed 33% of the Company (which was already sold August 2019) for $3m and plan to take Cannafornia public en route.

3. The case is supposedly stayed for 3 months and agreements are sent around so the Canadians can come up with the funds. Then, S King and yet another attorney try to get Plaintiff to sign a tolling agreement which he does not sign (Exhibit 62).

4. By now since King has dropped out of the legal obligations, Plaintiff spends hundreds of thousands of personal funds to keep Cannafornia alive.

5. At one point, Greenspoon asks for access into Dimitry's Cannafornia account to "make sure things are as we say they are."

6. Plaintiff sends investor updates regarding firing Dimitry, raising capital, and more; At no point does anyone tell King that he no longer owns shares in Cannafornia and should not be using his personal funds to keep Cannafornia alive (Exhibit 63)

7. Plaintiff finds that the case is ongoing in LA (Exhibit 64), calls and emails attorney Blake Osborn (Exhibit 65) and James Turken (Exhibit 66) Greenspoon Marder attorneys on record  to no avail.

8. While reporting Boren to the California Bar, Plaintiff finds a paul@DuardVentures email from July 10, 2020 showing that he signed a $3m loan note. Plaintiff believes King forged this document.

**F: King attempts to buy Plaintiffs shares for $100k then starts a new campaign against Plaintiff**

1. After a multi-year sustained effort to bankrupt Plaintiff and a new 10-day notice served on Plaintiff by landlord on February 16th, King sends Plaintiff a series of offers;

a.    March 4, 11:42am: Money back + 10% interest, equaling approx. $300k (**Exhibit 67**)

b.    March 4, 7pm: $100k (**Exhibit 68**)

c.    March 5, 2pm: $100k (**Exhibit 69**)

d.    March 11, 7:03pm: $350k (**Exhibit 70**)

e.    March 19, 10:23am: $350k (**Exhibit 71**)

2. Next, Plaintiff offers to mediate, instead King emails Plaintiffs shareholders, files lawsuits and press releases against Plaintiff

a.    Offer for mediation sent (**Exhibit 72**)

b.    Email to Plaintiffs investor/board member Darren (**Exhibit 73**)

c.    Text to Roman using alias (**Exhibit 74**)

d.    Text to Roman using alien (**Exhibit 75**)

e.    Texts King and S King (**Exhibit 76**)

f.      Text King and S King2 (**Exhibit 77**)

3.  Then, King and co-defendants sue Plaintiff in California and Florida

a.      For legal fees in California (**Exhibit 78**) which Venable charges a retainer to Plaintiff and does not seem to ever be on record

b.      For defamation in Florida (**Exhibit 79**)

c.      And issue press releases (**Exhibits 80, 81**)

**Counts 25-TBD**

*Racketeering, Bribery, Securities Fraud, Theft, Fraud, Forgery, Identity Theft by King, S. King, Dimitry and others for the variety of crimes named in Part III and due to time constraints for this amended complaint and the magnitude of crimes cannot be all individually identified at this time and will be as the case continues.*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.  For special, compensatory, and consequential damages according to proof;
2.  For punitive damages in a sum sufficient to punish Defendants adequately to discourage future antisocial behavior.

Nov 4, 2021

Dated: ~~October 14~~, 2021

Paul King, Pro-Se