| Exhibit | Document Name | Page # |
|---|---|---|
| | Complaint | 1-21 |
| | Exhibits | |
| 1 | King CEO Since 2014 | 1 |
| 2 | King forwards Merger Docs Aug '19 | 2-3 |
| 3 | Kings Shares | 4 |
| 4 | Plaintiffs Shares | 5 |
| 5 | Forged Merger Docs | 6-18 |
| 6 | $69.9M for 6 Buildings | 19 |
| 7 | 4 Buildings in Cathedral City | 20 |
| 8 | 7 Buildings in Palm Springs | 21 |
| 9 | 2017 & 2018 Salaries | 22 |
| 10 | 2019 & 2023 Salaries | 23 |
| 11 | Trump Application Dec '20 Shows King with $400K Salary | 24-31 |
| 12 | King Properties Whitepages | 32 |
| 13 | King $12.875M Home | 33 |
| 14 | King gives $8.5M loan to KG | 34 |
| 15 | Email to Dimitry with McLane Offer | 35-36 |
| 16 | Email to Dimitry McLane Agreement Enclosed | 37 |
| 17 | McLane Agreement | 38-56 |
| 18 | King/Kibby own DPS | 57 |
| 19 | Secretary of State 2021 Filed by Watkins | 58 |
| 20 | DPS Registered 2016 by Barton CPA | 59 |
| 21 | SBA Notice | 60-63 |
| 22 | DPS Receives $1.37M | 64 |
| 23 | Non-arms length transactions | 65 |
| 24 | Executive Compensation | 66 |
| 25 | 5 Year $600k Agreements 2019-2023 | 67 |
| 26 | King email re Wells Fargo KannaKing | 68 |
| 27 | King Amex | 69-70 |
| 28 | King Amex Username/Password | 71 |
| 29 | Marianna King has her own Amex card | 72-73 |
| 30 | King goes Shopping | 74 |
| 31 | King and Marianna go shopping | 75-78 |
| 32 | Dimitry and Invictus CPA classify the shopping as loans to KannaKing | 79 |
| 33 | Invictus to Dimitry regarding same | 80 |
| 34 | Greenspoon later deletes emails from Dimitrys account | 81-83 |
| 35 | Current Credit Report for Plaintiff | 84 |
| 36 | 1401 Address Changed | 85 |
| 37 | Sophia writes herself checks from Cannafornia | 86-89 |
| 38 | Dozens of employees involved in laundering / embezzlement | 90-114 |

| 39 | Sophia warns Dimitry | 115 |
|----|----------------------|-----|
| 40 | Sophia covers up bank accounts / no bank accounts | 116-117 |
| 41 | Normal PGE Invoice | 118 |
| 42 | New accounts created by S King | 119-131 |
| 43 | Dimitry paying PGE | 132-134 |
| 44 | King introduces Dama | 135 |
| 45 | S King manipulates to open more accounts | 136-137 |
| 46 | S King opens more accounts | 138-140 |
| 47 | S King misdirects regarding accounts | 141-142 |
| 48 | Jason from Dama nervous reply | 143 |
| 49 | Jason Lies | 144-146 |
| 50 | Kieran requests change of owner on Cannafornia license | 147-148 |
| 51 | Plaintiff responds to Kieran, no right to change owner | 149-151 |
| 52 | August 14 Co is quickly sold | 152-157 |
| 52A | Form D is used to sell Co | 158-165 |
| 53 | Barton CPA second QCD | 167-168 |
| 54 | QCD 12-22-20 | 169-171 |
| 55 | Trump App 400k Salary | 172-179 |
| 56 | Notary Carmen Jones Deposition | 180-281 |
| 57 | 50/50 on legal fees offer by King | 282-283 |
| 58 | Email chain Boren covers up sale of Cannafornia | 284 |
| 59 | Boren covers up Dimitry's $496k wire fraud | 285-286 |
| 59A | S King, Boren, King cover up Dimitry's wire fraud | 287-302 |
| 60 | SEC Investigation on Plaintiff emerges | 303-306 |
| 61 | Boren tags in Greenspoon | 307-308 |
| 62 | S King attempts to get Plaintiff to sign tolling agreement | 309-314 |
| 63 | Plaintiff sends company update regarding firing Dimitry March 2020 | 315 |
| 64 | Plaintiff finds Russians case is ongoing | 316-329 |
| 65 | Plaintiff emails Blake and Aryeh regarding case | 330-331 |
| 66 | Plaintiff emails Turken, attorney on record | 332 |
| 67 | King offers investment capital back + 10% | 333 |
| 68 | King offers Plaintiff 100k | 334 |
| 69 | King offers Plaintiff 100k again | 335 |
| 70 | King offers Plaintiff 350k | 336 |
| 71 | King offers Plaintiff 350k again | 337 |
| 72 | Plaintiff offers mediation | 338-339 |
| 73 | King emails Darren Carrigan regarding Plaintiff | 340-343 |
| 74 | King Texts Roman regarding Plaintiff | 344 |
| 75 | King to Roman 2 | 345 |
| 76 | S King and King exchange texts, S King sends to Plaintiff to provoke | 346 |
| 77 | S King and King 2 | 347 |
| 78 | King files lawsuit against Plaintiff for legal fees | 348-349 |

| 79 | King sues Plaintiff for defamation | 350-380 |
| 80 | King issues press releases against Plaintiff | 381-382 |
| 81 | King issues press releases 2 | 383-384 |

Background                                      385-410

**Michael King, Manager and Chief Executive Officer**

Michael King is an experienced professional with extensive experience in finance, private equity, real estate, consulting, and the cannabis industry. Mr. King has served as a manager and Chief Executive Officer of KG LLC, and its predecessors, substantially since 2014. Mr. King has also served as a director of KGI and Chief Executive Officer from May 2018 to June 2018 and then from July 2018 to the present. Prior to that, Mr. King began his career on Wall Street at WorldCo, a New York equity trading firm. Mr. King was recruited by iCap Trading, and worked as an equity trader, overseeing a team of 24 traders and $200+ million of the firm's capital, and was a partner until 2004. From 2004 to 2009, Mr. King was engaged in the real estate industry in South Florida, where he assisted various developers in the launch of multiple high-profile luxury developments in the Miami Beach area, as well as in new construction launches in many major Florida markets. Mr. King received a BBA in Finance from Pace University in 2002 and a Masters degree in Criminal Justice from Kaplan University in 2010.

**From:** **Michael King** michael@kingsgardeninc.com 🖉
**Subject:** Fwd: Execution documents for Merger
**Date:** August 16, 2019 at 10:30 PM
**To:** paul@cannafornia.co
**Cc:** Lauri Kibby lauri@kingsgardeninc.com



Hey, we sent out these merger docs which include a lot of stuff. Lauri didn't have your email on file. Lauri here it is: paul@cannafornia.co


Respectfully,


[?]


**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGardenInc.com

Begin forwarded message:

> **From:** Lauri Kibby <lauri@kingsgardeninc.com>
> **Date:** August 16, 2019 at 6:37:21 PM PDT
> **To:** Lauri Kibby <lauri@kingsgardeninc.com>
> **Cc:** Sean McGowan <smcgowan@kaufman-associates.com>, John Penn <jpenn@kaufman-associates.com>, Neil Kaufman <nkaufman@kaufman-associates.com>, Michael King <Michael@KingsGardenInc.com>, Charlie Kieley <Charlie@KingsGardenInc.com>
> **Subject: Execution documents for Merger**
>
> Dear Member/Stockholder:
>
> As promised - this is the beginning of the exciting path we have all been waiting for. Your quick response will support our efforts to move forward expeditiously and will position us for a strategic transaction.
>
> In connection with the approval by the members of Kings Garden, LLC of its proposed merger (the "Merger") with Kings Garden Inc. and the approval by the stockholders of Kings Garden Inc. of the Merger and its 2019 Equity Incentive Plan, set forth below are links to four (4) documents. For your convenience, documents 2 through 4 below are also attached to this email.
>
> 1. Joint Consent Solicitation Statement of Kings Garden, LLC and Kings Garden Inc., with all annexes and exhibits thereto--for your review
> 2. Kings Garden, LLC Written Consent--to be completed, signed and returned
> 3. Kings Garden Inc. Written Consent--to be completed, signed and returned
> 4. Securityholder Questionnaire--to be completed, signed and returned
>
> Detailed instructions for how to complete, sign and return these documents are included in the Joint Consent Solicitation Statement. If you elect to complete these documents on your Android phone, you may need to download the *Adobe Acrobat Reader: PDF*

*Viewer, Editor & Creator* App for free from the Google Playstore. On some devices, you may need to download these documents in order to return them electronically.

We would appreciate your immediate response.

Thank You

*Lauri*

**Lauri Kibby**
**Co-Founder/Chief Financial Officer**
**Kings Garden, LLC**
**310-877-3110**
lauri@kingsgardeninc.com



Annex E-Jt-
Conse...ire.pdf



Annex G-Jt-
Conse...Hs.pdf



Annex D-Jt-
Conse...ers.pdf

**KINGS GARDEN INC.**
**SCHEDULE C**
**Post-Merger Ownership of the Company**

Set forth below is the ownership of the Company subsequent to the consummation of the Merger. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Merger Agreement.

| Shareholder Name | Series A Preferred Stock | Common Stock |
|---|---|---|
| Charles Kieley | 18.75 | 307.67 |
| Michael King | 18.76 | 1356.69 |
| PS PF LLC | 18.76 | 23.67 |
| Patrick Jordan | 35.06 | 26.96 |
| Melissa Klebanoff Living Trust | 294.8 | 153.67 |
| Fiscal Strategies, L.L.C. | 268.49 | 136.3 |
| Manuel Rivelo Living Trust | 816.81 | 391.36 |
| Alyse Rivelo | 5.84 | 2 |
| Gabrielle Rivelo | 5.84 | 2 |
| Sheldon Cowen | 201.86 | 90.92 |
| William Goldberg | 90.94 | 146.93 |
| WHG IRA, LLC | 22.8 | 19 |
| Virginia Leon Law & Mediation Office, PS Sole 401K Plan | 13.21 | 12 |
| Betty Goldberg Living Trust | 18 | 19.02 |
| Nancy Edelstein | 27.52 | 15.02 |
| Michael Steward | 172.54 | 106.74 |
| DRMD, LLC | 103.74 | 44.92 |
| Craig Thorton | 8.96 | 4.44 |
| Alan Axelrod | 93.3 | 46.445 |
| Axelrod Family Enterprises | 11.43 | 7 |
| Helene Brown | 19.04 | 11 |
| Stephen Axelrod | 67.81 | 31 |
| Performax Properties, LLC | 9.52 | 6 |
| Ashraf Lalani | 9.52 | 6 |
| Farida Gowani | 9.52 | 6 |
| Sabira Mohamed | 9.52 | 6 |
| HK Leisure Mangement Ltd | 92.81 | 62 |
| Max Lupp | 41.94 | 12 |
| CMCI Anza Group, LLC | 213.84 | 50 |
| Zenmui Offshore, LLC | 11.69 | 6 |

45

| Shareholder Name | Series A Preferred Stock | Common Stock |
|---|---|---|
| CMCI Del Sol, LLC | 607.74 | 160.39 |
| Sophia Goldberg | - | 2.66 |
| Stephen Goldberg | - | 2.66 |
| Charles Stewart Smith | - | 7.96 |
| Hong Interests, LLC | - | 104 |
| Josh 3.5, LLC | - | 144.91 |
| Ivan Talan | - | 63 |
| Gary LaSalle | - | 36 |
| Vladimir Vladimirov | - | 30.88 |
| BC Consulting | - | 27 |
| Sophia King | - | 27 |
| Sierra Nevada Botanicals, LLC | - | 248 |
| Jeff Fellbaum | - | 19 |
| Paul King | - | 50 |
| Joseph Elia | - | 45 |
| Ryan Just | - | 9 |
| Cathedral City Holdings, LLC | - | 9 |
| Alexander Wuest and Martina Stoiani | - | 5 |
| Southwest MS II LP | - | 4 |
| Scott Zamir | - | 8 |
| Marshal D. Reid | - | 2 |
| Joey Stewart | - | 10 |
| Brent Duane Window | - | 2 |
| FSKJ Partners Ltd | - | 4 |
| Tony Garcia | - | 8 |
| Paul Zapata and Jeanette Keleman | - | 2 |
| Suzanne D. Rivera | - | 6 |
| Nils Wulf | - | 9 |
| Markena Modra | - | 6 |
| Myrna L. Bennett | - | 6 |
| Franklin T. Graham | - | 10 |
| James Blackburn | - | 5 |
| Christian Theede | - | 2.5 |
| Oliver Veltinger | - | 10 |
| Florian von Bechtolsheim | - | 10 |
| Stacey E. Mattus | - | 2 |
| Raymond D. and Kathleen B. Fontaine | - | 2 |
| Robert Tharp | - | 2 |
| Robert C. Kratschmer | - | 2 |

## ANNEX G

## WRITTEN CONSENT OF THE HOLDERS OF CLASS A COMMON STOCK OF KINGS GARDEN INC.

### THIS CONSENT IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned, being a stockholder of record of Kings Garden Inc., a Nevada corporation (the "**KGI**") as of August 15, 2019, hereby takes the following action, in accordance with the Bylaws of KGI, and pursuant to Section 78.315 of the Nevada Revised Statutes ("**NRS**"), with respect to all shares of Class A Common Stock, par value $0.0001 per share, of KGI held by the undersigned, in connection with the solicitation by the Board of Directors of the Company of written consent, pursuant to Section 78.315 of the NRS, to the Proposal set forth below, as the same are described in the KGI's consent solicitation statement, dated August 16, 2019, without a meeting.

(Place an "X" in the appropriate boxes)

The Board of Directors recommends that Stockholders CONSENT to the following proposals:

Proposal No. 1:    To approve the Merger and adopt the Merger Agreement included as Annex B to this joint consent solicitation statement, including the KGI Articles of Incorporation (which is included as Exhibit A to the Merger Agreement) contemplated thereby.

☐ **CONSENT (FOR)**      ☐**CONSENT WITHHELD (AGAINST)**      ☐**ABSTAIN**

Proposal No. 2:    To approve the KGI Plan, in the form included as Annex C.

☐ **CONSENT (FOR)**      ☐**CONSENT WITHHELD (AGAINST)**      ☐**ABSTAIN**

<u>INSTRUCTIONS</u>: TO CONSENT, WITHHOLD CONSENT OR ABSTAIN FROM CONSENTING TO THE APPROVAL OF THE PROPOSAL, CHECK THE APPROPRIATE BOX ABOVE. IF NO BOX IS MARKED ABOVE WITH RESPECT TO THE PROPOSAL, THE UNDERSIGNED WILL BE DEEMED TO HAVE CONSENTED TO THE PROPOSAL.

**PLEASE RETURN AS FOLLOWS:**

Mark, sign and date your Consent and return it:

**EMAIL:** via email (or text message attachment) to: Lauri Kibby, KGI's Chief Financial Officer at lauri@kingsgardeninc.com.

**MAIL/DELIVERY SERVICE:** via mail or delivery service to KGI, 3540 North Anza Road, Palm Springs, California 92262, Attn: Lauri Kibby, Chief Financial Officer.

**FACSIMILE:** via fax to: Lauri Kibby, KGI's Chief Financial Officer at (760) 867-2131.

If an individual, please sign exactly as the name you provided to KGI for its records representing your Class A Common Stock ownership. If a corporation, partnership, trust, limited liability company or other entity, please identify the entity as the name you provided to KGI for its records representing your Class A Common Stock ownership, cause an authorized person to sign on behalf of the entity, and clearly identify the title of such authorized person. This written consent of stockholders shall vote all shares to which the signatory is entitled.

If you are responding electronically and are unable to provide a manual or digital signature, then KGI will accept your typed name in the applicable signature box below as evidence of your execution hereof.

*Individual*

Name:

(Please type or print)

Signature

Date: 08 / 04 / 2019

*Partnership, Corporation or Other Entity*

Entity Name:

(Please type or print)

By:

Name:

Title:

Date:

## ANNEX E

## SECURITYHOLDER QUESTIONNAIRE

To be completed by: _____ (Securityholder)

This questionnaire ("**Questionnaire**") is being distributed to each member of Kings Garden, LLC and each stockholder of Kings Garden Inc. (the "**Securityholders**") by Kings Garden Inc., a Nevada corporation (the "**Issuer**"), to enable the Issuer to determine whether the Securityholder is qualified to invest in the Common Stock and/or Series A Preferred Stock (the "**Securities**") of the Issuer.

To be qualified to invest in the Securities, the Securityholder must either (i) be an "accredited investor" (as that term is defined in Rule 501(a) of Regulation D promulgated under Section 4(a)(2) of the Securities Act of 1933, as amended (the "**Securities Act**")), or (ii) have (and if applicable, its officers, employees, directors or equity owners have) either alone or with his, her or its purchaser representative or representatives, if any, such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of an investment in the Securities.

The Issuer will rely upon the accuracy and completeness of the information provided in this Questionnaire in establishing that the issuance of the Securities is exempt from the registration requirements of the Securities Act.

**ACCORDINGLY, THE SECURITYHOLDER IS OBLIGATED TO READ THIS QUESTIONNAIRE CAREFULLY AND TO ANSWER THE ITEMS CONTAINED HEREIN COMPLETELY AND ACCURATELY.**

ALL INFORMATION CONTAINED IN THIS QUESTIONNAIRE WILL BE TREATED CONFIDENTIALLY. However, the Securityholder understands and agrees that the Issuer may share this Questionnaire without prior notice to the Securityholder with such parties, including its legal, accounting and financial advisors and potential acquirers, as the Issuer reasonably deems appropriate, and such parties shall be entitled to rely hereon. The Securityholder understands that this Questionnaire is merely a request for information and is not an offer to sell, a solicitation of an offer to buy, or a sale of the Securities. The Securityholder also understands that the Securityholder may be required to furnish additional information.

PLEASE NOTE THE FOLLOWING INSTRUCTIONS BEFORE COMPLETING THIS SECURITYHOLDER QUESTIONNAIRE.

Unless instructed otherwise, the Securityholder should answer each question on the Securityholder Questionnaire. If the answer to a particular question is "None" or "Not Applicable," please so state. If the Securityholder Questionnaire does not provide sufficient space to answer a question, please attach a separate schedule to your executed Questionnaire that indicates which question is being answered thereon. Persons having questions concerning any of the information requested in this Questionnaire should consult with their purchaser representative or representatives, lawyer, accountant or may contact Lauri Kibby, the Chief Financial Officer (via email at lauri@kingsgardeninc.com or telephone at (310) 877-3110 or John Penn, an attorney with Kaufman & Associates, LLC, one of the law firms representing the Issuer via phone at (631) 972-0042 or via email at jpenn@kaufman-associates.com.

One completed, signed and dated copy of the Securityholder Questionnaire should be returned as soon as possible to Lauri Kibby, the Chief Financial Officer (via email at lauri@kingsgardeninc.com, fax to: Lauri Kibby, KG LLC's Chief Financial Officer at (760) 867-2131 or mail at KG LLC, 3540 North Anza Road, Palm Springs, California 92262) or John Penn via email at jpenn@kaufman-associates.com or via mail at Kaufman & Associates, LLC, 190 Motor Parkway, Suite 202, Hauppauge, New York 11788.

The other copy should be retained for the Securityholder's files.

E-1

## PART I—FOR INDIVIDUALS

### *1. Personal Data*

Name: *Paul M. King*

Residence Address: *801 South Miami Avenue Suite 1401*
*Miami Florida 33130*

Business Address: *78 SW 7 Street, 3rd Floor*
*Miami Florida 33130*

State of residence, if different: _____

Telephone: Residence *(786) 200-3429* Business _____

Age: *33* Citizenship: *USA*

Social Security or Taxpayer No.: _____

Send all correspondence to: Residence _____ Business _____

### *2. Investor Status*

To be qualified to invest in the Securities, the Securityholder must either (i) be an Accredited Investor, or (ii) have, either alone or with your purchaser representative or representatives, such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of such investment.

Please check the appropriate representation that applies to you.

**Accredited Investor:**

    I am an Accredited Investor (as defined in Rule 501 of Regulation D promulgated under the Securities Act) because (check all appropriate descriptions that apply):

    I am a natural person whose individual net worth, or joint net worth with my spouse, exceeds $1,000,000. For purposes of this item 6, "net worth" means the excess of total assets at fair market value (including personal and real property, but excluding the estimated fair market value of a person's primary home) over total liabilities. "Total liabilities" excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Securities are acquired, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the acquisition of Securities for the purpose of investing in the Securities.

    I am a natural person who had individual income exceeding $200,000 in each of the last two calendar years and I have a reasonable expectation of reaching the same income level in the current calendar year. For purposes of this Section 6, "income" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan;

E-2

and (v) alimony paid; and (vi) any gains excluded from the calculation of adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code of 1986, as amended.

☐ I am a natural person who had joint income with my spouse exceeding $300,000 in each of the last two calendar years and I have a reasonable expectation of reaching the same income level in the current calendar year, as defined above.

☐ I am a director, executive officer or general partner of the Issuer, or a director, executive officer or general partner of a general partner of the Issuer. (For purposes of this Section 6, "executive officer" means the president; any vice president in charge of a principal business unit, division or function, such as sales, administration or finance; or any other person or persons who perform(s) similar policymaking functions for the Issuer.)

**Sophisticated Investor (if NOT an Accredited Investor):**

☐ I am qualified to invest in the Securities because I have, either alone or with my purchaser representative or representatives, such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of such investment, as discussed in Sections 3 and 4 below.

**3. *Personal Data***

   a.  ***Educational, Employment and Business Experience***

      Education (college and postgraduate):

      Institution Attended:

      Degree:

      Present occupation:

      Do you own your own business or are you otherwise employed? Yes: ☐   No: ☐

      Name and type of business employed by or owned:

   b.  Please describe any additional information that reflects your knowledge and experience in business, financial, or investment matters and your ability to evaluate the merits and risks of this investment (e.g., professional licenses or registrations, including bar admissions, accounting certificates, real estate brokerage licenses, investment adviser registrations and SEC or state broker-dealer registrations).

E-3

**4. Representations**

I represent that:

a. I have sufficient knowledge and experience in similar investments to evaluate the merits and risks of an investment in Kings Garden Inc., or I have retained an attorney, accountant, financial advisor or consultant as my purchaser representative. If applicable, the name, employer, address, and telephone number of my purchaser representative follows:

b. I and, if applicable, my purchaser representative, have received the joint consent solicitation statement relating to this offering; and I and, if applicable, my purchaser representative, understand the joint consent solicitation statement and the risks involved in this offering. I and, if applicable, my purchaser representative, have been given the opportunity to ask questions and obtain material and relevant information from the Issuer enabling me to make an informed investment decision. All data that I and, if applicable, my purchaser representative, have requested has been furnished to me.

c. Any Securities I may acquire will be for my own account for investment and not with any view to the distribution thereof, and I will not sell, assign, transfer or otherwise dispose of any of the Securities, or any interest therein, in violation of the Securities Act or any applicable state securities law.

d. I understand that (i) any Securities I may acquire will not be registered under the Securities Act or any applicable state securities law and may not be sold or otherwise disposed of unless it is registered or sold or otherwise disposed of in a transaction that is exempt from such registration and (ii) the certificates representing the Securities will bear appropriate legends restricting the transferability thereof.

e. I understand that the Issuer will rely upon the completeness and accuracy of the Securityholder's responses to the questions in this Questionnaire in establishing that the contemplated transactions are exempt from the Securities Act and hereby affirm that all such responses are accurate and complete. I will notify the Issuer immediately of any changes in any of such information occurring prior to the acceptance of my subscription.

## PART II—PURCHASERS WHO ARE NOT INDIVIDUALS

**1. General Information**

Name of Entity:

Address of Principal Office:

Type of Organization:

Date and State of Organization:

**2. Accredited Investor Status**

To be qualified to invest in the Securities, the Securityholder must either (i) be an Accredited Investor, or (ii) have, and if applicable, its officers, employees, directors or equity owners have, either alone or with its purchaser representative or representatives, such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of such investment.

E-4

Please check the appropriate description which applies to you.

Accredited Investors:

☐   The undersigned entity is an Accredited Investor (as defined in Rule 501 of Regulation D promulgated under the Securities Act) because it is (check all appropriate descriptions that apply):

☐   A bank, as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in an individual or a fiduciary capacity.

☐   A broker or dealer registered under Section 15 of the Securities Exchange Act of 1934, as amended.

☐   An insurance company, as defined in Section 2(13) of the Securities Act.

☐   An investment company registered under the Investment Company Act of 1940 or a business development company, as defined in Section 2(a)(48) of that act.

☐   A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐   A plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if the plan has total assets in excess of $5 million.

☐   An employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is being made by a plan fiduciary, as defined in Section 3(21) of such act, and the plan fiduciary is either a bank, a savings and loan association, an insurance company, or a registered investment adviser, or if the employee benefit plan has total assets in excess of $5 million, or if the employee benefit plan is a self-directed plan in which investment decisions are made solely by persons that are accredited investors.

☐   A private business development company, as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

☐   A corporation, Massachusetts or similar business trust, or partnership, or an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, that was not formed for the specific purpose of acquiring the Securities, and that has total assets in excess of $5 million.

☐   A trust with total assets in excess of $5 million not formed for the specific purpose of acquiring the Securities, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act.

☐   An entity in which all of the equity owners are accredited investors and meet the criteria listed in Part I, Section 2 of this Questionnaire.

If the entity has checked the last box above, please complete the following part of this question:

(1) List all equity owners:

(2) What is the type of entity?

(3) Have each equity owner respond individually to Part I, Section 2 of this Questionnaire. Please attach these additional pages to the back of this Questionnaire.

Sophisticated Non-Individual Investor (if NOT an Accredited Investor):

☐   The undersigned entity is qualified to invest in the Securities because it has, and if applicable, its officers, employees, directors or equity owners have, either alone or with its purchaser representative or representatives, such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of such investment, as discussed in Section 3(a) below.

3. *Representations*

   a. ***Educational, Employment and Business Experience of Applicable Officers and Directors***

   **Note: Please complete for each sophisticated officer, director, manager or other applicable person, using extra paper if needed.**

Education (college and postgraduate):

Institution Attended:

Degree:

Name and type of business:

   b. Please describe any additional information that reflects the knowledge and experience in business, financial, or investment matters and the ability of the designated officers, directors, managers or other applicable persons to evaluate the merits and risks of this investment (e.g., officers' and directors' professional licenses or registrations, including bar admissions, accounting certificates, real estate brokerage licenses, investment adviser registrations and SEC or state broker-dealer registrations).

E-6

**4. *Representations***

The undersigned entity represents that:

a. The entity has, and if applicable, its officers, employees, directors or equity owners have, sufficient knowledge and experience in similar investments to evaluate the merits and risks of an investment in Kings Garden Inc., or the entity has retained an attorney, accountant, financial advisor or consultant as its purchaser representative. If applicable, the name, employer, address, and telephone number of the purchaser representative follows:



The entity and, if applicable, its purchaser representative, has received the joint consent solicitation statement relating to this offering; and the entity and, if applicable, its purchaser representative, understand the joint consent solicitation statement and the risks involved therewith. The entity and, if applicable, its purchaser representative, have been given the opportunity to ask questions and obtain material and relevant information from the Issuer enabling it to make an informed investment decision. All data that the entity and, if applicable, its purchaser representative, have requested has been furnished to it.

Any Securities the entity may acquire will be for its own account for investment and not with any view to the distribution thereof, and it will not sell, assign, transfer or otherwise dispose of any of the Securities, or any interest therein, in violation of the Securities Act or any applicable state securities law.

The entity understands that (i) any Securities it may acquire will not be registered under the Securities Act or any applicable state securities law and may not be sold or otherwise disposed of unless it is registered or sold or otherwise disposed of in a transaction that is exempt from such registration, and (ii) the certificates representing the Securities will bear appropriate legends restricting the transferability thereof.

The entity understands that the Issuer will rely upon the completeness and accuracy of the Securityholder's responses to the questions in this Questionnaire in establishing that the contemplated transactions are exempt from the Securities Act, and hereby affirms that all such responses are accurate and complete. The entity will notify the Issuer immediately of any changes in any of such information occurring prior to the acceptance of its subscription.

[SIGNATURE PAGE FOLLOWS]

If you are responding electronically and are unable to provide a manual or digital signature, then KGI will accept your typed name in the applicable signature box below as evidence of your execution hereof.

*Individual*

Name: Paul M Kim
(Please type or print)

Signature

Date: 08/04/2019

*Partnership, Corporation or Other Entity*

Entity Name:

(Please type or print)

By:
Name:
Title:

Date:

E-8

**From:** **Paul King** paul@cannafornia.co  📎
**Subject:** Fwd: Execution documents for Merger
**Date:** September 4, 2019 at 3:04 PM
**To:** Michael King michael@kingsgardeninc.com



---------- Forwarded message ----------
From: **Ana Prego** <ana@cannaforniacbd.com>
Date: Wed, Sep 4, 2019 at 12:34 PM
Subject: Fwd: Execution documents for Merger
To: Paul King <Paul@cannafornia.co>

Hi Paul.  Please see attached signed docs...let me know if you need anything further.  Best, Ana Prego

---------- Forwarded message ----------
From: **Ana Prego** <ana@cannaforniacbd.com>
Date: Wed, Sep 4, 2019 at 11:15 AM
Subject: Re: Execution documents for Merger
To: Paul King <paul@cannafornia.co>

Hi Paul.  Coming right up...

On Tue, Sep 3, 2019 at 4:45 PM Paul King <paul@cannafornia.co> wrote:
    Hey Ana

    Please print and scan to me so I can email

    ---------- Forwarded message ----------
    From: **Michael King** <michael@kingsgardeninc.com>
    Date: Fri, Aug 16, 2019 at 10:30 PM
    Subject: Fwd: Execution documents for Merger
    To: <paul@cannafornia.co>
    CC: Lauri Kibby <lauri@kingsgardeninc.com>

    Hey, we sent out these merger docs which include a lot of stuff. Lauri didn't have your email on file. Lauri here it
    is: paul@cannafornia.co


    Respectfully,



    [?]



    **Michael King**
    Founder
    Chairman & CEO

    +1.347.996.7844
    Michael@KingsGardenInc.com

    KingsGardenInc.com

    Begin forwarded message:

    > **From:** Lauri Kibby <lauri@kingsgardeninc.com>
    > **Date:** August 16, 2019 at 6:37:21 PM PDT
    > **To:** Lauri Kibby <lauri@kingsgardeninc.com>
    > **Cc:** Sean McGowan <smcgowan@kaufman-associates.com>, John Penn <jpenn@kaufman-associates.com>, Neil Kaufman
    > <nkaufman@kaufman-associates.com>, Michael King <Michael@KingsGardenInc.com>, Charlie Kieley

<Charlie@KingsGardenInc.com>>
**Subject: Execution documents for Merger**

Dear Member/Stockholder:

As promised - this is the beginning of the exciting path we have all been waiting for. Your quick response will support our efforts to move forward expeditiously and will position us for a strategic transaction.

In connection with the approval by the members of Kings Garden, LLC of its proposed merger (the "Merger") with Kings Garden Inc. and the approval by the stockholders of Kings Garden Inc. of the Merger and its 2019 Equity Incentive Plan, set forth below are links to four (4) documents. For your convenience, documents 2 through 4 below are also attached to this email.

1. Joint Consent Solicitation Statement of Kings Garden, LLC and Kings Garden Inc., with all annexes and exhibits thereto--for your review
2. Kings Garden, LLC Written Consent--to be completed, signed and returned
3. Kings Garden Inc. Written Consent--to be completed, signed and returned
4. Securityholder Questionnaire--to be completed, signed and returned

Detailed instructions for how to complete, sign and return these documents are included in the Joint Consent Solicitation Statement. If you elect to complete these documents on your Android phone, you may need to download the *Adobe Acrobat Reader: PDF Viewer, Editor & Creator* App for free from the Google Playstore. On some devices, you may need to download these documents in order to return them electronically.

We would appreciate your immediate response.


Thank You

*Lauri*

**Lauri Kibby**
**Co-Founder/Chief Financial Officer**
**Kings Garden, LLC**
**310-877-3110**
lauri@kingsgardeninc.com

--
Sincerely,
Paul King

--
   **Ana Prego**
Executive Assitant , Cannafornia CBD

(786) 218-3726 | Ana@CannaforniaCBD.com


Create your own email signature

--



**Ana Prego**
Executive Assitant . Cannafornia CBD

(786) 218-3726 | Ana@CannaforniaCBD.com

Create your own email signature
--
Sincerely,
Paul King

      

Annex D-        Annex G-       Annex E-
Signed.pdf      Signed.pdf     Signed.pdf

Table of Contents

## ITEM 2. *PROPERTIES*

As of December 31, 2020, we owned the following 66 properties, which were 99.3% leased (based on square footage) with a weighted-average remaining lease term of approximately 16.6 years:

| Property | Market | Closing Date | Rentable Square Feet[1] | Investment[2] | |
|---|---|---|---|---|---|
| | | | | *(In thousands)* | |
| Pharm AZ | Arizona | December 15, 2017 | 358,000 | $ 20,000 | |
| Pharm AZ Retail | Arizona | September 19, 2019 | 2,000 | 2,500 | |
| Sacramento CA | California | February 8, 2019 | 43,000 | 12,710 | |
| Kings Garden CA Portfolio | California | Various | 364,000 | 69,972 | [3] |
| Esperanza CA | California | July 23, 2019 | 35,000 | 13,000 | [4] |
| Vertical CA Portfolio | California | Various | 79,000 | 17,300 | [5] |
| Columbia Care CO | Colorado | October 30, 2018 | 58,000 | 11,250 | [6] |
| LivWell CO Retail Portfolio | Colorado | Various | 8,000 | 3,349 | [7] |
| Trulieve FL | Florida | October 23, 2019 | 120,000 | 17,000 | |
| Parallel FL Portfolio | Florida | Various | 593,000 | 60,308 | [8] |
| Ascend IL | Illinois | December 21, 2018 | 165,000 | 41,891 | [9] |
| Cresco IL Portfolio | Illinois | October 22, 2019 | 90,000 | 45,454 | [10] |
| Curaleaf IL | Illinois | October 30, 2019 | 120,000 | 23,300 | [11] |
| PharmaCann IL | Illinois | October 30, 2019 | 66,000 | 27,426 | [12] |
| GTI IL | Illinois | March 6, 2020 | 231,000 | 35,833 | [13] |
| Holistic MD | Maryland | May 26, 2017 | 72,000 | 21,721 | [14] |
| PharmaCann MA | Massachusetts | May 31, 2019 | 58,000 | 30,500 | |
| Holistic MA | Massachusetts | July 12, 2018 | 55,000 | 14,750 | [15] |
| Trulieve MA | Massachusetts | July 26, 2019 | 150,000 | 43,500 | |
| Ascend MA | Massachusetts | April 2, 2020 | 199,000 | 33,775 | [16] |
| Cresco MA | Massachusetts | June 30, 2020 | 118,000 | 8,904 | [17] |
| 4Front MA | Massachusetts | December 17, 2020 | 67,000 | 15,500 | |
| Green Peak MI | Michigan | August 2, 2018 | 56,000 | 15,799 | |
| Emerald Growth MI | Michigan | June 7, 2019 | 45,000 | 10,000 | |
| Ascend MI | Michigan | July 2, 2019 | 145,000 | 19,750 | |
| LivWell MI | Michigan | October 9, 2019 | 156,000 | 41,500 | [18] |
| Green Peak MI Retail Portfolio | Michigan | Various | 31,000 | 11,784 | [19] |
| Cresco MI | Michigan | April 22, 2020 | 115,000 | 10,510 | [20] |
| Holistic MI | Michigan | September 1, 2020 | 63,000 | 7,904 | [21] |
| Vireo MN | Minnesota | November 8, 2017 | 89,000 | 9,710 | |
| MJardin NV | Nevada | July 12, 2019 | 43,000 | 9,489 | [22] |
| Curaleaf NJ | New Jersey | July 13, 2020 | 111,000 | 18,940 | [23] |
| Columbia Care NJ Portfolio | New Jersey | July 16, 2020 | 54,000 | 13,033 | [24] |
| PharmaCann NY | New York | December 19, 2016 | 127,000 | 30,000 | [25] |
| Vireo NY | New York | October 23, 2017 | 40,000 | 6,717 | [26] |
| Curaleaf ND | North Dakota | December 20, 2019 | 33,000 | 12,190 | [27] |
| PharmaCann OH | Ohio | March 13, 2019 | 58,000 | 20,000 | |
| Vireo OH | Ohio | May 14, 2019 | 11,000 | 3,550 | |
| Cresco OH | Ohio | January 24, 2020 | 50,000 | 10,600 | [28] |
| GTI OH | Ohio | January 31, 2020 | 101,000 | 9,566 | [29] |
| Jushi PA | Pennsylvania | April 6, 2018 | 89,000 | 13,381 | [30] |
| Maitri PA | Pennsylvania | April 24, 2019 | 51,000 | 21,402 | [31] |
| Green Leaf PA | Pennsylvania | May 20, 2019 | 266,000 | 13,592 | [32] |
| PharmaCann PA | Pennsylvania | August 9, 2019 | 54,000 | 25,730 | [33] |
| GTI PA | Pennsylvania | November 12, 2019 | 148,000 | 39,600 | |
| Curaleaf PA | Pennsylvania | December 20, 2019 | 72,000 | 25,749 | [34] |
| Holistic PA | Pennsylvania | June 10, 2020 | 108,000 | 15,007 | [35] |
| Green Leaf VA | Virginia | January 15, 2020 | 82,000 | 19,750 | |
| 4Front WA | Washington | December 17, 2020 | 114,000 | 17,500 | |
| Total | | | 5,363,000 | $ 1,022,696 | |

(1)  Includes estimated rentable square feet at completion of construction.

(2)  Includes purchase price and development and tenant reimbursement commitments funded, if any. Excludes transaction costs and development and tenant reimbursement commitments not funded as of December 31, 2020.

(3)  Portfolio consists of four properties acquired on April 16, 2019, one property acquired on May 12, 2020 and one property acquired on November 16, 2020. Excludes available tenant improvement allowance of $25.0 million.

**Facilities in Cathedral City**

The facilities located in Cathedral City are described in the below table:

| | Location of Facility | Aggregate Square Feet in Facility (approximate) | Facility Use (approximate Square Feet) | Own or Lease | Base Monthly Rent |
|---|---|---|---|---|---|
| 1. | 36405 Bankside Drive, Cathedral City, CA 92234 ("**36405 Bankside Facility**") | 10,600 | Cultivation: 4,306 sq. ft. | Lease | US$20,711.19 |
| 2. | 36425 Bankside Drive, Cathedral City, CA 92234 ("**36425 Bankside Facility**") | 8,500 | Cultivation: 4,865 sq. ft. | Lease | US$25,750 |
| 3. | 36555 Bankside Drive, Cathedral City, CA 92234 ("**36555 Bankside Facility**") | 13,650 | Cultivation: 5,062 sq. ft. <br><br> Nursery: 210 sq. ft. | Lease | US$26,656.58 |
| 4. | 36605 Sunair Blvd, Cathedral City, CA 92234 ("**36605 Sunair Facility**") | 8,800 | Cultivation: 5,644 sq. ft. | Lease | US$26,522.50 |

KG LLC currently operates 10,600 square feet at the 36405 Bankside Facility. The 36405 Bankside Facility is covered by a Cannabis Cultivation License (Medicinal-Small Indoor). KG LLC leases from an unaffiliated third party and subleases to CKE the premises located at the 36405 Bankside Facility pursuant to a Commercial Real Estate Sublease Agreement (the "**36405 Sublease Agreement**"), effective as of December 1, 2017, pursuant to which CKE

A-12

**Palm Springs Facilities**

The facilities located in Palm Springs are described i          below table:

| | Location of Facility | Aggregate Square Feet in Facility (approximate) | Facility Use (approximate Square Feet) | Own or Lease | Base Monthly Rent |
|---|---|---|---|---|---|
| 1. | 3535 N. Anza Road, Suite A, Palm Springs, CA 92262 ("3535 Anza Facility") | 24,000 | Cultivation: 9,282 sq. ft. (for both Ste. A and B) Remainder is Nursery and storage. | Lease | US$68,350 |
| 2. | 3535 N. Anza Road, Suite B, Palm Springs, CA 92262 | | | | |
| 3. | 3540 N. Anza Road, Palm Springs, CA 92262 ("3540 Anza Facility") | 6,500 | Processing: 3,500 sq. ft. Remainder is Distribution and offices | Lease | US$17,100 |
| 4. | 3560 N Anza Road, Palm Springs, CA 92262("3560 Anza Facility"), together with 3591 West Del Sol Road, Palm Springs, CA 92262 | 10,000 | Manufacturing: 8,000 sq. ft. | Lease | US$28,500 |
| 5. | 3585 West Del Sol Road, Palm Springs, CA 92262 ("3585 Del Sol Facility") | 6,000 | Cultivation: 2,991 sq. ft. | Lease | US$17,100 |
| 6. | 63795 19th Ave, Palm Springs, CA 92262 ("63795 19th Ave Facility") | 60,000 | Cultivation: 22,616 sq. ft. | Lease | US$162,500 |
| 7. | 19533 Mclane Street, Palm Springs, CA 92262 (the "19533 Mclane Facility") | 80,000 | Cultivation: 24,000 Remainder is processing, distribution and offices. | Lease | US$92,340 |

A-10

KG LLC currently operates 24,000 square feet at the 3535 Anza Facility. Suite A of the 3535 Anza Facility

# EXECUTIVE COMPENSATION

**Summary**

This section discusses the compensation paid by KG LLC to its executive officers and managers, and to be paid by KGI to its executive officers and directors following the Merger, for the fiscal years ending December 31, 2019 and beginning January 1, 2019, respectively.

The following table sets forth a summary of all compensation paid to managers and executive officers of KG LLC, and the Predecessor LLCs, for the fiscal years ended December 31, 2018 and 2017.

| Name and Principal Position | Year(1) | Salary | Option Awards | Total |
|---|---|---|---|---|
| Michael King, Chief Executive Officer(2) | 2018 | $664,461(3) | $2,758,789.98 | $3,423,250.98 |
| | 2017 | $290,000(4) | $0.00 | $290,000 |
| Charles Kieley, Chief Operating Officer | 2018 | $466,645(5) | $270,991.38 | $737,636.38 |
| | 2017 | $203,205(6) | $0.00 | $203,205 |
| Lauri Kibby, Chief Financial Officer(2) | 2018 | $564,654(7) | $1,225,888.63 | $1,790,542.63 |
| | 2017 | $290,000(8) | $0.00 | $290,000 |

(1) This column sets forth the fiscal years covered by the table. All information provided for the fiscal years ended December 31, 2018 and 2017 are on a combined basis for KG LLC and the Predecessor LLCs.

(2) This table does not include (i) any fees paid by KG LLC to Desert Payroll Solutions, LLC, a California limited liability company ("**Desert Payroll**") operated, and a majority of which is owned by, Mr. King and Mrs. Kibby, in connection with services provided by Desert Payroll to KG LLC and the Predecessor LLCs; (ii) any interest paid by KG LLC pursuant to the $8.5M Note to a limited liability company of which Mr. King, an executive officer and manager of KG LLC and an executive officer and director of KGI, is the managing member,; and (iii) any amounts paid by KG LLC to Mclane, in which Mr. King is a manager and owns 25% of the membership interests thereof, which in-turn owns 66% of the 19533 Mclane Facility.

(3) Mr. King received compensation equal to $664,461, which is comprised of (i) $135,000 of the amounts

paid to Duard Ventures, LLC, in connection with services provided by Duard Ventures, LLC to KG LLC and the Predecessor LLCs; (ii) $100,000 in connection with the design and build out of a facility; and (iii) $429,461, in connection with Mr. King's annual salary pursuant to his employment agreement for the period in which such agreement was in effect (see "Executive Compensation-Employment Agreements").

(4) Represents $290,000 of the amounts paid to Duard Ventures, LLC in connection with services provided to KG LLC and the Predecessor LLCs.

**Employment Agreements**

In June 2018, KG LLC entered into an employment agreement, as amended, with Michael King, its Chief Executive Officer, which provides for: (a) an annual salary of $600,000; (b) an initial term of 5 years, with up to two additional one year renewal terms, (c) options to purchase certain equity of KG LLC; and (d) if such person's employment with KG LLC is terminated without cause or voluntarily by the executive with good reason, then KG LLC shall pay to the executive compensation for one calendar year from the date of termination, including accrued but unused vacation and sick time, and provide health insurance benefits for the same period of time. In the event of

A-29

a Change of Control (as defined in such employment agreement), such employee shall have the option, exercisable within 6 months of such employee becoming aware of such event, to immediately receive as a lump sum payment an amount equal to 3 times the average of the total annual compensation paid by KG LLC to Employee, with respect to the five fiscal years of KG LLC prior to such Change of Control, minus $1.00.



# LEASE /PURCHASE CHECKLIST

Unit # _____   Date: _____

### FOR MANAGEMENT USE ONLY

☐   Lease /Purchase Application                    _____

☐   Copy of ID's                                  _____

☐   Background Check                              _____

☐   Copy of a Lease                               _____

☐   Access Permission Form                        _____

☐   Package Release Form                          _____

☐   Pet Registration                              _____

☐   Sales Contract                                _____

☐   Mortgage /Bank Approval                       _____

☐   Security Deposit                              _____

☐   Application Fee                               _____

☐   Maintenance Account Status                    _____

☐   Move in Deposit                               _____

☐ Complete                                   ☐ Incomplete

Received By : _____Date: _____

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# LEASE/ PURCHASE APPLICATION

**Complete all questions. If any question is not answered or left blank, application will be considered incomplete.**
**Please print legibly. Missing or illegible information will cause delays. All information will be verified.**

| Lease /Purchase Unit Information | | | |
|---|---|---|---|
| Building Name: **TRUMP ROYALE** | Unit Number: | | Application Date /Received: |
| Lease / Purchase | | Application fee received: | |
| Anticipated Move in/ Close Date: | | Rent/ Lease Term: | |
| **Applicant Information** | | | |
| Last Name: | | First Name: | |
| Date of birth: | SSN: | | Cell Phone #: |
| Current address: | | | |
| City: | | State: | ZIP Code: |
| Own / Rent | Monthly payment or rent: | | How Long? |
| Passport # | | Country: | Expiration date: |
| Driver's License # | | State Issued: | Expiration date: |
| E-mail: | | | |
| **Applicant Employment Information** | | | |
| Current employer: | | | |
| Employer address: | | | How long? |
| Phone: | E-mail: | | Fax: |
| City: | State: | | ZIP Code: |
| Position: | Hourly / Salary | | Annual income: |
| **Co-Applicant Information** | | | |
| Last Name: | | First Name: | |
| Date of birth: | | SSN: | Cell Phone #: |
| Current address: | | | |
| City: | | State: | ZIP Code: |
| Own / Rent | Monthly payment or rent: | | How long? |
| Passport # | | Country: | Expiration date: |
| Driver's License # | | State Issued: | Expiration date: |
| E-mail: | | | |

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333

## Co-Applicant Employment Information

| | | |
|---|---|---|
| Current employer: | | |
| Employer address: | | How long? |
| Phone: | E-mail: | Fax: |
| City: | State: | ZIP Code: |
| Position: | Hourly / Salary | Annual income: |

## Emergency Contact Information

| | |
|---|---|
| Name: | Phone: |
| Address: | |
| City: | State: | ZIP Code: |

## Financial History

| | | |
|---|---|---|
| Bank Name: | Address: | |
| City: | State: | ZIP Code: |
| Phone: | Contact Name: | |
| Have you or the co-applicant ever filed for Bankruptcy? | | If Yes, when: |
| Have you or the co-applicant ever been Evicted from any tenancy? | Ever Broken a Lease? | Ever Sued? |

## Personal References (No Family Members)

| | |
|---|---|
| Name: | Phone: |
| Relationship: | |
| Name: | Phone: |
| Relationship: | |

## Vehicle /Motorcycle Information

| | | |
|---|---|---|
| Vehicle 1 Make: | Model: | Color: |
| Year: | License Plate # | State: |
| Vehicle 2 Make: | Model: | Color: |
| Year: | License Plate # | State: |

## Convictions

Have you or the co-applicant ever been arrested or convicted of any crime? Include misdemeanors, DUI, etc. or are any criminal charges now pending?   YES / NO

If YES, City:

State:

Date:

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333

| Other Occupants | |
|---|---|
| Name: | Relationship: |
| Name: | Relationship: |
| Name: | Relationship: |

I hereby authorize 18201 Collins Avenue Condominium Association dba Trump Royale to obtain a consumer report, and any other information it deems necessary, for the purpose of evaluating my application. I understand that such information may include, but not limited to, credit history, civil and criminal information, records of arrest, rental history, employment/salary details, vehicles records, licensing records, and/ or any other necessary information. I understand that subsequent consumer reports may be obtained and utilized under this authorization in connection with an update, renewal, extension or collection with respect or in connection with the lease or purchase of a residence for which this application was made. I hereby expressly release Trump Royale and any procurer or furnisher of information from any liability what-so-ever in the use, procurement, or furnishing of such information, and understand that my application information may be provided to various local, state, and /or federal government agencies including without limitation, various law enforcement agencies.

I /We further state this Application and Authorization was signed by me /us and was not originated with fraudulent intent by me /us or any other person that the signature(s) below are my /our own proper signature. I /We certify under penalty of perjury that the foregoing is true and correct.

| Signature of applicant | Date: |
|---|---|
| Signature of co-applicant | Date: |

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# PET REGISTRATION

| Unit No. | Date |
|---|---|
| Legal Owner Name ("Owner") | |
| Primary Resident /Occupant Name /Family | Lessee (if applicable) |

| **Pet Information** |
|---|
| Name: |
| Type: Dog / Cat / Bird |
| Breed |
| Age |
| Weight |
| Gender |
| Service animal license (if applicable) |
| Vaccination records received: |
| Picture received: |

Acknowledgement & Agreement
I /We am /are aware of the Association rules, regulations and restrictions regarding pets on the property and agree to abide by them.

Signed _____ Date _____

Signed _____ Date _____

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# BACKGROUND CHECK AUTHORIZATION FORM

You are hereby authorized to release any and all information requested with regards to verification of my bank account(s), credit history, criminal record history, employment verification and character references to Association's third-party screening company. This information is to be used for my /our credit report for my /our Application for Occupancy.

I /We hereby waive any privileges I /We may have with respect to the said information in reference to its release to the aforesaid party. Information obtained for this report is to be released to the screening company, Property Manager, Board of Directors and the Landlord for their exclusive use only.

PLEASE INCLUDE A COPY OF YOUR DRIVER'S LICENSE AND SOCIAL SECURITY CARD TO CONFIRM IDENTITY. IF YOU DO NOT HAVE A SOCIAL SECURITY CARD, PLEASE INCLUDE A COPY OF YOUR PASSPORT /CURRENT IDENTIFICATION CARD.

I /We further state this Authorization is signed by me /us and was not originated with fraudulent intent by me /us or any other person and the signature(s) below are my /our own proper signature.

I /We certify under penalty of perjury that the foregoing is true and correct.

If you or the co-applicant have falsified, deliberately mislead or omitted to mention any information on your application, you may not be approved for a purchase, lease and or occupancy.

_____     _____ Date _____
(Applicant Name Printed)                        (Applicant's signature)


_____     _____ Date _____
(Applicant Name Printed)                        (Applicant's signature)

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# OWNERS /TENANTS ACCESS PERMISSION FORM

This form is to be submitted to the Management Office in order for access to be granted to any individual or entity. Front Desk /Receiving Desk is not allowed to accept changes to existing access permissions forms under any circumstances.

_____, the undersigned do hereby certify that we are the owners/legal residents of Unit No. _____ in TRUMP ROYALE A CONDOMINIUM and we hereby authorize the following individuals and /or companies to enter upon the property maintained by the residential community known as TRUMP ROYALE A CONDOMINIUM.

|   | Guest Name | Relationship | Expiration Date |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |
| 4. | _____ | _____ | _____ |
| 5. | _____ | _____ | _____ |

We understand that by signing this Access Permission Form, we are granting access without a phone call to persons listed on this form.  Access is granted up to the unit _only_.   As owner, we will take responsibility for providing our guests and service contractor with access to our individual unit as necessary. Pursuant to the Declaration of Condominium for TRUMP ROYALE A CONDOMINIUM and the Declaration of Covenants, Restrictions and Easements for TRUMP ROYALE A CONDOMINIUM, we will be responsible for the expense of any maintenance, repairs or replacements rendered necessary by the act, neglect or carelessness of any and all of the foregoing persons. In connection therewith, we do hereby irrevocably and unconditionally agree to indemnify and hold harmless the TRUMP ROYALE A CONDOMINIUM, the Association, their respective affiliates, owners, partners, successors, assigns, agents, directors, officers and employees, from any and all claims, liabilities, damages, and expenses arising from or related to the presence of any of the foregoing persons on the property. Access will not be granted by verbal request.  THIS FORM IS NOT USED TO ALLOW ACCESS NOR ANY SERVICE TO BUILDING'S COMMON AREAS AND IT'S SERVICES.

Owner's /Tenant Signature _____   Date: _____

Received by Management _____   Date: _____

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# PACKAGE ACCEPTANCE/RELEASE FORM

Unit Number     _____

I/We, _____, by signing this addendum, give Trump Royale employees, its agent and affiliates permission to sign and accept package deliveries addressed to my/our name and unit number.

I understand and agree to hold Trump Royale, its agent, employees and affiliates harmless of any damage to delivered packages and will not hold them responsible for package damage, missing package items, theft, etc.  Residents have an option of requesting a package to be delivered and left at the front door of the unit.  Should I choose this option that is available to me, I will not hold Trump Royale, its employees, its agent and affiliates responsible for the package/s once left at the front door.

I agree and understand that any package left with management/receiving more than 30 days from delivery date will be returned to sender.

I agree and acknowledge that only a reasonable number of packages can be held for my unit.

_____     _____
Resident Signature                          Date

_____     _____
Resident Signature                          Date

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333

whitepages
SEARCH. FIND. KNOW.

PEOPLE

Michael King                    92262

Foreclosures | Owns Properties | Criminal Records | Multiple Legal Troubl...

## Michael King

8516 Hedges Pl
Los Angeles, CA 90069
Map

3540 N Anza Rd
Palm Springs, CA 92262
Map

5694 Mission Center Rd Ste 602
San Diego, CA 92108
Map

72239 Desert Dr
Rancho Mirage, CA 92270-4918
Map

**NEW**

8335 Summit Way
San Diego, CA 92108-2635
Map

**NEW**

8516 Hedges Way
Los Angeles, CA 90069-1412
Map

423 N Avenida Caballeros
Palm Springs, CA 92262-6167
Map

7695 Rockaway Ave
Yucca Valley, CA 92284-2384
Map

**NEW**

18975 Collins Ave Unit 3203
~~~~~~~~~ ~~~~~~, ~~ ~~~~~ ~~~~
Map

444 NW 1st Ave
~~~~ ~~~~~~~~~~, ~~ ~~~~~
Map

## Zillow

5 bd   6 ba   7,000 sqft

8516 Hedges Pl, Los Angeles, CA 90069

**Sold: $12,875,000**   Sold on 02/06/19

**Est. refi payment:** $55,888/mo   💲 **Refinance your loan**

Zestimate®: **$12,835,000**

🖊 Edit   ♡ Save   ↷ Share   °°° More

Zillow Offers   Home value   Owner tools   Home details   Neighborhood details

33 of 384

## Zillow Offers

### Curious what your home could be worth?

See if it's eligible for a cash offer from Zillow. No obligation.

✓  Skip staging and showings

✓  No repairs to manage

✓  Competitive cash offer

Zipcode

**Get started**

**Learn more about Zillow Offers**

Street View

## RELATED PARTY TRANSACTIONS

Other than as disclosed below and elsewhere herein, no manager, executive officer or member of KG LLC that beneficially owns, or controls or directs, directly or indirectly, more than 10% of the issued Class B Units, or any of their respective associates or affiliates, has any material interest, direct or indirect, in any transaction within the three years before the date hereof which has materially affected or is reasonably expected to materially affect KG LLC or a subsidiary of KG LLC.

Prior to 2019, Duard Ventures, LLC provided the services of Michael King and Lauri Kibby to KG LLC and each Predecessor LLC without a written agreement. Duard Ventures, LLC is 100% owned by Michael King and Lauri Kibby. KG LLC paid an aggregate of approximately $690,000 in 2017 and $470,000 in 2018 to Duard Ventures, LLC as compensation for its and their services. In June 2018, KG LLC entered into employment agreements, as amended, with each of Michael King, Lauri Kibby and Charles Kieley. See "Executive Compensation".

Desert Payroll has provided and continues to provide payroll services to KG LLC pursuant to a payroll services agreement, dated as of January 1, 2018 (the "**Payroll Agreement**"), pursuant to which KG LLC is obligated to pay Desert Payroll ten percent (10%) of its direct costs in exchange for such payroll-related services, though Desert Payroll historically has charged only two percent (2%). In 2018, KG LLC paid fees of approximately $133,010 to this company, and in 2017 no fees were paid thereto. Desert Payroll is majority owned and managed by Michael King and Lauri Kibby.

In September 2018, KG LLC issued an unsecured convertible promissory note pursuant to which it has borrowed an aggregate of $8,500,000 from a limited liability company of which Michael King, an executive officer and manager of KG LLC and an executive officer and director of KGI, is the managing member. The $8.5M Note bears interest at a rate of 4.5% per annum and matures on September 30, 2023. If there is a change of control in KG LLC, the $8.5M Note is required to be repaid as follows:

- If at least one-third of the purchase price pursuant to such change of control is payable in the securities of the purchaser then (i) KG LLC shall repay the then outstanding principal and all accrued but unpaid interest on the $8.5M Note and (ii) KG LLC or the purchaser shall issue or cause to be issued a number of Class B Units of KG LLC to the noteholder equal to 50% of the outstanding principal balance and all unpaid accrued interest due under the $8.5M Note at such time of the change of control, divided by the price per Class B Unit paid by such purchaser.
- If less than one-third of the purchase price pursuant to such change of control is payable in the securities of the purchaser, then KG LLC shall repay the noteholder an amount equal to the then outstanding principal balance and all unpaid accrued interest of the $8.5M Note multiplied by 150%.

The $8.5M Note automatically converts into Class B Units if:
- KG LLC's securities are listed on any domestic or international securities exchange or quoted on the OTC Bulletin Board, the OTC Markets or similar quotation system or association, upon which the $8.5M Note will convert into a number of Class B Units equal to 150% of the then outstanding principal balance and all unpaid accrued interest due under the $8.5M Note divided by the average of the opening and closing sales prices of the securities of KG LLC on the first day of trading in connection with such listing.
- At maturity, if no change of control or public listing has occurred, the $8.5M Note will convert into a number of KG LLC Class B Units equal to 150% of the then outstanding principal balance and all unpaid accrued interest due under the $8.5M Note divided by an amount equal to the valuation applicable in KG LLC's last equity financing (with gross proceeds of not less than $1,000,000) divided by the number of issued and outstanding units of KG LLC on a fully diluted basis.

The 19533 Mclane Facility is currently under construction. KG LLC anticipates that such construction at the 19533 Mclane Facility will be completed by the end of 2019. The 19533 Mclane Facility is covered by a Cannabis Cultivation License (Adult-Use-Processor) with respect to processing operations and JME has applied for two cultivation licenses and one distribution license. KG LLC currently leases the 19533 Mclane Facility from Mclane and an unaffiliated third-party, as assignees pursuant to the 19533 Lease Agreement, and KG LLC subleases such property to JME pursuant to the 19533 Sublease Agreement. Pursuant to the 19533 Sublease Agreement, (i) the term of the lease is ten (10) years, terminating on May 31, 2028, (ii) the term may be renewed for two (2) additional five

**From:** Michael King michael@duardventures.com
**Subject:** Re: Revised Final PS IV 4 Operating Agreement - CMCI McLane Group LLC_.docx
**Date:** February 14, 2018 at 7:59 AM
**To:** Dimitriy Romantsoff dromantsoff@verzasca-group.com

Privet Dima!

I will have yours today! Your. Commitment is 3mm for 25%. Money will be paid back equally 50/50 with priority return. Yours will just be paid back first. Then the remainder of theirs. I'll call you around 7am my time - 10am yours. Ty!

Best,



**Michael King**
Principal

+1 347 996 7844
Michael@DuardVentures.com

DuardVentures.com

On Feb 13, 2018, at 7:46 AM, Dimitriy Romantsoff <dromantsoff@verzasca-group.com> wrote:

Миша, привет!

Спасибо, получил, прочитал. В целом понятно. Когда мы сможешь прислать operating agreement уже с нашим участием? Что мы будем делать с $3.8M и нашими $3M? Когда ты планируешь, компания произведёт первый продукт? Есть ли у тебя вся финансовая модель на эту компанию? Если есть, можешь прислать?

Мы с удовольствием воспользуемся твоим приглашением и можем прилететь с Настей с 9 по 11 марта. Удобно тебе?

Дай мне знать, плз.

Спасибо,

Дима

CONFIDENTIALITY NOTICE AND DISCLAIMER

This email and any information contained herein are confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please notify the sender immediately and delete this message and any attachment from your system. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal. For the avoidance of doubt, in no event will this e-mail or any subsequent replies be construed as an enforceable agreement, contract or offer to buy, sell, lease, to amend or terminate any agreement, contract, or lease, to pay any consideration, or to undertake renovations of any property or settle any claim. This e-mail is not an agreement to negotiate. Either party may refuse to agree on any point, cease negotiations, or revise provisions previously agreed. The parties shall not be bound until all necessary parties sign final, definitive and formal agreements, contracts and/or leases reflecting all of the agreed upon terms of the proposed transaction, any consents are obtained making such agreement, contract or lease enforceable and the parties exchange fully executed agreements, contracts or leases.

On Feb 13, 2018, at 9:25 AM, Michael King <michael@duardventures.com> wrote:

Privet Dima!!!

This is what the other group signed and funded.

The status of the project is as follows:

+1 347 996 7844
Michael@DuardVentures.com

DuardVentures.com

**From:** **Michael King** michael@duardventures.com 
**Subject:** O.A., GIA, signed by Meade.pdf
**Date:** April 30, 2018 at 3:44 PM
**To:** Dimitriy Romantsoff  dromantsoff@verzasca-group.com

Pls review


Best,


**Michael King**
Principal

+1 347 996 7844
Michael@DuardVentures.com

DuardVentures.com

O.A., GIA,
signed...de.pdf

## OPERATING AGREEMENT
## OF
## PS IV 4, LLC
### a California limited liability company

This OPERATING AGREEMENT of PS IV 4, LLC, a California limited liability company ("Agreement"), is entered into effective as of <u>April 26, 2018</u> (the "Effective Date"), by and among GIA Investments, LLC. a Delaware limited liability company; MICHAEL MEADE, an individual; and MICHAEL KING, an individual, with reference to the following recitals which are incorporated into the
Agreement:

     A.     GIA Investments, LLC.; MICHAEL MEADE, an individual; and MICHAEL KING, an individual (each, an "Initial Member") desire to form a limited liability company under the laws of the State of California for the purposes of cultivation and/or manufacture of legal cannabis in the State of California, in compliance with the laws of the State of California, and for the other purposes set forth in this Agreement.

     B.     The Members intend this Agreement to govern the company business operations at the real property located at 19533 McLane in Palm Springs California (the "Property") for which the company has rights to lease said Property comprised of a +/-41,040 square foot industrial building.

     C.     Initial Member, GIA Investments, LLC. In the event that the company elects or desires to conduct business operations at any location other than the Property, additional capital contribution requirements will be established by the company as a condition to the Initial Members' referenced in this Section C participation in any other company business operations.

     D.     The Initial Members now desire to provide for the governance of the limited liability company and the conduct of its business and to specify their relative rights and obligations.

     NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

### ARTICLE 1: DEFINITIONS

While additional terms are defined elsewhere in this Agreement, whenever used herein, the following terms shall have the meanings set forth below:

"Act" means the California Revised Uniform Limited Liability Company Act, as it may be amended from time to time.

"Additional Capital Contributions" means the Capital Contributions, in excess of the Initial Capital Contributions, made by any Member pursuant to Section 4.3 below.

"Adjusted Capital Account Deficit" shall be determined before any allocation of the Company's income, gain, loss, deduction or Code Section 705(a)(2)(B) expenditure for the Company Taxable Year, and means the deficit balance, if any, in each Member's Capital Account, with the following adjustments: (a) credit to such Capital Account any amounts which such Member is either obligated to restore or is deemed obligated to restore pursuant to the second to last sentences of Regulation

Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (b) debit to such Capital Account the adjustments, allocations and distributions specified in subparagraphs (4), (5) and (6) of Regulations Section 1.704-1(b)(2)(ii)(d).

"Affiliate" of a Member means (i) any Person controlling, controlled by, or under common control with the Member; (ii) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of the Member; (iii) an officer, director, member, or partner of the Member; or (iv) any member of the immediate family of the Member or of an Affiliate of the Member. When the Affiliate is an officer, director, member, or partner, any entity for which the Affiliate acts in such a capacity is also an Affiliate. For purposes of this paragraph, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person.

"Articles of Organization" means those certain Articles of Organization filed with the California Secretary of State on behalf of the Company on July 12, 2017, including all amendments thereto or restatements thereof. The Articles of Organization provide that the Company is to be managed by more than one manager.

"Bankruptcy" means institution of any proceedings under federal or state laws for relief of debtors, including the filing of a voluntary or involuntary petition under the federal bankruptcy law, which is not dismissed within one hundred twenty (120) days; an adjudication as insolvent or bankrupt; an assignment of property for the benefit of creditors; the appointment of a receiver, trustee, or a conservator of any substantial portion of assets; or the seizure by a sheriff, receiver, trustee, or conservator of any substantial portion of assets.

"Capital Account" means, as to any Member, such Member's Capital Contributions, if any, increased by its share of Profits of the Company, reduced by its share of Loss, and further reduced by any Distributions to such Member. Notwithstanding the foregoing, the maintenance of each Member's Capital Account is subject to the requirements of the Code and the Regulations.

"Capital Contribution" means the total amount of money and the fair market value (determined without regard to Section 7701(g) of the Code) of any property (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code) contributed to the Company by any Member pursuant to Article 4 below, including Initial Capital Contributions and Additional Capital Contributions.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provisions of succeeding law.

"Company" means PS IV 4, LLC, a California limited liability company, as such limited liability company may from time to time hereafter be constituted.

"Company Nonrecourse Deductions" means any "nonrecourse" deductions of the Company which are characterized as such under Regulation Section 1.704-2(b).

"Distributable Proceeds" means, with respect to any period, all cash received by the Company during such period, less all sums expended or reserved by the Company in the conduct of its business during such period. For the purpose of determining Distributable Proceeds, the sums expended or reserved by the Company in the conduct of its business shall be deemed to include, without limiting

2

the generality of the foregoing: (i) debt service on all indebtedness of the Company, including debts to third parties and Members; (ii) all other amounts expended in connection with the operation of the business of the Company (but excluding Distributions); and (iii) any amounts set aside for the creation, restoration, or increase of Reserves.

"Distribution" means cash or the fair market value of property (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code) distributed to Members arising from their interests in the Company, other than payments to Members for services, as repayment of loans, or as reimbursement for expenditures made for the benefit of the Company in accordance with this Agreement.

"Initial Capital Contribution" means, with respect to each Member, the Capital Contribution, if any, required of such Member in accordance with Section 4.2 below.

"Invested Capital" means, with respect to each Member, the sum of all Capital Contributions made by such Member to the Company.

"Member" means the Initial Members and any other Person admitted to the Company as a Member pursuant to the terms of this Agreement, so long as such Initial Member or Person remains a Member in accordance with this Agreement.

"Member Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

"Member Loan" has the meaning set forth in Section 4.4 below.

"Member Nonrecourse Debt" means any "partner nonrecourse liability" or "partner nonrecourse debt" under Regulation Section 1.704-2(b)(4).  Subject to the foregoing, it means any liability of the Company to the extent such liability is nonrecourse for purposes of Regulation Section 1.1001-2, and any Member or related Person (within the meaning of Regulation Section 1.752-4(b)) bears the economic risk of loss under Regulation Section 1.752-2 because, for example, such Member or related Person is the creditor or a guarantor.

"Member Nonrecourse Deductions" means the deductions, losses and Section 705(a)(2)(B) expenditures of the Company, as the case may be, which are treated as deductions, losses, and expenditures attributable to any Member Nonrecourse Debt under Regulation Section 1.704-2(b)(4).

"Percentage Interest" means, with respect to each Member, at any particular point in time, the percentage interest set forth in Section 4.1 below, as such percentage interest may be adjusted from time to time in accordance with the terms of this Agreement.

"Person" means any natural person, limited liability company, partnership, company, association, trust, estate or other legal entity.

"Profits" and "Losses" means the net income and net loss, respectively, of the Company for each Taxable Year as determined by the Company for federal income tax purposes.

"Regulations" means the Federal income tax regulations promulgated under the Code, as such regulations may be amended from time to time, or any corresponding provisions of succeeding Regulations.

"Reserves" means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves, which shall be maintained in amounts deemed sufficient in the Approved Budget to cover the costs or expenses incident to the operation of the Company and not reasonably expected to be timely met by future income of the Company.

"Taxable Year" means the twelve-month period used by the Company for reporting federal and state income taxes (determined without regard to Section 706(c)(2)(A) of the Code). The initial Taxable Year for the Company shall be the calendar year.

## ARTICLE 2: ORGANIZATION

2.1    Formation and Name. The Members hereby associate themselves as members in a limited liability company to operate under the name and style of "PS IV 4, LLC" formed pursuant to and in accordance with the Act. Except as expressly provided in this Agreement to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the laws of the State of California.

2.2    Statutory Compliance. On January 29, 2018 the Members caused to be filed on behalf of the Company the Articles of Organization in the office of, and on the form prescribed by, the California Secretary of State. From and after the Effective Date, the President or managing members shall cause to be executed, acknowledged, recorded, filed and/or published such other documents or instruments as may be desirable or required by law to be recorded, filed or published in connection with the formation and operation of the Company. The President or managing members shall cause to be executed and cause to be filed, recorded or published renewals, restatements and amendments of the Articles of Organization and other documents or instruments when required by law or deemed desirable by the Company.

2.3    Personal Property. A Member's Member Interest in the Company shall be personal property for all purposes. All interests in all property, whether tangible or intangible, from time to time owned by the Company (collectively, the "Company Property"), shall be deemed owned by the Company as an entity, and no Member, individually, shall have any ownership of such Company Property.

2.4    Scope of Authority. Except as otherwise provided in this Agreement, no Member shall have any authority to act for, or assume any obligations or responsibility on behalf of, any other Member or the Company.

2.5    Place of Business. The Company's principal office shall be located at 72100 Magnesia Falls Drive, Suite 2, Rancho Mirage, California or at such other place or places as from time to time determined by the Approval of the Members.

2.6    Information to be Maintained by Company. The President or managing members shall keep at the Company's principal place of business such records and information as may from time to time be required by the Act and by all other applicable laws.

4

2.7     Registered Agent; Registered Office.  The Company's initial registered agent and registered office are set forth in the Articles of Organization.  Upon Approval of the Members, the Company's registered agent and registered office may be changed by filing a Form LLC-12 Statement of Information or a Form LLC-2 Certificate of Amendment.

## ARTICLE 3:  PURPOSES AND SCOPE

3.1     Purposes.  The purposes of the Company shall be (1) to conduct all of the activities described in Recital "A" above, (2) to take all actions and execute and deliver all documents and instruments necessary or convenient in connection with such activities, and (3) to take such actions as may otherwise be permitted by this Agreement or as may be "Approved by the Members" (as defined below).  Unless approved by the Members, the business of the Company shall be limited strictly to the purposes set forth in this Section 3.1.

3.2     Approvals.  The phrases "Approved by the Members" or "Approval of the Members" each mean the vote, consent, decision, determination, judgment, decree, instruction, authorization, waiver, resolution or other approval of Members holding, in the aggregate, sixty percent (60%) of the Percentage Interests, each Member's approval being a matter within such Member's sole and absolute discretion.

3.3     Other Activities of the Members.  Each Member may engage or invest in any other competitive or non-competitive activity or venture or possess any interest therein independently or with others. None of the Members, the Company or any other Person employed by, related to or in any way affiliated with any Member or the Company shall have any duty or obligation to disclose or offer to the Company or the Members, or obtain for the benefit of the Company or the Members, any such other activity or venture or interest therein. None of the Company, the Members, the creditors of the Company or any other Person having any interest in the Company shall have (i) any claim, right or cause of action against any of the Members or any other Person employed by, related to or in any way affiliated with, any of the Members by reason of any direct or indirect investment or other participation, whether active or passive in any such activity or venture or interest therein, or (ii) any right to any such activity or venture or interest therein or the income or profits derived therefrom.

## ARTICLE 4:  PERCENTAGE INTERESTS; CONTRIBUTIONS

4.1     Percentage Interests.  Each Member shall have the following Percentage Interest in the Company:

| Member | Percentage Interest |
|---|---|
| MICHAEL MEADE | 37.5% |
| MICHAEL KING | 37.5% |
| GIA Investments, LLC | 25.0% |
| Total | 100% |

5

4.2     Capital Contributions.  The Members have made initial capital contributions to the Company as set forth on Exhibit "A".  No Member shall have any right, power, privilege or authority or any duty, liability or obligation to make any Capital Contribution unless otherwise approved by the Members.

4.3     No Priorities of Members.  Except as specifically provided in this Agreement, including the return to Priority Members as set forth herein, no Member shall have the right to withdraw or to reduce its contributions to the capital of the Company.  No Member shall have the right to demand or to receive property other than cash in return for its Capital Contributions, nor shall any Member have priority over any other Member, either as to the return of Capital Contributions or as to Profits, Losses, tax items pursuant to Section 6.3, or distributions described in Articles 7 or 10.

4.4     Member Loans.  No Member or Affiliate shall be required to make any loans or otherwise lend any funds to the Company.  A Member or Affiliate may make nonrecourse loans to the Company with the Approval of the Members, to the extent such Member or Affiliate reasonably determines that such loans are necessary or advisable for the business of the Company (each, a "Member Loan").  Each Member Loan shall (a) be separately entered upon Company books; (b) be evidenced by a negotiable promissory note made by the Company payable to the order of the lending Member; (c) bear interest at a rate Approved by the Members; and (d) be payable from the first available proceeds and secured by such assets of the Company as may be Approved by the Members.  No Member Loans by a Member shall have any effect on such Member's Percentage Interest, such Member Loans representing a debt of the Company payable or collectible solely from the assets of the Company in accordance with the terms and conditions set forth herein.

4.5     Limited Liability.  No Member will be bound by, or be personally liable for, the expenses, liabilities or obligations of the Company except to the extent required by this Agreement, or by applicable law.

4.6     No Third Party Beneficiaries.  The right of any Member to make Capital Contributions and otherwise to do, perform, satisfy or discharge any liability or obligation hereunder, or to pursue any other right or remedy hereunder or at law or in equity provided, shall not confer any right or claim upon or otherwise inure to the benefit of any creditor or other third party having dealings with the Company, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective permitted successors and assigns.  None of the rights or obligations of the Members herein set forth shall be deemed an asset of the Company; and such rights and obligations may not be sold, transferred or assigned by the Company or any Member (except in connection with a sale or transfer of a Member Interest made in accordance with the provisions of this Agreement), and may not be pledged or encumbered to secure any debt or other obligation of the Company or of any of the Members.

### ARTICLE 5:  CAPITAL ACCOUNTS

5.1     Initial Capital Accounts.  An individual Capital Account shall be established and maintained for each Member reflecting such Member's Initial Contribution, if any, made under Section 4.2.

6

5.2     Subsequent Adjustments.

     5.2.1     Increases.  Each Member's Capital Account shall be increased by (a) such Member's Additional Contributions under Section 4.2; (b) such Member's share of Profits allocated to such Member under Section 6.1; and (c) such Member's share of any Company income, profits, or gain allocated to such Member under Section 6.2.

     5.2.2     Decreases.  Each Member's Capital Account shall be decreased by (a) the amount of any Distributions made to such Member; (b) such Member's share of Losses allocated to such Member under Section 6.1; and (c) such Member's share of Company expenses, losses or deductions allocated to such Member under Section 6.2.

     5.2.3     Other Adjustments.  Each Member's Capital Account shall also reflect such other adjustments that may from time to time be required in order for such Capital Accounts to be kept in strict accordance with Sections 704(b), 704(c) and other applicable provisions of the Code and Regulations, all as Approved by the President.

## ARTICLE 6:  PROFITS; LOSSES; TAX MATTERS

6.1     Allocation of Profits and Losses.

     6.1.1     Profits.  Profits of the Company shall be allocated among the Members in the following order of priority:

     6.1.1.1     First, to the Members in the reverse order of priority and amount of Losses allocated to the Members under Sections 6.1.2.1 through 6.1.2.3, until each Member has been allocated Profits in an amount equal to the sum of all Losses theretofore allocated to such Member under Sections 6.1.2.1 through 6.1.2.3 during the current and all prior Taxable Years, less the sum of all Profits previously allocated to such Member under this Section 6.1.1.1 during the current and all prior Taxable Years.

     6.1.1.2     Second, and subject to section 7.2 of this Agreement, to the Members in the same order of priority and amount of Distributable Proceeds distributed to the Members under Section 7.1 until each Member has been allocated Profits in an amount equal to the sum of all Distributable Proceeds theretofore distributed to such Member under Section 7.1 during the current and all prior Taxable Years, less the sum of all Profits previously allocated to such Members under this Section 6.1.1.2 during the current and all prior Taxable Years.  Allocations to the Members under this Section 6.1.1.2 shall be made pro rata in proportion to the total amounts of Distributable Proceeds theretofore received by each Member under Section 7.1.

     6.1.1.3     Third, and subject to section 7.2 of this Agreement, to the Members in proportion to their respective Percentage Interests.

     6.1.2     Losses.  Losses of the Company shall be allocated among the Members in the following order of priority:

     6.1.2.1     First, to the Members in the reverse order of priority and amount of Profits allocated to the Members under Sections 6.1.1.1 through 6.1.1.3, until each Member has been

<div align="center">7</div>

allocated Losses in an amount equal to the sum of all Profits allocated to such Member under Sections 6.1.1.1 through 6.1.1.3 during the current and all prior Taxable Years, less the sum of all Losses previously allocated to such Member under this Section 6.1.2.1 during the current and all prior Taxable Years;

6.1.2.2   Second, to the Members in proportion to their respective positive Capital Account balances, as calculated by making the adjustments described in clauses "(a)" and "(b)" of the definition of "Adjusted Capital Account Deficit", until each such adjusted Capital Account balance equals zero; and

6.1.2.3   Third, to the Members in proportion to their respective Percentage Interests.

6.2   Special Allocations.

6.2.1   Company Minimum Gain Chargeback.   If there is a net decrease in "partnership minimum gain," computed strictly in accordance with the principles of Regulation Section 1.704-2(d), during any Company Taxable Year, the "minimum gain chargeback" described in Regulation Sections 1.704-2(f) and (g) shall apply.   The allocation required by this Section 6.2.1 shall be made prior to any other allocation for the year.

6.2.2   Member Nonrecourse Debt Minimum Gain Chargeback.   In the event that there is a net decrease in "partner nonrecourse debt minimum gain" during any Taxable Year of the Company, any Member with a share of such "partner nonrecourse debt minimum gain" (determined under Regulation Section 1.704-2(i)(5)) as of the beginning of the year shall be allocated items of income or gain for the year (and, if necessary, subsequent years) equal to such Member's share of the net decrease in the "partner nonrecourse debt minimum gain" in accordance with Section 1.704-2(i). The allocation required by this Section 6.2.2 shall be made after the allocation required by Section 6.2.1 but prior to any other allocation for the year.

6.2.3   Qualified Income Offset.   If any Member unexpectedly receives an adjustment, allocation or distribution described in subparagraphs (4), (5) or (6) of Regulation Section 1.704-1(b)(2)(ii)(d) and such adjustment, allocation or distribution creates an Adjusted Capital Account Deficit with respect to such Member, or increases such Member's Adjusted Capital Account Deficit, such Member shall be allocated items of income or gain (consisting of a pro rata portion of each item of income or gain, including gross income and gain for such year) in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible in accordance with Regulation Section 1.704-1(b)(2)(ii)(d) and its requirements for a "qualified income offset." The allocations required by this Section 6.2.3 shall be made after the allocations required by Sections 6.2.1 and 6.2.2 but prior to any other allocation for the year.

6.2.4   Company Nonrecourse Deductions; Member Nonrecourse Deductions. Company Nonrecourse Deductions shall be allocated among the Members in proportion to their respective Percentage Interests.   Member Nonrecourse Deductions shall be allocated between the Members as required by Regulation Section 1.704-2(i), which generally requires that such deductions be allocated in accordance with the manner in which the Members bear the economic risk of loss with respect to the loan to which such Member Nonrecourse Deductions are attributable.   The allocation of Company Nonrecourse Deductions and Member Nonrecourse Deductions required by this Section 6.2.4 shall be made before the allocation of Losses required by Section 6.1.

8

6.3     Allocations for Tax Purposes. All items of Company income, gain, loss and deduction for federal and state income tax purposes shall be allocated to and between the Members in the same amounts that the corresponding "book" items of the Company are allocated to and between the Members under the provisions of Sections 6.1 and 6.2, except (a) as otherwise allocated under Section 704(c) of the Code, and (b) as otherwise allocated under Regulation Section 1.704-1(b)(4)(i).

6.4     Tax Returns. The President shall, at the expense of the Company, cause to be prepared and filed all tax returns and statements which must be filed on behalf of the Company with any taxing authority and the President shall use his best efforts (also at the expense of the Company) to cause such returns and statements to be filed in a timely manner (taking into account all extensions).

6.5     Section 754 Election. Upon Approval of the Members, the Company may make or revoke the election referred to in Section 754 of the Code and any like provision of any state income tax law or any similar provision or provisions enacted in lieu thereof.

6.6     Excess Nonrecourse Liabilities. Solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulation Section 1.752-3(a)(3), the Members' interests in Company Profits shall be in proportion to their respective Percentage Interests.

6.7     Tax Decisions Not Specified. The Company's "tax matters partner," as described in Section 6231(a)(7) of the Code (the "Tax Matters Member"), shall be MICHAEL MEADE and shall have the right (i) to make or revoke any other tax elections on behalf of the Company, (ii) to enter into any agreements with the Internal Revenue Service or any state taxing authority, and (iii) to commence litigation (or settle litigation) involving any tax issues affecting the Company or any of its assets.

6.8     Notice of Tax Audit. The Tax Matters Member shall give prompt notice to all Members upon receipt of notice that either the Internal Revenue Service or any state taxing authority intends to examine the Company's tax returns for any year.

6.9     Amounts Withheld. All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Members shall be treated as amounts distributed to the Members pursuant to Article 7 for all purposes under this Agreement. The President is authorized to withhold from distributions or with respect to allocations to the Members, and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law, and shall allocate any such amounts among the Members, to each Member the amount withheld for and on behalf of such Member.

6.10    Allocations Upon a Transfer. On a transfer of any Member Interest, Profits and Losses under Sections 6.1.1.3 and 6.1.2.3 shall be allocated between the transferor and the transferee according to the relative number of days in the year before and after the effective date of the transfer.

## ARTICLE 7:  DISTRIBUTIONS TO MEMBERS

7.1     <u>Distributions</u>.  Distributable Proceeds, when distributed, shall be distributed to the Members pro rata in proportion to their respective Percentage Interests.

7.2     <u>Priority Distribution to Initial Member GIA Investments.</u> Initial Member GIA Investments shall receive 80% of the Distributable Proceeds until said Member has received an amount equal to their initial capital contributions as set forth in Exhibit "A" to this Agreement. Members Meade and King shall each receive 10% of the Distributable Proceeds until Initial Member GIA has received an amount equal to his initial capital contributions as set forth in Exhibit "A" to this Agreement, at which time all Distributable Proceeds shall be distributed as set forth in section 7.1.

7.3     <u>Capital Account Charge</u>.  Distributions of Distributable Proceeds to a Member under this Article 7 shall be chargeable to such Member's Capital Account.

## ARTICLE 8:  MANAGEMENT AND CONTROL OF THE COMPANY

8.1     <u>Management</u>.  The business, property and affairs of the Company shall be managed by Managing Members MICHAEL MEADE and MICHAEL KING.

8.2     <u>General Authority of the Managing Members</u>.  Subject to the limitations set forth in this Agreement, the Managing Members shall have the exclusive right and authority to oversee and manage the business of the Company, and shall have all of the rights, power, and authority generally conferred by law or as necessary and advisable.

8.3     <u>Major Decisions</u>.  Notwithstanding anything to the contrary, contained in this Agreement, no act shall be taken, sum expended, decision made or obligation incurred by the Company or by the Managers with respect to a matter within the scope of any of the following decisions (collectively, the "Major Decisions") without Approval of the Members (as defined in section 3.2):

(a)     A change in control of the Company.

(b)     Entering into employment agreements on behalf of the Company.

(c)     Any substantial change (i.e., any proposed changes to Company's capital structure where such change results in a greater than 10% increase or decrease in the Fair Market Value of Member Interests).

(d)     Authorizing any distribution payable to any Member in a manner other than a as set forth in this Agreement.

(e)     Issuing, redeeming, purchasing, converting, altering the classification of, altering the rights attaching to, consolidating or cancelling, any Member Interests or otherwise reducing or increasing the issued Member Interests.

10

(f)     The dissolution of the Company.

(g)     Initiate a voluntary wind-up or otherwise voluntarily liquidating the Company.

(h)     Amending this Agreement in whole or in part.

(i)     Changing the general nature of the business of the Company.

(j)     Entering into any consolidation, amalgamation or merger with any entity, including acquiring any share capital, loan capital, securities or the assets of, such entity, or by entering into any joint venture, partnership or profit sharing arrangement with such entity.

(k)     Selling, transferring, licensing, leasing or otherwise disposing of all, or a material part, of the undertaking, business or assets of the Company, whether by a single transaction or series of transactions and whether related or not.

(l)     Resolving to enter into a scheme of arrangement with Company's creditors, applying for any administration order in respect of Company, appointing any receiver or liquidator or any other event analogous to any of these.

(m)     Appointing the auditors, determining the accounting period or effecting any significant change in the accounting principles and practices adopted by Company or changing the accounting principles.

(n)     Engaging in any transaction where Company borrows or lends to a third party, guarantees third party obligations, or encumbers Company property;

(o)     Acquiring, whether by formation or otherwise, any subsidiary, or disposing of, or diluting its interest in, any subsidiary (whether directly or indirectly).

(p)     Initiating any litigation, arbitration or other dispute resolution on behalf of Company, other than debt collection in the ordinary course of business, or the settlement of any such litigation or arbitration, whether initiated by Company or any third party against Company.


8.4     <u>Meetings</u>.  A meeting of the Members may be called at any time by any Member by the giving of at least fifteen (15) days' notice to the other Members, and if any such other Members are not then available, such meeting shall be held on the next date reasonably available to the Members, but no later than fifteen (15) days after the date first noticed for such meeting.  At the request of any Member, any such meeting may be held by conference telephone.

8.6     <u>Officers</u>

8.6.1     <u>Appointment of Officers</u>.  The Managers may appoint officers including President, Chief Financial Officer and Secretary.  Each officer so appointed shall devote the time and effort necessary and appropriate to the faithful performance of all duties of the office held.  Any

11

natural person may hold any number of offices. No officer need be a resident of the State of California or citizen of the United States. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be Approved by the Managers from time to time.

       8.6.2   <u>Removal, Resignation and Vacancy</u>. Any officer may be removed as an officer, either with or without cause, by the advance written Approval of Managers. Any officer may resign at any time by giving written notice to the Managers. Any resignation shall take effect on the date of the receipt of such notice or at any later time specified in such notice; and, unless otherwise specified in such notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

       8.6.3   <u>Salaries of Officers</u>. The salaries and employment agreements, if any, of all officers and agents of the Company shall be fixed by Approval of the Managers.

       8.6.4   <u>President</u>. The President shall be the chief executive officer of the Company, and shall, subject to the control of the Managers, shall have the right and authority to oversee and direct the other officers of the Company, shall manage the business of the Company, and shall have all of the rights, power, and authority generally conferred by law, necessary or advisable. The President shall also have the general powers and duties of a chief executive officer or president of a company, and shall have such other powers and duties as Approved by the Members or otherwise provided in this Agreement. In addition to the other duties and responsibilities of the President as set forth in this Agreement, the President shall have the following duties:

       (a)      The President shall file or cause to be filed with the Secretary of State of the State of California an initial and subsequent annual statements as required by the Act.

       (b)      The President shall file or cause to be filed for recordation in the office of the appropriate authorities of the State of California, and in each other jurisdiction in which the Company is qualified, such certificates (including, without limitation, articles of organization and fictitious business name certificates) and other documents as are required by the statutes, rules, or regulations of such jurisdictions.

       (c)      The President shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any federal, state, and local tax returns required to be filed by the Company. The President shall cause the Company to pay any taxes payable by the Company.

       (d)      The President shall obtain and keep in force, during the term hereof, workers' compensation as required by law, public liability insurance with such insurers and in such amounts as the President shall deem advisable.

       (e)      The President shall be under a fiduciary duty to the Company and the Members to conduct the affairs of the Company in the best interests of said parties, including the safekeeping and use of all Company funds and assets and the use thereof for the exclusive benefit of the Company.

8.6.5   <u>Chief Financial Officer</u>.  The Chief Financial Officer shall be the treasurer and controller of the Company and shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, and capital, and shall perform such other duties as may be prescribed by the President.  The Chief Financial Officer shall also have the general powers and duties of a chief financial officer of a company, and shall have such other powers and duties as Approved by the Managers or otherwise provided in this Agreement.

8.6.6   <u>Secretary</u>.  The Secretary shall attend all meetings of the Members and shall record all the proceedings of the meetings in a book to be kept for that purpose.  The Secretary shall give, or cause to be given, notice of all meetings of the Members and shall perform such other duties as may be prescribed by the President.  The Secretary shall also have the general powers and duties of a secretary of a company, and shall have such other powers and duties as Approved by the Managers or otherwise provided in this Agreement.

8.7   <u>Limitation of Liability</u>.  The duly appointed Managing Members and/or officers of the Company shall not be liable, responsible, or accountable in damages or otherwise to the other Members or the Company for any act or omission performed or omitted by it in good faith and in a manner reasonably believed by him or her to be within the scope of the authority granted to it by this Agreement and in the best interests of the Company and the Members; provided, however, that no Manager or officer shall be relieved of liability with respect to any claim, issue, or matter as to which it or any Affiliate shall have been adjudged to be liable for intentional misconduct, gross negligence, fraud, or bad faith in the performance of its fiduciary duty to the Members.  Except in such case where the Manager or officer is so adjudged liable, the Company shall indemnify such Manager and officer from and against any loss, damage, or expenses (including reasonable attorneys' fees) incurred by it in connection with the defense of any threatened, pending, or completed action or suit by any Person in connection with any such act or omission. The satisfaction of any obligation to indemnify and hold such Manager and/or officer harmless shall be from and limited to Company assets, and no Member shall have any personal liability on account thereof.

## ARTICLE 9: ACCOUNTING

9.1   <u>Books and Records</u>.  The Managers shall cause accurate and complete books and records to be maintained so as to reflect the Company's income, expenses, assets, and liabilities.  All books and records shall be kept using the tax method of accounting used to determine Profits and Losses.

9.2   <u>Reports</u>.  The Managers shall cause to be prepared and furnished to each Member: (a) monthly statements of cash receipts and disbursements, which the Managers shall exercise all reasonable efforts to provide to the Members within fifteen (15) days following the end of each calendar month, and (b) annual financial statements prepared in accordance with the tax method of accounting, which the Managers shall exercise all reasonable efforts to provide to the Members within ninety (90) days following the end of each Company fiscal year.  The financial statements referred to in clause "(b)" of the immediately preceding sentence shall include a balance sheet of the Company dated as of the end of the period for which the financial statements are being prepared and a related statement

of income or loss for such period. Unaudited financial statements shall be certified by the Managers as being, to the best of their knowledge, true, accurate, complete and reflective of the financial condition of the Company.

9.3    Location and Rights of Inspection. The Company's books and records shall be kept and maintained at all times at the principal office of the Company. Each Member and its authorized agents, employees and representatives, at such Member's cost and expense, shall have the right to inspect, examine and copy the books, records, files, and other documents of the Company at all reasonable times. The reasonable costs of copying books and records, and creating duplicate computer information, shall be a Member expense.

9.4    Bank Accounts. The Company funds shall be deposited in bank accounts of a type, in form and name, and in a bank or banks as Approved by the Managers.

## ARTICLE 10: DISSOLUTION AND TERMINATION

10.1    Term and Dissolution. The Company shall be dissolved and terminated only by Approval of the Members.

10.2    Dissolution.

10.2.1 Liquidating Sale. Upon the dissolution and termination of the Company pursuant to Section 10.1, the Company shall immediately commence to wind up its affairs and the Managers shall proceed with reasonable promptness to liquidate the business of the Company in an orderly and businesslike manner ("Liquidating Sale") and to pay the Company's liabilities and obligations to creditors (including any Member who is a creditor), and all expenses incurred in the liquidation shall be paid, in the order of priority as further described in subsection 10.2.3.

10.2.2 Allocation of Profits and Losses from Liquidating Sale. The Profits and Losses recognized in connection with the Liquidating Sale shall be allocated to the Members in the manner set forth in Article 6.

10.2.3 Distribution of Liquidation Proceeds. Following the allocations of Profits and Losses required by subsection 10.2.2, the proceeds from liquidation shall be used or distributed, as the case may be, as follows:

10.2.3.1 First, to pay the expenses of liquidation and the debts owed by the Company;

10.2.3.2 Second, to create a Reserve as Approved by the Members for the payment of any contingent or unforeseen liabilities or obligations of the Company (and when, as Approved by the Members, the Reserve is no longer necessary, all cash remaining in the Reserve shall be distributed to the Members in accordance with subsection 10.2.3.3 below); and

10.2.3.3 Third, among the Members pro rata, to each Member in proportion to the positive balance in such Member's Capital Account until such Capital Account balance equals zero; and

10.2.3.4 Fourth, among the Members in the manner and order of priority set forth in Section 7.1 hereof.

10.3   Dissolution Procedures.

10.3.1   Winding Up.  During the period of winding up of the affairs of the Company, the Managers shall make all decisions relating to the conduct of any business or operations during the winding-up period and to the sale or other disposition of the Company Property.  Upon liquidation, unsold Company assets, if any, shall be valued by the Managers to determine the gain or loss which would have resulted if such property had been sold at such value, and the unrecognized Profits or Losses therefrom shall be allocated to the Members in accordance with subsection 10.2.2.  After such allocation, the assets of the Company shall be used or distributed, as the case may be, in the manner set forth in subsection 10.2.3.

10.3.2   Cash and Non-Cash Assets.  Upon liquidation, if the Company Property consists of both cash and non-cash assets, the cash shall be distributed first and the non-cash assets shall be distributed second, with the non-cash assets being distributed using their values, determined in the above set forth manner.  If the Company is to distribute non-cash assets to the Members, then, unless the Managers shall determine otherwise, such non-cash assets shall be distributed to the Members pro rata in accordance with their then respective rights to receive Distributions.  Except as provided in Section 10.4.2 hereof, no Member shall be obligated to repay any deficit balance in its Capital Account upon liquidation of the Company, or otherwise.

10.3.3   Books and Records.  All documents and records of the Company, or true copies of such documents or records, including without limitation, all financial records, vouchers, canceled checks and bank statements, shall be retained by MICHAEL MEADE upon termination of the Company; provided, however, that each Member shall have the right (at its sole cost and expense), during the normal business hours and upon reasonable notice to inspect and copy all such documents and records.

10.3.4   Dissolution.  After all assets of the Company have been distributed, it shall be deemed that the Company has been wound-up, dissolved and terminated, this Agreement shall terminate, and the President shall thereupon cause to be executed and filed in the manner provided by law the appropriate forms in the office of, and as prescribed by, the California Secretary of State.

10.4   Deficit Capital Accounts.

10.4.1   No General Obligation.  Except as provided in Section 10.4.2 below, each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, its Capital Contributions thereto, its Capital Account and its share of Profits or Losses, and shall have no recourse therefor (upon dissolution or otherwise) against any other Member.  Accordingly,

15

except as provided in Section 10.4.2 below, if following liquidation, any Member has any Adjusted Capital Account Deficit (after giving effect to all contributions, Distributions and allocations for all Taxable Years, including the year during which the liquidation occurs), then such Member shall have no obligation to make any Capital Contribution with respect to such Adjusted Capital Account Deficit, and such Adjusted Capital Account Deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

      10.4.2   Elective Obligation. Any Member may file with the Company an election to restore all or a portion of any Adjusted Capital Account Deficit, at any time during the term of the Company; provided, however, that such election will be effective only for the following Taxable Years: (i) the year in which the election is received; (ii) the immediately preceding year if the election is received prior to the filing deadline for the Company's tax returns (taking into account any and all extensions); and (iii) all years following such election. If either Member has an election in effect under this Section 10.4.2 and has an Adjusted Capital Account Deficit at the time of the liquidation of the Company or the liquidation of its Interest in the Company (after crediting allocations of income and debiting allocations of loss to its Capital Account), such Member shall be obligated to repay to the Company an amount equal to the lesser of (a) such Adjusted Capital Account Deficit, or (b) that portion of such Adjusted Capital Account Deficit which such Member elected to restore. This amount, upon the liquidation of the Company, shall be paid to the creditors of the Company or be distributed to the other Members in accordance with their positive Capital Account balances in accordance with Section 1.704-1(b)(2)(ii)(b)(3) of the Regulations. Payment of the amount required hereunder shall be made in immediately available funds no later than the end of the Taxable Year of the liquidation of the Member's Interest in the Company (or, if later, within ninety (90) days after the date of liquidation), or, alternatively, by the applicable Member's assumption of one or more liabilities of the Company, or portions thereof, on or before such date.

      10.4.2.1  Liquidation/Adjustments. For purposes of this Section 10.4.2, (a) the term "liquidation" is used in the sense of Section 1.704-1(b)(2)(ii)(g) of the Regulations, and (b) a liquidated Member's Capital Account shall be determined after taking into account all Capital Account adjustments for the Company's Taxable Year during which the liquidation occurs.

      10.4.2.2  Unconditional Obligation. The Members intend that this Section 10.4.2 shall constitute an unconditional obligation to restore deficits in Members' Capital Accounts as described in Section 1.704-1(b)(2)(ii)(b)(3) of the Regulations. The Regulations shall control in the case of any conflict between the Regulations and this Section 10.4.2.

    10.5   Waiver of Right to Seek Court Decree of Dissolution. The Members agree that irreparable damage would be done to the goodwill and reputation of the Company and unreasonable expense would be incurred if any Member brings an action in court to dissolve the Company. Accordingly, each Member accepts the provisions under this Agreement as its sole entitlement on termination of its relationship with the Company. Except as permitted in this Agreement, each Member hereby waives and renounces its right to seek a court decree of dissolution, or to seek the appointment by a court of a liquidator for the Company or to compel or seek to compel a partition of the Company Property, or any portion thereof.

## ARTICLE 11: GENERAL

11.1 <u>Notices</u>. Any notice, offer, or other communication required or desired to be given in writing to any party shall be deemed given to (or received by such party) (i) upon delivery, if personally delivered to that party, or (ii) if sent by a nationally recognized courier service, such as FedEx, on the date indicated in the courier's records as the date of (first attempted) delivery to the address of such party set forth below. Any party may change its address for notice purposes by giving written notice to the Company and the Members.

11.2 <u>Governing Law</u>. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to any principle or doctrine regarding conflict of laws.

11.3 <u>Waiver</u>. No Member's consent to or waiver of, whether express or implied, any breach or default by another Member hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Member of the same or any other obligations of such Member hereunder. Failure on the part of any Member to complain of any act or failure to act on the part of another Member or to declare such other Member in default or to pursue any remedies herein provided, irrespective of how long such failure continues, shall not constitute a waiver by such Member of its rights hereunder.

11.4 <u>Severability</u>. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and such provisions shall be enforced to the greatest extent permitted by law.

11.5 <u>Arbitration</u>. Any controversy or claim arising out of or relating to this Agreement and which could be litigated in a court of law shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. Such arbitration shall take place in Riverside, California and shall be governed by the laws of the State of California, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration. The prevailing party shall be entitled to an award of reasonable attorneys' and expert witness fees and costs fees. The award shall be in writing, shall be signed by the arbitrator, and shall include a statement setting forth the findings of fact and conclusions of law supporting the disposition of any claim, not to exceed a page limit determined by the parties to such dispute.

11.6 <u>Further Assurances</u>. Each party agrees to execute such other and further instruments and documents as may be necessary or proper in order to complete the transactions contemplated by this Agreement.

11.7 <u>Computation of Time</u>. If any period of time or date specified in this Agreement would otherwise end or occur on a Saturday, Sunday or legal holiday, it shall be deemed extended to end on the next day following which is not a Saturday, Sunday or legal holiday.

11.8   <u>Binding Agreement</u>.  Subject to the restrictions on transfer and encumbrances set forth herein, this Agreement shall inure to the benefit of and be binding upon the undersigned Members and their respective heirs and permitted successors and assigns.  Whenever in this Agreement a reference to any party or Member is made, such reference shall be deemed to include a reference to the permitted successors and permitted assigns of such Member.

11.9   <u>Terminology</u>.  All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa.  Titles of articles, sections and subsections are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subsections shall refer to the corresponding article, section or subsection of this Agreement unless specific reference is made to such article, section or subsection of another document or instrument.  The use of the term "Section" in this Agreement shall be deemed to refer to "subsections" whenever the context so requires, and vice versa.

11.10   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.11   <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the Company, and all prior understandings, oral or in writing, by the parties hereto with respect to the Company are superseded by this Agreement.  No variations, modifications, supplements, waivers or changes herein or hereof shall be binding upon any party hereto unless set forth in a document duly executed by or on behalf of such party.

IN WITNESS WHEREOF, the Members have executed and delivered this Operating Agreement as of the Effective Date hereof.

Michael Meade

Address:
72100 Magnesia Falls Drive, Suite 2
Rancho Mirage, CA 92270

Michael King

Address:

18

GIA Investments, LLC
a Delaware limited liability company


By:_____
Anastasia Bukharoba, its Managing Member

Address:
_____
_____


## EXHIBIT "A"

## INITIAL CAPITAL CONTRIBUTIONS


| Member | Contribution |
|---|---|
| GIA Investments, LLC. | $3,000,000 |
| MICHAEL MEADE | $0 |
| MICHAEL KING | $0 |


**Capital Investment Schedule for GIA Investments, LLC.:**

GIA Investments agrees to adhere to the following funding schedule for their allocated shares. Failure to invest by said dates, with a 10-day grace period, may result in GIA losing their allocated shares in this company, at the sole discretion of the remaining partners.

| Investment Amount | Due Date |
|---|---|
| $500,000 USD | May 10, 2018 |
| $500,000 USD | June 15, 2018 |
| $500,000 USD | July 15, 2018 |
| $750,000 USD | August 15, 2018 |
| $750,000 USD | September 15, 2018 |
| **$3,000,000 USD** | |

19

Kibby, to provide services to the Company;

- The issuance of the $8.5M Note;

- The CKE Admin Agreement, CKE IP License Agreement and CKE Equipment Leasing Agreement with CKE, the JME Admin Agreement, JME IP License Agreement and JME Equipment Leasing Agreement with its subsidiary JME (as each term is defined in *"KG LLC Company Information-Material Contracts"* in Annex A hereto) and certain cooperative corporations controlled by officers or employees of the Company prior to 2018; and

- Obtaining payroll services from Desert Payroll Solutions, LLC, which is owned and managed by Michael King and Lauri Kibby.

*Competition*

The Company faces intense competition from other companies, some of which have longer operating histories and more financial resources and experience than the Company. In recent years, several large multi-state companies have emerged which have strategically purchased or assumed control of multiple

**Secretary of State**
Statement of No Change
(Limited Liability Company)

**LLC-12NC**

21-A26105

# FILED

In the office of the Secretary of State
of the State of California

JAN 14, 2021

*This Space For Office Use Only*

**IMPORTANT — Read instructions before completing this form. This form may be used only if a complete Statement of Information has been filed previously and there has been no change.**

**Filing Fee – $20.00**

**Copy Fee –** $1.00;
Certification Fee - $5.00 plus copy fee

1. **Limited Liability Company Name** (Enter the **exact** name of the LLC as it is recorded with the California Secretary of State. Note: If you registered in California using an alternate name, see instructions.)

DESERT PAYROLL SOLUTIONS, LLC

| 2. **12-Digit Secretary of State File Number** | 3. **State, Foreign Country or Place of Organization** (only if formed outside of California) |
|---|---|
| 201626710334 | CALIFORNIA |

**No Change Statement** (Do not alter the No Change Statement. If there has been any change, please complete a Statement of Information (Form LLC-12).)

*There has been no change in any of the information contained in the previous complete Statement of Information filed with the California Secretary of State.*

5. The information contained herein is true and correct.

| 01/14/2021 | SHAUNA WATKINS | PREPARER | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document, enter the name of a person or company and the mailing address. This information will become public when filed. (SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

!dress:

City/State/Zip:

# DESERT PAYROLL SOLUTIONS, LLC

**Company Number** 201626710334

**Status** Active

**Incorporation Date** 23 September 2016 (over 4 years ago)

**Company Type** DOMESTIC

**Jurisdiction** California (US)

**Registered Address** 1801 E TAHQUITZ CANYON WAY SUITE 201
PALM SPRINGS CA 92262

United States

**Agent Name** GREG BARTON

**Agent Address** 787 N PALM CANYON DRIVE PALM SPRINGS CA 92262

**Directors / Officers** GREG BARTON, agent

**Registry Page** https://businesssearch.sos.ca.gov/CBS...

# SBA Policy Notice

| | | | |
|---|---|---|---|
| **TO:** | All SBA Employees and SBA Lenders | **CONTROL NO.:** | 5000-17057 |
| **SUBJECT**: | Revised Guidance on Credit Elsewhere and Other Provisions in SOP 50 10 5(J) | **EFFECTIVE:** | April 3, 2018 |

SBA's Standard Operating Procedure (SOP) 50 10 5(J), *Lender and Development Company Loan Programs*, became effective on January 1, 2018.  Based on feedback received from SBA Lenders since the SOP was issued, SBA is issuing this Policy Notice to address lender concerns while SBA continues to review these issues.  This Policy Notice revises the guidance on credit elsewhere for 7(a) and 504 loans and the minimum equity requirements for 7(a) loans involving change of ownership transactions between existing owners.  In addition, SBA is issuing guidance regarding businesses that are involved with cannabis and their eligibility for SBA financial assistance. For consistency with this new guidance, SBA is also clarifying the leasing policies involving such businesses.  Finally, SBA is reducing the minimum monitoring requirements for Working Capital CAPLines.

These changes are effective immediately and will control over any conflicting provisions in SOP 50 10 5(J).  SBA will update the SOP after it has concluded its review of these issues and determined whether additional clarifications are needed.

### *Subpart B - 7(a) Loan Program*

Demonstrate the Need for Desired Credit (Credit not available elsewhere) (13 CFR § 120.101).  Chapter 2, Paragraph II.E.2.(page 97).  This SOP paragraph currently provides that lenders must include in the credit memorandum a determination as to the availability of credit from non-Federal sources related to the Applicant, including but not limited to the liquidity of owners of 10% or more of the equity of the Applicant.  Based on feedback from Lenders and Certified Development Companies (CDCs), SBA is increasing the minimum percentage ownership at which owners are subject to personal liquidity consideration from 10% to 20%.  As a reminder, the liquidity of the owner includes the liquid assets of the owner's spouse and any minor children.

Businesses Engaged in any Illegal Activity (13 CFR § 120.110(h)).  Chapter 2, Paragraph III.A.8. (Page 101).  This SOP paragraph currently provides that businesses engaged in any activity that is illegal under federal, state or local law are ineligible for SBA financial assistance.  SBA is issuing additional guidance to specifically address businesses that derive revenue from marijuana-related activities or that support the end-use of marijuana.  The following applies to both 7(a) and 504 loans:

---

SBA Form 1353.1 (12-93) MS Word Edition; previous editions obsolete
Must be accompanied by SBA Form 58


Federal Recycling Program      Printed on Recycled Paper

Marijuana-Related Businesses:

1.  Because federal law prohibits the distribution and sale of marijuana, financial transactions involving a marijuana-related business would generally involve funds derived from illegal activity.  Therefore, businesses that derive revenue from marijuana-related activities or that support the end-use of marijuana may be ineligible for SBA financial assistance.

2.  Whether a business is eligible is determined by the nature of the business's specific operations.  The following businesses are ineligible:

> (a) "Direct Marijuana Business" -- a business that grows, produces, processes, distributes, or sells marijuana or marijuana products, edibles, or derivatives, regardless of the amount of such activity.  This applies to personal use and medical use even if the business is legal under local or state law where the applicant business is or will be located.

> (b) "Indirect Marijuana Business" -- a business that derived any of its gross revenue for the previous year (or, if a start-up, projects to derive any of its gross revenue for the next year) from sales to Direct Marijuana Businesses of products or services that could reasonably be determined to support the use, growth, enhancement or other development of marijuana.  Examples include businesses that provide testing services, or sell grow lights or hydroponic equipment, to one or more Direct Marijuana Businesses.   In addition, businesses that sell smoking devices, pipes, bongs, inhalants, or other products that may be used in connection with marijuana are ineligible if the products are primarily intended or designed for such use or if the business markets the products for such use.

> (c)  Hemp-Related Business" -- a business that grows, produces, processes, distributes or sells products purportedly made from "hemp" is ineligible unless the business can demonstrate that its business activities and products are legal under federal and state law.  Examples of legal hemp products include paper, clothing and rope.

Leasing Part of a Building Acquired with Loan Proceeds (13 CFR § 120.131).  Chapter 2, Paragraph V.F.1.g) (page 131).  Currently, this SOP paragraph provides that, during the life of an SBA-guaranteed loan, the borrower may not lease space to a business that is engaged in any activity that is illegal under federal, state or local law.  For consistency with the changes identified above regarding marijuana-related businesses, Lenders are advised that, during the life of the SBA-guaranteed loan, a borrower may not lease space to the ineligible businesses described above because the collateral could be subject to seizure and because payments on the SBA loan would be derived from illegal activity.  If a borrower does lease to an ineligible marijuana-related business, SBA District Counsel should be consulted to determine what action should be taken.

---

**PAGE 2 of 4**                                    **EXPIRES: 4/01/2019**

SBA Form 1353.1 (12-93) MS Word Edition; previous editions obsolete
Must be accompanied by SBA Form 58

Equity requirements (13 CFR § 120.150(f)).  Chapter 4, Paragraph I.C.1.b)ii.(b)(ii) (page 174).
This SOP paragraph sets forth the minimum equity injection requirements for a change of
ownership transaction between existing owners ("partner buyout") for 7(a) loans greater than
$350,000 and loans of $350,000 or less that do not meet SBA's minimum credit score
requirements for 7(a) Small Loans.  Currently, the minimum equity required for such
transactions is a pro-forma equity position after the change of ownership of at least ten (10)
percent of the total assets, or the remaining owner(s) must provide an additional equity injection
that will result in at least a 10 percent net worth (maximum pro forma debt-to-worth ratio of 9:1).

Effective with the issuance of this Policy Notice, in order for a 7(a) loan to finance greater than
90% of the purchase price of a partner buyout:  (1) the remaining owner(s) must certify that
he/she has been actively participating in the business operation and held the same ownership
interest in the business for at least the past 24 months (Lender must include in the credit
memorandum confirmation that the borrower has made the required certification and retain such
certification in the loan file); and (2) the business balance sheets for the most recent completed
fiscal year and current quarter must reflect a debt-to-worth ratio of no greater than 9:1 prior to
the change in ownership.  In the event the Lender is unable to document that both (1) and (2)
above are satisfied, the remaining owner(s) must contribute cash in the amount of at least 10% of
the purchase price of the business, as reflected in the purchase and sale agreement.

Equity Requirements for 7(a) Small Loans.  Chapter 4, Paragraph I.C.2.c)ii.(b)(ii) (page 178).
For 7(a) loans of $350,000 or less to finance a partner buyout (excluding SBA Express, Export
Express, CAPLine and EWCP), Lenders must follow the revised minimum equity requirements
identified immediately above.

Working Capital CAPLines – Monitoring.  Chapter 7, Paragraph IV.K.4.a)ii.(i)iii. (page 245).
This SOP paragraph currently sets forth the minimum monitoring requirements for Working
Capital CAPLines.  The semi-annual monitoring requirement was included in the most recent
version of the SOP in error.  Lenders must comply with the monthly, quarterly and annual
monitoring requirements set forth in this SOP paragraph, but may disregard the semi-annual
monitoring requirement.


### *Subpart C - 504 Loan Program*

Demonstrate the Need for Desired Credit (Credit not Available Elsewhere) (13 CFR § 120.101).
Chapter 2, Paragraph II.E.2. (page 275).  This SOP paragraph currently provides that CDCs must
include in the credit memorandum a determination as to the availability of credit from non-
Federal sources related to the Applicant, including but not limited to the liquidity of owners of
10% or more of the equity of the Applicant.  As stated above with respect to Subpart B, based on
feedback from Lenders and CDCs, SBA is increasing the minimum percentage ownership at
which owners are subject to personal liquidity consideration from 10% to 20%.  As a reminder,
the liquidity of the owner includes the liquid assets of the owner's spouse and any minor
children.

---



<u>Businesses Engaged in any Illegal Activity (13 CFR § 120.110 (h)).  Chapter 2, Paragraph III.A.8. (page 279).</u>

CDCs must follow the guidance identified above regarding Marijuana-Related Businesses.

<u>Leasing Part of a Building Acquired with Loan Proceeds (13 CFR § 120.131).  Chapter 2, Paragraph IV.J.2.a)vii. (page 307).</u>

CDCs must follow the guidance identified above regarding a borrower leasing space to another business during the life of an SBA-guaranteed loan.

## ***Questions***

If you have questions or need further assistance, please contact either Robert Carpenter, Acting 7(a) Policy & Program Chief at robert.carpenter@sba.gov or Linda Reilly, 504 Policy & Program Chief at linda.reilly@sba.gov.

_____

Linda E. McMahon
Administrator

federalpay.org/paycheck-protection-program/desert-payroll-solutions-llc-palm-springs-ca

Maps  CERE-UNI.NE - Ce...  You searched for...  del real  ( 3/3)Fwd: Michae...

federalpay   Paycheck Protection Program Data   CA   Desert Payroll Solutions LLC

Home

PPP Loan Data [NEW]

**General Schedule**

GS Pay Scale

GS Jobs

GS Localities

GS Raise History

**GS Pay Calculator**

**Federal Wage System**

FWS Pay Scale

FWS Jobs

**FWS Pay Calculator**

**Law Enforcement Payscale**

LEO Pay Scale

LEO Agencies



🏛 **PPP Loan Data — Desert Payroll Solutions LLC,** *Palm Springs, CA*

☆ CA ☆

# Desert Payroll Solutions LLC

## Entity: Limited Liability Company (LLC)

## Industry: Payroll Services

## Location: Palm Springs, CA

🐦 Tweet This • Search All PPP Data

Desert Payroll Solutions LLC is a limited liability company (LLC) located at 1111 E Tahquitz Canyon Way, Suite 208 in Palm Springs, California that received a Coronavirus-related PPP loan from the SBA of **$1,370,560.00** in June, 2020.

The company has reported itself as a White owned business, and employed at least 185 people during the applicable loan period.

*Non-Arms-Length Transactions*

The Company has engaged in several transactions with related parties, the terms of which may not be as favorable to the Company as would be available from an unrelated third party, including without limitation:

- Engaging Duard Ventures, LLC, which is owned and managed by Michael King and Lauri Kibby, to provide services to the Company;
- The issuance of the $8.5M Note;
- The CKE Admin Agreement, CKE IP License Agreement and CKE Equipment Leasing Agreement with CKE, the JME Admin Agreement, JME IP License Agreement and JME Equipment Leasing Agreement with its subsidiary JME (as each term is defined in "*KG LLC Company Information-Material Contracts*" in Annex A hereto) and certain cooperative corporations controlled by officers or employees of the Company prior to 2018; and
- Obtaining payroll services from Desert Payroll Solutions, LLC, which is owned and managed by Michael King and Lauri Kibby.

*Competition*

The Company faces intense competition from other companies, some of which have longer operating histories and more financial resources and experience than the Company. In recent years, several large multi-state companies have emerged which have strategically purchased or assumed control of multiple

31

# EXECUTIVE COMPENSATION

**Summary**

This section discusses the compensation paid by KG LLC to its executive officers and managers, and to be paid by KGI to its executive officers and directors following the Merger, for the fiscal years ending December 31, 2019 and beginning January 1, 2019, respectively.

The following table sets forth a summary of all compensation paid to managers and executive officers of KG LLC, and the Predecessor LLCs, for the fiscal years ended December 31, 2018 and 2017.

| Name and Principal Position | Year(1) | Salary | Option Awards | Total |
|---|---|---|---|---|
| Michael King, Chief Executive Officer(2) | 2018 | $664,461(3) | $2,758,789.98 | $3,423,250.98 |
| | 2017 | $290,000(4) | $0.00 | $290,000 |
| Charles Kieley, Chief Operating Officer | 2018 | $466,645(5) | $270,991.38 | $737,636.38 |
| | 2017 | $203,205(6) | $0.00 | $203,205 |
| Lauri Kibby, Chief Financial Officer(2) | 2018 | $564,654(7) | $1,225,888.63 | $1,790,542.63 |
| | 2017 | $290,000(8) | $0.00 | $290,000 |

(1)    This column sets forth the fiscal years covered by the table. All information provided for the fiscal years ended December 31, 2018 and 2017 are on a combined basis for KG LLC and the Predecessor LLCs.

(2)    This table does not include (i) any fees paid by KG LLC to Desert Payroll Solutions, LLC, a California limited liability company ("**Desert Payroll**") operated, and a majority of which is owned by, Mr. King and Mrs. Kibby, in connection with services provided by Desert Payroll to KG LLC and the Predecessor LLCs; (ii) any interest paid by KG LLC pursuant to the $8.5M Note to a limited liability company of which Mr. King, an executive officer and manager of KG LLC and an executive officer and director of KGI, is the managing member.; and (iii) any amounts paid by KG LLC to Mclane, in which Mr. King is a manager and owns 25% of the membership interests thereof, which in-turn owns 66% of the 19533 Mclane Facility.

(3)    Mr. King received compensation equal to $664,461, which is comprised of (i) $135,000 of the amounts

paid to Duard Ventures, LLC, in connection with services provided by Duard Ventures, LLC to KG LLC and the Predecessor LLCs; (ii) $100,000 in connection with the design and build out of a facility; and (iii) $429,461, in connection with Mr. King's annual salary pursuant to his employment agreement for the period in which such agreement was in effect (see "Executive Compensation-Employment Agreements").

(4)    Represents $290,000 of the amounts paid to Duard Ventures, LLC in connection with services provided to KG LLC and the Predecessor LLCs.

(5)    Mr. Kieley received compensation equal to $466,645, which is comprised of (i) $100,000 in connection with the design and build out of a facility; and (ii) $366,645, which is comprised of Mr. Kieley's annual salary, part of which is pursuant to his employment agreement for the period in which such agreement was in effect (see "Executive Compensation-Employment Agreements").

(6)    Mr. Kieley received compensation equal to $203,205, which is comprised of (i) $143,205, in connection with Mr. Kieley's annual salary as an employee of KG LLC and certain Predecessor LLCs for the period in which such agreement was in effect; and (ii) $60,000, in connection with consulting fees paid to Mr. Kieley by two Predecessor LLCs in connection with services provided thereto.

(7)    Ms. Kibby received compensation equal to $564,654, which is comprised of (i) $135,000 paid to Duard Ventures, LLC, in connection with services provided by Duard Ventures, LLC to KG LLC and the Predecessor LLCs; and (ii) $429,654, in connection with Ms. Kibby's annual salary pursuant to her employment agreement for the period in which such agreement was in effect (see "Executive Compensation-Employment Agreements").

(8)    Represents $290,000 of the amounts paid to Duard Ventures, LLC in connection with services provided to KG LLC and the Predecessor LLCs.

**Executive Officers Compensation Going Forward**

Following the consummation of the Merger, KG LLC and KGI expect that Michael King, will remain as KGI's Chief Executive Officer, Charles Kieley will remain as KGI's Chief Operating Officer and Lauri Kibby will remain as KGI's Chief Financial Officer, Treasurer and Secretary. Each of such persons will continue to be entitled to receive an annual salary of $600,000 pursuant to their respective employment agreements and will serve as directors without compensation. See Executive Compensation Discussion and Analysis-Employment Agreements.

**Employment Agreements**

In June 2018, KG LLC entered into an employment agreement, as amended, with Michael King, its Chief Executive Officer, which provides for: (a) an annual salary of $600,000; (b) an initial term of 5 years, with up to two additional one year renewal terms, (c) options to purchase certain equity of KG LLC; and (d) if such person's employment with KG LLC is terminated without cause or voluntarily by the executive with good reason, then KG LLC shall pay to the executive compensation for one calendar year from the date of termination, including accrued but unused vacation and sick time, and provide health insurance benefits for the same period of time. In the event of

A-29

a Change of Control (as defined in such employment agreement), such employee shall have the option, exercisable within 6 months of such employee becoming aware of such event, to immediately receive as a lump sum payment an amount equal to 3 times the average of the total annual compensation paid by KG LLC to Employee, with respect to the five fiscal years of KG LLC prior to such Change of Control, minus $1.00.

In June 2018, KG LLC entered into an employment agreement, as amended, with Charles Kieley, its Chief Operating Officer, which provides for: (a) an annual salary of $600,000; (b) an initial term of 5 years, with up to two additional one year renewal terms, (c) options to purchase certain equity of KG LLC; and (d) if such person's employment with KG LLC is terminated without cause or voluntarily by the executive with good reason, then KG LLC shall pay to the executive compensation for one calendar year from the date of termination, including accrued but unused vacation and sick time, and provide health insurance benefits for the same period of time. In the event of a Change of Control (as defined in such employment agreement), such employee shall have the option, exercisable within 6 months of such employee becoming aware of such event, to immediately receive as a lump sum payment an amount equal to 3 times the average of the total annual compensation paid by KG LLC to Employee, with respect to the five fiscal years of KG LLC prior to such Change of Control, minus $1.00.

In June 2018, KG LLC entered into an employment agreement, as amended, with Lauri Kibby, its Chief Financial Officer, which provides for: (a) an annual salary of $600,000; (b) an initial term of 5 years, with up to two additional one year renewal terms, (c) options to purchase certain equity of KG LLC; and (d) if such person's employment with KG LLC is terminated without cause or voluntarily by the executive with good reason, then KG LLC shall pay to the executive compensation for one calendar year from the date of termination, including accrued but unused vacation and sick time, and provide health insurance benefits for the same period of time. In the event of a Change of Control (as defined in such employment agreement), such employee shall have the option, exercisable within 6 months of such employee becoming aware of such event, to immediately receive as a lump sum payment an amount equal to 3 times the average of the total annual compensation paid by KG LLC to Employee, with respect to the five fiscal years of KG LLC prior to such Change of Control, minus $1.00.

**From:** **Michael King** nycregroup@icloud.com
**Subject:** Fwd: Wells Fargo Direct Pay Billing Summary
**Date:** March 5, 2018 at 10:29 AM
**To:** Paul King paul@cannafornia.co

FYI - may want to update your email

Best,

Michael King
+1 347 996 7844

Begin forwarded message:

**From:** Wells Fargo Online <alerts@notify.wellsfargo.com>
**Date:** March 5, 2018 at 9:44:05 AM EST
**To:** nycregroup@icloud.com
**Subject: Wells Fargo Direct Pay Billing Summary**

                                                    **wellsfargo.com**

# Your Direct Pay billing summary is now available online

The new billing summary for your Direct Pay service is now available to view online.

| | |
|---|---|
| **Company or Customer Name:** | KANNAKING, LLC Accounts |
| **Period:** | 01/24/2018-02/23/2018 |
| **Billing Account:** | XXXXXX5254 |

To access your billing summary, sign on and go to the **Message Center**.

If you have questions, please contact us at 1-888-245-8454, Monday through Friday, 5 am to 8 pm Pacific Time.

**wellsfargo.com** | Fraud Information Center

**Please do not reply to this automated email.** Sign on to send a secure email.

939c0c76-06c0-4091-8819-0cedacb7cc2f

**From: Michael King** michael@kingsgardeninc.com 
**Subject:** Screenshot 2018-06-29 at 10.50.58 PM
**Date:** June 30, 2018 at 1:51 AM
**To:** paul@cannafornia.co

You may want to call Amex to take my number off your cc Alerts. Just started showing up.



# Earlier Today







Respectfully,



**Michael King**
Founder
Director of Business Development

+1.347.996.7844
Michael@KingsGardenInc.com

**From:** **Michael King** michael@duardventures.com
**Subject:** amex 2
**Date:** April 14, 2018 at 12:15 PM
**To:** Paul King paul@cannafornia.co

your new password is: paulking1

login is: mbuyanovsky1

--
Best,



**Michael King**
Principal

+1 347 996 7844
Michael@DuardVentures.com

DuardVentures.com



**From:** American Express AmericanExpress@welcome.aexp.com
**Subject:** We will deactivate your old Card soon
**Date:** May 19, 2018 at 3:49 AM
**To:** paul@cannafornia.co



Hello, PAUL KING

Account Ending:
41026

**Please provide this critical information to your Additional Card Member MARIANNA KING.**

We recently mailed you a new Card for your account ending in 41026. As a security measure, we will deactivate your old Card 15 days from today.

**Please note, your attention is required to avoid any interruptions when using your Card.**

1. **Confirm you have received your new Card.** Once confirmed you can begin using it immediately.

   Ready to confirm?

   — Yes, confirm now

   Or, confirm by:

   - Using the Amex mobile app
   - Following the instructions that appear on the sticker on the front of your Card

2. **Destroy your old Card.** It will no longer be valid.

**You don't need to update your Card information with merchants**
For your convenience, we have not changed your account number. That means you don't need to update your Card information with merchants who automatically bill to your Card, unless you are specifically asked to do so. Since your Card does include a new security code and expiration date though, you'll need to provide these details if they are requested during future transactions.

**We're here for you**
If your Card has not arrived, or if have any questions, you can reach us anytime by contacting us via customer service. We're always here to help you.

Thank you for your continued Membership.

American Express Customer Care

# RESOLVE FRAUD CONCERNS INSTANTLY
## Receive alerts and verify in seconds when we detect unusual activity.







Privacy Statement            |            Update Your Email

Your account information is included above to help you recognize this as a customer care e-mail from American Express. To learn more about e-mail security or report a suspicious e-mail, please visit us at americanexpress.com/phishing. We kindly ask you not to reply to this e-mail but instead contact us via Customer Care.

© 2018 American Express. All rights reserved.

ALEENICNCHP0056

**MICHAEL KING**
Card Ending 9-42016

| Date | Description | | Foreign Spend | Amount |
|---|---|---|---|---|
| 04/17/18 | EUROPA CAFE - TIMES SQUAR 000000001 212397300 | NEW YORK | NY | $65.00 |
| 04/18/18 | SAKS BROOKFIELD 655 DEPARTMENT STORE | NEW YORK | NY | $1,954.31 |
| 04/18/18 | PJ CLARKES ON THE 54292980313752O 2122851500 | NEW YORK | NY | $200.00 |
| 04/18/18 | 9/11 MEMORIAL 0000 212-312-8800 | NEW YORK | NY | $117.00 |

Continued on next page



Account Ending 9-43006

**Platinum Card®**
PAUL KING
Closing Date 05/16/18

**Detail Continued**

| Date | Description | | Foreign Spend | Amount |
|---|---|---|---|---|
| 04/19/18 | TAO DOWNTOWN 212-888-2724 | NEW YORK | NY | $765.57 |
| 04/19/18 | SAKS NEW YORK 601 DEPARTMENT STORE | NEW YORK | NY | $1,246.62 |
| 04/19/18 | LOUIS VUITTON #92 92 LUGGAGE/LEATHER GOODS | NEW YORK | NY | $5,917.15 |
| 04/19/18 | DUANE READE #14117 00014117 | NEW YORK | NY | $ |

**American Express**
**Transaction Report**
All Dates

### Marianna King

| Date | Type | Vendor | Vendor | | Account | Amount | Balance |
|---|---|---|---|---|---|---|---|
| 12/15/2017 | Expense | Louis Vuitton | Louis Vuitton | No | American Express | 302.74 | 302.74 |
| 12/18/2017 | Expense | MARCO21 EL REAL | Laura Marco Mission Hills | No | American Express | 84.25 | 286.97 |
| 12/20/2017 | Expense | Macy's | Macy's | No | American Express | 446.99 | 803.96 |
| 12/21/2017 | Expense | Bloomingdales | Bloomingdales | No | American Express | 497.78 | 1,301.74 |
| 12/21/2017 | Expense | Neiprese USA Inc | Neiprese USA Inc | No | American Express | 54.00 | 1,355.74 |
| 12/22/2017 | Expense | Jeffrey Ann Salon | Jeffrey Ann Salon | No | American Express | 56.00 | 1,411.74 |
| 01/02/2018 | Expense | Kids Amour Caasco | Kids Amour Caasco | No | American Express | 273.82 | 1,685.56 |
| 01/03/2018 | Expense | Barnes & Noble | Barnes & Noble | No | American Express | 13.52 | 1,703.08 |

### Marianna King

| Date | Type | Vendor | Vendor | | Account | Amount | Balance |
|---|---|---|---|---|---|---|---|
| 12/15/2017 | Expense | Yoox Group | Yoox Group | No | American Express | 1,012.85 | 1,012.85 |
| 12/16/2017 | Expense | Valerg Bazh USA | Valerg Bazh USA | No | American Express | 253.65 | 1,266.50 |
| 12/18/2017 | Expense | Chanel Boutique | Chanel Boutique | No | American Express | 10,440.00 | 11,706.50 |
| 12/20/2017 | Expense | Nike.com | Nike.com | No | American Express | 522.00 | 12,228.50 |
| 12/20/2017 | Expense | Chaparral Motorsports | Chaparral Motorsports | No | American Express | 11,000.00 | 23,228.50 |
| 01/12/2018 | Expense | Gucci America | Gucci America | No | American Express | 1,623.75 | 24,852.25 |
| 01/30/2018 | Credit Card Credit | Frances Fisher School C/C Credit | Frances Fisher School C/C Credit | No | American Express | 100.00 | 24,722.25 |
| 02/06/2018 | Expense | Gara Collery | Gara Collery | No | American Express | 300.58 | 25,032.83 |
| 02/11/2018 | Expense | Strong Lift Wear | Strong Lift Wear | No | American Express | 212.00 | 25,214.83 |
| 02/11/2018 | Expense | Under Armour Inc | Under Armour Inc | No | American Express | 360.68 | 25,575.51 |
| 02/15/2018 | Credit Card Credit | Under Armour Inc | Under Armour Inc | No | American Express | 324.32 | 25,900.13 |
| 03/15/2018 | Expense | Michael King Credit Card Refund from Bodybuilding.com | Michael King Credit Card Refund Strong Lift Wear | No | American Express | 63.80 | 25,836.33 |
| 03/15/2018 | Expense | Louis Vuitton | Louis Vuitton | No | American Express | 1,107.90 | 26,944.23 |
| 03/22/2018 | Expense | American Express | American Express | No | American Express | 212.00 | 26,732.23 |
| 03/16/2018 | Expense | HHDT | HHDT | No | American Express | 4,543.00 | 31,275.23 |
| 03/15/2018 | Expense | Oceania Cruises | Oceania Cruises | No | American Express | 14,123.00 | 45,398.23 |
| 03/29/2018 | Expense | Oceania Cruises | Oceania Cruises | No | American Express | 19,345.00 | 65,145.23 |
| 03/29/2018 | Expense | Oceania Cruises | Oceania Cruises | No | American Express | 2,331.90 | 67,477.23 |
| 04/18/2018 | Expense | Saks | Saks | No | American Express | 1,954.31 | 69,431.54 |
| 04/18/2018 | Expense | Saks Fifth Ave | Saks | No | American Express | 1,246.62 | 70,678.16 |
| 04/19/2018 | Expense | Saks New York | Saks New York | No | American Express | 5,917.15 | 76,595.31 |
| 04/20/2018 | Expense | Louis Vuitton | Louis Vuitton | No | American Express | 2,550.00 | 79,095.31 |
| 04/20/2018 | Credit Card Credit | Gvenchy Corporation | Gvenchy Corporation | No | American Express | 53.00 | 78,148.31 |
| 04/23/2018 | Expense | Gotham City Barber Shop | Gotham City Barber Shop | No | American Express | 97.98 | 79,052.33 |
| 04/21/2018 | Credit Card Credit | Hudson News Arava Refund | Hudson News Arava Refund | No | American Express | 165.00 | 79,218.33 |
| 04/22/2018 | Expense | Duty Free Americas | Duty Free Americas | No | American Express | 884.84 | 80,101.17 |
| 05/16/2018 | Expense | Louis Vuitton | Louis Vuitton | No | American Express | 16.50 | 80,126.67 |
| 05/19/2018 | Expense | 246 Springs Street NY Gift Shop | 246 Springs Street NY | No | American Express | 3,096.06 | 83,227.73 |
| 05/22/2018 | Expense | 246 Springs Street NY | 246 Springs Street NY | No | American Express | 6.71 | 83,236.44 |
| 05/24/2018 | Expense | 246 Springs Street NY | 246 Springs Street NY | No | American Express | 1,446.00 | 84,682.44 |
| 07/03/2018 | Credit Card Credit | Evolca Racing | Evolca Racing | No | American Express | 3,155.31 | 91,547.13 |
| 07/13/2018 | Credit Card Credit | Michael King Credit from HDMT NY | American Express | No | American Express | 3,631.25 | 77,965.88 |
| 08/18/2018 | Credit Card Credit | Michael King-payable Payment to American Express | American Express | No | American Express | 8,593.80 | 99,546.68 |
| 08/25/2018 | Expense | Vivid Seats | Vivid Seats | No | American Express | 20,452.14 | 106,568.52 |
| | | Norwegian Bliss Cruise | Norwegian Bliss | No | American Express | | |

### Michael King

| Date | Type | Vendor | Vendor | | Account | Amount | Balance |
|---|---|---|---|---|---|---|---|
| 12/16/2017 | Expense | Restaurant | Blue Smoke Sushi Lounge | No | American Express | 104.43 | 104.43 |
| 12/18/2017 | Expense | Gas Station | Exxon Mobil | No | American Express | 56.94 | 171.37 |
| 12/17/2017 | Expense | Jack in the Box | Jack in the Box | No | American Express | 12.46 | 183.83 |
| 12/19/2017 | Expense | Gas Station | Chevron | No | American Express | 67.98 | 251.81 |
| 12/20/2017 | Expense | Bed Bath & Beyond | Bed Bath & Beyond | No | American Express | 387.89 | 639.70 |
| 12/21/2017 | Expense | iTunes | iTUNES | No | American Express | 40.98 | 680.68 |
| 12/21/2017 | Expense | Whole Foods | Whole Foods | No | American Express | 93.73 | 774.41 |
| 12/21/2017 | Expense | The Container Store | The Container Store | No | American Express | 61.35 | 835.76 |
| 12/22/2017 | Expense | Starbucks | Starbucks | No | American Express | 7.70 | 843.46 |
| 12/22/2017 | Expense | Royal Gourmet | Royal Gourmet | No | American Express | 189.61 | 1,033.07 |

| Date | Type | Name | Cleared | Payee/Memo | Account | Amount | Balance |
|---|---|---|---|---|---|---|---|
| 12/23/2017 | Expense | ABC Financial Services | No | ABC Financial Services | American Express | 9.95 | 1,043.02 |
| 12/23/2017 | Credit Card Credit | American Express | No | Michael King Payment to American Express Card | American Express | -20,000.00 | 19,956.98 |
| 12/23/2017 | Expense | Trader Joe's | No | Trader Joe's | American Express | 94.38 | 18,952.60 |
| 12/23/2017 | Expense | Whole Foods | No | Whole Foods | American Express | 230.84 | 18,631.76 |
| 12/22/2017 | Expense | Whole Foods | No | Whole Foods | American Express | 24.45 | 18,607.31 |
| 12/25/2017 | Expense | Bed Bath & Beyond | No | Bed Bath & Beyond | American Express | 34.47 | 18,572.84 |
| 12/23/2017 | Expense | In & Out Burger | No | In & Out Burger | American Express | 16.69 | 18,556.15 |
| 12/24/2017 | Expense | Spotify | No | Spotify | American Express | 0.98 | 18,555.18 |
| 12/25/2017 | Expense | Equifax | No | Equifax | American Express | 29.95 | 18,525.23 |
| 12/25/2017 | Expense | Equifax | No | Equifax | American Express | 29.95 | 18,495.28 |
| 12/26/2017 | Expense | Ralph's | No | Ralph's Supermarket | American Express | 227.42 | 18,267.84 |
| 12/26/2017 | Expense | Exxon Mobil | No | Gas Station | American Express | 69.38 | 18,198.46 |
| 12/25/2017 | Expense | Media Temple | No | Media Temple | American Express | 50.00 | 18,148.46 |
| 12/30/2017 | Credit Card Credit | American Express | No | Pay-Kong Payment to American Express Card | American Express | -17,095.90 | 35,274.36 |
| 01/02/2018 | Expense | Pro Pacific Pest Control | No | Pro Pacific Pest Control | American Express | 128.00 | 35,566.26 |
| 01/01/2018 | Expense | GOOGLE | No | Google Guard Advertising | American Express | 80.00 | 34,986.26 |
| 01/03/2018 | Expense | Stubhub | No | Stubhub | American Express | 2,705.40 | 32,280.86 |
| 01/03/2018 | Expense | Target | No | Target | American Express | 81.72 | 32,199.14 |
| 01/03/2018 | Expense | iTUNES | No | iTunes | American Express | 24.98 | 32,174.16 |
| 01/05/2018 | Expense | Bristol Farms | No | Bristol Farms | American Express | 8.30 | 32,165.86 |
| 01/06/2018 | Expense | Wall Plaza | No | Parking | American Express | 32.03 | 32,133.86 |
| 01/07/2018 | Expense | Trader Joe's | No | Trader Joe's | American Express | 52.45 | 32,071.40 |
| 01/09/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | -3.54 | 32,074.94 |
| 01/09/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 416.99 | 32,491.93 |
| 01/09/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 81.72 | 32,573.65 |
| 01/09/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 457.78 | 33,031.43 |
| 01/09/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 238.84 | 33,270.27 |
| 01/09/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 522.03 | 33,792.30 |
| 01/09/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 387.89 | 34,180.19 |
| 01/10/2018 | Expense | iTUNES | No | iTunes | American Express | 0.99 | 34,181.18 |
| 01/22/2018 | Expense | ABC Financial Services | No | ABC Financial Services | American Express | 9.95 | 34,191.13 |
| 01/30/2018 | Expense | Media Temple | Yes | Media Temple | American Express | 130,000.00 | 63,789.78 |
| 01/30/2018 | Transfer | American Express | No | Pay-Kong Auto Payment | American Express | 50.00 | 63,848.78 |
| 01/01/2018 | Expense | American Express | No | | American Express | -29,929.85 | 35,218.92 |
| 02/06/2018 | Transfer | ABC Financial Services | No | ABC Financial Services | VIF 6429711036 (closed) | 50,000.00 | 86,218.92 |
| 02/06/2018 | Transfer | American Express | No | Pay-Kong Made Credit Card Payment to American Express | VIF 6429711036 (closed) | 50,000.00 | 136,218.92 |
| 02/13/2018 | Transfer | Amazon Digital Services | No | Amazon Digital Services | American Express | 0.99 | 136,219.91 |
| 02/20/2018 | Transfer | Amazon Digital Services | No | Amazon Digital Services | VIF 6429711036 (closed) | 25,000.00 | 161,219.91 |
| 02/22/2018 | Transfer | iTUNES | No | iTunes | VIF 6429711036 (closed) | 50,000.00 | 211,219.91 |
| 02/26/2018 | Credit Card Credit | American Express | No | ABC Financial Services | American Express | 9.95 | 211,229.86 |
| 03/01/2018 | Expense | American Express | No | Pay-Kong Made Credit Card Payment to American Express | American Express | 4,395.44 | 206,903.42 |
| 03/05/2018 | Transfer | American Express | No | Amazon Digital Services | VIF 6429711036 (closed) | 50,000.00 | 256,903.42 |
| 03/07/2018 | Transfer | American Express | No | Amazon Digital Services | VIF 6429711036 (closed) | 30,000.00 | 286,903.42 |
| 03/08/2018 | Transfer | American Express | No | | VIF 6429711036 (closed) | 20,000.00 | 306,903.42 |
| 03/08/2018 | Transfer | American Express | No | iTunes | VIF 6429711036 (closed) | 20,000.00 | 326,903.42 |
| 03/10/2018 | Expense | American Express | No | iTunes | American Express | 0.99 | 326,904.41 |
| 03/11/2018 | Expense | Amazon Digital Services | No | Amazon Digital Services | American Express | 9.99 | 326,874.40 |
| 03/12/2018 | Expense | Amazon Digital Services | No | Amazon Digital Services | American Express | 8.99 | 326,883.39 |
| 03/13/2018 | Transfer | American Express | No | | VIF 6429711036 (closed) | 20,000.00 | 346,883.39 |
| 03/13/2018 | Transfer | American Express | No | | VIF 6429711036 (closed) | 15,000.00 | 361,883.39 |
| 03/15/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 50.03 | 361,933.39 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 80.03 | 361,753.39 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 9.99 | 361,743.40 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 78.63 | 361,664.77 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | -9.95 | 361,654.82 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 25.00 | 361,629.82 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 8.99 | 361,620.83 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | -1.99 | 361,618.84 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | -25.00 | 361,593.84 |
| 03/19/2018 | Credit Card Credit | American Express | No | Pay-Kong Points from American Express | American Express | 310.30 | 361,283.54 |
| 03/19/2018 | Credit Card Credit | ABC Financial Services | No | ABC Financial Services | VIF 6429711036 (closed) | 20,000.00 | 381,283.54 |
| 03/19/2018 | Transfer | American Express | No | | American Express | 9.95 | 381,293.49 |
| 03/22/2018 | Credit Card Credit | American Express | No | Pay-Kong Credit Card Payment to American Express | American Express | 36,542.84 | 341,750.65 |

| Date | Type | No | Payee | Memo | Account | Amount | Balance |
|---|---|---|---|---|---|---|---|
| 03/23/2018 | Transfer | No | Spotify | Spotify | VF 6429711036 (closed) | 50,000.00 | 391,760.55 |
| 03/24/2018 | Expense | No | Media Temple | Media Temple | American Express | 9.99 | 391,760.54 |
| 03/26/2018 | Expense | No | iTUNES | iTunes | American Express | 50.03 | 391,810.54 |
| 04/01/2018 | Transfer | No | | | VF 6429711036 (closed) | 0.99 | 391,811.53 |
| 04/02/2018 | Transfer | No | | | VF 6429711036 (closed) | 20,000.00 | 411,811.63 |
| 04/04/2018 | Expense | No | Velmiequan Blanket | Velmiequan Blanket | American Express | 25,000.00 | 436,811.63 |
| 04/05/2018 | Expense | No | Sephora | Sephora | American Express | 404.75 | 437,286.38 |
| 04/05/2018 | Expense | No | Designer Eyes | Designer Eyes | American Express | 59.92 | 437,320.30 |
| 04/06/2018 | Expense | No | Bloomingdales | Bloomingdales | American Express | 172.00 | 437,493.30 |
| 04/09/2018 | Expense | No | All Saints (Boron) | All Saints (Boron) | American Express | 1,713.94 | 439,210.24 |
| 04/11/2018 | Transfer | No | | | American Express | 433.30 | 439,643.54 |
| 04/12/2018 | Expense | No | Shoe Lounge (Boron) | Shoe Lounge (Boron) | American Express | 85.74 | 439,730.28 |
| 04/13/2018 | Expense | No | Shoe Lounge (Boron) | Shoe Lounge (Boron) | American Express | 140.98 | 439,878.26 |
| 04/19/2018 | Transfer | No | | | VF 6429711036 (closed) | 2,500.00 | 442,376.26 |
| 04/20/2018 | Transfer | No | | | VF 6429711036 (closed) | 25,000.00 | 467,376.26 |
| 04/24/2018 | Credit Card Credit | No | American Express | American Express | American Express | -109.85 | 467,267.41 |
| 04/24/2018 | Credit Card Credit | No | American Express | Home Depot Refund - Paul King | American Express | 342.80 | 466,924.61 |
| 04/26/2018 | Expense | No | PET SMART | PET SMART | American Express | 245.35 | 467,169.96 |
| 04/26/2018 | Expense | No | ikea | ikea | American Express | 2,879.00 | 470,048.96 |
| 05/04/2018 | Expense | No | Aquarium Skin and Body Spa | Aquarium Skin and Body Spa | American Express | 140.00 | 470,188.94 |
| 05/06/2018 | Transfer | No | | | VF 6429711036 (closed) | 2,900.00 | 472,188.94 |
| 05/07/2018 | Transfer | No | | | VF 6429711036 (closed) | 1,500.00 | 473,688.94 |
| 05/08/2018 | Deposit | No | | | VF 6429711036 (closed) | 3,300.00 | 476,988.94 |
| 05/08/2018 | Transfer | No | Paul King | Paul King | American Express | 600.00 | 475,988.94 |
| 05/09/2018 | Transfer | No | | | VF 6429711036 (closed) | 10,900.00 | 485,988.94 |
| 05/09/2018 | Credit Card Credit | No | American Express | PayKing Payment made to American Express | VF 6429711036 (closed) | 8,879.98 | 477,008.96 |
| 05/10/2018 | Transfer | No | | | VF 6429711036 (closed) | 1,900.00 | 478,908.96 |
| 05/10/2018 | Expense | No | Zara USA | Zara USA | American Express | 303.24 | 478,311.90 |
| 05/10/2018 | Expense | No | Bloomingdales | Bloomingdales | American Express | 11,068.00 | 489,379.90 |
| 05/11/2018 | Expense | No | 9640 AMC Choice | 9640 AMC Choice | American Express | 34.48 | 489,413.79 |
| 05/11/2018 | Expense | No | H Collective | H Collective | American Express | 7,500.00 | 496,913.79 |
| 05/24/2018 | Expense | No | American Express | PayKing made Payment to American Express | American Express | 50,000.00 | 446,913.79 |
| 05/25/2018 | Credit Card Credit | No | American Express | PayKing made Payment to American Express | American Express | 38,372.58 | 408,941.21 |
| 05/25/2018 | Expense | No | Mit Ent Live Show Tickets | Mit Ent Live Show Tickets | American Express | 1,218.90 | 410,960.11 |
| 05/25/2018 | Expense | No | Saks | Saks | American Express | 1,058.36 | 411,118.46 |
| 05/29/2018 | Expense | No | Cosmopolitan | Cosmopolitan | American Express | 305.13 | 411,424.59 |
| 05/29/2018 | Expense | No | Cosmopolitan | Cosmopolitan | American Express | 1,417.25 | 412,841.84 |
| 06/02/2018 | Expense | No | Macy's | Macy's | American Express | 107.52 | 412,949.36 |
| 06/02/2018 | Expense | No | Elf Comedy Downtown | Elf Comedy Downtown | American Express | 37.64 | 412,985.00 |
| 06/02/2018 | Expense | No | Macy's | Macy's | American Express | 139.85 | 413,121.85 |
| 06/20/2018 | Expense | No | Macy's | Macy's | American Express | 4.12 | 413,126.00 |
| 06/26/2018 | Expense | No | Gucci America | Gucci America | American Express | 2,050.75 | 415,176.75 |
| 06/28/2018 | Expense | No | Equinox Fitness | Equinox Fitness | American Express | 355.00 | 415,531.75 |
| 06/30/2018 | Expense | No | Cosmopolitan | Cosmopolitan | American Express | 9.74 | 415,541.49 |
| 06/30/2018 | Expense | No | Creative | Creative | American Express | -41.55 | 415,497.04 |
| 06/30/2018 | Expense | No | AC Franchise | AC Franchise | American Express | 250.34 | 415,837.38 |
| 06/30/2018 | Expense | No | AC Franchise | AC Franchise | American Express | 12.50 | 415,849.88 |
| 06/22/2018 | Credit Card Credit | No | American Express | PayKing Refund from United Airlines | American Express | 203.20 | 415,646.68 |
| 06/22/2018 | Expense | No | American Express | PayKing Refund from United Airlines | American Express | 203.20 | 415,443.48 |
| 06/24/2018 | Expense | No | Dick's Sporting Goods | Dick's Sporting Goods | American Express | 238.61 | 415,782.09 |
| 06/26/2018 | Transfer | No | | | VF 6429711036 (closed) | 48,000.00 | 463,782.09 |
| 06/25/2018 | Transfer | No | American Express | PayKing made Payment to American Express | American Express | 49,476.11 | 414,305.98 |
| 06/25/2018 | Transfer | No | | | American Express | 5,000.00 | 419,305.98 |
| 06/29/2018 | Expense | No | Bloomingdales | Bloomingdales | American Express | 136.81 | 419,442.79 |
| 06/29/2018 | Expense | No | Equinox Fitness | Equinox Fitness | American Express | 130.90 | 419,573.19 |
| 06/30/2018 | Expense | No | Equinox Fitness | Equinox Fitness | American Express | 165.00 | 419,737.19 |
| 07/01/2018 | Expense | No | Venix 550 | Venix 550 | American Express | 550.90 | 420,287.19 |
| 07/02/2018 | Expense | No | Equinox Fitness | Equinox Fitness | American Express | 112.00 | 420,399.19 |
| 07/09/2018 | Credit Card Credit | No | American Express | PayKing made Payment to American Express | American Express | 43,976.54 | 376,423.55 |
| 07/13/2018 | Expense | No | Century Theatres | Century Theatres | American Express | 33.10 | 376,455.65 |
| 07/13/2018 | Expense | No | Monterey Bay Aquarium | Monterey Bay Aquarium | American Express | 289.70 | 376,745.35 |
| 07/16/2018 | Expense | No | In Shape Health Clubs | In Shape Health Clubs | American Express | 156.96 | 376,902.33 |
| 07/15/2018 | Expense | No | Cinemark | Cinemark | American Express | 60.00 | 376,962.33 |

| Date | Type | Num | Name | Memo | Account | Amount | Balance |
|---|---|---|---|---|---|---|---|
| 07/15/2018 | Expense | | Best Buy | Best Buy | American Express | 796.40 | 377,759.73 |
| 07/19/2018 | Expense | | Macy's | Macy's | American Express | 239.34 | 377,998.07 |
| 07/20/2018 | Expense | | Ross Dress for Less | Ross Dress for Less | American Express | 94.45 | 378,092.52 |
| 07/30/2018 | Transfer | | Om Oasis - Yoga | Om Oasis - Yoga | American Express | 20.00 | 378,112.52 |
| 08/07/2018 | Expense | | American Express | | VF 642971038 (closed) | 20,000.00 | 398,112.52 |
| 08/07/2018 | Credit Card Credit | | Paul King | Paul King made Payment to American Express | American Express | 19,527.17 | 378,585.35 |
| 09/13/2018 | Deposit | | Paul King | | VF 642971038 (closed) | -4,590.00 | 374,585.35 |
| 08/15/2018 | Expense | | Urban Outfitters | Urban Outfitters | American Express | 139.84 | 374,725.19 |
| 08/22/2018 | Deposit | | Paul King | | VF 642971038 (closed) | 10,060.03 | 364,725.16 |
| 08/22/2018 | Expense | | Zara USA | Zara USA | American Express | 175.74 | 364,900.90 |
| 08/24/2018 | Expense | | Nordstrom | Nordstrom | American Express | 43.73 | 364,944.66 |
| 08/24/2018 | Expense | | H & M | H&M Clothing | American Express | 91.63 | 365,036.59 |
| 08/26/2018 | Expense | | Nordstrom | Nordstrom | American Express | 117.73 | 365,154.28 |
| 08/25/2018 | Expense | | Zara USA | Zara USA | American Express | 242.54 | 365,396.82 |
| 08/30/2018 | Deposit | | Paul King | | VF 642971038 (closed) | -1,000.00 | 364,396.82 |
| 08/30/2018 | Deposit | | Paul King | | VF 642971038 (closed) | 4,820.00 | 369,396.82 |
| 09/04/2018 | Expense | | In-Shape Health Clubs | In-Shape Health Clubs Membership | American Express | 75.99 | 369,472.81 |
| 09/05/2018 | Expense | | Urban Outfitters | Urban Outfitters | American Express | 303.72 | 369,776.53 |
| 09/05/2018 | Expense | | Urban Outfitters | Urban Outfitters | American Express | 74.25 | 369,850.92 |
| 09/07/2018 | Expense | | Urban Outfitters | Urban Outfitters | American Express | 173.10 | 361,024.83 |
| 09/06/2018 | Expense | | Urban Outfitters | Urban Outfitters | American Express | 50.00 | 361,063.92 |
| 10/15/2018 | Credit Card Credit | | American Express | Paul King-Credit Card Payment | American Express | 45,949.45 | 315,234.16 |
| 10/26/2018 | Expense | | In-Shape Health Clubs | In-Shape Health Clubs - Membership | American Express | 75.59 | 315,310.15 |
| 10/31/2018 | Journal Entry | 126-RV | | | American Express | 45,949.45 | 361,159.61 |
| 02/26/2019 | Credit Card Credit | | American Express | To record expenses paid by GW-leadbehests for October 2018 from Bank of America | American Express | -2,030.00 | 359,159.61 |
| 02/26/2019 | Journal Entry | 130-RV | | | Split | 2,000.00 | 361,159.61 |
| 03/25/2019 | Credit Card Credit | | American Express | To record expenses paid by GW-leadbehests for February 2019 from Bank of America | American Express | 2,792.97 | 358,776.54 |
| 03/29/2019 | Credit Card Credit | | American Express | | American Express | -3,000.00 | 355,776.54 |

## California New Wave II LLC
## Transaction Report
### All Dates

| Date | Transaction Type | Num | Adj | Name | Memo/Description | Account | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Loans Receivable** | | | | | | | | | |
| **Loan to Kanna King** | | | | | | | | | |
| 05/01/2018 | Check | Debit | No | Kanna King LLC | | Loans Receivable:Loan to Kanna King | Wells Fargo Checking #1044 | 1,000.00 | 1,000.00 |
| 05/14/2018 | Check | Debit | No | Kanna King LLC | | Loans Receivable:Loan to Kanna King | Wells Fargo Checking #1044 | 5,000.00 | 6,000.00 |
| 05/23/2018 | Check | Debit | No | Kanna King LLC | | Loans Receivable:Loan to Kanna King | Wells Fargo Checking #1044 | 2,000.00 | 8,000.00 |
| 06/19/2018 | Check | Debit | No | Kanna King LLC | | Loans Receivable:Loan to Kanna King | Wells Fargo Checking #1044 | 1,000.00 | 9,000.00 |
| **Total for Loan to Kanna King** | | | | | | | | **$ 9,000.00** | |
| **Loan to Paul King** | | | | | | | | | |
| 04/02/2018 | Check | 1002 | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 250.00 | 250.00 |
| 04/02/2018 | Check | 1001 | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 6,250.00 | 6,500.00 |
| 04/27/2018 | Check | | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 50,000.00 | 56,500.00 |
| 05/14/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 40,000.00 | 96,500.00 |
| 05/24/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 35,000.00 | 131,500.00 |
| 05/25/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 35,000.00 | 166,500.00 |
| 05/29/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 9,000.00 | 175,500.00 |
| 06/13/2018 | Check | Debit | No | Unknown | cash withdrawal | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 17,000.00 | 192,500.00 |
| 06/13/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 5,000.00 | 197,500.00 |
| 06/19/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 6,000.00 | 203,500.00 |
| 06/19/2018 | Check | Debit | No | Unknown | cash withdrawal | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 5,000.00 | 208,500.00 |
| 06/21/2018 | Check | Debit | No | Unknown | cash withdrawal | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 6,000.00 | 214,500.00 |
| 07/09/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 44,000.00 | 258,500.00 |
| 07/30/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 300.00 | 258,800.00 |
| 07/30/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 300.00 | 259,100.00 |
| 07/30/2018 | Check | Debit | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | 300.00 | 259,400.00 |
| 08/17/2018 | Deposit | | No | Paul King | | Loans Receivable:Loan to Paul King | Wells Fargo Checking #1044 | -6,000.00 | 253,400.00 |
| **Total for Loan to Paul King** | | | | | | | | **$ 253,400.00** | |
| **Total for Loans Receivable** | | | | | | | | **$ 262,400.00** | |
| **TOTAL** | | | | | | | | **$ 262,400.00** | |

**From:** **Brian King** bking@InvictusAccounting.com  📎
**Subject:** Loans Receivable from Kings and Paul Dunbar
**Date:** September 10, 2019 at 3:10 PM
**To:** Dimitriy Romantsoff (dromantsoff@cannafornia.co) dromantsoff@cannafornia.co

Hi Dimitriy:

Attached are CNW I's, CNW II's and CNW III's listings of Loans Receivable transactions with the Kings and Paul Dunbar. Can you please review them?

Thanks.

Regards,


**Brian King** CPA, CGA
*Consultant*



**Office:** 604 343 3889 ext 104  |  **Mobile:** 778 840 0088
Suite 1915 – 1030 West Georgia St., Vancouver, BC  V6E 2Y3
**www.InvictusAccounting.com**

This email and any attachments may contain confidential and privileged information. The  contents of this email may not be distributed or communicated with any other party without the sender's express written consent. If you are not the intended recipient, please notify the sender immediately by return email, delete this email and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.



|  CNW  |  CNW  |  CNW  |
|-------|-------|-------|
| I_Trans...le.xlsx | II_Tran...le.xlsx | III_Tran...le.xlsx |

**From: Paul King** paul@cannafornia.co
**Subject:** Re: eDiscovery cost- Gia Investments v. Paul King matter
**Date:** January 28, 2021 at 8:11 PM
**To:** Ruth Weiss Ruth.Weiss@gmlaw.com
**Cc:** Julia Stepanova Julia.Stepanova@gmlaw.com, Sophia King sophiaking06@gmail.com

Hi Ruth,

Let's start with Dimitry's. Below are login details. It will send me a code, and I'll send to you when I receive it, and then you/the agency will be able to login. It is time sensitive. Text me before you login so I am ready to send you a code. #786-200-3429

go to gmail.com
username: dromantsoff@gmail.com
password: Sophiawins!

On Thu, Jan 28, 2021 at 4:36 PM Ruth Weiss <Ruth.Weiss@gmlaw.com> wrote:

Paul,

I am a Senior Associate and the Director of eDiscovery at the firm. I am providing advice on the electronic discovery to be performed with respect to the two gmail accounts to be collected, reviewed and produced in this matter and the associated pricing.

Because electronic discovery is done in multiple stages, the full anticipated cost cannot be determined when we initially collect the data. I reached out to several eDiscovery vendors for pricing for collection of the emails from the two accounts and received a quote of a flat fee of $350 per gmail account (total $700). The quote is reasonable for that work.

In the event electronic discovery is new to you, following is a brief overview of how it applies to the collection of the gmail accounts in your case. The vendor will first collect the data (i.e., the gmail account data) and then run search terms on the collected data to cull out what is not relevant. The purpose of running search terms is to limit the amount of data to only relevant data that will be reviewed. This step makes it more cost efficient because there will be less data to review. Once the search terms are run, there is a separate fee per gigabyte for the volume of data to be hosted. The documents will then be reviewed and analyzed. There are separate fees for the reviewers and others who work to review the data collected and fees for the specific tasks to be determined. We will not know the exact cost of review and the remaining tasks to be done until we establish the volume of data that remains and the respective tasks to be performed in each of the remaining stages of handling the discovery.

We are mindful of your goal to minimize the cost of electronic discovery in this matter and will work hard to get the best pricing we can. Once you have had a chance to consider the information I have provided, please let us know if you have any questions and feel free to contact Julia or me at your convenience.

Please note that we would like to start the email collection tomorrow.

Sincerely,

# GreenspoonMarder

## Ruth A. Weiss, Esq.

Senior Associate and

Director of eDiscovery

Greenspoon Marder LLP

One Boca Place

2255 Glades Road, Suite 400-E

Boca Raton, FL 33431

☎Telephone: (954) 491-1120 (Ext. 2910)

☎Cell: (561) 289–3433

✉ : ruth.weiss@gmlaw.com I www.gmlaw.com

Admitted to practice in Florida. California and Kentucky

GREENSPOON MARDER LLP LEGAL NOTICE
The information contained in this transmission may be attorney/client privileged and confidential. It is intended only for the use of
the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error,
please notify us immediately by reply e-mail.

Unless specifically indicated otherwise, any discussion of tax issues contained in this e-mail, including any attachments, is not, and
is not intended to be, "written advice" as defined in Section 10.37 of Treasury Department Circular 230.

A portion of our practice involves the collection of debt and any information you provide will be used for that purpose if we are
attempting to collect a debt from you.

--



**Paul King**

Founder & CEO at Cannafornia

**Address**  26800 Encinal Road, Salinas, CA 93908, USA

**Mobile**  (786) 200-3429  **Website**  www.cannafornia.co

# Credit Personal Information

## Names Reported

PAUL MICHAEL KING
PAUL BUYANOVSKY

## Date Of Birth

5/26/1984

## Addresses Reported

18201 COLLINS AVE APT 503
MIAMI, FL 33160

801 S MIAMI AVE UNIT 1401
MIAMI, FL 33130

26800 ENCINAL RD
SALINAS, CA 93908

3323 NE 163RD ST STE 509
NORTH MIAMI BEACH, FL 33160

3540 N ANZA RD
PALM SPRINGS, CA 92262

3575 MATANZAS CREEK LN
SANTA ROSA, CA 95404

5694 MISSION CENTER RD STE 602
SAN DIEGO, CA 92108

Wells Fargo Bank

Date    17-Sep-21
Token   CH214181935824.1B

Enclosed are the photocopies you requested. If we can be of any further service please feel free to contact us at 1-800-TO-WELLS.

Total Items Requested :    25
Tot Num of Items Sent :    25

PAUL M KING
15811 COLLINS AVE APT 1106
SUNNY ISLES BEACH, FL  331604171

## Withdrawal / Retiro:

(Check One/
Lo que Uno)

☑ Checking / Cuenta de Cheques   ☐ Savings / Ahorros   ☐ Money Market Access   ☐ Command

2753

WELLS FARGO

Account Number/
Numero de Cuenta

# 6429711036    Date/Fecha  4/5/18

Please print Name • / Letra de molde. Nombre

Sophia By Li King

Please print Street Address, City, State, Zip Code / Letra de molde: Domicilio Contol. Estado, Código Postal

Seven thousand only _____ Dollars    $ 7,000.00

I authorize this withdrawal and acknowledge receipt of the amount indicated below /
Yo autorizo este retiro y reconozco el recibo de la cantidad indicada abajo.

Please sign in teller's presence /
Firme aquí en la presencia del cajero.

Wells Fargo National Line When Computing /
Wells Fargo Cuadradura When Computing

Bank Use Only (When SVT is not Available)

| Customer ID: | | TLR/BKKR (BRP'S) MM HH DD/DD |
| | Exp. date | Status Verified (Y/N) | Approval |

⑈2753⑈ ⑆500000694⑆





88 of 384

**Withdrawal**

(Check One)  ☑ Checking   ☐ Savings   ☐ Money Market Access   ☐ Command

**WELLS FARGO**

2890

Wells Fargo Internal Use When Bank:
Wells Fargo Confidential When Completed

Date 10/30/19

Account Number
# 5510307595

Please print Name
Sophia L King
Please print Street Address, City, State, Zip Code

One hundred fifty six thousand six hundred fifty Dollars

Bank Use Only (When SVT is Not Available)   TL/R5384 (04/10)   Form #: 801.3260

| Exp. date | Token Verified (Y/N) | Approved |
| --- | --- | --- |
| Customer ID: | | |

I authorize this withdrawal from the account listed above.
Please sign in teller presence. Two forms of ID may be required.

X _____

$ 156650.28

Seven And 28/100

⑆ 2890 ⑆  ⑆ 5000006944 ⑆

89 of 384





CALIFORNIA NEW WAVE V LLC
26800 ENCINAL RD
SALINAS, CA 93908-9744

1132
63-751/631 10769

DATE 10/11/2019

PAY TO THE ORDER OF   Roman Severochykin   $ 9,900.00

Nine thousand nine hundred dollars 00/100   DOLLARS

Wells Fargo Bank, N.A.
Florida
wellsfargo.com

FOR

⑈000000113⑈ ⑈063107513⑈ 5516367595⑈



CALIFORNIA NEW WAVE V LLC
28900 ENCINAL RD
SALINAS, CA 93900-9744

1208

63-751/631 10769

DATE 10/05/2019

PAY TO THE ORDER OF   Ricardo Juan Ramirez                        $ 9,900.00

Nine Thousand Nine Hundred 00/100                                   DOLLARS

Wells Fargo Bank, N.A.
Florida
wellsfargo.com

FOR

⑈000000l208⑈ ⑆063l075l3⑆ 55l6367595⑈







CALIFORNIA NEW WAVE V LLC
25900 ENCINAL RD
SALINAS, CA 93908-9744

1161

63-751/6311 0789

DATE 10/18/2009

PAY TO THE ORDER OF   Ricardo Juan Ramirez          $ 9,350.00

Nine Thousand Three Hundred and fifty 00/100          DOLLARS

Wells Fargo Bank, N.A.
Florida
wellsfargo.com

FOR _____

⑈000000ı161⑈ ⑈063ı075ı3⑈ 55ı6367595⑈

95 of 384









CALIFORNIA NEW WAVE V LLC
26960 ENCINAL RD
SALINAS, CA 93908-9744

1018

69-751/631 10769

PAY TO THE ORDER OF _Jasmin Medina_

_Nine Thousand Four Hundred 00/100_ DOLLARS

DATE 9/13/20

$ 9,400.00

Wells Fargo Bank, N.A.
Florida
wellsfargo.com

FOR _____

⑆000000 1018⑆ ⑆063 1075⑆ 5516367595⑈



CALIFORNIA NEW WAVE V LLC
26600 ENCINAL RD
SALINAS, CA 93908-9744

1020

63-751/631 (D768)

DATE 9/13/2019

PAY TO THE ORDER OF   Anastasia Romantsova    $ 9,400.00

Nine Thousand & four hundred 00/100    DOLLARS

FOR

⑆000000102024⑆ ⑆063107513⑆ 5516367595⑆

100 of 384



CALIFORNIA NEW WAVE V LLC
26900 ENCINAL RD
SALINAS, CA 93908-9744

1016
03-751/631 10769

DATE 9/13/2019

PAY TO THE ORDER OF ___Alberto Varela___ $ 9,400.00

___Nine thousand four hundred 00/100___ DOLLARS

Wells Fargo Bank, N.A.
wellsfargo.com

FOR _____

⑆000000:0016⑆ ⑈063:0075:13⑈ 5516367595⑈

101 of 384









CALIFORNIA NEW WAVE V LLC
28800 ENCINAL RD
SALINAS, CA 93908-9744

1214
53-751/631 10789

DATE 10/25/2015

PAY TO THE ORDER OF  Denisse Yvonne Jaquine           $ 9,750.00

Nine thousand seven hundred and fifty 00/100 DOLLARS

Wells Fargo Bank, N.A.

FOR

⑈000000121⑈ ⑆063107513⑈ 5516367595⑈









109 of 384



CALIFORNIA NEW WAVE V LLC
29800 ENCINAL RD
SALINAS, CA 93908-9744

1205

53-731/631 10769

DATE 02/25/2019

PAY TO THE ORDER OF   Miriam Padla Aguirre Arellano           $ 9,500.00

Nine Thousand Five Hundred dollars 00/100                     DOLLARS

Wells Fargo Bank, N.A.
Florida
wellsfargo.com

FOR _____

⑈000000l205⑈ ⑆063l07513⑆ 55l6367595⑈







112 of 384



CALIFORNIA NEW WAVE V LLC
26560 ENCINAL RD
SALINAS, CA 93906-9744

1210

43-751/631 110769

DATE 10/25/2013

PAY TO THE ORDER OF   Anastasia Romantsova                    $ 9700.00

Nine thousand seven hundred dollars 00/100   DOLLARS

Wells Fargo Bank, N.A.
Florida
wellsfargo.com

FOR

⑈000000⑈1210⑈ ⑈063⑈07513⑈ 5516367545⑈

113 of 384



CALIFORNIA NEW WAVE V LLC
26800 ENCINAL RD
SALINAS, CA 93908-8744

1130

63-751/631 10769

DATE 10/11/2019

PAY TO THE ORDER OF _____

Nine Thousand Nine hundred dollars 00/100 _____ $ 9,900.00

DOLLARS

Wells Fargo Bank, N.A.
Florida
wellsfargo.com

FOR _____

⑈000000ıı30⑈ ⑈063ı07⑈ 55ı636759⑈

**From:** **Sophia King** sophiaking06@gmail.com
**Subject:** Re: ALL Bank Accounts in Wells Fargo
**Date:** February 28, 2020 at 9:13 AM
**To:** Динара: Paul's Accountant dinara@cannafornia.co, Paulie King paul@cannafornia.co, Dimitriy Romantsoff dromantsoff@cannafornia.co

Hello, everyone!

TGIF!!!

**This is just a Friendly Reminder that ALL BANK ACCOUNTS in Wells Fargo will be closed tomorrow!**

Please remind all your employees and vendors to cash their checks today!

Have a great day!

Thank you all!

Please feel free to call or email me 24/7!

Sincerely,

**Sophia Lyalya King**
**President**
CENTURY 21 1st Class Realty
17070 Collins Ave., Suite 259
Sunny Isles Beach, Florida 33160
Office: (305) 949-0266
**Cell: (305) 401-4723**
Fax: (305) 394-6080
Email: Sophia.King@CENTURY21.com
www.Century21-1stClassRealty.org

**Click here for information on New Construction Developments**

*Paul King, Broker/Owner*
*Voted one of "Top 30 under 30" in America & #1 in Florida!*
Top 30 under 30 - Realtor.com (Click for details)

**From:** **Sophia King** sophiaking06@gmail.com
**Subject:** Re: Some wires
**Date:** March 21, 2021 at 5:02 PM
**To:** Paul King paul@cannafornia.co

There were no bank accounts - only Ami Maliza's escrow ledger. You have her ledger and confirmation of wires.

On Sun, Mar 21, 2021 at 4:59 PM Paul King <paul@cannafornia.co> wrote:
Sophie who has the bank statements for all of these accounts? have you seen them?

---------- Forwarded message ---------
From: **Dimitriy Romantsoff** <dromantsoff@cannafornia.co>
Date: Thu, Nov 7, 2019 at 2:36 PM
Subject: Some wires
To: Amy Maliza <Amaliza@disantolaw.com>
Cc: Paul King <paul@cannafornia.co>, Veronica Melgoza <veronica@cannafornia.co>, Dinara Akzhigitova <dinara@cannafornia.co>, Matt Stevens <matt@cannafornia.co>

ACC# 5516367595
Routing number#121000248

2.
ACC# 5516367660
Routing number#121000248

3.
ACC# 5516367660
Routing number#121000248

4.
ACC# 5516367611
Routing number#121000248

5. **Monterey Land Group - $100,000 (Lease November and Red Tag Reimbursement)**
**Acc# 3623915570**
Routing number#121000248

6. **Del Real Holdings, Inc. - $80,000 (Lease)**
**CHASE BANK**
**Routing# 021000021**
**Account # 260765703**

**Thank you,**



**Dimitriy Romantsoff**

Board Advisor at Cannafornia

---

**Address** 26800 Encinal Road, Salinas, CA 93908, USA

**Mobile** (305) 978-7922 **Email** dromantsoff@cannafornia.co

**Website** www.cannafornia.co

---

--



**Paul King**

Founder & CEO at Cannafornia

**Address**  26800 Encinal Road, Salinas, CA 93908, USA

**Mobile**  (786) 200-3429  **Website**  cannafornia.world

--
Please feel free to call or email me 24/7!

Sincerely,

**Sophia Lyalya King**
**Realtor Associate**
CENTURY 21 King Realty
2434 Hollywood Blvd
Hollywood, FL 33020
**Cell: (305) 401-4723**
Office: (305) 651-6161
Email: sophiaking06@gmail.com
www.Century21-1stClassRealty.org

CENTURY 21
King Realty

**Click here for information on New Construction Developments**

Fax: (305) 394-6080
Ema

Four Seasons Produce Packing Company Inc
26800 Encinal Rd
Salinas, CA 93908
(831) 424-8023
(831) 424-8006

## Invoice

**Bill To:**
CALIFORNIA NEW WAVE 1, LLC
26800 ENCINAL ROAD
SALINAS, CA 93908

Acct # 369

| | Invoice #: | 10032 |
|---|---|---|
| | Invoice Date: | 09/10/2018 |
| | Terms | Net On Receipt |

| Date | Description | Quantity | Price | Total |
|---|---|---|---|---|
| Field: ENCINAL SHOP | | 2,431.78 | 1.00 | 2,431.78 |
| 09/10/2018 PG&E BILL 7/20/18-8/20/18 | Total Field Charges | | | 2,431.78 |

| | |
|---|---|
| Invoice Total | $2,431.78 |

*Paid
GIA
INuesiments*

*page 1-4*



# Billing & Payment History

## Billing Summary for Account #1872443974-2

| Billing Address | Last Payment | Last Received | Amount Due | Due Date |
|---|---|---|---|---|
| 26800 ENCINAL RD SALINAS CA 93908 | $2293.50 | 01/19/21 | $39327.71 | 04/09/21 |

## Bills and Payments (Past 24 Months)

| Date | Type | Amount | Payment Method | Status |
|---|---|---|---|---|
| 03/23/21 | Bill | $4106.89 | | |
| 02/22/21 | Bill | $3486.77 | | |
| 01/21/21 | Bill | $5168.57 | | |
| 01/19/21 | Payment | -$2293.50 | eCheckCNWI Checking ************3315 | Processed |
| 12/21/20 | Bill | $3630.55 | | |
| 12/17/20 | Payment | -$2293.50 | | Processed |
| 11/23/20 | Payment | -$2000.00 | | Processed |
| 11/19/20 | Bill | $3398.08 | | |
| 10/28/20 | Payment | -$10000.00 | | Processed |
| 10/21/20 | Bill | $5525.40 | | |
| 09/21/20 | Bill | $7002.51 | | |
| 09/11/20 | Payment | -$5000.00 | | Processed |
| 08/20/20 | Bill | $6791.10 | | |
| 07/21/20 | Bill | $5980.07 | | |
| 07/10/20 | Payment | -$5000.00 | | Processed |
| 06/22/20 | Bill | $4925.78 | | |
| 05/21/20 | Bill | $4734.07 | | |
| 04/22/20 | Bill | $3601.92 | | |
| 04/08/20 | Payment | -$6495.61 | | Processed |
| 03/23/20 | Bill | $3973.98 | | |
| 03/10/20 | Payment | -$6780.00 | | Processed |
| 02/26/20 | Bill | $3304.34 | | |
| 01/31/20 | Bill | $3140.34 | | |
| 12/27/19 | Bill | $2880.06 | | |
| 11/26/19 | Bill | $3237.44 | | |
| 10/28/19 | Bill | $4302.45 | | |
| 10/24/19 | Payment | -$11113.33 | | Processed |
| 09/27/19 | Bill | $5227.41 | | |
| 08/28/19 | Bill | $13427.96 | | |
| 08/23/19 | Payment | -$11801.16 | | Processed |
| 08/23/19 | Payment | $7606.35 | | Cancelled |
| 08/23/19 | Payment | -$7606.35 | | Processed |
| 08/01/19 | Payment | -$13237.00 | | Processed |
| 08/01/19 | Payment | $13237.00 | | Cancelled |
| 08/01/19 | Payment | -$13237.00 | | Processed |
| 07/29/19 | Bill | $8993.83 | | |
| 06/27/19 | Bill | $3742.11 | | |
| 06/20/19 | Payment | -$10369.88 | | Processed |
| 05/29/19 | Bill | $4760.18 | | |
| 05/02/19 | Bill | $2845.91 | | |

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. Pacific Gas and Electric Company. All rights reserved.



# Billing & Payment History

## Billing Summary for Account #4131507824-0

| Billing Address | Last Payment | Last Received | Amount Due | Due Date |
|---|---|---|---|---|
| 26800 ENCINAL RD SALINAS CA 93908 | $10000.00 | 01/21/21 | $245182.73 | 04/12/21 |

## Bills and Payments (Past 24 Months)

| Date | Type | Amount | Payment Method | Status |
|---|---|---|---|---|
| 03/24/21 | Bill | $36713.31 | | |
| 02/23/21 | Bill | $44268.59 | | |
| 01/22/21 | Bill | $32411.06 | | |
| 01/21/21 | Payment | -$10000.00 | eCheckCNWI Checking ************3315 | Processed |
| 12/22/20 | Bill | $45950.68 | | |
| 12/17/20 | Payment | -$10000.00 | | Processed |
| 11/20/20 | Bill | $31430.12 | | |
| 11/10/20 | Payment | -$5000.00 | | Processed |
| 11/03/20 | Bill | $8473.91 | | |
| 10/22/20 | Bill | $0.00 | | |
| 09/22/20 | Bill | $14993.81 | | |
| 09/11/20 | Payment | -$10000.00 | | Processed |
| 08/21/20 | Bill | $6939.84 | | |
| 07/22/20 | Bill | $8608.72 | | |
| 07/10/20 | Payment | -$10000.00 | | Processed |
| 06/23/20 | Bill | $8300.65 | | |
| 05/22/20 | Bill | $8515.76 | | |
| 04/23/20 | Bill | $13599.35 | | |
| 04/09/20 | Payment | -$18809.20 | | Processed |
| 03/24/20 | Bill | $15282.96 | | |
| 03/10/20 | Payment | -$17446.31 | | Processed |
| 02/23/20 | Bill | $16056.85 | | |
| 01/31/20 | Payment | -$16000.00 | | Processed |
| 01/23/20 | Bill | $18926.52 | | |
| 12/22/19 | Bill | $19016.01 | | |
| 11/21/19 | Bill | $11104.63 | | |
| 10/23/19 | Payment | -$134.22 | | Processed |
| 10/23/19 | Bill | $1845.47 | | |
| 09/24/19 | Bill | $69.74 | | |
| 08/23/19 | Payment | -$31933.48 | | Processed |
| 08/23/19 | Payment | $31997.96 | | Cancelled |
| 08/23/19 | Payment | -$31997.96 | | Processed |
| 08/23/19 | Bill | $81.98 | | |
| 08/01/19 | Payment | -$25000.00 | | Processed |
| 07/24/19 | Bill | $14176.74 | | |
| 07/23/19 | Payment | -$42738.00 | | Processed |
| 06/23/19 | Bill | $87.10 | | |
| 05/23/19 | Bill | $84.99 | | |
| 04/24/19 | Bill | $87.52 | | |

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. Pacific Gas and Electric Company. All rights reserved.

**From:** **Sophia King** sophiaking06@gmail.com
**Subject:** Re: PG&E Statements from 12/21/2020
**Date:** December 29, 2020 at 2:31 PM
**To:** Lisa Pukhyr lisa@cannafornia.co

Received! TY

On Tue, Dec 29, 2020 at 1:58 PM Lisa Pukhyr <lisa@cannafornia.co> wrote:

# ENERGY STATEMENT
www.pge.com/MyEnergy

Account No: 1872443974-
Statement Date:     12/21/202
**Due Date:     01/07/202**

## Service For:

CALIFORNIA NEW WAVE I LLC
26800 ENCINAL RD
SALINAS, CA  93908

### Questions about your bill?

Agricultural Specialist available:
Mon-Fri: 7am to 6pm
1-877-311-3276
www.pge.com/MyEnergy

### Ways To Pay

www.pge.com/waystopay

## Your Account Summary

| | |
|---|---|
| Amount Due on Previous Statement | $29,521.9 |
| Payment(s) Received Since Last Statement | -4,293.5 |
| Previous Unpaid Balance | $25,228.4 |
| Current PG&E Electric Delivery Charges | $2,782.6 |
| Central Coast Community Energy Electric Generation Charges | 847.9 |

| **Total Amount Due** by 01/07/2021 | **$28,858.9** |
|---|---|



## Important Messages

**Your agricultural electricity rate** Your electricity usage is currently billed on an agricultural rate schedule, which means 70 percent or more of your electricity usage is used for agricultural purposes. If this is incorrect, please call us at **1-877-311-FARM (3276)** for a free rate analysis

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Please return this portion with your payment. No staples or paper clips. Do not fold. Thank you.

999018724439742000036305500028858978



| Account Number: | Due Date: | Total Amount Due: | Amount Enclosed: |
|---|---|---|---|
| **1872443974-2** | **01/07/2021** | **$28,858.98** | $ |

481170079075 01 AV    0.38  456 7715 9

PG&E
BOX 997300

123 of 384

CALIFORNIA NEW WAVE I LLC
26800 ENCINAL RD
SALINAS, CA 93908-9744

SACRAMENTO, CA 95899-7300

Page 1 of 4



# ENERGY STATEMENT
www.pge.com/MyEnergy

**Account No:** 1872443974-
**Statement Date:** 12/21/202
**Due Date:** **01/07/202**

## Important Phone Numbers - Monday-Friday 7 a.m.-9 p.m., Saturday 8 a.m.-6 p.m.

### Customer Service (All Languages; Relay Calls Accepted) 1-800-743-5000
TTY 7-1-1

| | |
|---|---|
| Servicio al Cliente en Español (Spanish) | 1-800-660-6789 |
| 華語客戶服務 (Chinese) | 1-800-893-9555 |

| | |
|---|---|
| Dịch vụ khách tiếng Việt (Vietnamese) | 1-800-298-8438 |
| Business Customer Service | 1-800-468-4743 |

**Rules and rates**

You may be eligible for a lower rate. Find out about optional rates or view a complete list of rules and rates, visit www.pge.com or call 1-800-743-5000

**If you believe there is an error on your bill,** please call **1-800-743-5000** to speak with a representative. If you are not satisfied with our response, contact the California Public Utilities Commission (CPUC), Consumer Affairs Branch (CAB), 505 Van Ness Avenue, Room 2003, San Francisco, CA 94102, 1-800-649-7570 or 7-1-1 (8:30 AM to 4:30 PM, Monday through Friday) or by visiting www.cpuc.ca.gov/complaints/

To avoid having service turned off while you wait for the outcome of a complaint to the CPUC specifically regarding the accuracy of your bill, please contact CAB for assistance. If your case meets the eligibility criteria, CAB will provide you with instructions on how to mail a check or money order to be impounded pending resolution of your case. You must continue to pay your current charges while your complaint is under review to keep your service turned on

**If you are not able to pay your bill,** call PG&E to discuss how we can help. You may qualify for reduced rates under PG&E's CARE program or other special programs and agencies may be available to assist you. You may qualify for PG&E's Energy Savings Assistance Program which is an energy efficiency program for income-qualified residential customers.

**Important definitions**

**Rotating outage blocks** are subject to change without advance notice due to operational conditions.

**Demand charge:** Many non-residential rates include a demand charge Demand is a measurement of the highest usage of electricity in any single fifteen (or sometimes five) minute period during a monthly billing cycle. Demand is measured in kilowatts (or kW). High demand is usually associated with equipment start-up. By spreading equipment start-ups over a longer period of time, you may be able to lower demand and reduce your demand charges

**Time-of-use electric** prices are higher every day during afternoons and evenings, and lower at other times of the day. Prices also change by season, with higher prices in the summer and lower prices in the winter

**Wildfire Fund Charge:** Charge on behalf of the State of California Department of Water Resources (DWR) to fund the California Wildfire Fund. For usage prior to October 1, 2020, this charge included costs related to the 2001 California energy crisis, also collected on behalf of the DWR. These charges belong to DWR, not PG&E.

**Power Charge Indifference Adjustment (PCIA):** Ensures that non-exempt customers under PG&E's GT and ECR rate schedules or who purchase electricity (generation) from non-PG&E suppliers pay their share of generation costs

**Gas Public Purpose Program (PPP) Surcharge.** Used to fund state-mandate gas assistance programs for low-income customers, energy efficiency programs and public-interest research and development

Visit www.pge.com/billexplanation for more definitions. To view most recent bill inserts including legal or mandated notices, visit www.pge.com/billinserts

### Your Electric Charges Breakdown

| | |
|---|---|
| Transmission | $726 |
| Distribution | 605 |
| Electric Public Purpose Programs | 333 |
| Nuclear Decommissioning | 29 |
| Wildfire Fund Charge | 170 |
| Competition Transition Charges (CTC) | 24 |
| Energy Cost Recovery Amount | 1 |
| PCIA | 874 |
| Taxes and Other | 17 |
| **Total Electric Charges** | **$2,782** |

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. © 2020 Pacific Gas and Electric Company. All rights reserved.

Please do not mark in box. For system use only.



## Update My Information (English Only)

Please allow 1-2 billing cycles for changes to take effect

**Account Number: 1872443974-2**

Change my mailing address to _____

_____

City _____ State _____ ZIP code _____

Primary _____ Primary _____
Phone Email

## Ways To Pay



- **Online** via web or mobile at www.pge.com/waystopay
- **By mail:** Send your payment along with this payment stub in the envelope provided.
- **By debit card, Visa, MasterCard, American Express, or Discover:** Call 877-704-8470 at any time. (Our independent service provider charges a fee per transaction.)
- **At a PG&E payment center or local office:** To find a payment center or local office near you, please visit www.pge.com or call 800-743-5000 Please bring a copy of your bill with you

Phone _____   Email _____

Page 2 of 4

# ENERGY STATEMENT
www.pge.com/MyEnergy

**Account No:** 1872443974-
**Statement Date:** 12/21/202
**Due Date:** **01/07/202**

## Details of PG&E Electric Delivery Charges
### 11/19/2020 - 12/20/2020 (32 billing days)

Service For  26800 ENCINAL RD
Service Agreement ID  1878765309
Rate Schedule  AG5B  Large Time-of-Use Agricultural Power

**Service Information**
Meter #                               500003608
Total Usage            29,346.720000 kV
Serial
Rotating Outage Block                      5

**11/19/2020 – 11/30/2020**

| | | | | |
|---|---|---|---|---|
| Customer Charge | 12 | days | @ $1.19446 | $14.33 |
| Demand Charge [1] | | | | |
| Max Demand | 55.200000 | kW | @ $7.37000 | 152.56 |
| Energy Charges | | | | |
| Part Peak | 3,408.800000 | kWh | @ $0.12990 | 442.80 |
| Off Peak | 7,114.560000 | kWh | @ $0.09818 | 698.51 |
| Generation Credit | | | | -617.88 |
| Power Charge Indifference Adjustment | | | | 313.60 |
| Franchise Fee Surcharge | | | | 6.21 |

**12/01/2020 – 12/20/2020**

| | | | | |
|---|---|---|---|---|
| Customer Charge | 20 | days | @ $1.19446 | $23.89 |
| Demand Charge [1] | | | | |
| Max Demand | 52.160000 | kW | @ $7.37000 | 240.26 |
| Energy Charges | | | | |
| Part Peak | 6,858.520000 | kWh | @ $0.12990 | 890.92 |
| Off Peak | 11,964.840000 | kWh | @ $0.09818 | 1,174.71 |
| Generation Credit | | | | -1,129.36 |
| Power Charge Indifference Adjustment | | | | 560.94 |
| Franchise Fee Surcharge | | | | 11.11 |

**$2,782.60**

[1] Demand charges are prorated for the number of days in each rate period

2017 Vintaged Power Charge Indifference Adjustment



**Electric Usage This Period: 29,346.720000 kWh, 32 billing days**

| | Usage | Energy Charges |
|---|---|---|
| Peak[1] | 0.00% | $0.00 |
| Part Peak[2] | 34.99% | $1,333.72 |
| Off Peak[3] | 65.01% | $1,873.22 |

[1]**Peak:** 5/1-10/31 12:00pm-6:00pm, M-F (except Holidays).
[2]**Part Peak:** 11/1-4/30 8:30am-9:30pm, M-F (except Holidays).
[3]**Off Peak:** All Other Hours, M-F, All Day Sat, Sun, Holidays

*Visit* **www.pge.com/MyEnergy** *for a detailed bill comparison*

Page 3 of 4



# ENERGY STATEMENT
www.pge.com/MyEnergy

Account No: 1872443974-
Statement Date:    12/21/202
**Due Date:    01/07/202**

## Details of Central Coast Community Energy Electric Generation Charges

**11/19/2020 - 12/20/2020 (32 billing days)**

Service For  26800 ENCINAL RD
Service Agreement ID  1878126715  ESP Customer Number  1878765309
Rate Schedule  MBAETCH1  3Cchoice AG5B

**11/19/2020 – 11/30/2020**

Electric Generation Charges

| | | | | |
|---|---|---|---|---|
| Part Peak - Winter - 11/19 | 3,408 800000 | kWh | @ $0 04880 | $166 35 |
| Off Peak - Winter - 11/19 | 7,114 560000 | kWh | @ $0 01772 | 126 07 |
| | | | Net Charges     292 42 | |

Energy Commission Tax                                                       3 16

**12/01/2020 – 12/20/2020**

Electric Generation Charges

| | | | | |
|---|---|---|---|---|
| Part Peak - Winter - 12/01 | 6,858 520000 | kWh | @ $0 04880 | $334 70 |
| Off Peak - Winter - 12/01 | 11,964 840000 | kWh | @ $0 01772 | 212 02 |
| | | | Net Charges     546 72 | |

Energy Commission Tax                                                       5 65

**$847.95**

### Service Information

Meter #                                        500003606
Total Usage                    29,346 720000 kW\
Serial

For questions regarding charges on this page, please contact
CENTRAL COAST COMMUNITY ENERGY
70 GARDEN CT STE 300
MONTEREY CA 93940
1-888-909-6227
www cccenergy org

### Additional Messages

**Monterey Bay Community Power is now Central Coast Community Energy (CCCE).**

CCCE is a community-owned public agency governed by board members who represent each community served. Sourcing electricity from clean and renewable energy resources, revenue generated by CCCE stays local and helps keep electricity rates competitive for customers, while also funding innovative energ' programs designed to lower greenhouse gas emissions and stimulate economic developmen CCCE serves customers in communities throughout Monterey, San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties. Visit cccenergy org or call (888) 909-6227 to learn more

NOTE  Your CCCE Electric Generation Charge replaces PG&E's charge for electric generation This change is reflected in the "Generation Credit" line item shown on the "Details of the PG&E Electric Delivery Charges" page of your bill. PG&E continues to provide all electric delivery, billing, and gas services (if applicable) for CCCE service area

### Customer Privacy

Learn about CCCE's privacy policy at www cccenergy org/privacy-policy/

Page 4 of 4

*Visit* **www.pge.com/MyEnergy** *for a detailed bill comparison*



# ENERGY STATEMENT
www.pge.com/MyEnergy

Account No: 4131507824
Statement Date: 12/22/202
**Due Date: 01/08/202**

## Service For:

CALIFORNIA NEW WAVE I LLC
26800 ENCINAL RD
SALINAS, CA 93908

### Questions about your bill?

Business Specialist available:
Mon-Fri: 7am to 6pm
1-800-468-4743
www.pge.com/MyEnergy

### Ways To Pay

www.pge.com/waystopay

## Your Account Summary

| | |
|---|---:|
| Amount Due on Previous Statement | $105,839. |
| Payment(s) Received Since Last Statement | -10,000. |
| Previous Unpaid Balance | $95,839. |
| Current Gas Charges | $45,950. |

**Total Amount Due** by 01/08/2021    **$141,789.7**



Gas Monthly Billing History

*Visit* **www.pge.com/MyEnergy** *for a detailed bill comparison*

---

.......... Please return this portion with your payment. No staples or paper clips. Do not fold. Thank you.

99904131507824000045950680014178977



| Account Number: | Due Date: | Total Amount Due: | Amount Enclosed: |
|---|---|---|---|
| **4131507824-0** | **01/08/2021** | **$141,789.77** | $ . |

482090086767 01 AV    0.38  504 9609 10

CALIFORNIA NEW WAVE I LLC
26800 ENCINAL RD
SALINAS, CA 93908-9744

PG&E
BOX 997300
SACRAMENTO, CA 95899-7300

Page 1 of 3

Page 2 of 3



# ENERGY STATEMENT
www.pge.com/MyEnergy

| | |
|---|---|
| **Account No:** | 4131507824 |
| **Statement Date:** | 12/22/202 |
| **Due Date:** | **01/08/202** |

## Important Phone Numbers - Monday-Friday 7 a.m.-9 p.m., Saturday 8 a.m.-6 p.m.

## Customer Service (All Languages; Relay Calls Accepted) 1-800-743-5000
## TTY 7-1-1

| | | | |
|---|---|---|---|
| Servicio al Cliente en Español (Spanish) | 1-800-660-6789 | Dich vu khách tiếng Việt (Vietnamese) | 1-800-298-8438 |
| 華語客戶服務 (Chinese) | 1-800-893-9555 | Business Customer Service | 1-800-468-4743 |

**Rules and rates**

You may be eligible for a lower rate. Find out about optional rates or view a complete list of rules and rates, visit www.pge.com or call 1-800-743-5000

**If you believe there is an error on your bill**, please call **1-800-743-5000** to speak with a representative. If you are not satisfied with our response, contact the California Public Utilities Commission (CPUC), Consumer Affairs Branch (CAB), 505 Van Ness Avenue. Room 2003, San Francisco, CA 94102. 1-800-649-7570 or 7-1-1 (8:30 AM to 4:30 PM, Monday through Friday) or by visiting www.cpuc.ca.gov/complaints/.

To avoid having service turned off while you wait for the outcome of a complaint to the CPUC specifically regarding the accuracy of your bill, please contact CAB for assistance. If your case meets the eligibility criteria, CAB will provide you with instructions on how to mail a check or money order to be impounded pending resolution of your case. You must continue to pay your current charges while your complaint is under review to keep your service turned on

**If you are not able to pay your bill**, call PG&E to discuss how we can help. You may qualify for reduced rates under PG&E's CARE program or other special programs and agencies may be available to assist you. You may also qualify for PG&E's Energy Savings Assistance Program which is an energy efficiency program for income-qualified residential customers.

**Important definitions**

**Rotating outage blocks** are subject to change without advance notice due to operational conditions.

**Demand charge:** Many non-residential rates include a demand charge. Demand is a measurement of the highest usage of electricity in any single fifteen (or sometimes five) minute period during a monthly billing cycle. Demand is measured in kilowatts (or kW). High demand is usually associated with equipment start-up. By spreading equipment start-ups over a longer period of time, you may be able to lower demand and reduce your demand charges.

**Time-of-use electric** prices are higher every day during afternoons and evenings, and lower at other times of the day. Prices also change by season with higher prices in the summer and lower prices in the winter.

**Wildfire Fund Charge:** Charge on behalf of the State of California Department of Water Resources (DWR) to fund the California Wildfire Fund. For usage prior to October 1, 2020, this charge included costs related to the 2001 California energy crisis, also collected on behalf of the DWR. These charges belong to DWR, not PG&E

**Power Charge Indifference Adjustment (PCIA):** Ensures that non-exempt customers under PG&E's GT and ECR rate schedules or who purchase electricity (generation) from non-PG&E suppliers pay their share of generation costs

**Gas Public Purpose Program (PPP) Surcharge.** Used to fund state-mandate gas assistance programs for low-income customers, energy efficiency programs, and public-interest research and development

Visit www.pge.com/billexplanation for more definitions. To view most recent bill inserts including legal or mandated notices, visit www.pge.com/billinserts

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. © 2020 Pacific Gas and Electric Company. All rights reserved.

Please do not mark in box. For system use only

## Update My Information (English Only)

Please allow 1-2 billing cycles for changes to take effect

**Account Number: 4131507824-0**

Change my mailing address to: _____

_____

City _____ State _____ ZIP code _____
Primary                              Primary
Phone _____ Email _____

## Ways To Pay

- Online via web or mobile at www.pge.com/waystopay
- By mail: Send your payment along with this payment stub in the envelope provided.
- By debit card, Visa, MasterCard, American Express, or Discover: Call 877-704-8470 at any time. (Our independent service provider charges a fee per transaction.)
- At a PG&E payment center or local office: To find a payment center or local office near you, please visit www.pge.com or call 800-743-5000. Please bring a copy of your bill with you.

Page 2 of 3

# ENERGY STATEMENT
www.pge.com/MyEnergy

Account No: 4131507824-
Statement Date:      12/22/202
**Due Date:       01/08/202**

## Details of Gas Charges

### 11/20/2020 - 12/21/2020 (32 billing days)

Service For  26800 ENCINAL RD
Service Agreement ID  4135154869
Rate Schedule  GNR1 Gas Service to Small Commercial Customers

**11/20/2020 – 11/30/2020**

| | | | |
|---|---|---|---|
| Customer Charge | 11  days  @ $2 14936 | | $23 64 |
| Gas Charges | | | |
| First 4,000 Therms/month | 1,375 000000 Therms @ $1 34743 | | 1,852 72 |
| > 4 000 Therms/month | 13,358 125000 Therms @ $0 95964 | | 12,818 99 |
| Gas PPP Surcharge ($0 05861 /Therm) | | | 863 51 |

**12/01/2020 – 12/21/2020**

| | | | |
|---|---|---|---|
| Customer Charge | 21  days  @ $2 14936 | | $45 14 |
| Gas Charges | | | |
| First 4,000 Therms/month | 2,625 000000 Therms @ $1 37191 | | 3,601 26 |
| > 4 000 Therms/month | 25,501 875000 Therms @ $0 98412 | | 25,096 91 |
| Gas PPP Surcharge ($0 05861 /Therm) | | | 1,648 51 |

**$45,950.68**

### Service Information

| | |
|---|---|
| Meter # | 4785010 |
| Current Meter Reading | 324 85 |
| Prior Meter Reading | 283 55 |
| Difference | 41 30 |
| Multiplier | 1 03775 |
| Total Usage | 42,860 000000 Therm |
| Serial | |

### Gas Procurement Costs ($/Therm)

| | |
|---|---|
| 11/20/2020 - 11/30/2020 | $0 43956 |
| 12/01/2020 - 12/21/2020 | $0 46404 |

### Additional Messages

**Customer Charge** To help deliver safe, reliab
and affordable gas service to your business,
PG&E charges a customer fee which is based
on your highest average daily gas usage within
the past 12 months. For the billing period endin
on 12/21/2020 your highest average daily gas
usage was 1339 4 therms

---

**Gas Usage This Period: 42,860.000000 Therms, 32 billing days**

Therms        - - - - = Average Daily Usage 1,339 38


*Visit **www.pge.com/MyEnergy** for a detailed bill comparison*

Page 3 of 3



**From:** **Dimitriy Romantsoff** dromantsoff@cannafornia.co
**Subject:** Re: CALIFORNIA NEW WAVE I LLC - ACCOUNT #4131507824-0
**Date:** August 26, 2019 at 2:18 PM
**To:** Enriquez, Anna AME7@pge.com
**Cc:** Janie Sanchez ju1k@pge.com, Veronica Melgoza veronica@cannafornia.co, Paul King paul@cannafornia.co

Anna,

We wired $43,751.64 on Friday from Amy Maliza Trust Account. Please kindly confirm receiving.

Thank you,



**Dimitriy Romantsoff**

Board Advisor at Cannafornia

**Address** 26800 Encinal Road, Salinas, CA 93908, USA

**Mobile** (305) 978-7922 **Email** dromantsoff@cannafornia.co

**Website** www.cannafornia.co

---

On Aug 26, 2019, at 7:37 AM, Enriquez, Anna <AME7@pge.com> wrote:

Hi Dimitriy,

Attached is the banking information for submitting ach or wire payments to PG&E.

Thanks,

Anna Enriquez
Pacific Gas and Electric
Payment Research Unit
ACH/WIRE
Tel 916-375-5054
Fax 916-375-5102
Email: ame7@pge.com

**From:** Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Sent:** Friday, August 23, 2019 10:53 AM
**To:** Enriquez, Anna <AME7@pge.com>
**Cc:** Sanchez, Janie <JU1K@pge.com>; Veronica Melgoza <veronica@cannafornia.co>
**Subject:** Re: CALIFORNIA NEW WAVE I LLC - ACCOUNT #4131507824-0

\*\*\*\*\***CAUTION: This email was sent from an EXTERNAL source. Think before clicking links or opening attachments.**\*\*\*\*\*
Anna,

Would you please so kind and resend me the wire details for your account? By some I couldn't find them.

Thank you,



**Dimitriy Romantsoff**
Board Advisor at Cannafornia

**Address** 26800 Encinal Road, Salinas, CA 93908, USA
**Mobile** (305) 978-7922 **Email** dromantsoff@cannafornia.co
**Website** www.cannafornia.co

On Jul 23, 2019, at 1:43 PM, Enriquez, Anna <AME7@pge.com> wrote:

Hi Dimitriy,

I will send you confirmation once we receive the $42,738.00 payment.

Thank you,

Anna Enriquez
Pacific Gas and Electric
Payment Research Unit
ACH/WIRE
Tel 916-375-5054
Fax 916-375-5102
Email: ame7@pge.com


**From:** Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Sent:** Tuesday, July 23, 2019 11:36 AM
**To:** Enriquez, Anna <AME7@pge.com>; Sanchez, Janie <JU1K@pge.com>
**Cc:** Paul King <paul@cannafornia.co>
**Subject:** Re: CALIFORNIA NEW WAVE I LLC - ACCOUNT #4131507824-0

*****CAUTION: This email was sent from an EXTERNAL source.
Think before clicking links or opening attachments.*****
Dear Janie and Anna,

Please see attached the wire confirmation for $42,738. The sender is
California New Wave I LLC. Please kindly confirm receiving it.

Thank you for your patience.



**Dimitriy Romantsoff**
Board Advisor at Cannafornia

**Address** 26800 Encinal Road, Salinas, CA 93908, USA
**Mobile** (305) 978-7922 **Email** dromantsoff@cannafornia.co
**Website** www.cannafornia.co


On Jul 22, 2019, at 1:01 PM, Enriquez, Anna <AME7@pge.com>
wrote:

Hello Dimitriy,

Attached is the banking information for submitting ach or wire
payments to PG&E.

Thank you,

Anna Enriquez
Pacific Gas and Electric
Payment Research Unit
ACH/WIRE
Tel 916-375-5054
Fax 916-375-5102
Email: ame7@pge.com

We respect your privacy. Please review our privacy policy for more information.
http://www.pge.com/en/about/company/privacy/customer/index.page <Citibank ACH Enrollment Info _Email Verison.pdf>

<image001.jpg>

<Citibank ACH Enrollment Info _Email Verison.pdf>

**From:** **Michael King** michael@kingsgardeninc.com
**Subject:** intro
**Date:** August 19, 2019 at 6:13 PM
**To:** Liz C LizC@damafinancial.com
**Cc:** Paul King paul@cannafornia.co, Steve Morss stevem@damafinancial.com

Hi Liz/Steve want to introduce you to my brother - Paul.

Paul has a large company in California and is currently using other banking services.

Wanted to make an intro.

You can leave me out as its Paul private business. Thanks


--
Respectfully,



**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGardenInc.com

**From: Sophia King** sophiaking06@gmail.com
**Subject:** Fwd: Welcome to Dama Financial!
**Date:** April 2, 2021 at 4:53 PM
**To:** Paulie King paul@cannafornia.co

CHAMP,

Please click on the link below to register for CNW III online account!

Have a great weekend!!!

---------- Forwarded message ---------
From: <support@damafinancial.com>
Date: Sun, Mar 28, 2021 at 10:28 PM
Subject: Welcome to Dama Financial!
To: <sophiaking06@gmail.com>

Dama Financial

Dear Sophia King:

We look forward to providing you access to secure banking services that help you better manage and grow your business, California New Wave III, LLC.

To get started, please click on the link below to set up your Online Account Center account and to select your username. A temporary password will be emailed to you separately after you complete this step. You will be required to change your password when you log in to your account for the first time.

If you don't receive your password, please check your SPAM folder before contacting Dama Financial at clientservices@DamaFinancial.com.

https://secure.damafinancial.com/#/set-username/30ae224d-35d5-4309-9478-572b66c7f0bf

Welcome!
Dama Financial Client Services

To ensure delivery of Dama emails, add                                    to your contacts. As a current account holder, you are not able to opt-out of receiving account-related emails.

Dama Financial respects your privacy. For a complete description of our privacy policy,

©2018 Dama Financial. All rights reserved worldwide. All other trademarks and service marks belong to their owners.

DamaFinancial.com I Privacy Policy

Dama Financial, P.O. Box 5730, South San Francisco, CA 94083

**From:** **Sophia King** sophiaking06@gmail.com 
**Subject:** Re: California New Wave III- Application Has been submitted
**Date:** March 24, 2021 at 7:27 PM
**To:** Alexis E alexise@damafinancial.com
**Cc:** Paul King paul@cannafornia.co, Lisa Pukhyr lisa@cannafornia.co

😃 😃

On Wed, Mar 24, 2021 at 4:21 PM Alexis E <alexise@damafinancial.com> wrote:

It shouldn't take more than a day or two. Maybe sooner!

**From:** Sophia King <sophiaking06@gmail.com>
**Date:** Wednesday, March 24, 2021 at 6:17 PM
**To:** Alexis E <alexise@damafinancial.com>
**Cc:** Jason Wang <jason@damaone.com>, CSTeam <csteam@damaone.com>, Lisa Pukhyr <lisa@cannafornia.co>, Paul King <paul@cannafornia.co>, Steve M <stevem@damafinancial.com>
**Subject:** Re: California New Wave III- Application Has been submitted

# How long does it usually take? Thank you, Alexis!

On Wed, Mar 24, 2021 at 4:05 PM Alexis E <alexise@damafinancial.com> wrote:

Hi All,

As soon as this account is approved I will provide you all the details! Congrats on another app to the bank. 😊

-Alexis

**From:** Sophia King <sophiaking06@gmail.com>
**Date:** Wednesday, March 24, 2021 at 6:00 PM
**To:** Jason Wang <jason@damaone.com>
**Cc:** Alexis E <alexise@damafinancial.com>, CSTeam <csteam@damaone.com>, Lisa Pukhyr <lisa@cannafornia.co>, Paul King <paul@cannafornia.co>, Steve M <stevem@damafinancial.com>
**Subject:** Re: California New Wave III- Application Has been submitted

# Great News, Jason!!!

Thank you ALL for all your help!!!

On Wed, Mar 24, 2021 at 6:40 PM Jason Wang <jason@damaone.com> wrote:

Hey Lisa and Team,

Great news!  California New Wave III has been submitted to the Bank for a Premier Checking account. In this email, I am introducing **you** to our client success team and Steve, our V.P. of Cash Operations.

Your dedicated relationship manager will reach out with next steps.

Thank you for choosing Dama Financial – it was a pleasure working with you.

Best,



**Jason Wang**

C.O.R.E. Team

Client Onboarding Resolution Experts

**650-319-3222** (C)

Jasonw@damafinancial.com

**Schedule a Consultation**

www.damafinancial.com

www.paytender.com



DAMA FINANCIAL CONFIDENTIALITY NOTICE: This electronic mail message and any files transmitted with it are intended exclusively for the individual or entity to which it is addressed. This message, together with any attachment, may have information that is confidential to Dama Financial. Any unauthorized review, use, printing,

saving, copying, disclosure, or distribution is strictly prohibited and may result in legal liability on your part. If you have received this message in error, please immediately notify the sender by return e-mail and erase all copies of the message and/or any attachments.

**From:** **Sophia King** sophiaking06@gmail.com
**Subject:** Fwd: Bank Statements California New Wave III
**Date:** August 16, 2021 at 11:07 AM
**To:** Paulie King paul@cannafornia.co

TD BANK  - statements for CNW 3

---------- Forwarded message ---------
From: **Sophia King** <sophiaking06@gmail.com>
Date: Wed, Jun 9, 2021 at 10:01 AM
Subject: Fwd: Bank Statements California New Wave III
To: Rachel Wright <rwright@abfinwright.com>
Cc: Lisa Pukhyr <lisa@cannafornia.co>

FYI

California New Wave III, LLC
25800 Encinal, Salinas, CA 93908
Salinas, California 93908
(831) 227-2218

Account No. 6680004784

Statement Month:
March 2021

**Monthly Statement**

ACTIVITY HISTORY

| Date | Description | Debit Amount | Credit Amount | Fee | Balance |
|------|-------------|--------------|---------------|-----|---------|
| 03/31/2021 | Axiom Cash Pick Up - BCI000099672 | $0.00 | $25,776.00 | $257.76 | $25,518.24 |
| 03/31/2021 | Cash Courier Fee | $210.00 | $0.00 | $0.00 | $25,308.24 |

BALANCE ACTIVITY

| | |
|---|---|
| Beginning Balance | $0.00 |
| Total Credit | $25,776.00 |
| Total Debit | $210.00 |
| Total fees | $257.76 |
| Closing Balance | $25,308.24 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFER

Email us at ClientServices@DamaFinancial.com, telephone us at 1-877-401-3262 (DAMA) or write us at Dama Financial, P.O. Box 22685 Kansas City, MO 64113 as soon as you can if you think an error has occurred with respect to your Account. We will allow you to report an error until sixty (60) days after the earlier of (i) the date you electronically access an Account statement or a transaction history where the error could be viewed or (ii) the date we sent you the FIRST written transaction history in which the error appeared.

In your error report, you will need to tell us:

1. Tell us your name and account number;
2. Why you believe there is an error and the dollar amount involved; and
3. Approximately when the error took place.

If you tell us orally, we may require that you send us your complaint or question in writing within ten (10) business days.

CHANGES TO YOUR INFORMATION

You are responsible for notifying us of any change in your name, business name, ultimate beneficial owners, physical address, mailing address, email address or phone number no later than two (2) weeks after any such change goes into effect. Any notice of change of address or name required by this Agreement may be provided to us via email at ClientServices@DamaFinancial.com or by telephone at 1-877-401-3262 (DAMA). Requests for address or name changes may be subject to additional verification requirements.

Your client account is maintained at Lead Bank (member FDIC) and serviced by Dama Financial, as Agent of Lead Bank.




5680004784_st atemen...21.pdf

5680004784_st atemen...21.pdf

**From:** **Jason W** JasonW@damafinancial.com
**Subject:** Re:
**Date:** September 13, 2021 at 11:19 AM
**To:** Paul King paulkingceo@gmail.com

Paul,

Who requested this information? I will forward this to your relationship manager.

Best,



**Jason Wang**
C.O.R.E. Team
Client Onboarding Resolution Experts
**650-319-3222** (C)
 Jasonw@damafinancial.com

**Schedule a Consultation**
www.damafinancial.com
www.paytender.com

DAMA FINANCIAL CONFIDENTIALITY NOTICE: This electronic mail message and any files transmitted with it are intended exclusively for the individual or entity to which it is addressed. This message, together with any attachment, may have information that is confidential to Dama Financial. Any unauthorized review, use, printing, saving, copying, disclosure, or distribution is strictly prohibited and may result in legal liability on your part. If you have received this message in error, please immediately notify the sender by return e-mail and erase all copies of the message and/or any attachments.

**From:** Paul King <paulkingceo@gmail.com>
**Date:** Monday, September 13, 2021 at 8:15 AM
**To:** Jason W <JasonW@damafinancial.com>
**Subject:** <no subject>

Hi Jason,

Please connect me with the appropriate person at the bank - I am looking to get the account information for the "A2A" transfers in these statements.

Thank you.

**From:** **Jason W** JasonW@damafinancial.com  🖉
**Subject:** Re:
**Date:** September 13, 2021 at 6:30 PM
**To:** Paul King paulkingceo@gmail.com

Paul

I was told that those A2A transactions are transfers between interest bearing account and checking.

Best,



**Jason Wang**
C.O.R.E. Team
Client Onboarding Resolution Experts
**650-319-3222** (C)
  Jasonw@damafinancial.com

**Schedule a Consultation**
www.damafinancial.com
www.paytender.com

DAMA FINANCIAL CONFIDENTIALITY NOTICE: This electronic mail message and any files transmitted with it are intended exclusively for the individual or entity to which it is addressed. This message, together with any attachment, may have information that is confidential to Dama Financial. Any unauthorized review, use, printing, saving, copying, disclosure, or distribution is strictly prohibited and may result in legal liability on your part. If you have received this message in error, please immediately notify the sender by return e-mail and erase all copies of the message and/or any attachments.

**From:** Paul King <paulkingceo@gmail.com>
**Date:** Monday, September 13, 2021 at 10:20 AM
**To:** Jason W <JasonW@damafinancial.com>
**Subject:** Re:

Alexis?

On Mon, Sep 13, 2021 at 8:29 AM Jason W <JasonW@damafinancial.com> wrote:

Paul,

I have sent this to your relationship manager who will reach out.

Best,

**Jason Wang**
C.O.R.E. Team
Client Onboarding Resolution Experts
650-319-3222 (C)



650-319-3222 (C)
Jasonw@damafinancial.com

**Schedule a Consultation**
www.damafinancial.com
www.paytender.com



DAMA FINANCIAL CONFIDENTIALITY NOTICE: This electronic mail message and any files transmitted with it are intended exclusively for the individual or entity to which it is addressed. This message, together with any attachment, may have information that is confidential to Dama Financial. Any unauthorized review, use, printing, saving, copying, disclosure, or distribution is strictly prohibited and may result in legal liability on your part. If you have received this message in error, please immediately notify the sender by return e-mail and erase all copies of the message and/or any attachments.

**From:** Paul King <paulkingceo@gmail.com>
**Date:** Monday, September 13, 2021 at 8:27 AM
**To:** Jason W <JasonW@damafinancial.com>
**Subject:** Re:

What do you mean?

It was my accounts - california new wave

On Mon, Sep 13, 2021 at 8:19 AM Jason W <JasonW@damafinancial.com> wrote:

Paul,

Who requested this information? I will forward this to your relationship manager.

Best,



**Jason Wang**
C.O.R.E. Team
Client Onboarding Resolution Experts
**650-319-3222** (C)
Jasonw@damafinancial.com



**Schedule a Consultation**
www.damafinancial.com
www.paytender.com



DAMA FINANCIAL CONFIDENTIALITY NOTICE: This electronic mail message and any files transmitted with it are intended exclusively for the individual or entity to which it is addressed. This message, together with any attachment, may have information that is confidential to Dama Financial. Any unauthorized review, use, printing, saving, copying, disclosure, or distribution is strictly prohibited and may result in legal liability on your part. If you have received this message in error, please immediately notify the sender by return e-mail and erase all copies of the message and/or any attachments.

**From:** Paul King <paulkingceo@gmail.com>
**Date:** Monday, September 13, 2021 at 8:15 AM
**To:** Jason W <JasonW@damafinancial.com>
**Subject:** <no subject>

Hi Jason,

Please connect me with the appropriate person at the bank - I am looking to get the account information for the "A2A" transfers in these statements.

Thank you.

**From:** **CORI@Cannabis** CORI@cannabis.ca.gov
**Subject:** RE: Owner Change to California New Wave Companies
**Date:** September 24, 2021 at 4:20 PM
**To:** Kieran Ringgenberg kieran@ringgenberglaw.com
**Cc:** cnwlicensing@gmail.com

Hi Kieran,
There are many delegate contacts with permission to discuss these licenses, but you are not one of them. Please have Paul provide a delegate authorization as described below and also have him let us know if the prior delegates should be removed.

The Department of Cannabis Control does not have authorization to discuss this cultivation application/license with you.
If the applicant entity/licensee would like to grant this authorization, the Designated Responsible Party (PAUL KING) must upload a document to their active applications and/or licenses with the following information:
• Name, contact phone number, and email of the delegate contact
• Whether the delegate contact has the authority for any or all of the following:
- Speak on behalf of the DRP and the business applicant entity
- Request status updates on application and/or license
- Retrieve copies of the application and/or license records
- Take action on an application and/or license (i.e., withdrawal of an application or surrender of license)

Instructions for uploading the document can be found on our eLearning website:
https://www.cdfa.ca.gov/calcannabis/training/


**Stephanie Buck**
AGPA

844-61-CA-DCC (844-612-2322)
info@cannabis.ca.gov
www.cannabis.ca.gov

 **Department of Cannabis Control**
CALIFORNIA


**From:** Kieran Ringgenberg <kieran@ringgenberglaw.com>
**Sent:** Wednesday, September 22, 2021 3:01 PM
**To:** Licensing@Cannabis <licensing@cannabis.ca.gov>
**Cc:** Christopher Bonham <chrisbonham30@gmail.com>
**Subject:** Owner Change to California New Wave Companies

[EXTERNAL]: kr@ringgenberglaw.com

CAUTION: THIS EMAIL ORIGINATED OUTSIDE THE DEPARTMENT OF CANNABIS

CONTROL!
DO NOT: click links or open attachments unless you know the content is safe.
NEVER: provide credentials on websites via a clicked link in an Email.

Dear DCC:

Attached please find owner amendment forms  and a form 27 change form for the licenses listed below, each adding a new owner, Christopher Bonham.

Thank you in advance for your attention.

| License | Entity | Type |
| --- | --- | --- |
| C11-0000268-LIC | California New Wave I, LLC | Commercial - Distributor |
| CCL19-0000766 | California New Wave I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0000767 | California New Wave I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0000923 | California New Wave I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0001020 | CALIFORNIA NEW WAVE I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0001399 | CALIFORNIA NEW WAVE III, LLC | Cultivation - Nursery |
| CCL19-0001525 | CALIFORNIA NEW WAVE V, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0001561 | CALIFORNIA NEW WAVE V, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0004999 | CALIFORNIA NEW WAVE I, LLC | Cultivation - Processor |

**Kieran Ringgenberg**
Ringgenberg Law Firm PC
1940 Embarcadero Oakland, California 94606
(510) 775-7000 (main)
(510) 775-7001 (direct)
*www.ringgenberglaw.com*

**From:** **Paul King** cnwlicensing@gmail.com 
**Subject:** Re: Owner Change to California New Wave Companies
**Date:** September 30, 2021 at 12:08 PM
**To:** CORI@cannabis.ca.gov
**Cc:** Kieran Ringgenberg kieran@ringgenberglaw.com

Kieran has no rights to do anything with the license. They are trying to wrestle control from me. Please keep security measures on my licenses.

Thank you,
Paul King

On Fri, Sep 24, 2021 at 4:20 PM CORI@Cannabis <CORI@cannabis.ca.gov> wrote:

Hi Kieran,

There are many delegate contacts with permission to discuss these licenses, but you are not one of them. Please have Paul provide a delegate authorization as described below and also have him let us know if the prior delegates should be removed.

The Department of Cannabis Control does not have authorization to discuss this cultivation application/license with you.

If the applicant entity/licensee would like to grant this authorization, the Designated Responsible Party (PAUL KING) must upload a document to their active applications and/or licenses with the following information:

• Name, contact phone number, and email of the delegate contact

• Whether the delegate contact has the authority for any or all of the following:

- Speak on behalf of the DRP and the business applicant entity

- Request status updates on application and/or license

- Retrieve copies of the application and/or license records

- Take action on an application and/or license (i.e., withdrawal of an application or surrender of license)

Instructions for uploading the document can be found on our eLearning website: https://www.cdfa.ca.gov/calcannabis/training/

**Stephanie Buck**

AGPA

844-61-CA-DCC (844-612-2322)
info@cannabis.ca.gov
www.cannabis.ca.gov

 **Department of
Cannabis Control**

 CALIFORNIA

**From:** Kieran Ringgenberg <kieran@ringgenberglaw.com>
**Sent:** Wednesday, September 22, 2021 3:01 PM
**To:** Licensing@Cannabis <licensing@cannabis.ca.gov>
**Cc:** Christopher Bonham <chrisbonham30@gmail.com>
**Subject:** Owner Change to California New Wave Companies

[EXTERNAL]: kr@ringgenberglaw.com

CAUTION: THIS EMAIL ORIGINATED OUTSIDE THE DEPARTMENT OF CANNABIS
CONTROL!
DO NOT: click links or open attachments unless you know the content is safe.
NEVER: provide credentials on websites via a clicked link in an Email.

Dear DCC:

Attached please find owner amendment forms  and a form 27 change form for the
licenses listed below, each adding a new owner, Christopher Bonham.

Thank you in advance for your attention.

| License | Entity | Type |
| --- | --- | --- |
| C11-0000268-LIC | California New Wave I, LLC | Commercial - Distributor |
| CCL19-0000766 | California New Wave I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0000767 | California New Wave I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0000923 | California New Wave I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0001020 | CALIFORNIA NEW WAVE I, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0001399 | CALIFORNIA NEW WAVE III, LLC | Cultivation - Nursery |
| CCL19-0001525 | CALIFORNIA NEW WAVE V, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0001561 | CALIFORNIA NEW WAVE V, LLC | Cultivation - Small Mixed-Light Tier 2 |
| CCL19-0004999 | CALIFORNIA NEW WAVE I, LLC | Cultivation - Processor |

**Kieran Ringgenberg**
Ringgenberg Law Firm PC

Ringgenberg Law Firm PC
1940 Embarcadero Oakland, California 94606
(510) 775-7000 (main)
(510) 775-7001 (direct)
*www.ringgenberglaw.com*

**From:** **Bond, Andrew** AndrewBond@dwt.com
**Subject:** RE: SEC Form D for Cannafornia
**Date:** August 23, 2019 at 2:45 PM
**To:** Garrett Lee GLee@dumoulinblack.com, Dimitriy Romantsoff dromantsoff@cannafornia.co
**Cc:** Lindsay Hamelin lindsay@takeitpublicservices.com, Paul King paul@cannafornia.co, Spiro Kletas kletas.spiro@gmail.com,
Leighton Bocking lbocking@nbcap.ca, Tim Lobanov tlobanov@cannafornia.co

Thanks Garrett. The Form D has been successfully filed.

Best regards,

Andrew

**From:** Garrett Lee <GLee@dumoulinblack.com>
**Sent:** Friday, August 23, 2019 11:21 AM
**To:** Dimitriy Romantsoff <dromantsoff@cannafornia.co>; Bond, Andrew
<AndrewBond@dwt.com>
**Cc:** Lindsay Hamelin <lindsay@takeitpublicservices.com>; Paul King <paul@cannafornia.co>;
Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>; Tim
Lobanov <tlobanov@cannafornia.co>
**Subject:** RE: SEC Form D for Cannafornia

[EXTERNAL]

Thanks Andrew.

Please proceed to file.

––––––––––––––––––––
**Garrett Lee**
Associate

**From:** Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Sent:** Friday, August 23, 2019 9:39 AM
**To:** Bond, Andrew <AndrewBond@dwt.com>
**Cc:** Garrett Lee <GLee@dumoulinblack.com>; Lindsay Hamelin
<lindsay@takeitpublicservices.com>; Paul King <paul@cannafornia.co>; Spiro Kletas
<kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>; Tim Lobanov
<tlobanov@cannafornia.co>
**Subject:** Re: SEC Form D for Cannafornia

Hello Andrew,

I am good with it.

Thank you,

*Cannafornia*

**Dimitriy Romantsoff**
Board Advisor at Cannafornia

**Address** 26800 Encinal Road, Salinas, CA 93908, USA
**Mobile** (305) 978-7922 **Email** dromantsoff@cannafornia.co
**Website** www.cannafornia.co

On Aug 23, 2019, at 9:29 AM, Bond, Andrew <AndrewBond@dwt.com> wrote:

Thanks Garrett. Revised Form D attached.

Please let me know if there are any further comments or if we are authorized to file this with the SEC.

Best regards,

Andrew

**From:** Garrett Lee <GLee@dumoulinblack.com>
**Sent:** Thursday, August 22, 2019 4:23 PM
**To:** Bond, Andrew <AndrewBond@dwt.com>; Lindsay Hamelin <lindsay@takeitpublicservices.com>; Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Cc:** Paul King <paul@cannafornia.co>; Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>
**Subject:** RE: SEC Form D for Cannafornia

**[EXTERNAL]**

Thank you Andrew.

Jose Delascasas is also a director of the company. His listed address is 907-1030 W. Georgia St Vancouver, BC V6E 2Y3  Canada.

Other than that chance, everything looks fine to file.

Regards,

**Garrett Lee**
Associate

**From:** Bond, Andrew <AndrewBond@dwt.com>
**Sent:** Thursday, August 22, 2019 3:29 PM
**To:** Garrett Lee <GLee@dumoulinblack.com>; Lindsay Hamelin <lindsay@takeitpublicservices.com>; Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Cc:** Paul King <paul@cannafornia.co>; Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>
**Subject:** RE: SEC Form D for Cannafornia

All,

I've enclosed a revised Form D reflecting the new company name and the new directors and officer.

Please let me know if you have any questions or if we are authorized to file it with the SEC.

Best regards,

Andrew

**From:** Garrett Lee <GLee@dumoulinblack.com>
**Sent:** Thursday, August 15, 2019 11:05 AM
**To:** Bond, Andrew <AndrewBond@dwt.com>; Lindsay Hamelin <lindsay@takeitpublicservices.com>; Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Cc:** Paul King <paul@cannafornia.co>; Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>
**Subject:** RE: SEC Form D for Cannafornia

[EXTERNAL]

Hi Andrew,

The sole office of the company is Paul King.  Paul is President and CEO.

Thanks.

_____

**Garrett Lee**
Associate

**From:** Bond, Andrew <AndrewBond@dwt.com>
**Sent:** Thursday, August 15, 2019 10:36 AM
**To:** Garrett Lee <GLee@dumoulinblack.com>; Lindsay Hamelin <lindsay@takeitpublicservices.com>; Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Cc:** Paul King <paul@cannafornia.co>; Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>
**Subject:** RE: SEC Form D for Cannafornia

Hi Garrett,

I'm updating the Form D to reflect the new name and the new directors listed on the Notice of Articles. Can you please let me know the list of officers to also include on the Form.

Thanks,

Andrew

**From:** Garrett Lee <GLee@dumoulinblack.com>
**Sent:** Wednesday, August 14, 2019 2:41 PM
**To:** Lindsay Hamelin <lindsay@takeitpublicservices.com>; Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Cc:** Bond, Andrew <AndrewBond@dwt.com>; Paul King <paul@cannafornia.co>; Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>
**Subject:** RE: SEC Form D for Cannafornia

[EXTERNAL]

Hi Lindsay,

That is correct.   Effective yesterday Cannafornia changed its name to Big Hugs Holdings Inc.  Attached is the Certificate of Name Change, Notice of Alteration and Notice of Articles

Notice of Articles.

Please let us know if you need anything further.

Regards,

_____

**Garrett Lee**
Associate

**From:** Lindsay Hamelin <lindsay@takeitpublicservices.com>
**Sent:** Wednesday, August 14, 2019 2:19 PM
**To:** Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Cc:** Bond, Andrew <AndrewBond@dwt.com>; Paul King <paul@cannafornia.co>;
Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>;
Garrett Lee <GLee@dumoulinblack.com>
**Subject:** RE: SEC Form D for Cannafornia

Hi Dimitriy,

I have not been made aware of the name change effective date but I have copied in Garrett who can confirm. Thank you.

Kind regards,

**Lindsay Hamelin**

**B** 604.682.2928  **D** 778.945.0348  **F** 604.685.6905
E:  lindsay@takeitpublicservices.com

**From:** Dimitriy Romantsoff <dromantsoff@cannafornia.co>
**Sent:** August 14, 2019 2:17 PM
**To:** Lindsay Hamelin <lindsay@takeitpublicservices.com>
**Cc:** Bond, Andrew <AndrewBond@dwt.com>; Paul King <paul@cannafornia.co>;
Spiro Kletas <kletas.spiro@gmail.com>; Leighton Bocking <lbocking@nbcap.ca>
**Subject:** Re: SEC Form D for Cannafornia

Lindsay,

Per my understanding, we changed the Corporate name for Cannafornia Holding Inc Canada yesterday. Are you aware of that?



**Dimitriy Romantsoff**
Board Advisor at Cannafornia

**Address** 26800 Encinal Road, Salinas, CA 93908, USA
**Mobile** (305) 978-7922  **Email** dromantsoff@cannafornia.co
**Website** www.cannafornia.co

On Aug 14, 2019, at 9:43 AM, Lindsay Hamelin <lindsay@takeitpublicservices.com> wrote:

Hi Andrew,

I believe Leighton is a promoter too (item 3). I don't have any other comments.
Thank you.

Kind regards,

**Lindsay Hamelin**

**B** 604.682.2928  **D** 778.945.0348  **F** 604.685.6905
E: lindsay@takeitpublicservices.com

**From:** Bond, Andrew <AndrewBond@dwt.com>
**Sent:** August 14, 2019 9:33 AM
**To:** Paul King <paul@cannafornia.co>; Spiro Kletas
<kletas.spiro@gmail.com>
**Cc:** Dimitri Romantsoff <Dromantsoff@cannafornia.co>; Leighton
Bocking <lbocking@nbcap.ca>; Lindsay Hamelin
<lindsay@takeitpublicservices.com>
**Subject:** RE: SEC Form D for Cannafornia

Hi Paul,

Draft Form D attached.

Best regards,

Andrew

**From:** Paul King <paul@cannafornia.co>
**Sent:** Wednesday, August 14, 2019 9:07 AM
**To:** Spiro Kletas <kletas.spiro@gmail.com>
**Cc:** Bond, Andrew <AndrewBond@dwt.com>; Dimitri Romantsoff
<Dromantsoff@cannafornia.co>; Leighton Bocking
<lbocking@nbcap.ca>; lindsay@takeitpublicservices.com
**Subject:** Re: SEC Form D for Cannafornia

**[EXTERNAL]**

Hi guys, nothing attached

On Tue, Aug 13, 2019 at 3:46 PM Spiro Kletas
<kletas.spiro@gmail.com> wrote:

> Andrew, I have ccd Paul King, the ceo of the company and Lindsay
> and Leighton (Director).
> Looks good to me. Do you guys have any comments?
>
> Spiro Kletas
> 604-723-0710
>
> Sent from my iPhone
>
> On Aug 13, 2019, at 2:14 PM, Bond, Andrew
> <AndrewBond@dwt.com> wrote:

Hi Spiro,

I've enclosed for review and approval the Form D we intend to file with the SEC on behalf of Cannafornia Holdings (Canada) in connection with the Class B shares issued pursuant to the Contribution Agreement.

Please let me know if you have any questions or comments or if we have authorization to file on behalf of the company.

Best regards,

Andrew

<CANNAFORNIA HOLDINGS INC- FORM D - DRAFT (8-13-19).pdf>

--



**Paul King**
Founder & CEO at Cannafornia

**Address** 26800 Encinal Road, Salinas, CA 93908, USA
**Mobile** (786) 200-3429 **Website** www.cannafornia.co

<Big Hugs Holdings Inc. - Form D - Draft (08.23.2019).pdf>

**FORM D**

Notice of Exempt Offering of Securities

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C.

**OMB APPROVAL**

OMB Number: 3235-0076

Estimated Average burden hours per response: 4.0

---

CIK (Filer ID Number)        Previous Name(s)    ☑ None        Entity Type

| 0001785283 |

Name of Issuer

| Cannafornia Holdings, Inc./CAN |

Jurisdiction of Incorporation/Organization

| BRITISH COLUMBIA, CANADA |

**Year of Incorporation/Organization**

○ Over Five Years Ago

◉ Within Last Five Years (Specify Year)    | 2019 |

○ Yet to Be Formed

◉ Corporation

○ Limited Partnership

○ Limited Liability Company

○ General Partnership

○ Business Trust

○ Other

---

Name of Issuer

| Cannafornia Holdings, Inc./CAN |

Street Address 1                              Street Address 2

| 907-1030 WEST GEORGIA STREET |

City                    State/Province/Country    ZIP/Postal Code    Phone No. of Issuer

| VANCOUVER | | BRITISH COLUMBIA, CANADA | | V6E 2Y3 | | 604-307-8225 |

158 of 384

| Last Name | First Name | Middle Name |
|---|---|---|
| Bocking | Leighton | |

| et Address 1 | Street Address 2 |
|---|---|
| 907 - 1030 West Georgia Street | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Vancouver | BRITISH COLUMBIA, CANADA | V6E 2Y3 |

| Relationship: | ☐ Executive Officer | ☑ Director | ☐ Promoter |
|---|---|---|---|

Clarification of Response (if Necessary)

○ Agriculture

**Banking & Financial Services**

○ Commercial Banking

○ Insurance

○ Investing

○ Investment Banking

○ Pooled Investment Fund

○ Other Banking & Financial Services

○ Business Services

**Energy**

○ Coal Mining

○ Electric Utilities

○ Energy Conservation

○ Environmental Services

○ Oil & Gas

○ Other Energy

**Health Care**

○ Biotechnology

○ Health Insurance

○ Hospitals & Physicians

○ Pharmaceuticals

○ Other Health Care

○ Manufacturing

**Real Estate**

○ Commercial

○ Construction

○ REITS & Finance

○ Residential

○ Other Real Estate

○ Retailing

○ Restaurants

**Technology**

○ Computers

○ Telecommunications

○ Other Technology

**Travel**

○ Airlines & Airports

○ Lodging & Conventions

○ Tourism & Travel Services

○ Other Travel

◉ Other

---

**Revenue Range**

◉ No Revenues

○ $1 - $1,000,000

○ $1,000,001 - $5,000,000

○ $5,000,001 - $25,000,000

○ $25,000,001 - $100,000,000

○ Over $100,000,000

○ Decline to Disclose

○ Not Applicable

**Aggregate Net Asset Value Range**

○ No Aggregate Net Asset Value

○ $1 - $5,000,000

○ $5,000,001 - $25,000,000

○ $25,000,001 - $50,000,000

○ $50,000,001 - $100,000,000

○ Over $100,000,000

○ Decline to Disclose

○ Not Applicable

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☑ Rule 506(b)

☐ Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Investment Company Act Section 3(c)

☑ New Notice    Date of First Sale    **2019-07-26**    ☐ First Sale Yet to Occur

☐ Amendment

Does the Issuer intend this offering to last more than one year?    ○ Yes    ◉ No

☐ Pooled Investment Fund Interests      ☑ Equity

☐ Tenant-in-Common Securities          ☐ Debt

☐ Mineral Property Securities          ☐ Option, Warrant or Other Right to Acquire
                                          Another Security

☐ Security to be Acquired Upon Exercise   ☐ Other (describe)
  of Option, Warrant or Other Right to
  Acquire Security

Is this offering being made in connection with a business combination transaction,      ⦿ Yes   ○ No
such as a merger, acquisition or exchange offer?

Clarification of Response (if Necessary)

Class B voting shares of the Issuer were issued to the shareholders of Cannafornia
Holdings, Inc. ("USCO") in exchange for all shares of common stock of USCO
pursuant to the Contribution Agreement between the Issuer USCO and each
shareholder of USCO.

Minimum investment accepted from any outside         $ 0                          USD
investor

Recipient

Recipient CRD Number

☐ None

(Associated) Broker or Dealer

☐ None

(Associated) Broker or Dealer CRD Number

☐ None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation

☐ All States

Total Offering Amount  $ [                    ] USD  ☑ Indefinite

l Amount Sold  $ [0                   ] USD

Total Remaining to be Sold  $ [                    ] USD  ☑ Indefinite

Clarification of Response (if Necessary)

[                                        ]

Select if securities in the offering have been or may be sold to persons who do
not qualify as accredited investors.
☐  Number of such non-accredited investors who already have invested in the
offering

[                    ]

Regardless of whether securities in the offering have been or may be sold to
persons who do not qualify as accredited investors, enter the total number of
investors who already have invested in the offering:

[12                  ]

vide separately the amounts of sales commissions and finders' fees expenses, if any. If the amount of an expenditure is
not known, provide an estimate and check the box next to the amount.

Sales Commissions  $ [0                ] USD  ☐ Estimate

Finders' Fees  $ [0                ] USD  ☐ Estimate

Clarification of Response (if Necessary)

[                                        ]

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of
the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is
unknown, provide an estimate and check the box next to the amount.

$ [0                    ] USD  ☐ Estimate

Clarification of Response (if Necessary)

[                                        ]

Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.

Terms of Submission

**In submitting this notice, each Issuer named above is:**

- **Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, the information furnished to offerees.**
- **Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the Issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.**
- **Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).**

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Cannafornia Holdings, Inc./CAN | /s/ Leighton Bocking | Leighton Bocking | Director | 2019-08-13 |

**Prepared By**

SHAUNA WATKINS
787 N. PALM CANYON DRIVE
PALM SPRINGS, CALIFORNIA
92262

**After Recording Return To**

MICHAEL KING
18975 COLLINS AVENUE, UNIT 3203
SUNNY ISLES BEACH, FLORIDA
33160

Space Above This Line for Recorder's Use

## <u>FLORIDA QUIT CLAIM DEED</u>

STATE OF FLORIDA
MIAMI-DADE COUNTY

KNOW ALL MEN BY THESE PRESENTS, that for and in consideration of the sum of Seven Hundred Thousand Dollars ($700,000.00) and/or other valuable consideration to the below in hand paid to the Grantor(s) known as:

PAUL KING, a single individual, residing at 18201 COLLINS AVENUE #503, SUNNY ISLES BEACH, Florida, 33160.

The receipt whereof is hereby witnessed and acknowledged, the undersigned hereby quitclaims to MICHAEL KING and MARIANNA KING, a married couple, residing at 18975 COLLINS AVENUE, UNIT 3203, SUNNY ISLES BEACH, Florida, 33160 (hereinafter called the "Grantee(s)") as joint tenants, all the rights, title, interest, and claim in or to the following described real estate, situated in MIAMI-DADE County, Florida, to-wit:

Condominium Unit No. 503, TRUMP ROYALE. a condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 26542, Page 626, of the Public Records of Miami-Dade County, Florida, together with all appurtenances thereto, including an undivided interest in the Common Elements of said Condominium, as set forth in the Declaration. Parcel Identification Number: 31-2211-080-1120

Page 1

**To have and to hold**, the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever for the said first party, either in law or equity, to the only proper use, benefit and behoof of the said second party forever.

**Grantor's Signature** _____ Date December, 22 2020

**Print Name:** PAUL KING

**Address:** 18201 COLLINS AVENUE #503, SUNNY ISLES BEACH, Florida, 33160

_____ Date December, 22 2020

**Witness's Signature**

_____

Name of Witness

_____

Street Address

_____ Date December, 22 2020

**Witness's Signature**

_____

Name of Witness

_____

Street Address

Page 2

State of Florida

County of MIAMI-DADE

I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that
_____ whose
names are signed to this Quit Claim Deed, and who is known to me, acknowledged before me on this
day that, being informed of the contents of the instrument, they, executed the same voluntarily on the
day the same bears date.

Given under my hand this ___ day of _____, 20___.

_____ **(SEAL)**

Notary Public

My Commission Expires: _____

CFN: 20210106967 BOOK 32344 PAGE 2806
DATE:02/10/2021  11:23:02 AM
DEED DOC 0.60
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

PREPARED BY :
Name:   Arianna Goldman, Esq.
Address: 320 SE 18th Street
         Fort Lauderdale, FL 33316

File No:  King QCD

AND RETURN TO:
Michael King
18975 Collins Ave., #3203
Sunny Isles Beach, FL 33160

(Space Above This Line For Recording Data)

## Quit Claim Deed

**THIS QUIT-CLAIM DEED** is made as of this **22nd** day of **December, 2020**, by **Paul King, a single man** ("**Grantor**"), whose post office address is **18201 Collins Ave., #503, Sunny Isles Beach, FL 33160**, given to second party, **Michael King and Marianna King, a married couple**, whose post office address is **18975 Collins Ave., #3203, Sunny Isles Beach, FL 33160** ("**Grantee**").

W I T N E S S E T H :

For good and valuable consideration to Grantor, the receipt whereof is hereby acknowledged, Grantor does hereby quit-claim, grant, bargain, sell, alien, remise, release and convey unto Grantee, its successors and assigns all of Grantor's right, title and interest in and to that certain property interest (the "Property") in **Miami-Dade** County, Florida, as more particularly described as follows:

**Condominium Unit No. 503 in TRUMP ROYALE, a condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 26642, Page 626, of the Public Records of Miami-Dade County, Florida, together with all appurtenances thereto, including an undivided interest in the Common Elements of said Condominium, as set forth in the Declaration. to time, together with an undivided interest in the common elements appurtenant thereto.**
**Parcel ID No 31-2211-080-1120**

**Transfer of unencumbered property between related parties and minimum transfer taxes are being remitted.**

**Preparer of this deed did not conduct a title search in connection with this transaction.**

SUBJECT to taxes for 2021 and subsequent years, not yet due and payable; covenants, restrictions, easements, reservations and limitations of record, if any, without intention of creation or reimposing same.

*\*\*SIGNATURE PAGE TO FOLLOW\*\**

CFN: 20210106967 BOOK 32344 PAGE 2807

**To have and to hold**, the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever for the said first party, either in law or equity, to the only proper use, benefit and behoof of the said second party forever.

**Grantor's Signature** _____ Date December, 22 2020

**Print Name**: PAUL KING

**Address**: 18201 COLLINS AVENUE #503, SUNNY ISLES BEACH, Florida, 33160

---

_____ Date December, 22 2020

**Witness's Signature**

Carmen A. Jones

Name of Witness

2425 NE 183rd St, NMB, FL 33160

Street Address

_____ Date December, 22 2020

**Witness's Signature**

Sophia L. King

Name of Witness

15811 Collins Ave #1106, SIB, FL 33160

Street Address

State of Florida

County of MIAMI-DADE

I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that
_Paul mKing_____ whose
names are signed to this Quit Claim Deed, and who is known to me, acknowledged before me on this
day that, being informed of the contents of the instrument, they, executed the same voluntarily on the
day the same bears date.

Given under my hand this _18_ day of _December_, 20_20_

_____ (SEAL)
Notary Public

CARMEN A. JONES
Commission # GG 302361
Expires May 12, 2023

My Commission Expires: _5/12/23_



# LEASE /PURCHASE CHECKLIST

Unit # _____   Date: _____

### FOR MANAGEMENT USE ONLY

☐ Lease /Purchase Application _____

☐ Copy of ID's _____

☐ Background Check _____

☐ Copy of a Lease _____

☐ Access Permission Form _____

☐ Package Release Form _____

☐ Pet Registration _____

☐ Sales Contract _____

☐ Mortgage /Bank Approval _____

☐ Security Deposit _____

☐ Application Fee _____

☐ Maintenance Account Status _____

☐ Move in Deposit _____

☐ Complete           ☐ Incomplete

Received By : _____ Date: _____

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# LEASE/ PURCHASE APPLICATION

**Complete all questions. If any question is not answered or left blank, application will be considered incomplete.**
**Please print legibly. Missing or illegible information will cause delays. All information will be verified.**

| Lease /Purchase Unit Information | | | |
|---|---|---|---|
| Building Name: **TRUMP ROYALE** | Unit Number: 503 | | Application Date /Received: |
| Lease / Purchase   Purchase | | Application fee received: | |
| Anticipated Move in/ Close Date: Jan 2021 | | Rent/ Lease Term: | |

| Applicant Information | | | |
|---|---|---|---|
| Last Name:   King | | First Name:   Michael | |
| Date of birth:   06/20/1978 | SSN:   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 | | Cell Phone #:   347-996-7844 |
| Current address:   18975 Collins Ave #3203 | | | |
| City:   Sunny Isles | | State:   Florida | ZIP Code: 33160 |
| Own / Rent   own | Monthly payment or rent: | | How Long?   1 year |
| Passport # | Country: | | Expiration date: |
| Driver's License #   Y2741957 | | State Issued:   CA | Expiration date: 06/20/24 |
| E-mail:   nycregroup@icloud.com | | | |

| Applicant Employment Information | | | |
|---|---|---|---|
| Current employer:   Desert Construction Services, LLC | | | |
| Employer address:   3540 N Anza Rd | | | How long?   6 yrs |
| Phone:   3479967844 | E-mail: nycregroup@icloud.com | | |
| City:   Palm Springs | State:   CA | | ZIP Code:   92262 |
| Position:   President | Hourly / Salary | | Annual income:   400k/yr |

| Co-Applicant Information | | | |
|---|---|---|---|
| Last Name:   King | | First Name:   Marianna | |
| Date of birth:   07/29/1977 | SSN: 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 | Cell Phone #:   305-494-2009 | |
| Current address:   18975 Collins Ave #3203 | | | |
| City:  Sunny Isles | State:   Florida | ZIP Code:   33160 | |
| Own / Rent   own | Monthly payment or rent: | | How Long? |
| Passport # | Country: | Expiration date:   7/29/2023 | |
| Driver's License #   Y5518300 | State Issued:   CA | Expiration date:   9/10/2018 | |
| E-mail:   mariannaking777@gmail.com | | | |

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333

173 of 384

## Co-Applicant Employment Information

| | | | |
|---|---|---|---|
| Current employer: mom/house wife | | | |
| Employer address: | | | How long? |
| Phone: | E-mail: | | Fax: |
| City: | State: | | ZIP Code: |
| Position: | Hourly / Salary | | Annual income: |

## Emergency Contact Information

| | |
|---|---|
| Name: Sophia King | Phone: 305-401-4723 |

Address: 15811 Collins Ave. #1505

| City: Sunny Isles | State: Florida | ZIP Code: 33160 |
|---|---|---|

## Financial History

| Bank Name: Salal Credit Union | Address: PO Box 75029 | |
|---|---|---|
| City: Seatle | State: Washington | ZIP Code: 98175 |
| Phone: 800.562.5515 | Contact Name: Steve Lousier | |

| Have you or the co-applicant ever filed for Bankruptcy?   NO | | If Yes, when: | |
|---|---|---|---|
| Have you or the co-applicant ever been Evicted from any tenancy?   NO | | Ever Broken a Lease?   NO | Ever Sued?   NO |

## Personal References (No Family Members)

| | |
|---|---|
| Name: Charles Kieley | Phone: 714-587-0383 |
| Relationship: Business Associate | |
| Name: Lauri Kibby | Phone: 310-877-3110 |
| Relationship: Business Associate | |

## Vehicle /Motorcycle Information

| Vehicle 1 Make: NA | Model: | Color: |
|---|---|---|
| Year: | License Plate # | State: |
| Vehicle 2 Make: | Model: | Color: |
| Year: | License Plate # | State: |

## Convictions

Have you or the co-applicant ever been arrested or convicted of any crime? Include misdemeanors, DUI, etc. or are any criminal charges now pending?   YES / NO

If YES, City:        NO

State:

Date:

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333

| Other Occupants | | |
|---|---|---|
| Name: NA | Relationship: | |
| Name: | Relationship: | |
| Name: | Relationship: | |

I hereby authorize 18201 Collins Avenue Condominium Association dba Trump Royale to obtain a consumer report, and any other information it deems necessary, for the purpose of evaluating my application. I understand that such information may include, but not limited to, credit history, civil and criminal information, records of arrest, rental history, employment/salary details, vehicles records, licensing records, and/ or any other necessary information. I understand that subsequent consumer reports may be obtained and utilized under this authorization in connection with an update, renewal, extension or collection with respect or in connection with the lease or purchase of a residence for which this application was made. I hereby expressly release Trump Royale and any procurer or furnisher of information from any liability what-so-ever in the use, procurement, or furnishing of such information, and understand that my application information may be provided to various local, state, and /or federal government agencies including without limitation, various law enforcement agencies.

I /We further state this Application and Authorization was signed by me /us and was not originated with fraudulent intent by me /us or any other person that the signature(s) below are my /our own proper signature. I /We certify under penalty of perjury that the foregoing is true and correct.

| Signature of applicant | Date: 12/15/2020 |
|---|---|
| Signature of co-applicant | Date: 12/15/2020 |

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# PET REGISTRATION

| Unit No. NA | Date |
|---|---|
| Legal Owner Name ("Owner") | |
| Primary Resident /Occupant Name /Family | Lessee (if applicable) |

| **Pet Information** |
|---|
| Name: |
| Type: Dog / Cat / Bird |
| Breed |
| Age |
| Weight |
| Gender |
| Service animal license (if applicable) |
| Vaccination records received: |
| Picture received: |

Acknowledgement & Agreement

I /We am /are aware of the Association rules, regulations and restrictions regarding pets on the property and agree to abide by them.

Signed _____ Date  12/18/2020

Signed _____ Date _____

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# BACKGROUND CHECK AUTHORIZATION FORM

You are hereby authorized to release any and all information requested with regards to verification of my bank account(s), credit history, criminal record history, employment verification and character references to Association's third-party screening company. This information is to be used for my /our credit report for my /our Application for Occupancy.

I /We hereby waive any privileges I /We may have with respect to the said information in reference to its release to the aforesaid party. Information obtained for this report is to be released to the screening company, Property Manager, Board of Directors and the Landlord for their exclusive use only.

PLEASE INCLUDE A COPY OF YOUR DRIVER'S LICENSE AND SOCIAL SECURITY CARD TO CONFIRM IDENTITY. IF YOU DO NOT HAVE A SOCIAL SECURITY CARD, PLEASE INCLUDE A COPY OF YOUR PASSPORT /CURRENT IDENTIFICATION CARD.

I /We further state this Authorization is signed by me /us and was not originated with fraudulent intent by me /us or any other person and the signature(s) below are my /our own proper signature.

I /We certify under penalty of perjury that the foregoing is true and correct.

If you or the co-applicant have falsified, deliberately mislead or omitted to mention any information on your application, you may not be approved for a purchase, lease and or occupancy.

Michael King
(Applicant Name Printed)            (Applicant's signature)            Date 12/18/2020

Marianna King
(Applicant Name Printed)            (Applicant's signature)            Date 12/18/2020

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# OWNERS /TENANTS ACCESS PERMISSION FORM

This form is to be submitted to the Management Office in order for access to be granted to any individual or entity. Front Desk /Receiving Desk is not allowed to accept changes to existing access permissions forms under any circumstances.

NA

_____, the undersigned do hereby certify that we are the owners/legal residents of Unit No. _____ in TRUMP ROYALE A CONDOMINIUM and we hereby authorize the following individuals and /or companies to enter upon the property maintained by the residential community known as TRUMP ROYALE A CONDOMINIUM.

| | Guest Name | Relationship | Expiration Date |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

We understand that by signing this Access Permission Form, we are granting access without a phone call to persons listed on this form.  Access is granted up to the unit only.  As owner, we will take responsibility for providing our guests and service contractor with access to our individual unit as necessary. Pursuant to the Declaration of Condominium for TRUMP ROYALE A CONDOMINIUM and the Declaration of Covenants, Restrictions and Easements for TRUMP ROYALE A CONDOMINIUM, we will be responsible for the expense of any maintenance, repairs or replacements rendered necessary by the act, neglect or carelessness of any and all of the foregoing persons. In connection therewith, we do hereby irrevocably and unconditionally agree to indemnify and hold harmless the TRUMP ROYALE A CONDOMINIUM, the Association, their respective affiliates, owners, partners, successors, assigns, agents, directors, officers and employees, from any and all claims, liabilities, damages, and expenses arising from or related to the presence of any of the foregoing persons on the property. Access will not be granted by verbal request.  THIS FORM IS NOT USED TO ALLOW ACCESS NOR ANY SERVICE TO BUILDING'S COMMON AREAS AND IT'S SERVICES.

Owner's /Tenant Signature _____     Date: 12/18/2020

Received by Management _____     Date: _____

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333



# PACKAGE ACCEPTANCE/RELEASE FORM

Unit Number   503

I/We,   Michael King   , by signing this addendum, give Trump Royale employees, its agent and affiliates permission to sign and accept package deliveries addressed to my/our name and unit number.

I understand and agree to hold Trump Royale, its agent, employees and affiliates harmless of any damage to delivered packages and will not hold them responsible for package damage, missing package items, theft, etc. Residents have an option of requesting a package to be delivered and left at the front door of the unit. Should I choose this option that is available to me, I will not hold Trump Royale, its employees, its agent and affiliates responsible for the package/s once left at the front door.

I agree and understand that any package left with management/receiving more than 30 days from delivery date will be returned to sender.

I agree and acknowledge that only a reasonable number of packages can be held for my unit.

_____          12/18/2020
Resident Signature                        Date

_____          _____
Resident Signature                        Date

18201 Collins Avenue, Sunny Isles Beach, FL 33160 * T 305.917.0300 * F 305.917.0333

Jones, Carmen                                    June 17, 2021

1

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA


PAUL KING,

       Plaintiff,

vs.                              Case No.: 2021-009769-CA-01

MICHAEL KING,

       Defendant.

_____/


DEPOSITION OF CARMEN JONES


TAKEN BY:        Defendant Herein

DATE:            Thursday, June 17, 2021

TIME:            2:20 p.m. - 4:11 p.m.

PLACE:           Videoconference

REPORTED BY:     Linda C. Mead, CCR, CSR
                 Notary Public, State of Florida

Jones, Carmen                                    June 17, 2021

2

```
1    APPEARANCES:      (All by Videoconference)

2    MENACHEM MAYBERG, ESQUIRE
        Seltzer Mayberg
3       10750 NW 6th Court
        Miami, Florida 33168
4       (305)444-1565
        menachem@smfirm.com
5         Appearing on behalf of Plaintiff

6

     JASON R. BURATTI, ESQUIRE
7       Buratti, P.A.
        17111 Biscayne Boulevard
8       Suite 1708
        Aventura, Florida 33160
9       (954)683-1072
        jason@burattilaw.com
10        Appearing on behalf of Defendant

11

12   ALSO PRESENT:  Paul King

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jones, Carmen                                           June 17, 2021

3

1    DEPOSITION OF:   CARMEN JONES

2

3                           INDEX

4    Examination                              Page

5    By Mr. Buratti................................   14

6    By Mr. Mayberg...............................   60

7

8

9

10                          EXHIBITS

11                                            Page

12   PLAINTIFF'S

13   Exhibit 1, M. King/Jones 5/25/21 E-Mail........   64

14   Exhibit 1A, Jones/Buratti E-Mail Chain.........   72

15   Exhibit 2, 6/3/21 M. King/Jones E-Mail........   76

16   Exhibit 3, 5/26/21 Jones/M. King E-Mail........   76

17   Exhibit 4, 5/26/21 M.King/Jones E-Mail.........   76

18

19   DEFENDANT'S

20   Exhibit 1, Quit Claim Deed....................   25

21   Exhibit 2, Jones/Buratti E-Mail Chain..........   41

22

23

24

25

Jones, Carmen                                          June 17, 2021

4

```
1                        PROCEEDINGS

2                      *  *  *  *  *

3

4            THE COURT REPORTER:  The attorneys

5     participating in this deposition acknowledge that

6     I, the court reporter, am not present with the

7     witness and that I will be reporting the

8     proceedings and administering the oath remotely.

9            This arrangement is pursuant to an order of

10    the Florida Supreme Court.  The parties and their

11    counsel consent to this arrangement and waive any

12    objections to this manner of reporting.

13           Would counsel please indicate your agreement

14    by stating your name and your agreement on the

15    record.

16           MR. BURATTI:  My name is Jason Buratti and

17    I'm counsel for Michael King, the Defendant, in

18    this case and his wife Marianna King, co-Defendant

19    in this case, and I agree to that statement.

20           MR. MAYBERG:  So my name is Menachem Mayberg.

21    I'm the attorney for Paul King.

22           And I don't understand.  What -- Is this a

23    statement that's standard?

24           This is the -- I've taken Zoom depos and I

25    haven't heard this statement read and I don't
```

Jones, Carmen                                    June 17, 2021

5

1    quite understand.

2         Was this an agreement that was supposed to

3    have had between the attorneys specifically for

4    this?

5         THE COURT REPORTER:  No.  This is a standard

6    statement that we read over here in this local

7    area.

8         MR. MAYBERG:  No, I understand that, but why

9    is the deponent not in your office?

10        THE COURT REPORTER:  It was just set up this

11   way, everybody by Zoom.

12        MR. MAYBERG:  I didn't agree to that and I

13   don't know of any other prior counsel that did.

14        Perhaps Mr. Buratti can enlighten us.

15        MR. BURATTI:  Yes.  So we have made all the

16   efforts that we need to make in order to clear the

17   date for this deposition.

18        I do apologize that you're the newest counsel

19   on the file for Mr. Paul King, who I understand to

20   be your client; however, I tried to clear these

21   dates with two other co-counsel that are still of

22   record in this file with them in advance and I

23   plan to proceed.

24        I understand you'll be registering objections

25   to that and that you're going to reserve the right

Jones, Carmen                                    June 17, 2021

6

1    to recross -- or to cross.

2         MR. MAYBERG:  Yeah, no, but I -- And I will,

3    and thank you for you that, but I'm just asking

4    about this particular procedure where --

5         MR. BURATTI:  We're proceeding according to

6    the handbook by the Florida Courts.

7         MR. MAYBERG:  Okay.  So that's what I'm

8    asking.  So this deponent is -- Is it --

9         But from the statement it seems like it has

10   to be by agreement between both sides.  So if you

11   moved forward without -- without hearing back from

12   what you say is opposing counsel on whether or not

13   this is an agreeable date, if you did move

14   forward, then I would argue that if you set it

15   unilaterally, or at least without response, you

16   still have to have the deponent in an area where

17   the court reporter's office is.

18        Because the only way to do it offsite, the

19   way we're doing it now, based on the statement

20   that the court reporter just mentioned, is by

21   agreement with attorneys.

22        So that's not the rule, that's only by

23   agreement if the attorneys agree for the deponent

24   not to be in the office of one of the attorneys or

25   the -- the court reporter.

Jones, Carmen                                          June 17, 2021

7

1          MR. BURATTI:  I believe we're following the

2     Florida procedures and rules that are in place for

3     this deposition, and if you have an objection,

4     you're welcome to make the objection.

5          MR. MAYBERG:  So then, Madam Court Reporter,

6     if you can read that statement again.

7          THE COURT REPORTER:  The attorneys --

8          MR. MAYBERG:  Because you reference --

9          THE COURT REPORTER:  The attorneys --

10          MR. MAYBERG:  Can we put it on the screen so

11     I can see the -- the reference you used, the

12     court -- whatever code or --

13          THE COURT REPORTER:  I -- I don't have the

14     actual administrative number.  I'd have to go back

15     and research that.  There is a code number for it

16     that the Florida Supreme Court put in place

17     through -- because of COVID-19.

18          MR. MAYBERG:  No, I understand that, but if

19     you can -- Then maybe I can parse the statement as

20     it goes.  So if you can just start it and then

21     I'll ask you questions.

22          THE COURT REPORTER:  The attorneys

23     participating in this deposition acknowledge that

24     I, the court reporter, am not present with the

25     witness and that I will be reporting the

Jones, Carmen                                    June 17, 2021

8

1     proceedings and administering the oath remotely.

2          This arrangement is pursuant to an order of

3     the Florida Supreme Court.  The parties and their

4     counsel consent to this arrangement and waive any

5     objections to this manner of reporting.

6          Would counsel please indicate your agreement

7     by stating your name and your agreement on the

8     record.

9          MR. MAYBERG:  All right.  I just need to know

10    the administrative order so I can look it up,

11    because Mr. -- Mr. Buratti is stating that this is

12    the nature of how it's done.

13         You're asking me to acknowledge an

14    administrative order, but I don't know what

15    administrative order you're asking me to

16    acknowledge.

17         So if the administrative order says that

18    because of COVID it must happen this way, then

19    obviously that's different than if the attorneys

20    have to agree for the deponent to be on their own

21    and the administered oath to be the way we're

22    doing it today and the recording to be today.

23         So I just -- If you can tell me that

24    administrative order, I'll look it up right now.

25         THE COURT REPORTER:  It will take me a

Jones, Carmen                                    June 17, 2021

1        minute.  I can tell you we have gone without this

2        statement being read before.  This is just to

3        clarify for -- to put on the record that I am

4        remote from the deponent.

5            MR. MAYBERG:  Right.  I'm not acknowledging

6        or agreeing --

7            THE COURT REPORTER:  It's just --

8            MR. MAYBERG:  -- to it.  Is doesn't --

9            THE COURT REPORTER:  The local area around

10       here we use this.

11           MR. MAYBERG:  -- reference what

12       administrative order we're talking about.

13           THE COURT REPORTER:  I'd have to just Google

14       it.

15           MR. MAYBERG:  Sure.  I'm trying to do that as

16       we speak to save time, but...

17           MR. BURATTI:  Is that a procedural objection,

18       Mendy?

19           MR. MAYBERG:  No.  Really I just don't

20       understand what I'm being asked to do.

21           MR. BURATTI:  We have a witness here --

22           MR. MAYBERG:  If it's something the Court is

23       allowing, of course.

24           MR. BURATTI:  If -- If you have a procedural

25       objection, just register it and let's deal with

Jones, Carmen                                                    June 17, 2021

10

1      this stuff later.

2           MR. MAYBERG:  Yes.  My procedural objection

3      is I'm being asked to acknowledge an

4      administrative order and I don't know what that

5      order is.

6           MR. BURATTI:  Actually you're just being

7      asked to confirm that you agree or don't agree

8      with the statement about her -- whether or not

9      she's administering a remote oath, right?

10          MR. MAYBERG:  The statement -- The statement

11     is referencing an administrative order.  It just

12     doesn't tell me which one.

13          MR. BURATTI:  So it might be...

14          All rules of procedure, court orders and

15     opinions applicable to remote testimony,

16     depositions and other legal testimony...

17          It looks like it's Administrative Order --

18          THE COURT REPORTER:  41 --

19          MR. BURATTI:  -- AO -- Sorry?

20          THE COURT REPORTER:  I have -- I have one

21     that's through our Association.  It's ARS 41-375,

22     41-378.

23          MR. MAYBERG:  I'll look that up.

24          MR. BURATTI:  I see one that looks like it's

25     SC20-23, Comprehensive COVID-19 emergency measures

Jones, Carmen                                June 17, 2021

11

1     for the Florida State Courts.  That governs

2     deposition practice, but I just don't know if it's

3     the right one or the current one or which one is

4     the second amendment.

5          It's my understanding that the Florida

6     Supreme Court has implemented procedures that are

7     designed to protect and administer oaths remotely.

8     I'd like to proceed with the deposition now.  If

9     you have an objection, please register it.

10         MR. MAYBERG:  Well, I'd like to be able to

11    read that order that she's referencing.

12         MR. BURATTI:  I'd like the court reporter to

13    start the examination.

14         Swear in the witness, please.

15         MR. MAYBERG:  I'm objecting.

16         MR. BURATTI:  Understood.

17         To the procedures or to swearing in the

18    witness?

19         MR. MAYBERG:  Procedures and swearing in the

20    witness unless she wants to retract that

21    statement.

22         MR. BURATTI:  What statement?

23         MR. MAYBERG:  Whatever statement she asked me

24    to acknowledge.  I'm not acknowledging it.  I

25    don't know -- I don't know anything about what

Jones, Carmen                                                    June 17, 2021

12

1          Administrative Order 41-375 is.

2              MR. BURATTI:  Or the other one I said or any

3      of the other Florida Supreme Court --

4              MR. MAYBERG:  No.  That's not -- The one you

5      said is not applicable because I'm going off --

6      The court reporter is asking -- made a statement

7      and asked me to acknowledge her statement.  This

8      is what she said her statement is based on, an

9      Administrative Order 41-375.

10             MR. BURATTI:  She was speculating.

11             Can we swear in the witness and get started,

12     please.

13             MR. MAYBERG:  Madam Court Reporter, were you

14     speculating or did you say that that came from

15     your business?

16             THE COURT REPORTER:  It's not my business.

17     It was -- This is a statement that we have created

18     over in this general area, but there is an

19     administrative order, yes.

20             MR. MAYBERG:  Right.  And do --

21             THE COURT REPORTER:  And it also -- It says,

22     Remote administration of legal oaths, SC20-16.

23     But I have reported depositions without reading

24     this statement, yes.

25             MR. MAYBERG:  Okay.  So I'm objecting to this

Jones, Carmen                                          June 17, 2021

13

1    deposition on multiple grounds, but I can't

2    acknowledge that statement if I don't know what it

3    is, but I don't want to stop anything else based

4    on that statement.

5         But I'm objecting for the record, before the

6    witness gets on, this witness -- this deposition

7    was set unilaterally.  The notice -- The amended

8    notice for this deposition came in today.  It was

9    filed on the 16th of June at 2:54 p.m. and today

10   is the 17th of June.  So effectively it's not even

11   24 hours.  This amended notice of taking

12   deposition is not even 24 hours before this

13   deposition is being started.

14        As such I am not prepared.  Plaintiff has had

15   no notice of this and Plaintiff's counsel has not

16   agreed to this and I haven't seen anything that

17   prior counsel agreed to this date.  So I'm

18   objecting to this witness' deposition at this

19   time.

20        MR. BURATTI:  Will the court reporter please

21   swear in the witness.

22        THE COURT REPORTER:  Ms. Jones, will you

23   raise your right hand.

24   THEREUPON,

25                    CARMEN JONES,

Jones, Carmen                                          June 17, 2021

14

1    a Witness herein, having been first duly sworn to tell

2    the truth, the whole truth, and nothing but the truth,

3    testified and said as follows:

4                          EXAMINATION

5    BY MR. BURATTI:

6        Q    Good afternoon, Ms. Jones.

7        A    **Good afternoon.**

8        Q    This is my first Zoom deposition.  Is it also

9    yours?

10       A    **Yes.**

11       Q    Have you been deposed before?

12       A    **Yes.**

13       Q    How many times?

14       A    **Twice in my lifetime.**

15       Q    Were they in the last ten years?

16       A    **Yes.  Well, maybe not.**

17            **Yes.  Yes.  One yes, and another one was 20**

18   **years ago.**

19       Q    Did either of those depositions have to do

20   with your providing notary services?

21       A    **Yes.**

22       Q    Okay.  Both of them or just one?

23       A    **Just one.**

24       Q    In that one what was the nature of

25   the dispute?

Jones, Carmen                                      June 17, 2021

15

1              Please don't get into any confidential
2       information.
3              MR. MAYBERG:  Mr. Buratti, if -- if we can
4       just for a moment, just to give you a heads up,
5       because we discussed this before the deposition
6       started, I'm having my office call the Judge's
7       chamber to ask for clarification on whether or not
8       the Judge wants to intervene at this point to hear
9       us in terms of the deposition going forward.
10             So I'm just letting you know we're reaching
11      out to Judge Thomas' chambers as we speak.
12             MR. BURATTI:  Thank you.
13  BY MR. BURATTI:
14      Q    You may proceed with your answer.
15      A    **The question again.  I don't know what the**
16  **question is.  Repeat the question.**
17      Q    I'll say it again.
18             What was the general nature of the deposition
19  that you sat for that pertained to notary services?
20      A    **To verify that I notarized the document.**
21      Q    Are you working today?
22      A    **I'm a realtor, so I'm an independent**
23  **contractor.**
24      Q    Are you also a notary?
25      A    **Yes.**

Jones, Carmen                                        June 17, 2021

16

1      Q      Do you do anything else for work presently?

2      A      **I'm a real estate instructor.**

3      Q      Anything else?

4      A      **That's it.**

5      Q      Who do you work for today?

6      A      **EXP Realty as a realtor, and Optimum School**

7   **of Real Estate as a real estate instructor.**

8      Q      Anyone else?

9      A      **That's it.  No one else.**

10     Q      How long have you worked for those entities?

11     A      **How -- For who?**

12     Q      For those entities that you just described

13  you --

14     A      **Since December.**

15     Q      Since December?

16     A      **Since December 28th.**

17     Q      Were you working for anyone else at that time

18  in December of 2020?

19     A      **No.**

20     Q      Prior to working for those businesses, who

21  were you employed by?

22     A      **Paul King and Sophia King.**

23     Q      Was there also a business associated with

24  Paul and Sophia King?

25     A      **A business of what?  I'm sorry.**

Jones, Carmen                                      June 17, 2021

17

1       Q    Was there also a business associated with the

2   services that you were providing for Paul King and

3   Sophia King?

4       **A    Yes.  Century 21 1st Class Realty and Real**

5   **Estate Schools of America.**

6       Q    Anything else?

7       **A    That's it.**

8       Q    How long did you work for them?

9       **A    Ten years.**

10      Q    So since approximately 2010?

11      **A    August 17th, 2010.**

12      Q    When did you stop working for Paul and Sophia

13  King?

14      **A    December 15th, 2020.**

15      Q    What did you do for Paul and Sophia King from

16  August 2017 -- sorry, August 17, 2010 until

17  December 15, 2020?

18      **A    I was their office manager.**

19      Q    Did you continue to provide any services to

20  them after December 15th of 2020?

21      **A    On a freelance basis.  On an hourly basis.**

22      Q    For how long did you continue to provide

23  services on an hourly basis after December 15th, 2020?

24      **A    I don't remember the last time I did some**

25  **work for Sophia.  I don't remember.**

Jones, Carmen                                    June 17, 2021

18

1     Q    Is there anything that you can think of that
2 would help remind you of when that was?

3     A    I -- Nothing to remind me.  I don't remember
4 the exact last time I spoke to Sophia.

5     Q    Was it this year?

6     A    This year, yes.

7     Q    Do you know if it was after the first
8 calendar quarter?

9     A    After the first what?

10     Q    Calendar quarter.  So after March.

11     A    Probably.  I really don't remember.  I don't
12 remember the last time I did some work for her.  It's
13 like minor jobs.  Like an hour, $25.

14     Q    Is that how much they pay you in the post
15 2015, 2020 period?

16     A    Yes.  She wanted me to help her occasionally
17 when -- you know, to prepare a contract or change a
18 listing on the MLS, and I told her minimum $25 for an
19 hour.  Even if I did 15 minutes she would still owe me
20 $25.

21     Q    How do you get paid by her for this hourly
22 work?

23     A    After she let me go, by Zelle or -- or cash.

24     Q    Do you submit invoices?

25     A    No.  No invoices.

Jones, Carmen                                     June 17, 2021

19

1      Q    How do you convey to her how much she owed

2  you?

3      A    **Just tell her.  She just Zelle's it.  Zelle**

4  **is easy.**

5      Q    Do you have any idea how much she's paid you

6  for hourly work since December 15th, 2020?

7      A    **$50 was the last time I did any work, and I**

8  **remember she -- Oh, actually $25, but she gave me 50**

9  **because that's all she had.  And I said okay.  I can**

10  **live with $50.**

11      Q    Sure.

12      A    **And that was cash in person.**

13      Q    So I was trying to get to approximately how

14  much she's paid you since December 15, 2020.  Was it in

15  the hundreds?  Thousands?

16      A    **No.  Not even -- Not even a hundred.**

17      Q    Did you provide notary services during this

18  time for Sophia?

19      A    **Just one time, yes.**

20      Q    Just one time?

21      A    **Yes.**

22      Q    Did you also provide notary services for Paul

23  subsequent to December 15 of 2020?

24      A    **No.  That was the document that Sophia**

25  **brought me to notarize.**

Jones, Carmen                                      June 17, 2021

20

1    Q    So, sorry, you did -- you did for Paul and

2    Sophia provide hourly services after December 15th,

3    2020?

4    A    Not for Paul.  Only Sophia.  I don't -- I

5    mean, I haven't talked to Paul.  Sophia is the one that

6    hires me for random jobs.

7    Q    Prior to the end of January of 2020, while

8    you were working with Paul and Sophia King, were you

9    providing notary services?

10   A    No.  The last time I did a notary service was

11   in December.

12   Q    Okay.  Sorry, I said 2020.

13        Prior to COVID --

14   A    Oh, I thought you meant this January.

15   Q    I want to take you back -- I want to take you

16   back to the January 2020 time period.  Before COVID --

17   A    Okay.

18   Q    -- when we all went to offices and worked

19   normally.

20   A    I haven't done any notary because we closed

21   our office in May -- or actually in March is when they

22   closed and then we went -- went back in May but only

23   opened for a week and they sent me home.

24        And I've been working from home from I would

25   say May -- May 18th is when they closed the --

Jones, Carmen                                                    June 17, 2021

21

1    physically closed the office and I came home and worked

2    until December -- December 15th.  I remember because

3    that's the day she let me go.  So I was surprised.

4        Q    You were surprised?

5        A    Yeah.  I wasn't expecting to be fired.  I

6    worked for them for ten years.

7        Q    Did they give you a reason?

8        A    They can't afford me anymore.

9        Q    Anything else?

10       A    That's it.

11       Q    During the time you worked with Paul and

12   Sophia King during the ten years leading up to December

13   of 2020, were you regularly asked to provide notary

14   services?

15       A    Yes.

16       Q    What processings did they use in order for

17   you to provide notary services?

18       A    What -- What --

19       Q    I'm curious to know what the business

20   processes were used by the Kings in your work with them

21   when you were notarizing things.  Was there a process?

22       A    A process?  No.  They just had to be present.

23   They'd have to sign in front of me and provide ID and I

24   would notarize documents.  Whether it's a closing or --

25   Whatever documents that they needed, as long as they

Jones, Carmen                                    June 17, 2021

22

1    were there.

2        Q    So your standard practice when you worked

3    with Paul and Sophia King was to only notarize things

4    in person?

5        A    Correct.

6        Q    And that's every single notarization that you

7    made was only notarizing when a person was present in

8    front of you?

9        A    Yes.  Most of the time until December.  The

10   document in question for this lawsuit, he was not

11   present.  Sophia is his mother and he brought -- she

12   brought the document, Sign this for -- please notarize

13   this for Paul.

14            I didn't think anything of it.  You know, I

15   worked for them for ten years.  They're brothers.

16   That's his mom.  So I had any -- no worries.  I thought

17   I was notarizing Paul's signature.

18       Q    So during COVID there were practices that you

19   had to do outside of the office, right?

20       A    Not with the notary, because I didn't do much

21   notary.  That was not my main job.  My main job was

22   training and recruiting and handling the school and

23   things like that.  Notary is nothing.

24       Q    You also did marketing, right?

25       A    Marketing.  Promotion.  E-mail blasts.

Jones, Carmen                                        June 17, 2021

23

1    Mostly training, training the agents.

2        Q    How many agents had you trained over that

3    time period?

4        A    It was about 90.  90 agents.

5        Q    Did you do any marketing work for the Trump

6    Royale Unit 503 prior to the quit claim?

7        A    Not at all.

8        Q    So if Sophia had said that you were busy

9    marketing the 503 unit in 2018, she would have been

10   lying?

11       A    In 20 -- What year?  You're saying --

12       Q    2018.

13       A    2018.  It's -- Marketing is not, you know,

14   what I did for her listings.  Maybe I added to the MLS,

15   you know, but I was definitely not actively marketing

16   Unit 503.  That's her -- Or Paul's property.  It was

17   rented.

18       Q    Yeah.

19       A    It was rented, so I haven't done any

20   marketing.  It was on the MLS for sale and for rent.

21   That's all I -- I know about it.

22            For years it's been on the market.

23       Q    How many times do you think you have

24   notarized Paul King's signature?

25       A    Over the last ten years I would not even

Jones, Carmen                                    June 17, 2021

24

1    know.  I've -- I've done a lot of notaries.

2        Q    More than 50?

3        A    In ten years?  Maybe.  Maybe in ten years 50.

4    Maybe.  It's possible.  Not for him, but just in

5    general.

6        Q    So -- So you would notarize in general for

7    Paul King?

8        A    For Sophia King mostly, because she was the

9    one that was always there.

10       Q    So you were notarizing documents for Sophia?

11       A    For Sophia, not Paul.  Anything that Sophia

12   would give me for notary would be clients or come to

13   her office and notarize, things like that.

14       Q    Okay.  So the 50 applies to the times that

15   you've notarized for Paul and Sophia together?

16       A    In general.  Just notarizing period.

17       Q    Do you have any idea how many times you've

18   notarized Paul King's signature?

19       A    Paul, I wouldn't even have a number in my

20   head.  I don't remember specifics at all.

21       Q    More than ten?

22       A    Ten years, I -- I can barely remember.

23       Q    How many times do you think you've seen Paul

24   King's signature?

25       A    Paul?

Jones, Carmen                                      June 17, 2021

25

1    Q   On different individual documents.

2    **A   Over ten years, a lot.  I mean -- But not**

3  **notary.  I mean, I've seen his signature.  Sophia ran**

4  **the office for Paul.  So I'd just do what Sophia tells**

5  **me to do.**

6    Q   So if Sophia brings you a stack of documents

7  to notarize while you're working with them -- for

8  her you --

9    **A   That would never happen.  She would never do**

10  **that.  It's -- It's a transaction.  It could be a sale,**

11  **a closing for one of her clients, or they'd come to my**

12  **office and I'd notarize documents for closings.**

13      **One person, he always comes to me for closing**

14  **was a client of Sophia's.  So, yeah, it's just random.**

15  **It's not like a normal every day thing of notarizing**

16  **documents.  It's not my job description.  I just happen**

17  **to have a notary.**

18    Q   I'm going to mark for identification purposes

19  Exhibit 1.  The title of the document, the electronic

20  document, that I'm going to populate to the HLS share

21  file and provide to counsel is 1.QCD.recorded.pdf.

22      MR. MAYBERG:  I don't see it anywhere.

23      MR. BURATTI:  One second.  I'm still not

24    terribly proficient at this, Mendy.

25      MR. MAYBERG:  No problem.  I just wanted to

Jones, Carmen                                        June 17, 2021

26

1        let you know.

2              MR. BURATTI:  We'll all have to work through

3        it a little bit together.

4    BY MR. BURATTI:

5        Q    Okay.  Can you see the document?

6        **A    Are you asking me something?**

7        Q    Yes.  Sorry.

8              Ms. Jones, can you see on the screen a

9    document titled quit claim deed?

10       **A    Yes.**

11       Q    Okay.  I'm going to -- I want you to take a

12   moment to scan the entire document.  You tell me when I

13   need to move it up.

14             All right.  I understand this to be the

15   recorded quit claim deed pertaining to Trump Royale

16   Unit 503 that's at issue in this litigation.

17       **A    I don't see how to move it up and down.**

18       Q    No, no.  You tell me.  I have to -- I think I

19   have to move it.  So you just tell me when you're ready

20   for me to move it up.

21       **A    You can move it up.**

22            **You can move it up.**

23            **You can move it up.**

24            **You can move it up.**

25            **You can move it up.**

Jones, Carmen                                    June 17, 2021

27

1           Okay.

2      Q    Okay.  Do you recognize this document?  It's

3  marked as Exhibit 1.

4      A    Yes.

5      Q    What is it?

6      A    It's a quit claim deed.

7      Q    Could you be more specific?

8      A    It's a quit claim deed from Paul King to

9  Michael and Marianna King, signed and witnessed by me

10  and Sophia and Paul.

11      Q    I'm going to move down to the witnesses.

12           Well, first -- The second page.  There's a

13  signature there, grantor's name, do you see that?

14      A    Yes.

15      Q    Do you recognize that signature?

16      A    Yeah.  That's the one I've always seen.

17      Q    Okay.  So let me take you through the

18  questions.

19           Whose signature is it?

20      A    Paul King.

21      Q    How do you know?

22      A    As far as I know it's Paul King.  I've always

23  seen this signature as Paul King.

24      Q    You've seen that signature a lot of times in

25  the ten years that you worked with him, right?

Jones, Carmen                                    June 17, 2021

28

1      A    Yes.  Absolutely.

2      Q    Is it safe to say more than a thousand times?

3      A    No, not a thousand times.

4      Q    Hundreds of times?

5      A    I can't say a hundred times, because the only

6    time I ever see signatures is when there's a notary

7    document or, I don't know, maybe when they get

8    insurance, somebody signs the declaration or --

9          I really can't even remember what kind of

10   documents I've seen this, but I definitely recognize

11   it.

12     Q    During the ten years that you worked with

13   Paul, did you become familiar with his signature?

14     A    Yeah.

15     Q    Do you see there a witness' signature dated

16   December 22nd, 2020?

17     A    The what?  Signature?

18     Q    Yes.

19          Below Paul King's signature you see here this

20   witness signature section?

21     A    That's me.  My signature and my -- my name.

22     Q    Okay.  When --

23     A    And my home address.

24     Q    Sorry.

25          When did you sign this document as a witness?

Henderson Legal Services, Inc.

Jones, Carmen

June 17, 2021

29

1    **A    December -- December 22nd.**

2    Q    And is that your signature?

3    **A    I remember this, doing this.  This is the**

4    **last notary I ever did for Paul.  Sophia brought it to**

5    **me and asked me to notarize it along with other work**

6    **that I had to do for her that day.**

7    **We were here about an hour and didn't think**

8    **anything of it.  This is his mother, my boss.  I just**

9    **did it for her.  I definitely -- I definitely confirm**

10   **that I did notarize it without him being present**

11   **because I thought Sophia needed me to do that for her.**

12   Q    Because you thought she needed you to or

13   because she told you to do it?

14   **A    She told me.  She told me, Hi, Carmen, I'm**

15   **bringing you a notary to sign and I need some help**

16   **with, you know, a listing change, some listings on the**

17   **MLS, change pricing.**

18   **Let me see, what else did she ask me to do**

19   **that day.  Yeah, we just went over in the computer all**

20   **the listings to make sure they were correct.  Because**

21   **she had fired me on the 15th and she said, I just need**

22   **you for a couple of hours, when can I come, and she**

23   **came that date.  This was right before my vacation was**

24   **supposed to start, but she already had let me go.**

25   Q    Do you see the second witness signature

Jones, Carmen                                  June 17, 2021

30

1    block?

2        A    Sophia King.  I definitely know that

3    signature forever.

4        Q    How do you know that signature?

5        A    Because I've seen her sign it and I've

6    learned her signature because she tells me to help her

7    sign things when she's not there.  She -- She gives me

8    that kind of trust.  So I have no cause and I remember

9    her signature for sure.

10       Q    And the same -- So the same basic reasons

11   that apply to why you recognize Paul's signature?

12       A    Yeah.  We're talking about a family I've

13   loved for ten years, all -- all three of them.

14   Actually four, Danny, too.  But I don't know Danny

15   much, I know Michael, Paul and Sophia.  They're my

16   employers.  I called Sophia mom.  So I have no reason

17   to doubt that this was -- this was for her, for Paul.

18       Q    I think you just said they're my lawyers.

19   Did you mean family?

20       A    No, no, no.  They're --

21       Q    Employers.  Employers.  I gotcha.

22       A    Employers, yeah.  For ten years.  I called

23   Sophia mom.  So I had no hesitation or doubts about,

24   you know, when they needed something.  I would help

25   them.

Jones, Carmen                                    June 17, 2021

31

1    Q    When Sophia came to you with these documents,
2    did she seem nervous?
3    **A    I'm sorry, say it again.**
4    Q    When Sophia came to you with this document,
5    did she seem nervous?
6    **A    No.**
7    Q    Uncomfortable?
8    **A    No, not at all.**
9    Q    Fearful?
10   **A    Careful?**
11   Q    Fearful.  Scared.
12   **A    No.**
13   Q    Was she concerned about anything, could you
14   tell?
15   **A    No, not concerned.  I was just sad about**
16   **being let go and -- but other than that I didn't see**
17   **anything wrong with this at all.**
18   Q    So --
19   **A    I mean, you're talking two brothers and a**
20   **mom.  Like why would I even doubt anything.  I didn't**
21   **see anything wrong.**
22   Q    I'm going to go to the third page.  I'm
23   trying to get the whole thing on the screen for you
24   here.
25        The third page of Exhibit 1 bears at the top

Jones, Carmen                                    June 17, 2021

32

1   there CFN: 20210106967 Book 23 -- sorry, 32344 Page

2   2808.

3          Do you know what that is?

4   **A    What that is?  No, I have no idea.**

5   Q     Do you recognize this notary block here?

6   **A    What notary block?**

7   Q     Sorry.  Let me close the last line of

8   questions.

9          If Sophia had been upset or scared when she

10  came to you with this document, how would you have

11  known it?

12         MR. MAYBERG:  Jason -- Sorry.

13         THE DEPONENT:  She --

14         MR. MAYBERG:  Hello?

15         MR. BURATTI:  Do you have an objection?

16         MR. MAYBERG:  No.  We got an e-mail from the

17     Court with regard -- You got it, too.  I see it.

18     I don't know if you've been looking at it.  It's

19     about a motion -- an emergency motion regarding

20     this depo.

21         Being that we started, and I just want to

22     confirm, if you have any objection -- I'm not

23     going to cross-examine her now, because obviously

24     I was unaware and you just noticed it yesterday,

25     at least the amended notice, but if you'll agree

Jones, Carmen                                    June 17, 2021

33

1    that I will have the right to redepose Ms. Jones,

2    if need be, then I think that it would be best not

3    to waste the Judge's time for the emergency motion

4    to stop the deposition.  Because that's really

5    what it would entail.  So --

6        MR. BURATTI:  You're going to stay within the

7    scope of my direct, right?

8        MR. MAYBERG:  You know, I would stay with --

9        No, of course not.  I would have the right to

10   depose her.  I mean, I have the right to depose

11   her the same way you do.  This is not your

12   witness.  This is a witness in the case.  It's a

13   third-party witness.

14       MR. BURATTI:  I have no objection as long as

15   I have the right to follow up.

16       MR. MAYBERG:  Sure.  I mean, like the way any

17   deposition -- I just want to make sure, and then I

18   can let the Judge know we don't need to take the

19   Court's emergency time to say that I have a right

20   to redepose this witness and ask whatever

21   questions I would have the right to do had I been

22   the one who's noticing her any -- on any given

23   day.

24       MR. BURATTI:  No objection as long as I can

25   follow up.

Jones, Carmen

June 17, 2021

34

1          MR. MAYBERG:  As long as -- Pardon?  I just
2     couldn't hear.
3          MR. BURATTI:  As long as I can redirect on
4     your examination, I have no objection to -- to
5     doing it.
6          MR. MAYBERG:  Do you mean recross -- just
7     cross or --
8          MR. BURATTI:  Right.  As long as I can
9     examine -- You depose her, as long as I can
10    examine on your examination, I don't have an
11    objection to that.  I don't want to take up her
12    time unnecessarily or more than once or any of
13    that stuff.
14         MR. MAYBERG:  Right.  Okay.  So then if -- if
15    you don't mind, I'm going to -- if you can pause
16    for one moment, I'm going to let my -- my
17    assistant reach out to the Judge so that they
18    don't -- because in four minutes the Judge is
19    going to get on Zoom, and let the Judge know that
20    we've reached an agreement that would save the
21    Court the -- the necessity for an emergency Judge
22    to jump in.
23         Does that work?  Do you want to take a
24    three-minute break?
25         MR. BURATTI:  Sure.

Jones, Carmen                                          June 17, 2021

35

 1          MR. MAYBERG:  Okay.  Thank you.

 2          (Break was taken.)

 3          MR. MAYBERG:  Judge -- For the record, Judge

 4      Lopez, who was the emergency Judge who was going

 5      to hear it, we just called Judge Thomas' chambers

 6      and they're letting Judge Lopez know that he

 7      doesn't have to be available for that emergency

 8      hearing because we reached an agreement.

 9          MR. BURATTI:  All right.  I'll go back and

10      resume?

11          MR. MAYBERG:  Yes.  Yeah.

12          Just -- Court Reporter, did you get that?  We

13      were still on the record, right?

14          THE COURT REPORTER:  Yes.

15          MR. MAYBERG:  Okay.  Yeah.  Absolutely we can

16      resume the questioning.  Thank you.

17  BY MR. BURATTI:

18      Q    Ms. Jones, the question I had asked prior to

19  that exchange was if -- if Sophia had been upset when

20  she brought this document to you to notarize, how would

21  you have been able to tell?

22      **A    I don't know.  I -- If she was upset, I would**

23  **see it in her face I guess.**

24      Q    Have you ever seen her upset before?

25      **A    Not really.  I mean, I don't remember any --**

Jones, Carmen                                    June 17, 2021

36

1    her being upset.  I just don't remember any occasion

2    where -- Except when she fired me.

3        Q    She was upset because she had to let you go?

4        A    Well, she was sad.  I was sad.  I was, you

5    know, hurt.  No warning.  There was one -- Not even a

6    day's notice.  You know, right before my vacation,

7    right before the holidays.  That's about it.  And she

8    just said that she's -- she's broke, everybody's broke.

9    I said, Okay, no problem.

10            But at least -- You know, I warned her two

11   months before if she was going to let me go to let me

12   know so that I could start looking.  Because I could

13   get a job instantly, I've been in business a long time.

14   And she didn't.  She didn't give me any notice.  So I

15   know that she was upset.  I was upset.  I was teary

16   eyed.  But that was, you know, December 15th.

17       Q    Did she give you any indication that there

18   was any issue with the deed that you were notarizing

19   that's Exhibit 1?

20       A    Not at all.

21       Q    Did you have any understanding why the deed

22   that's Exhibit 1 was being signed by Paul King?

23       A    I -- Just the fact that she said that they

24   were broke and that she fired me I was thinking they

25   were selling the property -- or transferring the

Jones, Carmen                                          June 17, 2021

37

1    property on their own decision, you know, to make money

2    or -- I don't know.  I have no idea.

3         Q    So she --

4         A    All of this is new to me, this thing between

5    them.  All of this is brand new to me.  Never heard of

6    such a thing.  I would have never thought of all of

7    this.  I'm shocked.

8         Q    So Sophia didn't give you a reason why the

9    deed was being signed?

10        A    No.

11        Q    Did you discuss -- Did you --

12             Have you had any discussion about this

13   Exhibit 1 quit claim deed since the date that you

14   notarized it with anyone?

15        A    No.

16        Q    So Paul never talked to you about the quit

17   claim deed for Trump Royale 503 subsequent to December

18   18th, 2020?

19        A    Not at all.

20        Q    Had Sophia?

21        A    Sophia, no, not at all.  Not until I was

22   served.  Or not even served, the e-mail from Michael

23   was the first time I heard about any of this.

24        Q    So -- So no e-mails?

25        A    No e-mails.

Jones, Carmen                                          June 17, 2021

38

1       Q     No texts?

2       A     Sophia called -- Sophia called me only after

3   I tell her, What are you -- what is -- what is

4   happening.  That was my words to her.  And she said,

5   I'll call you tomorrow.  And I was upset because I

6   didn't understand what was happening.

7             She called me the next morning and said that

8   she didn't know that this was happening, that -- that

9   Michael told her that this was an agreement between

10  Paul and Michael, that she didn't know that this --

11  this was a quit claim deed that Paul didn't agree to.

12            And I said, I'm going to tell the truth, he

13  wasn't in front of me.  I'm not playing any games

14  whatsoever, be completely truthful.  Lack of judgment,

15  you know, doing it, but after ten years with a family I

16  had grown to love, you know, I didn't expect any of

17  this.  So I said, I'm telling the truth, I don't care

18  and I don't want any of them to ever call me or contact

19  me again.

20            And I think I responded to your e-mail to

21  tell them don't -- I blocked them.  I don't want to

22  talk to anyone.  I'm going to tell the truth, period.

23  I have nothing to hide.  Nothing I did wrong as --

24  except notarize it.  But I did it out of trust, out of

25  ten years of locality to a family that I -- I grew to

Jones, Carmen                                           June 17, 2021

39

1    love.  That's about it.

2           After that I never spoke to them again and I

3    blocked them.  I'm not picking sides to this at all.

4    I'm telling you exactly what happened and the truth.

5    That I'm not part of this.

6    Q    When was the conversation with Sophia that

7    you're describing right now, Carmen?

8    A    I'm trying to remember the exact date.

9    Q    It would have been after you heard from

10   Michael King that there was --

11   A    Maybe the next day, the next morning, the

12   first contact.  But like I have to check my e-mail.

13   Because the only e-mails I have from Michael are the

14   e-mails from -- about this.  That's it.  Three e-mails.

15   Q    So you didn't use your --

16   A    Lawsuit -- This lawsuit.  And then the next

17   day he e-mailed me the lawsuit he filed against Paul

18   and sent me that.  And I read it and I'm flabbergasted,

19   but...  Wow.

20          And the last message I sent to Michael after

21   the third e-mail was, I'm at a loss for words.  Because

22   after I read all that, I was like what is this.

23          And then the last e-mails were from you as

24   the attorney telling me about preservation of

25   documents.  I don't have any documents whatsoever.  I'm

Jones, Carmen                                    June 17, 2021

40

1    working from home so I don't have any files or copies

2    of anything.

3           And Michael, the last e-mail he sent I didn't

4    reply.  He tried calling, I didn't answer and I blocked

5    and I said, I don't want to discuss this with

6    absolutely anyone except whoever wants to depose me.

7    That's all.

8       Q    So I'm just going to go ahead and mark

9    Exhibit 2.  This is a document --

10      A    These are the -- Yeah.  These are the e-mails

11   that I -- that I was sending you.  Those are the ones I

12   did preserve because you were sending them.  So -- But

13   I don't have anything else.  I even Googled Michael's

14   name to see if there's any old e-mails, but I didn't

15   find anything because I don't communicate with Michael.

16          MR. MAYBERG:  Jason, can you send -- e-mail

17      this e-mail that you got and the other documents

18      that you received from the deponent.

19          MR. BURATTI:  Well, we haven't received

20      anything except for this e-mail string.  So

21      I'll -- But I'll get --

22          MR. MAYBERG:  Whatever --

23          MR. BURATTI:  -- you all this stuff.

24          MR. MAYBERG:  -- e-mail string she sent to

25      you, if you can just forward that to me now so I

Jones, Carmen                                          June 17, 2021

41

1       can read it while you're questioning her and try

2       to get whatever I can out of the way today so we

3       don't have to take too much more time when the

4       next time comes up.

5            MR. BURATTI:  I agree.

6            This one I'm going to send you right now so

7       you can see it live.

8            MR. MAYBERG:  Thank you.

9            THE DEPONENT:  Give me two seconds.  I'm

10      going to open the door for my cat.  He's screaming

11      outside.

12           MR. MAYBERG:  Sure.

13   BY MR. BURATTI:

14      Q    Okay.  So, Carmen, I have up on the screen

15   what's been marked as Exhibit 2, which is a June 11th,

16   2021, 8:30 a.m. e-mail from you to me that has a string

17   over the course of the period from June 5th.

18           Is this an e-mail that you sent me?

19      A    **Yes.**

20      Q    This is the e-mail that you referred to a

21   moment ago in your testimony?

22      A    **Yes.**

23      Q    Is it still the case today that you have not

24   received any summons whatsoever?

25      A    **Nothing.  I check my mailbox every day.  I'm**

Jones, Carmen                                    June 17, 2021

42

1    home everyday.  I don't go anywhere.  I'm a diabetic,

2    so I'm scared of COVID.  So no, nothing.

3         MR. BURATTI:  Let's just designate her

4         response to that last question as some sort of

5         confidential since it contains potentially

6         protected health information.

7         Can we agree about that, Mendy?

8         MR. MAYBERG:  Yes, of course.

9    BY MR. BURATTI:

10   Q    Okay.

11   A    I don't mind.  Everyone knows I fear because

12   I'm a diabetic.  And it's a big killer, COVID, for a

13   diabetic.  Seventy percent of diabetics died with

14   COVID.  So I've been home.

15   Q    You mentioned in this second e-mail from

16   June 11th at 8:20 a.m. that you didn't have any

17   documents or e-mails regarding the matter.

18        Do you see that?

19   A    Uh-huh.

20   Q    Apart from the -- the e-mail from Michael

21   that you mentioned before and the exchange with me, do

22   you have any other documents that are material -- or

23   sorry, that are related to this quit claim deed or the

24   issues in this litigation?

25   A    Not at all.

Jones, Carmen                                          June 17, 2021

43

1      Q      Is that because you don't use this

2   carmenajones@gmail.com address for work with Sophia and

3   Paul King prior to December 15th of 2020?

4      A      Yeah.  This is an e-mail I've had all my

5   life.  Well, at least until gmail came around.

6      Q      What was the e-mail that you used prior to

7   being let go last December 15th of 2020?

8      A      This e-mail.

9      Q      Sorry.

10     A      There were -- There were three e-mails I

11  used, but this one is mine.  The other two e-mails are

12  real estate school, schoolsofamerica@gmail.com and

13  C211stclassrealty@gmail.com that Sophia has access to.

14            I -- I changed the passwords when she let me

15  go because I didn't want it on my computer, and I said,

16  Here, I put a simple password, you've got to change it.

17  And that was about December 15th.

18            Because I didn't want to get any more

19  e-mails.  You know, I didn't work for her anymore, so I

20  changed the password so that she could access it and

21  change the password for her use.  I don't have access

22  to those e-mails at all.

23     Q      Paul --

24     A      Only mine.

25     Q      Paul is the broker in that business that he

Jones, Carmen                                    June 17, 2021

44

1    and Sophia run, right?

2        **A    Yes.**

3        Q    So isn't he ultimately accountable for

4    everything that the office does?

5        **A    I guess so.**

6        Q    Did you --

7        **A    I'm sure he does.**

8        Q    Did you also have this -- this e-mail

9    address, carman.jones@century21homes.com?

10       **A    Yeah, but I don't use it.  It's a forwarding**

11   **e-mail.  It's an e-mail --**

12       Q    It's a forwarding --

13       **A    Yeah.  It's like -- In the Century 21 system**

14   **they give you like a brand e-mail and it has just**

15   **forwarding.  So anything that goes from there --**

16           **Which nobody knew it.  You know, nobody**

17   **really knew that e-mail because I never really gave it**

18   **out and nobody ever sent e-mails to it.  I've always**

19   **been a proponent of using my own e-mail, but they do**

20   **provide it at Century 21 or Remax.  They always give**

21   **you an e-mail.**

22           **I don't like them because if I ever leave,**

23   **they just cut off the e-mail.  So you'll never get**

24   **e-mails from your clients again.  So I don't use it.**

25       Q    Do you know where that e-mail forwarded to

Jones, Carmen                                    June 17, 2021

45

1    when it was in place?

2         A    To my e-mail.

3         Q    Carmenajones@gmail?

4         A    Yes.

5         Q    Do you see the sentence that starts with

6    Sophia King here?

7         A    Uh-huh.

8         Q    Sophia King brought me the document Paul

9    signed to notarize from home since I was in

10   self-isolation due to COVID in person.

11            Is that sentence accurate?

12        A    Yeah.  She came to my house with the

13   document.

14        Q    Had you notarized other things out -- from

15   outside the office because of the pandemic or any other

16   reason?

17        A    No.  Oh, yes, yes, I have.  I have a customer

18   that always comes when he has closings.  His name is

19   Fedor Baryshnikov and he comes to my house.  When he

20   purchases property, I do his closing documents.

21        Q    I'm going to go back for a minute to the

22   conversation that you had with Sophia King the week

23   after you heard from Michael about the disputes that

24   were going on.

25        A    Uh-huh.  It wasn't a week, it was the next

Jones, Carmen                                     June 17, 2021

46

1    day.

2         Q    It was the next day.  The day after?

3         A    The day after.

4         Q    Did Sophia tell you that it was Paul's

5    signature on the quit claim deed that was Exhibit 1?

6         A    She didn't ever mention it.  It wasn't part

7    of the conversation.  I just said, What's happening.

8    That's all.

9         Q    Did she ever tell you that it was not Paul's

10   signature?

11        A    No.

12        Q    Did Paul ever tell you that it was not Paul's

13   signature?

14        A    No.

15        Q    During the conversation that you had with

16   Sophia King the day after Michael reached out earlier

17   this year, did you discuss the quit claim deed at all?

18        A    Not at all.

19        Q    What did Sophia say to you on that call about

20   the lawsuits between the brothers?

21        A    She's heartbroken, can't believe her sons are

22   fighting.  That she had no idea.  That she did not

23   agree -- That he did not agree to this.

24             I was shocked as well.  I'm out of my mind

25   shocked.  I never saw that coming.

Jones, Carmen                                          June 17, 2021

47

1          MR. MAYBERG:  I object to it all being

2     hearsay.

3          THE DEPONENT:  Oh, okay.  I don't know.  I'm

4     just, you know, talking, chatting.

5     BY MR. BURATTI:

6     Q     Did she say anything else about the lawsuit

7     or the disputes?

8     **A     No.**

9          MR. MAYBERG:  Object to hearsay.

10          THE DEPONENT:  All I said was -- The end of

11     the conversation was, I'm going to tell the truth

12     that Paul was not present in front of me.  I have

13     no reason to lie.  And Sophia said that she

14     thought there was an agreement between Paul and

15     Michael.  That's the only thing she said about it.

16          You know, I wouldn't have doubted it.

17     BY MR. BURATTI:

18     Q     What was --

19          Can I hear that last question back, Linda.  I

20     mean, last answer.

21          (Record was read by the court reporter.)

22     BY MR. BURATTI:

23     Q     Did you have an understanding of what that

24     agreement was?

25     **A     No.  That's the only word that she used was**

Jones, Carmen                                          June 17, 2021

48

1    an agreement.  I didn't go into details, but she said

2    that they agreed.  Both brothers agreed to do this quit

3    claim deed.  That's it.  That's as far as she said.

4         Q    I'm going back to the notary stamp, and it's

5    actually on Exhibit 1, which is the quit claim deed in

6    question.

7              Is that your signature in the notary public

8    line?

9         A    Yes.

10        Q    Is this your notary stamp that's shown here?

11        A    Yes.

12        Q    She brought you a document to your home that

13   day on December 18th --

14        A    Uh-huh.  Yes.

15        Q    -- that was -- had original signatures on it,

16   right?

17        A    Yes.

18        Q    Do you have any knowledge about who prepared

19   Exhibit 1 prior to its execution?

20        A    No, but I can see that it's Arianna Goldman.

21   She's the title company we used a lot in the office.

22        Q    Could you -- Did you discuss --

23             You said you didn't see a draft of this

24   document or anything.  Like the first time you saw it

25   was when it was brought to you for signature?

Jones, Carmen                                      June 17, 2021

49

1      A      Exactly, yes.

2      Q      Do you know anything about any application to

3   the Trump Royale homeowners association with respect to

4   Trump Royale Unit 503?

5      A      Nothing.  Not at all.

6      Q      Did you make any changes to the listing on

7   MLS subsequent to December 15th, 2020 for the Trump

8   Royal property?

9      A      I don't remember the last time I edited her

10  listing.  I'd have to check online on MLS.

11     Q      Her is Sophia?

12     A      Because it will -- It usually tells you a

13  status change.  So if there's a status change, whether

14  it went pending or canceled or rented, it will -- it

15  has a time stamp and a history.  So I could check that

16  if you'd like.

17     Q      I'm sorry, can you -- can you explain that to

18  me.  I didn't quite follow.

19     A      When the -- When you add a listing to the

20  MLS, everything is time stamped or date stamped.  So if

21  I made any changes --

22             I can remember looking at the history of the

23  listing itself.  And a listing will appear as long as

24  the property has been on -- since day one.  It will

25  have the history of how long a property has been on the

Jones, Carmen                                        June 17, 2021

50

1    market.  You know, for years.  It will tell you every

2    time it's been listed, pending, rented, things like

3    that.

4        Q    And -- And the her in your answer, you're

5    referring to Sophia's listings, right?

6        A    Well, the listings are in Paul's name.  All

7    of the listings are Paul's.  Sophia did the work, but

8    Paul was the listing agent.

9        Q    Right.  Okay.  That was actually what I was

10   trying to confirm, was that these are all really Paul's

11   listings and Paul's responsible for them, right?

12       A    Exactly.

13       Q    All right.  Have you ever discussed Trump

14   Royale Unit 503 with Paul King at any time?

15       A    No.

16       Q    Have you ever discussed Trump Royale Unit 503

17   with Sophia King other than in the conversation that we

18   discussed the day after Michael reached out earlier

19   this year?

20       A    As to like what?

21       Q    And the signing of the quit claim deed.

22            Have you ever -- Except for those two days,

23   okay, the day that you talked to Sophia, the day after

24   Michael reached out this year, and the day that she

25   came to you with this quit claim deed to notarize --

Jones, Carmen                                    June 17, 2021

51

1    **A**    **Uh-huh.**

2    Q    -- did you discuss Trump Royale 503 with

3    Sophia King at any other time?

4    **A**    **Not at all.**

5    Q    Do you know Sophia King's e-mail address that

6    she used while she was doing -- while you were doing

7    notary work for her?

8    **A**    **Sophiaking06@gmail.com.**

9    Q    Do you know any other e-mail addresses for

10   Sophia King?

11   **A**    **Sophia -- I don't know her other.  I know**

12   **she -- she made another e-mail with her middle name.**

13   **Sophialyalya--I don't know how to spell it--king@gmail.**

14   **I've never known how to spell her middle name.**

15   Q    Is it L-y-a-l-y-a?

16   **A**    **Say it again.**

17   Q    L-y-a-l-y-a.

18   **A**    **Yes.  It's like Lily but not really.  Lyalya.**

19   Q    When Paul was in California and wanted a

20   change to an MLS listing, how would he communicate that

21   to you?

22   **A**    **If he wanted to make a change?**

23   Q    To an MLS listing, how would he communicate

24   that to you?

25   **A**    **He wouldn't.  Sophia did.**

Jones, Carmen                                      June 17, 2021

52

1      Q    So how was -- How would Sophia know to

2   communicate to you what Paul wanted?

3      A    **Sophia would tell me.**

4           MR. MAYBERG:  Objection as to the form.

5   BY MR. BURATTI:

6      Q    Do you have an understanding --

7      A    **I don't understand the question.  Maybe I**

8   **don't understand.**

9      Q    I'll try it a different way.

10          Do you have an understanding of how Sophia

11   got her instructions from her boss, Paul, who is the

12   broker for the office?

13     A    **I don't know what they talk about.  No, I**

14   **don't.**

15     Q    When you would get instructions from Sophia,

16   did you have an understanding that -- Strike that.

17          When Sophia -- When Sophia asked you to

18   change a listing under Paul's broker number, who did

19   you consider those instructions to come from?

20     A    **Sophia.**

21     Q    Okay.  Because she's the office manager,

22   right?

23     A    **Because she for me was the actual listing**

24   **agent for everything but under Paul's name.**

25     Q    Under Paul's broker license?

Jones, Carmen                                    June 17, 2021

53

1      A     She wanted everything under Paul's name and

2    that's how it's been for ten years.

3      Q     Is that because --

4      A     Listing agreements.  MLS listings.

5    Everything was done as if Paul did it, but it's Sophia.

6    Sophia got the listings, but the listings were in

7    Paul's name.  The contracts were in Paul's name.

8    Everything was always Paul's name.  It was nothing new

9    to me for ten years.

10     Q     To your knowledge does Sophia have a broker's

11   license?

12     A     She has a sales person's license.  Sales

13   associate.  Not a broker.  Paul's a broker, Sophia's a

14   sales associate.

15     Q     Is that why Paul's name is on these

16   materials?

17     A     No.  She just -- They were her listings and

18   she just wanted them in Paul's name.  It's always been

19   like that.

20     Q     All right.  So --

21     A     There's never been a listing that I've added

22   to the MLS that was not Paul's.  Anything that Sophia

23   listed, it was in Paul's name.

24     Q     So for the ten years that you worked for them

25   leading up to December 15th of 2020 and for the hourly

Jones, Carmen                                    June 17, 2021

54

1    work thereafter Sophia was a real estate agent and Paul

2    was the broker for this business?

3         **A    Correct.**

4         Q    So -- So generally in the business practice

5    during that time period Sophia would give you

6    instructions on behalf of her and on behalf of Paul,

7    right?

8         **A    Correct.**

9         Q    Has Paul King ever told you not to listen to

10   Sophia?

11        **A    No, never.  Never.**

12        Q    Has Paul King instructed you to follow her

13   instructions in concert with work during that time

14   period?

15        **A    When they hired me?  He was there when they**

16   **hired me, yes.**

17        Q    And he told you to follow Sophia's

18   instructions while you work with them?

19        **A    Absolutely.  Sophia and him are my boss,**

20   **yeah.**

21        Q    Okay.  I'm looking at Exhibit 1 now,

22   grantor's signature.

23             Do you have any reason to believe that that's

24   not Paul King's signature that's on the screen right

25   now in grantor's signature on Exhibit 1?

Jones, Carmen                                          June 17, 2021

55

1      A    Not that I -- That's the signature I've
2  always seen.

3      Q    Do you have any reason to believe that it's
4  not Paul's original signature that was on that
5  document?

6      A    Not at all.

7      Q    Did Sophia give you instructions on Paul's
8  behalf while Paul was in California while you worked
9  for them for the ten years that we're talking about and
10 for the hourly stuff afterwards?

11     A    No, only Sophia.  Sophia instructed me in
12 everything I did in the office.

13     Q    Right.  So if --
14          Did Sophia ever instruct you to do anything
15 while Paul was in California?

16     A    No.

17     Q    Sophia never gave you instructions while Paul
18 was out of the state?

19     A    Well, Paul's always out of the state.

20     Q    Okay.  So, I'm sorry, we -- we misunderstood
21 each other just then.  That's why --

22     A    Sophia was my boss and Paul was the broker of
23 that office and Paul was always traveling.  I saw him
24 maybe two or three times a year when he's visiting or
25 his sons are visiting or Michael is visiting or Danny

Jones, Carmen                                        June 17, 2021

56

1    is visiting.

2        Q    And that -- that was the case for the whole

3    ten years?

4        A    All ten years.  Sophia was the big boss.

5        Q    So it must have been a pretty regular

6    practice for Sophia to bring you things to -- to do for

7    Paul?

8        A    Yeah.  Because the bank account is in Paul's

9    name, the brokerage is in Paul's name.  Never doubted

10   it.

11       Q    Did you ever notarize personal things for the

12   Kings, any of the three of them?

13       A    For Michael I've notarized I think once.  I

14   don't remember what it was, but I remember notarizing

15   something for Michael.  But I don't remember what.

16       Q    Anything --

17       A    Beyond that --

18       Q    -- for Sophia?

19       A    It's very rare I did Paul.  I did closings in

20   the office.  Notaries for clients or closings.

21       Q    To your knowledge --

22            Besides the quit claim deed that we're

23   looking at right now, have you ever notarized anything

24   in Paul's absence?

25       A    No.  I don't remember notarizing anything.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jones, Carmen                                          June 17, 2021

57

1      Q    So if I go and analyze all of ISTA, the

2    business as we refer to this business unit, for the

3    last ten years, I shouldn't find anything notarized for

4    Paul except for during those two or three times a year

5    when you saw him?

6         A    **Yeah.  Exactly.**

7      Q    Did anyone other than Sophia King give you

8    direct instructions with respect to the quit claim deed

9    that is Exhibit 1?

10        A    **No.**

11        Q    Did anyone else discuss it with you at any

12   time?

13        A    **Never.**

14        Q    Did you take instructions from anyone else

15   with respect to your witness or notary signatures on

16   the quit claim deed that's Exhibit 1?

17        A    **No.**

18           MR. BURATTI:  Let's take a five-minute break.

19      Let me see if I can wrap up.

20           (Break was taken.)

21   BY MR. BURATTI:

22        Q    Okay.  During the break counsel for Plaintiff

23   asked the witness to provide a couple of e-mails that I

24   think we -- we have a different understanding about

25   what's in the record.  So let's just clear it up.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jones, Carmen                                      June 17, 2021

58

1          Carmen, did you send me any of the

2    communications with Michael prior to today?

3       **A    No.  Not at all.  I only replied to your**

4    **e-mail.**

5       Q    And you're going to send them to Paul's

6    counsel and me after the deposition?

7       **A    Yes.  I --**

8          MR. MAYBERG:  No, right now.

9          THE DEPONENT:  Oh, right now or after the

10         deposition?

11         MR. MAYBERG:  No, right now.  I'd like them

12         now so that way I can conduct my

13         cross-examination, however limited on it, so we

14         don't have to deal with that on a -- the

15         subsequent deposition to save time.

16         MR. BURATTI:  Totally agree, Mendy.  In fact,

17         if you have any questions and you need a few

18         minutes to get reset, that's fine with me if you

19         want to take them.

20         MR. MAYBERG:  No.  I'm ready to go for what

21         limited ability I have so that way we don't, you

22         know, take longer the next time.

23         THE DEPONENT:  Okay.  I just sent the first

24         e-mail.

25         MR. BURATTI:  Mendy, I also sent you the --

Jones, Carmen                                    June 17, 2021

59

1    the actual exhibit I used as Number 1 there so

2    you're using the exact same one.

3      MR. MAYBERG:  Number 1 was the e-mail chain?

4      MR. BURATTI:  1 was the quit claim deed and

5    the -- the file itself is actually marked with one

6    period at the beginning.  I just sent it.  It's in

7    follow-up to the same e-mail that contained 2

8    earlier.

9      MR. MAYBERG:  Okay.

10     THE DEPONENT:  I sent three.

11     Hold on.  Let me go back to the screen.

12     I sent the three e-mails I got from Michael

13    and any responses to it.

14     Menachem, did you receive them?

15     MR. MAYBERG:  I'm receiving -- I see --

16     THE DEPONENT:  Just to make sure it went

17    through.

18     MR. MAYBERG:  Yeah.  Yeah.  I just got one,

19    two, and a third one just popped in.

20     THE DEPONENT:  Those are the three

21    communications I received.

22     MR. MAYBERG:  Okay.

23     THE DEPONENT:  And only one response from me,

24    which is, I'm at a loss for words, and the rest

25    is -- I didn't respond to.

Jones, Carmen                                        June 17, 2021

60

1          MR. BURATTI:  I'm still waiting for the third

2     one, but you can start, Mendy.

3          MR. MAYBERG:  Okay.  Hold on.

4                    EXAMINATION

5  BY MR. MAYBERG:

6     Q    Okay.  So, Carmen, I don't have any of them

7  that say your response.

8     **A    Let me check.  I'm going to Google -- I'm**

9  **going to gmail search it because I know I said it, so**

10  **it has to be in there.**

11     Q    It might be in a different folder.  It might

12  be in your sent mail.

13     **A    No, but I sent you like the e-mails like from**

14  **the bottom up.  Meaning, it will include everything**

15  **above it, you know, like the responses.**

16          **Let me see.  Yeah, I searched the word loss,**

17  **because I said I'm at a loss for words.**

18          **Oh, here it is.  Oh, your e-mail is not**

19  **saving the three e-mails.  You'll have to -- I'm**

20  **sending it again.  You did receive it, you just have to**

21  **scroll down --**

22     Q    Oh, okay.

23     **A    -- and you'll see the responses.  That was**

24  **the only response I had.**

25     Q    Okay.  All right.  So I'm ready to begin.  I

Jones, Carmen                                    June 17, 2021

61

1    guess we're still --

2              We're still on the record, right, Madam Court

3    Reporter?

4              THE COURT REPORTER:  Yes.

5    BY MR. MAYBERG:

6        Q    Okay.  Just, you know, to reiterate, Jason --

7    for Mr. Buratti and Ms. Jones, so I -- I wasn't aware

8    of this.  We got notice and I objected to this depo.

9    Mr. Buratti has been taking the deposition in order so

10   as not to cause a Judge to have to jump in an emergency

11   hearing.

12             We've agreed, Mr. Buratti and I, that we can

13   have the right to redepose you without their objection.

14   So I'm going to try to get as much as I can done today

15   so perhaps we can -- we can shorten that if need be.

16             Okay, Ms. Jones?  Is that all right with you?

17       **A    That's fine.**

18       Q    Okay.  So my name is Menachem Mayberg.  I'm

19   Paul King's attorney.  If you have any questions, if

20   you don't understand anything, please let me know.

21             This shouldn't feel oppressive, so if at any

22   point in time you feel my questions make you

23   uncomfortable, just let me know.  That shouldn't be

24   happening.

25             Okay?

Jones, Carmen                                      June 17, 2021

62

1      **A      Okay.**

2      Q    So I want to start with -- And I'm going to

3    try -- I'm going to share a screen that was shared

4    before.

5            Do you see that?  Is that the e-mail chain

6    with you and Mr. Buratti?

7      **A      Yes.**

8      Q    Okay.  So I'm going down to one, two, three,

9    four -- five lines from the -- from the top line where

10   it says, I have also not received any summons

11   whatsoever.  You wrote, Sophia King brought me the

12   document Paul signed to notarize from home since I was

13   in self-isolation.

14           So Mr. Buratti questioned you and we

15   discussed and we went over it and you answered clearly

16   Mr. -- Mr. Paul King wasn't there.  And the only thing

17   that Mr. Buratti questioned you about --

18           And the way -- And this could be what lawyers

19   sometimes do, the question to you is, it says here,

20   Sophia King brought me the document Paul signed.  You

21   clearly over the course of this deposition explained

22   that you have no idea and you did not see him sign that

23   document, correct?

24     **A      Correct.   Correct.**

25     Q    You're writing in your e-mail to Mr. Buratti,

Jones, Carmen                                    June 17, 2021

63

1   Sophia brought me the document Paul signed, that's what

2   your assumption was based on what was going on in the

3   transaction, correct?

4        **A    Exactly.  Yes.**

5        Q    You didn't see him sign it?

6        **A    No.**

7        Q    And you don't, in fact, know if he did sign

8   it?

9        **A    I do not know that.**

10       Q    So the next thing I'd just like to clear up

11  is have you been -- have you --

12           You seem to have had a relationship with

13  Michael King, correct?

14       **A    No.**

15       Q    And when I say relationship, I mean business

16  relationship.  Sorry.

17       **A    Not much, but yes.  I've talked to him over**

18  **the last ten years, yes.**

19       Q    And what -- When he sent you an e-mail --

20           And I'm going to go to -- I'm going to pull

21  up the e-mail that he sent you.  I guess it's the first

22  e-mail that he sent you.

23           So Michael sent you an e-mail on Tuesday,

24  May 25th.  I'm going to try to share that.

25           And are you seeing this, Amended complaint,

Jones, Carmen

June 17, 2021

64

1    Carmen Jones to Menachem Mayberg, Jason Buratti and it

2    shows an e-mail from Michael?

3            This is the e-mail you --

4       **A    Yes.  Yes.  Yes.**

5            MR. MAYBERG:  Madam Court Reporter, if we can

6       make this Exhibit 1 from the Plaintiff.  And I'll

7       send that to you, Madam Court Reporter, after this

8       deposition.

9            THE COURT REPORTER:  Okay.

10   BY MR. MAYBERG:

11      Q    So I'm going down.  Hey, Carmen -- If you can

12   just read what Michael wrote on May 25th, starting,

13   Hey, Carmen.

14           MR. BURATTI:  Object to form.

15           THE DEPONENT:  It says, Hey, Carmen, look at

16      what this piece of worthless shit did.  See

17      attached -- I'm sorry, I need glasses.  See --

18      It's so small.  See attached -- Okay.  He named

19      you in -- in the lawsuit.  Just so you know, I

20      have had issues with this kid, including him

21      filing a falsified police report for which I am

22      pressing charges now against --

23           I can't see because of the Zoom boxes --

24   BY MR. MAYBERG:

25      Q    Oh, okay.

Jones, Carmen                                    June 17, 2021

65

```
1        A      -- on the right.  After against I can't see
2  anything.  And --
3              Okay.  Against him.  This was released today,
4  and he sent the link.
5        Q    Okay.  And so prior to May 25th, 2021 you
6  mentioned that you notarized for Michael some
7  documents, correct, Michael King?
8        A    In the past, yeah.
9        Q    In the past.
10             And in the past when you notarized for
11  Michael in those documents, would that -- was that
12  Michael's signature that you notarized or other
13  people's documents as well, or both?
14       A    That I wouldn't remember.
15       Q    Right.
16       A    It was very long.  I would not remember.
17       Q    Okay.  And in the past Michael has given you
18  documents to sign for other people when -- when those
19  other people weren't present and just like here he's
20  asked you to do it because it was a deal of his,
21  correct?
22             MR. BURATTI:  Object to form and misleading.
23             THE DEPONENT:  No.
24  BY MR. MAYBERG:
25       Q    So has he ever given you any documents where
```

Henderson Legal Services, Inc.

Jones, Carmen                                          June 17, 2021

66

1   the people's signature you were signing weren't

2   present?

3       **A    No.**

4       Q    Okay.  So have you ever signed a document for

5   Michael -- Have you ever signed a document for Michael

6   where the person whose signature you were notarizing

7   wasn't present?

8           MR. BURATTI:  Object to form.

9           THE DEPONENT:  No.

10  BY MR. MAYBERG:

11      Q    Have you ever signed a document for Michael

12  where his -- for his signature when he wasn't present?

13      **A    Possibly.  Actually, no.**

14          **Wait a minute.  No, I never got to notarize**

15  **it.  He sent me a document for his son's, what do you**

16  **call it, driving permit, and Sophia said the date --**

17  **the birthday was wrong, and I said, I can't change it,**

18  **and I never heard back after that.**

19      Q    So -- But what he wanted you to do had the

20  birthday not been wrong was sign it for the son even

21  though the son wasn't there?

22          MR. BURATTI:  Object to form.  Calls for

23      speculation.

24          THE DEPONENT:  No, not the son.  Michael.

25  ///

Henderson Legal Services, Inc.

Jones, Carmen                                    June 17, 2021

67

BY MR. MAYBERG:

Q    Oh, so it was for Michael's license?

A    **No.  Michael's signature as a parent.**

Q    Michael's signature as a parent.

So you were going to sign a document for Michael, his signature as a parent, but he wasn't going to be present, correct?

A    **Right.  Correct.**

Q    Okay.  And when Michael -- Did Michael -- Before he sent you that e-mail on May 25th, 2021, did he call you to talk to you about any of these -- the issues that we're here today about?

A    **No.  Not at all.**

Q    Not at all.

And after he sent you that e-mail, did he call you at all?

A    **No.  I only got one phone call.  I'm trying to remember.  It was recent, but I don't remember the actual date that I saw his caller ID and I didn't answer.**

Q    Okay.

A    **And he left a voice message.  I think.  I don't even think I read it, I just immediately blocked him.  Because I didn't want to talk to anyone.**

Q    And was this after --

Jones, Carmen                                        June 17, 2021

68

1      A      Not Paul.  Not Sophia.  Anyone.

2      Q      Was that phone call and voice message after

3  you had been in contact with Mr. Buratti, if you can

4  recall?

5      A      I don't remember.  I have terrible memory.

6  But I don't remember.  I think it was --

7              The third e-mail, that's the date he called.

8  Because when I didn't answer, he e-mailed.  So check

9  the most recent e-mail that is -- I don't think he even

10  left a message, I just know that I immediately got an

11  e-mail right -- a few minutes after.  So check the date

12  for the third e-mail or the most recent e-mail, that's

13  the time he called.

14      Q      Okay.  So we have a June 8th.

15      A      Yeah.  It was recent.  It was like very

16  recent.

17      Q      Right.

18      A      It says, Call me back, Carmen, please call me

19  back.  I didn't think it was proper to talk to anyone,

20  except Sophia because she was my boss.

21      Q      Who's Carmen Estrada?

22      A      Carmen Estrada?  My daughter.  But I used to

23  be Carmen Estrada.

24      Q      Oh, because there's a Carmen -- There's a

25  ceestrada96@gmail that I see on --

Jones, Carmen                                    June 17, 2021

69

1       A    That's my daughter.  She's a paralegal.

2       Q    Okay.  So I see you forwarded the message

3  from Michael King.  Is that to Carmen Estrada?

4       A    Yeah, my daughter.

5       Q    Okay.

6       A    I was asking her about it.  She works for a

7  law office.

8       Q    Okay.  And so I see there's a date of

9  June 3rd, Thursday, June 3rd, 2021 at 2:16.

10           I'm going to share this e-mail.

11      A    One of the e-mails says, Please call me.  It

12  was very short.  It wasn't explaining anything, it was

13  just after he called me.  And as soon as he called me I

14  blocked him.  I just didn't want to deal with anyone

15  until this deposition.

16      Q    So is this -- I'm showing you on the screen.

17  Do you see it?

18           At the top it says, Carmen Jones, the first

19  thing as it's scrolling --

20           Madam Court Reporter, if you can make this

21  Plaintiff --

22      A    This is two minutes after he called me.

23      Q    Right.  So two minutes after that missed

24  phone call.  So the date was June 3rd, Thursday,

25  June 3rd, at -- 2021 at 2:16.  So he called you within

Jones, Carmen                                    June 17, 2021

70

1    two minutes before that?

2         A    Yes.

3         Q    And then he sends you the e-mail that says,

4    Hey, Carmen, please call me if you can, thanks?

5         A    **Right.  Because the e-mail before that was**

6    **May 26 and then all of a sudden I get a phone call and**

7    **then I ignore it and I got an e-mail soon thereafter.**

8         Q    I gotcha.  And I see the chain here.  Now,

9    it's -- I'm finding -- I see, I'm at a loss for words.

10        A    **Like a chain, yeah.  Any response -- I made**

11   **only one response, and it was, Loss -- I'm at a loss**

12   **for words.**

13        Q    And when you spoke to Mr. Buratti --

14             Did you speak to Mr. Buratti other than in

15   the e-mail chain?

16             Did you have telephone conversations with

17   Mr. Buratti?

18        A    **I think I got a call a couple of days ago,**

19   **and I didn't -- I did not answer the phone and I got a**

20   **voicemail and I said I didn't want -- I heard he had**

21   **said that I didn't want to talk to anyone until I'm**

22   **deposed.**

23        Q    And --

24        A    **I wanted nothing improper.**

25        Q    No, I'm -- I'm glad to hear that.  Thank you

Jones, Carmen                                June 17, 2021

71

1    for that.

2           Did -- Prior to the -- to Mr. Buratti's

3    e-mail chain with you, did you speak to anybody from

4    his office or him?

5           **A    No, I did not.**

6           MR. MAYBERG:  Okay.  And, Madam Court

7           Reporter, if you can --

8    BY MR. MAYBERG:

9           Q    I'm sharing the screen.  Do you see -- Is

10   this -- Carmen, do you see on the screen your e-mails

11   back and forth that I showed you with Mr. Buratti?

12          MR. BURATTI:  Exhibit 2, right?

13          MR. MAYBERG:  Yes.

14          Is that what you're seeing on the screen

15          right now?

16          THE COURT REPORTER:  Are you asking me, the

17          court reporter?

18          MR. MAYBERG:  Madam Court Reporter, if you

19          see it, it's Exhibit 2.

20   BY MR. MAYBERG:

21          Q    And, Ms. Jones, do you see in front of you on

22   the shared screen Exhibit 2, the e-mail chain with you

23   and Mr. Buratti?

24          **A    I see the e-mail, but I don't -- I don't see**

25   **where it says what exhibit it is.**

Jones, Carmen                                              June 17, 2021

72

1    Q    Oh, no.  That's what I was just clarifying.

2         Madam Court Reporter, this is -- Sorry.

3         This is Exhibit 2, Madam Court Reporter.

4         MR. BURATTI:  Defendant's 2.  We should

5    probably clarify.  Sorry.

6         MR. MAYBERG:  It's Plaintiff's -- I'm sorry,

7    was it Plaintiff's 2 or 1, Madam Court Reporter?

8         MR. BURATTI:  Defendant's 2.

9         MR. MAYBERG:  Defendant's 2.  So I wanted to

10   make it a Plaintiff's exhibit as well.

11        MR. BURATTI:  Plaintiff's 2 then.

12        MR. MAYBERG:  And I believe it was -- Madam

13   Court Reporter, I believe this was Plaintiff's 1,

14   correct?

15        THE COURT REPORTER:  You marked one e-mail as

16   Plaintiff's 1, yes.

17        MR. MAYBERG:  Right.  So Plaintiff's 1 is an

18   e-mail chain between Carmen A. Jones and Jason

19   Buratti.

20        Do you have that, Madam Court Reporter?

21   That's Plaintiff 1.

22        THE COURT REPORTER:  All right.

23        MR. MAYBERG:  Okay.  And Plaintiff 2 was the

24   one that we just read from a moment ago, which was

25   the e-mails between Michael King and Ms. Jones.

Jones, Carmen                                      June 17, 2021

73

1               THE COURT REPORTER:  Okay.

2    BY MR. MAYBERG:

3        Q    Okay.  So, Ms. Jones, so I'm going to go and

4    I'm going to -- I'm showing -- I'm scrolling down.

5               So the first e-mail that I have here,

6    Mr. Buratti to you, is on June 5th, and there's a, Dear

7    Ms. Jones, I'm Michael King's --

8               Do you see that?  Is that what's showing on

9    the screen right now?

10       **A    Yes.  Yes.  It's in green?**

11       Q    Yes.  It's in green.

12       **A    Yes.**

13       Q    Okay.  Great.

14              And so that was the first time you heard from

15   Mr. Buratti or anybody from Michael King's attorneys?

16       **A    I -- I think so.**

17       Q    Okay.  Now, has anyone called you on behalf

18   of Michael other than Mr. Buratti or reached out to you

19   or tried to contact you on behalf of Michael King other

20   than Mr. Buratti?

21       **A    No.**

22       Q    Now, in those ten years that you worked for

23   the Kings, what was Michael King's position and

24   different positions in the company, if you can recall?

25              MR. BURATTI:  Object to form.

Jones, Carmen                                          June 17, 2021

74

```
 1          THE DEPONENT:  Nothing.  He didn't have any
 2     position there.
 3  BY MR. MAYBERG:
 4     Q    Okay.
 5     A    It was his brother.
 6     Q    His brother.
 7          And how many times over the ten years, if can
 8  you recall, did Michael ask you to notarize things for
 9  him other than the driver's license for his son?
10     A    None.  Sophia is the one that always told me
11  to notarize things.
12     Q    Okay.  And has Sophia asked you or told you
13  to notarize things for Michael in his business or any
14  dealings that had to do with Michael?
15     A    I don't remember.
16     Q    Okay.
17     A    Ten years.  Very rare if he ever communicated
18  at all with me.  Sophia did.
19     Q    Right.  So I'm not -- I'm not asking about
20  Michael.  Now the question is Sophia.
21          How many times over the ten years has Sophia
22  asked you to -- to notarize things or have people come
23  in and sign documents for Michael?
24     A    I have no idea.  Not -- Not Michael.  Sophia.
25  Not --
```

Jones, Carmen                                    June 17, 2021

75

1      Q    Right.

2      A    Not documents for Michael, just Sophia gave

3   me -- I would notarize documents for closings, things

4   like that over ten years.  I don't remember exactly,

5   but yes.

6      Q    Do you remember if any of the documents that

7   Sophia asked you to notarize, if any of those documents

8   were for Michael or any deals that Michael was working

9   on?

10     A    I don't recall.

11     Q    Okay.  Now --

12          MR. BURATTI:  Object to form on that last

13     question.  Sorry.

14   BY MR. MAYBERG:

15     Q    Now, you were discussing -- In the beginning

16   of this depo opposing counsel was asking you some

17   questions about a summons, and you've referenced it in

18   your e-mail.

19          What was that regarding?

20     A    Well, once I saw the e-mails from Michael,

21   they said that they filed a lawsuit against me, so, you

22   know, I'm a realtor, I could check that on Clerk of

23   Courts and I see something, and then I started reading

24   all of the e-mails and links about it and that's it.

25   That's how I found out about this.  I didn't have no

Jones, Carmen                                    June 17, 2021

76

1    **idea about this.**

2            MR. MAYBERG:  Okay.  If I may have a moment,

3    Counsel.

4            MR. BURATTI:  Of course.

5            (Pause in proceedings.)

6            (Discussion was held off the record.)

7            MR. MAYBERG:  So what I'm going to do is I'm

8    going to share my screen.

9            So this exhibit, Madam Court Reporter, that I

10   asked Carmen will be Exhibit 2, and then I'm going

11   to make the other e-mails independent e-mails

12   Exhibit 3 and 4.

13           Okay, Jason?

14           MR. BURATTI:  That's fine.

15           THE COURT REPORTER:  I don't see -- I don't

16   see it on the screen.  I don't know what you're

17   referring to.

18           MR. MAYBERG:  Oh, sorry.  Do you see it now?

19           THE COURT REPORTER:  Yes.  So this is

20   Number 2?

21           MR. MAYBERG:  This is Number 2.  Where it --

22   Right in front of you it says, I'm at a loss for

23   words.  And above it it has, Michael King,

24   Thursday, June 3rd at 2:16, Hey, Carmen, please

25   call me if you can.

Jones, Carmen                                          June 17, 2021

77

1          So we -- we talked about that and I asked her

2      questions so we'll make that Number 2.

3              THE COURT REPORTER:  Okay.

4              MR. MAYBERG:  Okay.

5   BY MR. MAYBERG:

6      Q    So, Carmen, just to -- to wrap up,

7   Mr. Buratti asked a whole bunch of general questions

8   about some procedures that you had, and you answered

9   all of it.

10             I just wanted to go back to this document

11  that was -- And I'm showing you --

12             This was marked Defendant's Exhibit what,

13  Madam Court Reporter, the quit claim deed?

14             THE COURT REPORTER:  1.

15  BY MR. MAYBERG:

16     Q    Defendant's Exhibit 1.

17             So just to clarify, on Defendant's Exhibit 1,

18  you didn't speak to Paul King prior to you having this

19  document brought to you by Sophia, correct?

20     **A    No, I did not.**

21     Q    Okay.  And you didn't speak to Paul King

22  after having Sophia bring you this document?

23     **A    No, I did not.**

24     Q    And -- And you never received any written or

25  any other electronic communication from Paul King

Henderson Legal Services, Inc.

Jones, Carmen

June 17, 2021

78

1  regarding this document before --

2      A    No.

3      Q    -- or after?

4      A    No, I did not.

5      Q    Okay.  And the only discussion you ever had

6  regarding this document outside of signing it for

7  Sophia was later on when you had a conversation with

8  Sophia when Sophia was explaining to you and she said

9  to you that she thought there was some deal based on

10  this document between the brothers and that's why she

11  gave it to you?

12      A    Yes.  She called it an agreement, that they

13  had an agreement between each other.

14      Q    Okay.  And as Mr. Buratti questioned you, you

15  don't know what the terms -- or you didn't hear from

16  Sophia what the terms of that agreement were, correct?

17      A    No, she did not.

18      Q    Okay.  Until this day you haven't heard it

19  from anybody else?

20      A    No.  After my last conversation that day, I

21  blocked everyone.

22          MR. MAYBERG:  Okay.  At this time, if I may

23      have a moment, my secretary just stepped in then

24      we can wrap up.  Hold on one more second.

25          THE DEPONENT:  Sure.

Henderson Legal Services, Inc.

Jones, Carmen                                              June 17, 2021

1          (Pause in proceedings.)

2          MR. MAYBERG:  Okay.  For the purposes of this

3      round, I have nothing -- I have nothing to ask

4      here.  Of course I'm reserving my right in general

5      and as to our agreement, Mr. Buratti, to -- if I

6      need to retake this -- or retake or take an hour

7      depo, but my examination in response to yours at

8      this limited amount is -- I have no more questions

9      for this round.

10          MR. BURATTI:  I have to check one thing.

11          No, I don't have to check one thing.  We're

12      good.

13          Thank you very much everyone for your time.

14          Carmen, thank you very much for your time.

15      Sorry for the situation.

16          THE DEPONENT:  No worries.

17          MR. BURATTI:  Linda, thank you for your time.

18          THE COURT REPORTER:  Read or waive?

19          MR. BURATTI:  Carmen, do you want to read and

20      sign this transcript, which means you review it

21      and sign it and send an errata sheet if there's

22      errors and things like that?

23          THE DEPONENT:  Are you going to do that via

24      e-mail or --

25          MR. BURATTI:  So Henderson will send -- The

Jones, Carmen                                    June 17, 2021

80

1      regular process is basically Henderson will send a

2      transcript to all of us.  The witness is generally

3      given an opportunity to read and then sign it, and

4      you'll need a notary for that, and you -- if you

5      identify any errors, there will be a little sheet

6      at the end that you just fill it out.  Maybe

7      you've seen that before, that process before.

8           And, Mendy, jump in if you don't agree with

9      the way I've said it.

10          MR. MAYBERG:  Yeah.  I don't know if you

11     have -- If you don't have corrections, I don't

12     know if you have to sign and notarize it, but I

13     think the errata is just if you think there was

14     something that was incorrect, then you sign and

15     notarize it.  Otherwise -- But I don't know the

16     process.  But it just means that you want to

17     review it before it gets official.

18          THE DEPONENT:  Okay.  No problem.

19          THE COURT REPORTER:  Is that a yes, you want

20     to read or no, you waive?

21          THE DEPONENT:  Well, read now would be -- I'd

22     be on for awhile or -- Can I read it on my own and

23     then --

24          MR. BURATTI:  Later -- Later there will be a

25     transcript that's distributed and you can read

Jones, Carmen                                    June 17, 2021

81

```
 1    that one.  And it's somewhere between days and
 2    weeks, depending on how Mendy and I decide to take
 3    the speed of the return, which depends on a large
 4    part probably on the -- on the upcoming of the
 5    evidentiary hearing.  So for now --
 6         THE DEPONENT:  I can read it now if you -- if
 7    you guys want to wait.
 8         MR. BURATTI:  Oh, no.  They have to make the
 9    transcript first.
10         THE DEPONENT:  Oh, okay.  I thought she did
11    it now.  I misunderstood.  I totally
12    misunderstood.  Okay.  No problem.
13         MR. BURATTI:  I think Linda's very good, but
14    I don't --
15         MR. MAYBERG:  Thank you.
16         MR. BURATTI:  -- think it will be that fast.
17         THE DEPONENT:  I thought she was typing it
18    right there and she had it on her screen.  Okay.
19    All right.  No problem.  Let me know.  I'm
20    available anytime for everyone.
21         MR. MAYBERG:  We --
22         THE DEPONENT:  I'm going to be -- I'm going
23    to be out of town from June -- hold on, I'm
24    looking at my calendar, from June -- June 25th
25    until June 28th.  So I can't do anything.  It's my
```

Jones, Carmen                                      June 17, 2021

82

1      grandchildren's birthdays, so I'll be in Orlando.

2      So if you need a deposition at that time, I won't

3      be here.

4          Okay.

5          MR. MAYBERG:  Yes.  Enjoy.

6          MR. BURATTI:  Until which day in July?  I'm

7      sorry.

8          THE DEPONENT:  Between June 25th and

9      June 28th.

10         MR. BURATTI:  Okay.

11         THE DEPONENT:  I'm going to be in Orlando

12     with my grandchildren.  It's their birthdays.

13     So -- But any time after that just let me know in

14     advance, so I can clear my schedule.  I'm a

15     realtor so my -- my schedule is flexible.  Unless

16     I'm teaching, and I'm not doing that yet.

17         Okay?

18         MR. BURATTI:  Very good.

19         THE COURT REPORTER:  Are you ordering at this

20     time, Counsel?

21         MR. BURATTI:  I will send -- Kim well send

22     our order in.

23         I'm not planning to expedite at this point,

24     Mendy, but if I do, I'll let you know.

25         MR. MAYBERG:  Please.  Thank you.  Okay.

Jones, Carmen

June 17, 2021

83

1        MR. BURATTI:  Okay.

2        THE COURT REPORTER:  And copy for you if he

3   does order?

4        MR. MAYBERG:  Yes.

5        Wait.  Let's just -- While we do some

6   bookkeeping here, if we can let the witness go,

7   then we'll talk to the court reporter about

8   exhibits and how to send them to her and whatnot.

9        MR. BURATTI:  Yes.

10       MR. MAYBERG:  Carmen, thank you.  I just

11  didn't want to hold you here while we work out how

12  we're going to send her the exhibits.

13       THE DEPONENT:  Okay.  Thank you.  Bye-bye.

14       MR. MAYBERG:  Thank you very much.  Bye.

15       (Discussion was held off the record.)

16       MR. MAYBERG:  Back on the record.

17       So I'm going to -- This is Menachem Mayberg

18  and I'm going to agree to your statement and

19  acknowledge your statement about taking the oath

20  of the deponent remote and -- and referencing the

21  Supreme Court administrative order.  And Menachem

22  Mayberg and Paul King are in agreement.

23       MR. BURATTI:  That's good enough for me --

24  He's referring to the -- the statement that you

25  read at the beginning the deposition.  That's good

Jones, Carmen                                    June 17, 2021

84

1        enough for me, but if you need to read it, that's

2        okay with me also.

3                THE COURT REPORTER:  No, that's fine.

4                MR. MAYBERG:  Okay.

5                (Deposition concluded at 4:11 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jones, Carmen                                    June 17, 2021

85

1                    CERTIFICATE OF OATH

2     STATE OF FLORIDA     )

3     COUNTY OF SARASOTA )

4            I, the undersigned authority, certify that

5     CARMEN JONES appeared before me via Zoom and was duly

6     sworn.

7            WITNESS my hand and official seal this 29th

8     day of June, 2021.

9

10

11

12            LINDA C. MEAD, CSR, CCR
              Notary Public - State of Florida
13            Commission Number GG158376
              Commission Expires 11/13/21

14

15

16

17

18

19

20

21

22

23

24

25

Henderson Legal Services, Inc.

Jones, Carmen                                           June 17, 2021

86

```
 1              REPORTER'S DEPOSITION CERTIFICATE
 2    STATE OF FLORIDA   )
 3    COUNTY OF SARASOTA )
 4              I, LINDA C. MEAD, Certified Court Reporter,
 5    certify that I was authorized to and did stenographically
 6    report the deposition of CARMEN JONES; that a review of
 7    the transcript was requested; and that the transcript
 8    is a true and complete record of my stenographic notes.
 9              I further certify that I am not a relative,
10    employee, attorney, or counsel of any of the parties,
11    nor am I a relative or employee of any of the parties
12    attorney or counsel connected with the action, nor am I
13    financially interested in the action.
14              Dated this 29th day of June, 2021.
15
16
17          _____
18          LINDA C. MEAD, CSR, CCR
19
20
21
22
23
24
25
```

Jones, Carmen                                          June 17, 2021

87

1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____, do hereby

4    acknowledge that I have read and examined the

5    foregoing testimony, and the same is a true, correct

6    and complete transcription of the testimony given by

7    me, and any corrections appear on the attached Errata

8    Sheet signed by me.

9

10   _____    _____

11    (DATE)                    (SIGNATURE)

12

13                NOTARIZATION   (If Required)

14

15   State of _____

16   County of _____

17

18   Subscribed and sworn to (or affirmed) before me on

19   this _____ day of _____, 20_____, by

20   _____, proved to me on the

21   basis of satisfactory evidence to be the person who

22   appeared before me.

23

24   Signature: _____

25                        (Seal)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jones, Carmen

June 17, 2021

1

| A | | | | |
|---|---|---|---|---|
| **a.m** 41:16 42:16 | **administering** 4:8 8:1 10:9 | **agreements** 53:4 | **Arianna** 48:20 | **awhile** 80:22 |
| **ability** 58:21 | **administrati...** 12:22 | **ahead** 40:8 | **arrangement** 4:9,11 8:2,4 | **B** |
| **able** 11:10 35:21 | **administrative** 7:14 8:10,14 | **allowing** 9:23 | **ARS** 10:21 | **back** 6:11 7:14 20:15,16,22 |
| **absence** 56:24 | 8:15,17,24 | **amended** 13:7 13:11 32:25 | **asked** 9:20 10:3,7 11:23 | 35:9 45:21 47:19 48:4 |
| **absolutely** 28:1 35:15 | 9:12 10:4,11 10:17 12:1,9 | 63:25 | 12:7 21:13 29:5 35:18 | 59:11 66:18 68:18,19 |
| 40:6 54:19 | 12:19 83:21 | **amendment** 11:4 | 52:17 57:23 65:20 74:12 | 71:11 77:10 83:16 |
| **access** 43:13 43:20,21 | **advance** 5:22 82:14 | **America** 17:5 | 74:22 75:7 76:10 77:1,7 | **bank** 56:8 |
| **account** 56:8 | **affirmed** 87:18 | **amount** 79:8 | 76:10 77:1,7 | **barely** 24:22 |
| **accountable** 44:3 | **afford** 21:8 | **analyze** 57:1 | **asking** 6:3,8 | **Baryshnikov** 45:19 |
| **accurate** 45:11 | **afternoon** 14:6 14:7 | **answer** 15:14 40:4 47:20 | 8:13,15 12:6 26:6 69:6 | **based** 6:19 12:8 13:3 |
| **acknowledge** 4:5 7:23 8:13 | **agent** 50:8 52:24 54:1 | 50:4 67:20 68:8 70:19 | 71:16 74:19 75:16 | 63:2 78:9 |
| 8:16 10:3 | **agents** 23:1,2 23:4 | **answered** 62:15 77:8 | **assistant** 34:17 | **basic** 30:10 |
| 11:24 12:7 13:2 83:19 | **ago** 14:18 | **anybody** 71:3 73:15 78:19 | **associate** 53:13,14 | **basically** 80:1 |
| 87:4 | 41:21 70:18 72:24 | **anymore** 21:8 43:19 | **associated** 16:23 17:1 | **basis** 17:21,21 17:23 87:21 |
| **acknowledg...** 9:5 11:24 | **agree** 4:19 5:12 6:23 | **anytime** 81:20 | **association** 10:21 49:3 | **bears** 31:25 |
| **ACKNOWLE...** 87:1 | 8:20 10:7,7 32:25 38:11 | **AO** 10:19 | **assumption** 63:2 | **beginning** 59:6 75:15 83:25 |
| **action** 86:12 86:13 | 41:5 42:7 46:23,23 | **Apart** 42:20 | **attached** 64:17 64:18 87:7 | **behalf** 2:5,10 54:6,6 55:8 |
| **actively** 23:15 | 58:16 80:8 83:18 | **apologize** 5:18 | **attorney** 4:21 39:24 61:19 | 73:17,19 |
| **actual** 7:14 52:23 59:1 | **agreeable** 6:13 | **appear** 49:23 87:7 | 86:10,12 | **believe** 7:1 46:21 54:23 |
| 67:19 | **agreed** 13:16 13:17 48:2,2 | **APPEARAN...** 2:1 | **attorneys** 4:4 5:3 6:21,23 | 55:3 72:12 72:13 |
| **add** 49:19 | 61:12 | **appeared** 85:5 87:22 | 6:24 7:7,9,22 8:19 73:15 | **best** 33:2 |
| **added** 23:14 53:21 | **agreeing** 9:6 | **Appearing** 2:5 2:10 | **August** 17:11 17:16,16 | **Beyond** 56:17 |
| **address** 28:23 43:2 44:9 | **agreement** 4:13,14 5:2 | **applicable** 10:15 12:5 | **authority** 85:4 | **big** 42:12 56:4 |
| 51:5 | 6:10,21,23 8:6,7 34:20 | **application** 49:2 | **authorized** 86:5 | **birthday** 66:17 66:20 |
| **addresses** 51:9 | 35:8 38:9 47:14,24 | **applies** 24:14 | **available** 35:7 81:20 | **birthdays** 82:1 82:12 |
| **administer** 11:7 | 48:1 78:12 78:13,16 | **apply** 30:11 | **Aventura** 2:8 | **Biscayne** 2:7 |
| **administered** 8:21 | 79:5 83:22 | **approximately** 17:10 19:13 | **aware** 61:7 | **bit** 26:3 |
| | | **area** 5:7 6:16 9:9 12:18 | | **blasts** 22:25 |
| | | **argue** 6:14 | | **block** 30:1 32:5,6 |

Henderson Legal Services, Inc.

202-220-4158

www.hendersonlegalservices.com

blocked 38:21
39:3 40:4
67:23 69:14
78:21
Book 32:1
bookkeeping
83:6
boss 29:8
52:11 54:19
55:22 56:4
68:20
bottom 60:14
Boulevard 2:7
boxes 64:23
brand 37:5
44:14
break 34:24
35:2 57:18
57:20,22
bring 56:6
77:22
bringing 29:15
brings 25:6
broke 36:8,8
36:24
broker 43:25
52:12,18,25
53:13,13
54:2 55:22
broker's 53:10
brokerage
56:9
brother 74:5,6
brothers 22:15
31:19 46:20
48:2 78:10
brought 19:25
22:11,12
29:4 35:20
45:8 48:12
48:25 62:11
62:20 63:1
77:19
bunch 77:7
Buratti 2:6,7

3:5 4:16,16
5:14,15 6:5
7:1 8:11 9:17
9:21,24 10:6
10:13,19,24
11:12,16,22
12:2,10
13:20 14:5
15:3,12,13
25:23 26:2,4
32:15 33:6
33:14,24
34:3,8,25
35:9,17
40:19,23
41:5,13 42:3
42:9 47:5,17
47:22 52:5
57:18,21
58:16,25
59:4 60:1
61:7,9,12
62:6,14,17
62:25 64:1
64:14 65:22
66:8,22 68:3
70:13,14,17
71:11,12,23
72:4,8,11,19
73:6,15,18
73:20,25
75:12 76:4
76:14 77:7
78:14 79:5
79:10,17,19
79:25 80:24
81:8,13,16
82:6,10,18
82:21 83:1,9
83:23
Buratti's 71:2
business
12:15,16
16:23,25
17:1 21:19

36:13 43:25
54:2,4 57:2,2
63:15 74:13
businesses
16:20
busy 23:8
Bye 83:14
Bye-bye 83:13

---

**C**

C 1:19 85:12
86:4,18
C211stclass...
43:13
calendar 18:8
18:10 81:24
California
51:19 55:8
55:15
call 15:6 38:5
38:18 46:19
66:16 67:11
67:16,17
68:2,18,18
69:11,24
70:4,6,18
76:25
called 30:16
30:22 35:5
38:2,2,7 68:7
68:13 69:13
69:13,22,25
73:17 78:12
caller 67:19
calling 40:4
Calls 66:22
canceled
49:14
care 38:17
Careful 31:10
carman.jone...
44:9
Carmen 1:11
3:1 13:25
29:14 39:7

41:14 58:1
60:6 64:1,11
64:13,15
68:18,21,22
68:23,24
69:3,18 70:4
71:10 72:18
76:10,24
77:6 79:14
79:19 83:10
85:5 86:6
Carmenajon...
45:3
carmenajon...
43:2
case 1:6 4:18
4:19 33:12
41:23 56:2
cash 18:23
19:12
cat 41:10
cause 30:8
61:10
CCR 1:19
85:12 86:18
ceestrada96...
68:25
Century 17:4
44:13,20
CERTIFICATE
85:1 86:1
Certified 86:4
certify 85:4
86:5,9
CFN 32:1
chain 3:14,21
59:3 62:5
70:8,10,15
71:3,22
72:18
chamber 15:7
chambers
15:11 35:5
change 18:17
29:16,17

43:16,21
49:13,13
51:20,22
52:18 66:17
changed 43:14
43:20
changes 49:6
49:21
charges 64:22
chatting 47:4
check 39:12
41:25 49:10
49:15 60:8
68:8,11
75:22 79:10
79:11
CIRCUIT 1:1,1
claim 3:20
23:6 26:9,15
27:6,8 37:13
37:17 38:11
42:23 46:5
46:17 48:3,5
50:21,25
56:22 57:8
57:16 59:4
77:13
clarification
15:7
clarify 9:3 72:5
77:17
clarifying 72:1
Class 17:4
clear 5:16,20
57:25 63:10
82:14
clearly 62:15
62:21
Clerk 75:22
client 5:20
25:14
clients 24:12
25:11 44:24
56:20
close 32:7

Jones, Carmen

June 17, 2021

3

closed 20:20
20:22,25
21:1
closing 21:24
25:11,13
45:20
closings 25:12
45:18 56:19
56:20 75:3
co-counsel
5:21
co-Defendant
4:18
code 7:12,15
come 24:12
25:11 29:22
52:19 74:22
comes 25:13
41:4 45:18
45:19
coming 46:25
Commission
85:13,13
communicate
40:15 51:20
51:23 52:2
communicat...
74:17
communicat...
77:25
communicat...
58:2 59:21
company
48:21 73:24
complaint
63:25
complete 86:8
87:6
completely
38:14
Comprehen...
10:25
computer
29:19 43:15
concerned

31:13,15
concert 54:13
concluded
84:5
conduct 58:12
confidential
15:1 42:5
confirm 10:7
29:9 32:22
50:10
connected
86:12
consent 4:11
8:4
consider
52:19
contact 38:18
39:12 68:3
73:19
contained
59:7
contains 42:5
continue
17:19,22
contract 18:17
contractor
15:23
contracts 53:7
conversation
39:6 45:22
46:7,15
47:11 50:17
78:7,20
conversations
70:16
convey 19:1
copies 40:1
copy 83:2
correct 22:5
29:20 54:3,8
62:23,24,24
63:3,13 65:7
65:21 67:7,8
72:14 77:19
78:16 87:5

corrections
80:11 87:7
counsel 4:11
4:13,17 5:13
5:18 6:12 8:4
8:6 13:15,17
25:21 57:22
58:6 75:16
76:3 82:20
86:10,12
County 1:1
85:3 86:3
87:16
couple 29:22
57:23 70:18
course 9:23
33:9 41:17
42:8 62:21
76:4 79:4
court 1:1 2:3
4:4,6,10 5:5
5:10 6:17,20
6:25 7:5,7,9
7:12,13,16
7:22,24 8:3
8:25 9:7,9,13
9:22 10:14
10:18,20
11:6,12 12:3
12:6,13,16
12:21 13:20
13:22 32:17
34:21 35:12
35:14 47:21
61:2,4 64:5,7
64:9 69:20
71:6,16,17
71:18 72:2,3
72:7,13,15
72:20,22
73:1 76:9,15
76:19 77:3
77:13,14
79:18 80:19
82:19 83:2,7

83:21 84:3
86:4
Court's 33:19
Courts 6:6
11:1 75:23
COVID 8:18
20:13,16
22:18 42:2
42:12,14
45:10
COVID-19 7:17
10:25
created 12:17
cross 6:1 34:7
cross-exami...
58:13
cross-exami...
32:23
CSR 1:19
85:12 86:18
curious 21:19
current 11:3
customer
45:17
cut 44:23

——————
D
——————
Danny 30:14
30:14 55:25
date 1:15 5:17
6:13 13:17
29:23 37:13
39:8 49:20
66:16 67:19
68:7,11 69:8
69:24 87:11
dated 28:15
86:14
dates 5:21
daughter
68:22 69:1,4
day 21:3 25:15
29:6,19
33:23 39:11
39:17 41:25

46:1,2,2,3,16
48:13 49:24
50:18,23,23
50:24 78:18
78:20 82:6
85:8 86:14
87:19
day's 36:6
days 50:22
70:18 81:1
deal 9:25
58:14 65:20
69:14 78:9
dealings 74:14
deals 75:8
Dear 73:6
December
16:14,15,16
16:18 17:14
17:17,20,23
19:6,14,23
20:2,11 21:2
21:2,12 22:9
28:16 29:1,1
36:16 37:17
43:3,7,17
48:13 49:7
53:25
decide 81:2
decision 37:1
declaration
28:8
deed 3:20 26:9
26:15 27:6,8
36:18,21
37:9,13,17
38:11 42:23
46:5,17 48:3
48:5 50:21
50:25 56:22
57:8,16 59:4
77:13
Defendant 1:8
1:13 2:10
4:17

Jones, Carmen

June 17, 2021

4

| | | | | |
|---|---|---|---|---|
| **Defendant's** | 64:8 69:15 | 15:20 19:24 | **e-mail** 3:13,14 | 50:18 59:8 |
| 3:19 72:4,8,9 | 82:2 83:25 | 22:10,12 | 3:15,16,17 | **easy** 19:4 |
| 77:12,16,17 | 84:5 86:1,6 | 25:19,20 | 3:21 22:25 | **edited** 49:9 |
| **definitely** | **depositions** | 26:5,9,12 | 32:16 37:22 | **effectively** |
| 23:15 28:10 | 10:16 12:23 | 27:2 28:7,25 | 38:20 39:12 | 13:10 |
| 29:9,9 30:2 | 14:19 | 31:4 32:10 | 39:21 40:3 | **efforts** 5:16 |
| **depending** | **described** | 35:20 40:9 | 40:16,17,20 | **either** 14:19 |
| 81:2 | 16:12 | 45:8,13 | 40:24 41:16 | **electronic** |
| **depends** 81:3 | **describing** | 48:12,24 | 41:18,20 | 25:19 77:25 |
| **depo** 32:20 | 39:7 | 55:5 62:12 | 42:15,20 | **ELEVENTH** |
| 61:8 75:16 | **description** | 62:20,23 | 43:4,6,8 44:8 | 1:1 |
| 79:7 | 25:16 | 63:1 66:4,5 | 44:11,11,14 | **emergency** |
| **deponent** 5:9 | **designate** 42:3 | 66:11,15 | 44:17,19,21 | 10:25 32:19 |
| 6:8,16,23 | **designed** 11:7 | 67:5 77:10 | 44:23,25 | 33:3,19 |
| 8:20 9:4 | **details** 48:1 | 77:19,22 | 45:2 51:5,9 | 34:21 35:4,7 |
| 32:13 40:18 | **diabetic** 42:1 | 78:1,6,10 | 51:12 58:4 | 61:10 |
| 41:9 47:3,10 | 42:12,13 | **documents** | 58:24 59:3,7 | **employed** |
| 58:9,23 | **diabetics** | 21:24,25 | 60:18 62:5 | 16:21 |
| 59:10,16,20 | 42:13 | 24:10 25:1,6 | 62:25 63:19 | **employee** |
| 59:23 64:15 | **died** 42:13 | 25:12,16 | 63:21,22,23 | 86:10,11 |
| 65:23 66:9 | **different** 8:19 | 28:10 31:1 | 64:2,3 67:10 | **employers** |
| 66:24 74:1 | 25:1 52:9 | 39:25,25 | 67:15 68:7,9 | 30:16,21,21 |
| 78:25 79:16 | 57:24 60:11 | 40:17 42:17 | 68:11,12,12 | 30:22 |
| 79:23 80:18 | 73:24 | 42:22 45:20 | 69:10 70:3,5 | **Enjoy** 82:5 |
| 80:21 81:6 | **direct** 33:7 | 65:7,11,13 | 70:7,15 71:3 | **enlighten** 5:14 |
| 81:10,17,22 | 57:8 | 65:18,25 | 71:22,24 | **entail** 33:5 |
| 82:8,11 | **discuss** 37:11 | 74:23 75:2,3 | 72:15,18 | **entire** 26:12 |
| 83:13,20 | 40:5 46:17 | 75:6,7 | 73:5 75:18 | **entities** 16:10 |
| 87:1 | 48:22 51:2 | **doing** 6:19 | 79:24 | 16:12 |
| **depos** 4:24 | 57:11 | 8:22 29:3 | **e-mailed** 39:17 | **errata** 79:21 |
| **depose** 33:10 | **discussed** | 34:5 38:15 | 68:8 | 80:13 87:7 |
| 33:10 34:9 | 15:5 50:13 | 51:6,6 82:16 | **e-mails** 37:24 | **errors** 79:22 |
| 40:6 | 50:16,18 | **door** 41:10 | 37:25 39:13 | 80:5 |
| **deposed** 14:11 | 62:15 | **doubt** 30:17 | 39:14,14,23 | **ESQUIRE** 2:2 |
| 70:22 | **discussing** | 31:20 | 40:10,14 | 2:6 |
| **deposition** | 75:15 | **doubted** 47:16 | 42:17 43:10 | **estate** 16:2,7,7 |
| 1:11 3:1 4:5 | **discussion** | 56:9 | 43:11,19,22 | 17:5 43:12 |
| 5:17 7:3,23 | 37:12 76:6 | **doubts** 30:23 | 44:18,24 | 54:1 |
| 11:2,8 13:1,6 | 78:5 83:15 | **draft** 48:23 | 57:23 59:12 | **Estrada** 68:21 |
| 13:8,12,13 | **dispute** 14:25 | **driver's** 74:9 | 60:13,19 | 68:22,23 |
| 13:18 14:8 | **disputes** 45:23 | **driving** 66:16 | 69:11 71:10 | 69:3 |
| 15:5,9,18 | 47:7 | **due** 45:10 | 72:25 75:20 | **everybody** |
| 33:4,17 58:6 | **distributed** | **duly** 14:1 85:5 | 75:24 76:11 | 5:11 |
| 58:10,15 | 80:25 | ——————— | 76:11 | **everybody's** |
| 61:9 62:21 | **document** | **E** | **earlier** 46:16 | 36:8 |

Henderson Legal Services, Inc.

Jones, Carmen

June 17, 2021

5

everyday 42:1
evidence 87:21
evidentiary 81:5
exact 18:4 39:8 59:2
exactly 39:4 49:1 50:12 57:6 63:4 75:4
examination 3:4 11:13 14:4 34:4,10 60:4 79:7
examine 34:9 34:10
examined 87:4
exchange 35:19 42:21
execution 48:19
exhibit 3:13,14 3:15,16,17 3:20,21 25:19 27:3 31:25 36:19 36:22 37:13 40:9 41:15 46:5 48:5,19 54:21,25 57:9,16 59:1 64:6 71:12 71:19,22,25 72:3,10 76:9 76:10,12 77:12,16,17
exhibits 3:10 83:8,12
EXP 16:6
expect 38:16
expecting 21:5
expedite 82:23
Expires 85:13
explain 49:17

explained 62:21
explaining 69:12 78:8
eyed 36:16

F

face 35:23
fact 36:23 58:16 63:7
falsified 64:21
familiar 28:13
family 30:12 30:19 38:15 38:25
far 27:22 48:3
fast 81:16
fear 42:11
Fearful 31:9 31:11
Fedor 45:19
feel 61:21,22
fighting 46:22
file 5:19,22 25:21 59:5
filed 13:9 39:17 75:21
files 40:1
filing 64:21
fill 80:6
financially 86:13
find 40:15 57:3
finding 70:9
fine 58:18 61:17 76:14 84:3
fired 21:5 29:21 36:2 36:24
first 14:1,8 18:7,9 27:12 37:23 39:12 48:24 58:23 63:21 69:18

73:5,14 81:9
five 62:9
five-minute 57:18
flabbergasted 39:18
flexible 82:15
Florida 1:1,20 2:3,8 4:10 6:6 7:2,16 8:3 11:1,5 12:3 85:2,12 86:2
folder 60:11
follow 33:15 33:25 49:18 54:12,17
follow-up 59:7
following 7:1
follows 14:3
foregoing 87:5
forever 30:3
form 52:4 64:14 65:22 66:8,22 73:25 75:12
forth 71:11
forward 6:11 6:14 15:9 40:25
forwarded 44:25 69:2
forwarding 44:10,12,15
found 75:25
four 30:14 34:18 62:9
freelance 17:21
front 21:23 22:8 38:13 47:12 71:21 76:22
further 86:9

G

games 38:13
general 12:18 15:18 24:5,6 24:16 77:7 79:4
generally 54:4 80:2
GG158376 85:13
give 15:4 21:7 24:12 36:14 36:17 37:8 41:9 44:14 44:20 54:5 55:7 57:7
given 33:22 65:17,25 80:3 87:6
gives 30:7
glad 70:25
glasses 64:17
gmail 43:5 60:9
go 7:14 18:23 21:3 29:24 31:16,22 35:9 36:3,11 40:8 42:1 43:7,15 45:21 48:1 57:1 58:20 59:11 63:20 73:3 77:10 83:6
goes 7:20 44:15
going 5:25 12:5 15:9 25:18,20 26:11 27:11 31:22 32:23 33:6 34:15 34:16,19

35:4 36:11 38:12,22 40:8 41:6,10 45:21,24 47:11 48:4 58:5 60:8,9 61:14 62:2,3 62:8 63:2,20 63:20,24 64:11 67:5,6 69:10 73:3,4 76:7,8,10 79:23 81:22 81:22 82:11 83:12,17,18
Goldman 48:20
good 14:6,7 79:12 81:13 82:18 83:23 83:25
Google 9:13 60:8
Googled 40:13
gotcha 30:21 70:8
governs 11:1
grandchildren 82:12
grandchildr... 82:1
grantor's 27:13 54:22 54:25
Great 73:13
green 73:10,11
grew 38:25
grounds 13:1
grown 38:16
guess 35:23 44:5 61:1 63:21
guys 81:7

H

**hand** 13:23
  85:7
**handbook** 6:6
**handling**
  22:22
**happen** 8:18
  25:9,16
**happened**
  39:4
**happening**
  38:4,6,8 46:7
  61:24
**head** 24:20
**heads** 15:4
**health** 42:6
**hear** 15:8 34:2
  35:5 47:19
  70:25 78:15
**heard** 4:25
  37:5,23 39:9
  45:23 66:18
  70:20 73:14
  78:18
**hearing** 6:11
  35:8 61:11
  81:5
**hearsay** 47:2,9
**heartbroken**
  46:21
**held** 76:6
  83:15
**Hello** 32:14
**help** 18:2,16
  29:15 30:6
  30:24
**Henderson**
  79:25 80:1
**hesitation**
  30:23
**Hey** 64:11,13
  64:15 70:4
  76:24
**Hi** 29:14
**hide** 38:23
**hired** 54:15,16

**hires** 20:6
**history** 49:15
  49:22,25
**HLS** 25:20
**hold** 59:11
  60:3 78:24
  81:23 83:11
**holidays** 36:7
**home** 20:23,24
  21:1 28:23
  40:1 42:1,14
  45:9 48:12
  62:12
**homeowners**
  49:3
**hour** 18:13,19
  29:7 79:6
**hourly** 17:21
  17:23 18:21
  19:6 20:2
  53:25 55:10
**hours** 13:11
  13:12 29:22
**house** 45:12
  45:19
**hundred** 19:16
  28:5
**hundreds**
  19:15 28:4
**hurt** 36:5

_____

**I**

**ID** 21:23 67:19
**idea** 19:5
  24:17 32:4
  37:2 46:22
  62:22 74:24
  76:1
**identification**
  25:18
**identify** 80:5
**ignore** 70:7
**immediately**
  67:23 68:10
**implemented**

  11:6
**improper**
  70:24
**include** 60:14
**including**
  64:20
**incorrect**
  80:14
**independent**
  15:22 76:11
**INDEX** 3:3
**indicate** 4:13
  8:6
**indication**
  36:17
**individual** 25:1
**information**
  15:2 42:6
**instantly** 36:13
**instruct** 55:14
**instructed**
  54:12 55:11
**instructions**
  52:11,15,19
  54:6,13,18
  55:7,17 57:8
  57:14
**instructor** 16:2
  16:7
**insurance**
  28:8
**interested**
  86:13
**intervene** 15:8
**invoices** 18:24
  18:25
**issue** 26:16
  36:18
**issues** 42:24
  64:20 67:12
**ISTA** 57:1
**it--king@gm...**
  51:13

_____

**J**

**January** 20:7
  20:14,16
**Jason** 2:6 4:16
  32:12 40:16
  61:6 64:1
  72:18 76:13
**jason@bura...**
  2:9
**job** 22:21,21
  25:16 36:13
**jobs** 18:13
  20:6
**Jones** 1:11 3:1
  13:22,25
  14:6 26:8
  33:1 35:18
  61:7,16 64:1
  69:18 71:21
  72:18,25
  73:3,7 85:5
  86:6
**Jones/Buratti**
  3:14,21
**Jones/M** 3:16
**Judge** 15:8,11
  33:18 34:17
  34:18,19,21
  35:3,3,4,5,6
  61:10
**Judge's** 15:6
  33:3
**judgment**
  38:14
**JUDICIAL** 1:1
**July** 82:6
**jump** 34:22
  61:10 80:8
**June** 1:15 13:9
  13:10 41:15
  41:17 42:16
  68:14 69:9,9
  69:24,25
  73:6 76:24
  81:23,24,24
  81:25 82:8,9

  85:8 86:14

_____

**K**

**kid** 64:20
**killer** 42:12
**Kim** 82:21
**kind** 28:9 30:8
**King** 1:4,7
  2:12 3:16
  4:17,18,21
  5:19 16:22
  16:22,24
  17:2,3,13,15
  20:8 21:12
  22:3 24:7,8
  27:8,9,20,22
  27:23 30:2
  36:22 39:10
  43:3 45:6,8
  45:22 46:16
  50:14,17
  51:3,10 54:9
  54:12 57:7
  62:11,16,20
  63:13 65:7
  69:3 72:25
  73:19 76:23
  77:18,21,25
  83:22
**King's** 23:24
  24:18,24
  28:19 51:5
  54:24 61:19
  73:7,15,23
**King/Jones**
  3:13,15
**Kings** 21:20
  56:12 73:23
**knew** 44:16,17
**know** 5:13 8:9
  8:14 10:4
  11:2,25,25
  13:2 15:10
  15:15 18:7
  18:17 21:19

Jones, Carmen

June 17, 2021

7

22:14 23:13
23:15,21
24:1 26:1
27:21,22
28:7 29:16
30:2,4,14,15
30:24 32:3
32:18 33:8
33:18 34:19
35:6,22 36:5
36:6,10,12
36:15,16
37:1,2 38:8
38:10,15,16
43:19 44:16
44:25 47:3,4
47:16 49:2
50:1 51:5,9
51:11,11,13
52:1,13
58:22 60:9
60:15 61:6
61:20,23
63:7,9 64:19
68:10 75:22
76:16 78:15
80:10,12,15
81:19 82:13
82:24
**knowledge**
48:18 53:10
56:21
**known** 32:11
51:14
**knows** 42:11

—————————
**L**
**L-y-a-l-y-a**
51:15,17
**Lack** 38:14
**large** 81:3
**law** 69:7
**lawsuit** 22:10
39:16,16,17
47:6 64:19

75:21
**lawsuits** 46:20
**lawyers** 30:18
62:18
**leading** 21:12
53:25
**learned** 30:6
**leave** 44:22
**left** 67:22
68:10
**legal** 10:16
12:22
**let's** 9:25 42:3
57:18,25
83:5
**letting** 15:10
35:6
**license** 52:25
53:11,12
67:2 74:9
**lie** 47:13
**life** 43:5
**lifetime** 14:14
**Lily** 51:18
**limited** 58:13
58:21 79:8
**Linda** 1:19
47:19 79:17
85:12 86:4
86:18
**Linda's** 81:13
**line** 32:7 48:8
62:9
**lines** 62:9
**link** 65:4
**links** 75:24
**listed** 50:2
53:23
**listen** 54:9
**listing** 18:18
29:16 49:6
49:10,19,23
49:23 50:8
51:20,23
52:18,23

53:4,21
**listings** 23:14
29:16,20
50:5,6,7,11
53:4,6,6,17
**litigation**
26:16 42:24
**little** 26:3 80:5
**live** 19:10 41:7
**local** 5:6 9:9
**locality** 38:25
**long** 16:10
17:8,22
21:25 33:14
33:24 34:1,3
34:8,9 36:13
49:23,25
65:16
**longer** 58:22
**look** 8:10,24
10:23 64:15
**looking** 32:18
36:12 49:22
54:21 56:23
81:24
**looks** 10:17,24
**Lopez** 35:4,6
**loss** 39:21
59:24 60:16
60:17 70:9
70:11,11
76:22
**lot** 24:1 25:2
27:24 48:21
**love** 38:16
39:1
**loved** 30:13
**Lyalya** 51:18
**lying** 23:10

—————————
**M**
**M** 3:13,15
**M.King/Jones**
3:17
**Madam** 7:5

12:13 61:2
64:5,7 69:20
71:6,18 72:2
72:3,7,12,20
76:9 77:13
**mail** 60:12
**mailbox** 41:25
**main** 22:21,21
**manager**
17:18 52:21
**manner** 4:12
8:5
**March** 18:10
20:21
**Marianna** 4:18
27:9
**mark** 25:18
40:8
**marked** 27:3
41:15 59:5
72:15 77:12
**market** 23:22
50:1
**marketing**
22:24,25
23:5,9,13,15
23:20
**material** 42:22
**materials**
53:16
**matter** 42:17
**Mayberg** 2:2,2
3:6 4:20,20
5:8,12 6:2,7
7:5,8,10,18
8:9 9:5,8,11
9:15,19,22
10:2,10,23
11:10,15,19
11:23 12:4
12:13,20,25
15:3 25:22
25:25 32:12
32:14,16
33:8,16 34:1

34:6,14 35:1
35:3,11,15
40:16,22,24
41:8,12 42:8
47:1,9 52:4
58:8,11,20
59:3,9,15,18
59:22 60:3,5
61:5,18 64:1
64:5,10,24
65:24 66:10
67:1 71:6,8
71:13,18,20
72:6,9,12,17
72:23 73:2
74:3 75:14
76:2,7,18,21
77:4,5,15
78:22 79:2
80:10 81:15
81:21 82:5
82:25 83:4
83:10,14,16
83:17,22
84:4
**Mead** 1:19
85:12 86:4
86:18
**mean** 20:5
25:2,3 30:19
31:19 33:10
33:16 34:6
35:25 47:20
63:15
**Meaning** 60:14
**means** 79:20
80:16
**meant** 20:14
**measures**
10:25
**memory** 68:5
**Menachem** 2:2
4:20 59:14
61:18 64:1
83:17,21

menachem...
2:4
**Mendy** 9:18
25:24 42:7
58:16,25
60:2 80:8
81:2 82:24
mention 46:6
mentioned
6:20 42:15
42:21 65:6
message
39:20 67:22
68:2,10 69:2
Miami 2:3
**MIAMI-DADE**
1:1
**Michael** 1:7
4:17 27:9
30:15 37:22
38:9,10
39:10,13,20
40:3,15
42:20 45:23
46:16 47:15
50:18,24
55:25 56:13
56:15 58:2
59:12 63:13
63:23 64:2
64:12 65:6,7
65:11,17
66:5,5,11,24
67:6,9,9 69:3
72:25 73:7
73:15,18,19
73:23 74:8
74:13,14,20
74:23,24
75:2,8,8,20
76:23
**Michael's**
40:13 65:12
67:2,3,4
middle 51:12

51:14
**mind** 34:15
42:11 46:24
mine 43:11,24
minimum
18:18
minor 18:13
minute 9:1
45:21 66:14
minutes 18:19
34:18 58:18
68:11 69:22
69:23 70:1
misleading
65:22
missed 69:23
misundersto...
55:20 81:11
81:12
**MLS** 18:18
23:14,20
29:17 49:7
49:10,20
51:20,23
53:4,22
mom 22:16
30:16,23
31:20
moment 15:4
26:12 34:16
41:21 72:24
76:2 78:23
money 37:1
months 36:11
morning 38:7
39:11
mother 22:11
29:8
motion 32:19
32:19 33:3
move 6:13
26:13,17,19
26:20,21,22
26:23,24,25
27:11

**moved** 6:11
multiple 13:1

_____
**N**
_____

name 4:14,16
4:20 8:7
27:13 28:21
40:14 45:18
50:6 51:12
51:14 52:24
53:1,7,7,8,15
53:18,23
56:9,9 61:18
named 64:18
nature 8:12
14:24 15:18
necessity
34:21
need 5:16 8:9
26:13 29:15
29:21 33:2
33:18 58:17
61:15 64:17
79:6 80:4
82:2 84:1
needed 21:25
29:11,12
30:24
nervous 31:2
31:5
never 25:9,9
37:5,6,16
39:2 44:17
44:23 46:25
51:14 53:21
54:11,11
55:17 56:9
57:13 66:14
66:18 77:24
new 37:4,5
53:8
newest 5:18
normal 25:15
normally
20:19

notaries 24:1
56:20
notarization
22:6 87:13
notarize 19:25
21:24 22:3
22:12 24:6
24:13 25:7
25:12 29:5
29:10 35:20
38:24 45:9
50:25 56:11
62:12 66:14
74:8,11,13
74:22 75:3,7
80:12,15
notarized
15:20 23:24
24:15,18
37:14 45:14
56:13,23
57:3 65:6,10
65:12
notarizing
21:21 22:7
22:17 24:10
24:16 25:15
36:18 56:14
56:25 66:6
notary 1:20
14:20 15:19
15:24 19:17
19:22 20:9
20:10,20
21:13,17
22:20,21,23
24:12 25:3
25:17 28:6
29:4,15 32:5
32:6 48:4,7
48:10 51:7
57:15 80:4
85:12
notes 86:8
notice 13:7,8

13:11,15
32:25 36:6
36:14 61:8
noticed 32:24
noticing 33:22
number 7:14
7:15 24:19
52:18 59:1,3
76:20,21
77:2 85:13
**NW** 2:3

_____
**O**
_____

oath 4:8 8:1,21
10:9 83:19
85:1
oaths 11:7
12:22
object 47:1,9
64:14 65:22
66:8,22
73:25 75:12
objected 61:8
objecting
11:15 12:25
13:5,18
objection 7:3
7:4 9:17,25
10:2 11:9
32:15,22
33:14,24
34:4,11 52:4
61:13
objections
4:12 5:24 8:5
obviously 8:19
32:23
occasion 36:1
occasionally
18:16
office 5:9 6:17
6:24 15:6
17:18 20:21
21:1 22:19
24:13 25:4

Jones, Carmen

June 17, 2021

9

25:12 44:4
45:15 48:21
52:12,21
55:12,23
56:20 69:7
71:4
**offices** 20:18
**official** 80:17
85:7
**offsite** 6:18
**Oh** 19:8 20:14
45:17 47:3
58:9 60:18
60:18,22
64:25 67:2
68:24 72:1
76:18 81:8
81:10
**okay** 6:7 12:25
14:22 19:9
20:12,17
24:14 26:5
26:11 27:1,2
27:17 28:22
34:14 35:1
35:15 36:9
41:14 42:10
47:3 50:9,23
52:21 54:21
55:20 57:22
58:23 59:9
59:22 60:3,6
60:22,25
61:6,16,18
61:25 62:1,8
64:9,18,25
65:3,5,17
66:4 67:9,21
68:14 69:2,5
69:8 71:6
72:23 73:1,3
73:13,17
74:4,12,16
75:11 76:2
76:13 77:3,4

77:21 78:5
78:14,18,22
79:2 80:18
81:10,12,18
82:4,10,17
82:25 83:1
83:13 84:2,4
**old** 40:14
**once** 34:12
56:13 75:20
**ones** 40:11
**online** 49:10
**open** 41:10
**opened** 20:23
**opinions**
10:15
**opportunity**
80:3
**opposing** 6:12
75:16
**oppressive**
61:21
**Optimum** 16:6
**order** 4:9 5:16
8:2,10,14,15
8:17,24 9:12
10:4,5,11,17
11:11 12:1,9
12:19 21:16
61:9 82:22
83:3,21
**ordering** 82:19
**orders** 10:14
**original** 48:15
55:4
**Orlando** 82:1
82:11
**outside** 22:19
41:11 45:15
78:6
**owe** 18:19
**owed** 19:1

---
**P**
---
**P.A** 2:7

**p.m** 1:16,16
13:9 84:5
**page** 3:4,11
27:12 31:22
31:25 32:1
**paid** 18:21
19:5,14
**pandemic**
45:15
**paralegal** 69:1
**Pardon** 34:1
**parent** 67:3,4
67:6
**parse** 7:19
**part** 39:5 46:6
81:4
**participating**
4:5 7:23
**particular** 6:4
**parties** 4:10
8:3 86:10,11
**password**
43:16,20,21
**passwords**
43:14
**Paul** 1:4 2:12
4:21 5:19
16:22,24
17:2,12,15
19:22 20:1,4
20:5,8 21:11
22:3,13
23:24 24:7
24:11,15,18
24:19,23,25
25:4 27:8,10
27:20,22,23
28:13,19
29:4 30:15
30:17 36:22
37:16 38:10
38:11 39:17
43:3,23,25
45:8 46:12
47:12,14

50:8,14
51:19 52:2
52:11 53:5
54:1,6,9,12
54:24 55:8
55:15,17,22
55:23 56:7
56:19 57:4
61:19 62:12
62:16,20
63:1 68:1
77:18,21,25
83:22
**Paul's** 22:17
23:16 30:11
46:4,9,12
50:6,7,10,11
52:18,24,25
53:1,7,7,8,13
53:15,18,22
53:23 55:4,7
55:19 56:8,9
56:24 58:5
**pause** 34:15
76:5 79:1
**pay** 18:14
**pending** 49:14
50:2
**people** 65:18
65:19 74:22
**people's** 65:13
66:1
**percent** 42:13
**period** 18:15
20:16 23:3
24:16 38:22
41:17 54:5
54:14 59:6
**permit** 66:16
**person** 19:12
22:4,7 25:13
45:10 66:6
87:21
**person's** 53:12
**personal**

56:11
**pertained**
15:19
**pertaining**
26:15
**phone** 67:17
68:2 69:24
70:6,19
**physically**
21:1
**picking** 39:3
**piece** 64:16
**place** 1:18 7:2
7:16 45:1
**Plaintiff** 1:5
2:5 13:14
57:22 64:6
69:21 72:21
72:23
**Plaintiff's** 3:12
13:15 72:6,7
72:10,11,13
72:16,17
**plan** 5:23
**planning**
82:23
**playing** 38:13
**please** 4:13
8:6 11:9,14
12:12 13:20
15:1 22:12
61:20 68:18
69:11 70:4
76:24 82:25
**point** 15:8
61:22 82:23
**police** 64:21
**popped** 59:19
**populate**
25:20
**position** 73:23
74:2
**positions**
73:24
**possible** 24:4

Jones, Carmen

June 17, 2021

10

Possibly 66:13
post 18:14
potentially
    42:5
practice 11:2
    22:2 54:4
    56:6
practices
    22:18
prepare 18:17
prepared
    13:14 48:18
present 2:12
    4:6 7:24
    21:22 22:7
    22:11 29:10
    47:12 65:19
    66:2,7,12
    67:7
presently 16:1
preservation
    39:24
preserve
    40:12
pressing
    64:22
pretty 56:5
pricing 29:17
prior 5:13
    13:17 16:20
    20:7,13 23:6
    35:18 43:3,6
    48:19 58:2
    65:5 71:2
    77:18
probably
    18:11 72:5
    81:4
problem 25:25
    36:9 80:18
    81:12,19
procedural
    9:17,24 10:2
procedure 6:4
    10:14

procedures
    7:2 11:6,17
    11:19 77:8
proceed 5:23
    11:8 15:14
proceeding
    6:5
proceedings
    4:1,8 8:1
    76:5 79:1
process 21:21
    21:22 80:1,7
    80:16
processes
    21:20
processings
    21:16
proficient
    25:24
Promotion
    22:25
proper 68:19
property 23:16
    36:25 37:1
    45:20 49:8
    49:24,25
proponent
    44:19
protect 11:7
protected 42:6
proved 87:20
provide 17:19
    17:22 19:17
    19:22 20:2
    21:13,17,23
    25:21 44:20
    57:23
providing
    14:20 17:2
    20:9
public 1:20
    48:7 85:12
pull 63:20
purchases
    45:20

purposes
    25:18 79:2
pursuant 4:9
    8:2
put 7:10,16 9:3
    43:16

**Q**

quarter 18:8
    18:10
question
    15:15,16,16
    22:10 35:18
    42:4 47:19
    48:6 52:7
    62:19 74:20
    75:13
questioned
    62:14,17
    78:14
questioning
    35:16 41:1
questions
    7:21 27:18
    32:8 33:21
    58:17 61:19
    61:22 75:17
    77:2,7 79:8
quit 3:20 23:6
    26:9,15 27:6
    27:8 37:13
    37:16 38:11
    42:23 46:5
    46:17 48:2,5
    50:21,25
    56:22 57:8
    57:16 59:4
    77:13
quite 5:1 49:18

**R**

R 2:6
raise 13:23
ran 25:3
random 20:6

    25:14
rare 56:19
    74:17
reach 34:17
reached 34:20
    35:8 46:16
    50:18,24
    73:18
reaching
    15:10
read 4:25 5:6
    7:6 9:2 11:11
    39:18,22
    41:1 47:21
    64:12 67:23
    72:24 79:18
    79:19 80:3
    80:20,21,22
    80:25 81:6
    83:25 84:1
    87:4
reading 12:23
    75:23
ready 26:19
    58:20 60:25
real 16:2,7,7
    17:4 43:12
    54:1
really 9:19
    18:11 28:9
    33:4 35:25
    44:17,17
    50:10 51:18
realtor 15:22
    16:6 75:22
    82:15
Realty 16:6
    17:4
reason 21:7
    30:16 37:8
    45:16 47:13
    54:23 55:3
reasons 30:10
recall 68:4
    73:24 74:8

    75:10
receive 59:14
    60:20
received 40:18
    40:19 41:24
    59:21 62:10
    77:24
receiving
    59:15
recognize 27:2
    27:15 28:10
    30:11 32:5
record 4:15
    5:22 8:8 9:3
    13:5 35:3,13
    47:21 57:25
    61:2 76:6
    83:15,16
    86:8
recorded
    26:15
recording 8:22
recross 6:1
    34:6
recruiting
    22:22
redepose 33:1
    33:20 61:13
redirect 34:3
refer 57:2
reference 7:8
    7:11 9:11
referenced
    75:17
referencing
    10:11 11:11
    83:20
referred 41:20
referring 50:5
    76:17 83:24
regard 32:17
regarding
    32:19 42:17
    75:19 78:1,6
register 9:25

11:9
**registering**
5:24
**regular** 56:5
80:1
**regularly**
21:13
**reiterate** 61:6
**related** 42:23
**relationship**
63:12,15,16
**relative** 86:9
86:11
**released** 65:3
**Remax** 44:20
**remember**
17:24,25
18:3,11,12
19:8 21:2
24:20,22
28:9 29:3
30:8 35:25
36:1 39:8
49:9,22
56:14,14,15
56:25 65:14
65:16 67:18
67:18 68:5,6
74:15 75:4,6
**remind** 18:2,3
**remote** 9:4
10:9,15
12:22 83:20
**remotely** 4:8
8:1 11:7
**rent** 23:20
**rented** 23:11
23:19 49:14
50:2
**Repeat** 15:16
**replied** 58:3
**reply** 40:4
**report** 64:21
86:6
**reported** 1:19

12:23
**reporter** 4:4,6
5:5,10 6:20
6:25 7:5,7,9
7:13,22,24
8:25 9:7,9,13
10:18,20
11:12 12:6
12:13,16,21
13:20,22
35:12,14
47:21 61:3,4
64:5,7,9
69:20 71:7
71:16,17,18
72:2,3,7,13
72:15,20,22
73:1 76:9,15
76:19 77:3
77:13,14
79:18 80:19
82:19 83:2,7
84:3 86:4
**reporter's** 6:17
86:1
**reporting** 4:7
4:12 7:25 8:5
**requested**
86:7
**Required**
87:13
**research** 7:15
**reserve** 5:25
**reserving** 79:4
**reset** 58:18
**respect** 49:3
57:8,15
**respond** 59:25
**responded**
38:20
**response** 6:15
42:4 59:23
60:7,24
70:10,11
79:7

**responses**
59:13 60:15
60:23
**responsible**
50:11
**rest** 59:24
**resume** 35:10
35:16
**retake** 79:6,6
**retract** 11:20
**return** 81:3
**review** 79:20
80:17 86:6
**right** 5:25 8:9
8:24 9:5 10:9
11:3 12:20
13:23 22:19
22:24 26:14
27:25 29:23
33:1,7,9,10
33:15,19,21
34:8,14 35:9
35:13 36:6,7
39:7 41:6
44:1 48:16
50:5,9,11,13
52:22 53:20
54:7,24
55:13 56:23
58:8,9,11
60:25 61:2
61:13,16
65:1,15 67:8
68:11,17
69:23 70:5
71:12,15
72:17,22
73:9 74:19
75:1 76:22
79:4 81:18
81:19
**round** 79:3,9
**Royal** 49:8
**Royale** 23:6
26:15 37:17

49:3,4 50:14
50:16 51:2
**rule** 6:22
**rules** 7:2 10:14
**run** 44:1

**S**

**sad** 31:15 36:4
36:4
**safe** 28:2
**sale** 23:20
25:10
**sales** 53:12,12
53:14
**SARASOTA**
85:3 86:3
**sat** 15:19
**satisfactory**
87:21
**save** 9:16
34:20 58:15
**saving** 60:19
**saw** 46:25
48:24 55:23
57:5 67:19
75:20
**saying** 23:11
**says** 8:17
12:21 62:10
62:19 64:15
68:18 69:11
69:18 70:3
71:25 76:22
**SC20-16** 12:22
**SC20-23** 10:25
**scan** 26:12
**scared** 31:11
32:9 42:2
**schedule**
82:14,15
**school** 16:6
22:22 43:12
**Schools** 17:5
**schoolsofa...**
43:12

**scope** 33:7
**screaming**
41:10
**screen** 7:10
26:8 31:23
41:14 54:24
59:11 62:3
69:16 71:9
71:10,14,22
73:9 76:8,16
81:18
**scroll** 60:21
**scrolling**
69:19 73:4
**seal** 85:7
87:25
**search** 60:9
**searched**
60:16
**second** 11:4
25:23 27:12
29:25 42:15
78:24
**seconds** 41:9
**secretary**
78:23
**section** 28:20
**see** 7:11 10:24
25:22 26:5,8
26:17 27:13
28:6,15,19
29:18,25
31:16,21
32:17 35:23
40:14 41:7
42:18 45:5
48:20,23
57:19 59:15
60:16,23
62:5,22 63:5
64:16,17,18
64:23 65:1
68:25 69:2,8
69:17 70:8,9
71:9,10,19

71:21,24,24
73:8 75:23
76:15,16,18
**seeing** 63:25
71:14
**seen** 13:16
24:23 25:3
27:16,23,24
28:10 30:5
35:24 55:2
80:7
**self-isolation**
45:10 62:13
**selling** 36:25
**Seltzer** 2:2
**send** 40:16
41:6 58:1,5
64:7 79:21
79:25 80:1
82:21,21
83:8,12
**sending** 40:11
40:12 60:20
**sends** 70:3
**sent** 20:23
39:18,20
40:3,24
41:18 44:18
58:23,25
59:6,10,12
60:12,13
63:19,21,22
63:23 65:4
66:15 67:10
67:15
**sentence** 45:5
45:11
**served** 37:22
37:22
**service** 20:10
**services** 14:20
15:19 17:2
17:19,23
19:17,22
20:2,9 21:14

21:17
**set** 5:10 6:14
13:7
**Seventy** 42:13
**share** 25:20
62:3 63:24
69:10 76:8
**shared** 62:3
71:22
**sharing** 71:9
**sheet** 79:21
80:5 87:8
**shit** 64:16
**shocked** 37:7
46:24,25
**short** 69:12
**shorten** 61:15
**showed** 71:11
**showing** 69:16
73:4,8 77:11
**shown** 48:10
**shows** 64:2
**sides** 6:10
39:3
**sign** 21:23
22:12 28:25
29:15 30:5,7
62:22 63:5,7
65:18 66:20
67:5 74:23
79:20,21
80:3,12,14
**signature**
22:17 23:24
24:18,24
25:3 27:13
27:15,19,23
27:24 28:13
28:15,17,19
28:20,21
29:2,25 30:3
30:4,6,9,11
46:5,10,13
48:7,25
54:22,24,25

55:1,4 65:12
66:1,6,12
67:3,4,6
87:11,24
**signatures**
28:6 48:15
57:15
**signed** 27:9
36:22 37:9
45:9 62:12
62:20 63:1
66:4,5,11
87:8
**signing** 50:21
66:1 78:6
**signs** 28:8
**simple** 43:16
**single** 22:6
**situation**
79:15
**small** 64:18
**somebody**
28:8
**son** 66:20,21
66:24 74:9
**son's** 66:15
**sons** 46:21
55:25
**soon** 69:13
70:7
**Sophia** 16:22
16:24 17:3
17:12,15,25
18:4 19:18
19:24 20:2,4
20:5,8 21:12
22:3,11 23:8
24:8,10,11
24:11,15
25:3,4,6
27:10 29:4
29:11 30:2
30:15,16,23
31:1,4 32:9
35:19 37:8

37:20,21
38:2,2 39:6
43:2,13 44:1
45:6,8,22
46:4,16,19
47:13 49:11
50:7,17,23
51:3,5,10,11
51:25 52:1,3
52:10,15,17
52:17,20
53:5,6,10,22
54:1,5,10,19
55:7,11,11
55:14,17,22
56:4,6,18
57:7 62:11
62:20 63:1
66:16 68:1
68:20 74:10
74:12,18,20
74:21,24
75:2,7 77:19
77:22 78:7,8
78:8,16
**Sophia's** 25:14
50:5 53:13
54:17
**Sophiaking0...**
51:8
**Sophialyaly...**
51:13
**sorry** 10:19
16:25 17:16
20:1,12 26:7
28:24 31:3
32:1,7,12
42:23 43:9
49:17 55:20
63:16 64:17
72:2,5,6
75:13 76:18
79:15 82:7
**sort** 42:4
**speak** 9:16

15:11 70:14
71:3 77:18
77:21
**specific** 27:7
**specifically**
5:3
**specifics**
24:20
**speculating**
12:10,14
**speculation**
66:23
**speed** 81:3
**spell** 51:13,14
**spoke** 18:4
39:2 70:13
**stack** 25:6
**stamp** 48:4,10
49:15
**stamped** 49:20
49:20
**standard** 4:23
5:5 22:2
**start** 7:20
11:13 29:24
36:12 60:2
62:2
**started** 12:11
13:13 15:6
32:21 75:23
**starting** 64:12
**starts** 45:5
**state** 1:20 11:1
55:18,19
85:2,12 86:2
87:15
**statement**
4:19,23,25
5:6 6:9,19
7:6,19 9:2
10:8,10,10
11:21,22,23
12:6,7,8,17
12:24 13:2,4
83:18,19,24

Jones, Carmen

June 17, 2021

13

stating 4:14
8:7,11
status 49:13
49:13
stay 33:6,8
stenographic
86:8
stenographi...
86:5
stepped 78:23
stop 13:3
17:12 33:4
Strike 52:16
string 40:20
40:24 41:16
stuff 10:1
34:13 40:23
55:10
submit 18:24
Subscribed
87:18
subsequent
19:23 37:17
49:7 58:15
sudden 70:6
Suite 2:8
summons
41:24 62:10
75:17
supposed 5:2
29:24
Supreme 4:10
7:16 8:3 11:6
12:3 83:21
sure 9:15
19:11 29:20
30:9 33:16
33:17 34:25
41:12 44:7
59:16 78:25
surprised 21:3
21:4
swear 11:14
12:11 13:21
swearing

11:17,19
sworn 14:1
85:6 87:18
system 44:13

_____ T _____

take 8:25
20:15,15
26:11 27:17
33:18 34:11
34:23 41:3
57:14,18
58:19,22
79:6 81:2
taken 1:13
4:24 35:2
57:20
talk 38:22
52:13 67:11
67:24 68:19
70:21 83:7
talked 20:5
37:16 50:23
63:17 77:1
talking 9:12
30:12 31:19
47:4 55:9
teaching 82:16
teary 36:15
telephone
70:16
tell 8:23 9:1
10:12 14:1
19:3 26:12
26:18,19
31:14 35:21
38:3,12,21
38:22 46:4,9
46:12 47:11
50:1 52:3
telling 38:17
39:4,24
tells 25:4 30:6
49:12
ten 14:15 17:9

21:6,12
22:15 23:25
24:3,3,21,22
25:2 27:25
28:12 30:13
30:22 38:15
38:25 53:2,9
53:24 55:9
56:3,4 57:3
63:18 73:22
74:7,17,21
75:4
terms 15:9
78:15,16
terrible 68:5
terribly 25:24
testified 14:3
testimony
10:15,16
41:21 87:5,6
texts 38:1
thank 6:3
15:12 35:1
35:16 41:8
70:25 79:13
79:14,17
81:15 82:25
83:10,13,14
thanks 70:4
they'd 21:23
25:11
thing 25:15
31:23 37:4,6
47:15 62:16
63:10 69:19
79:10,11
things 21:21
22:3,23
24:13 30:7
45:14 50:2
56:6,11 74:8
74:11,13,22
75:3 79:22
think 18:1
22:14 23:23

24:23 26:18
29:7 30:18
33:2 38:20
56:13 57:24
67:22,23
68:6,9,19
70:18 73:16
80:13,13
81:13,16
thinking 36:24
third 31:22,25
39:21 59:19
60:1 68:7,12
third-party
33:13
Thomas' 15:11
35:5
thought 20:14
22:16 29:11
29:12 37:6
47:14 78:9
81:10,17
thousand 28:2
28:3
Thousands
19:15
three 30:13
39:14 43:10
55:24 56:12
57:4 59:10
59:12,20
60:19 62:8
three-minute
34:24
Thursday 1:15
69:9,24
76:24
time 1:16 9:16
13:19 16:17
17:24 18:4
18:12 19:7
19:18,19,20
20:10,16
21:11 22:9
23:3 28:6

33:3,19
34:12 36:13
37:23 41:3,4
48:24 49:9
49:15,20
50:2,14 51:3
54:5,13
57:12 58:15
58:22 61:22
68:13 73:14
78:22 79:13
79:14,17
82:2,13,20
times 14:13
23:23 24:14
24:17,23
27:24 28:2,3
28:4,5 55:24
57:4 74:7,21
title 25:19
48:21
titled 26:9
today 8:22,22
13:8,9 15:21
16:5 41:2,23
58:2 61:14
65:3 67:12
told 18:18
29:13,14,14
38:9 54:9,17
74:10,12
tomorrow 38:5
top 31:25 62:9
69:18
totally 58:16
81:11
town 81:23
trained 23:2
training 22:22
23:1,1
transaction
25:10 63:3
transcript
79:20 80:2
80:25 81:9

Jones, Carmen

June 17, 2021

14

| | | | | |
|---|---|---|---|---|
| 86:7,7 | uncomforta... | 56:1 | 33:11,16 | 27:11 |
| **transcription** | 31:7 61:23 | **voice** 67:22 | 41:2 52:9 | **word** 47:25 |
| 87:6 | **undersigned** | 68:2 | 58:12,21 | 60:16 |
| **transferring** | 85:4 | **voicemail** | 62:18 80:9 | **words** 38:4 |
| 36:25 | **understand** | 70:20 | **we'll** 26:2 77:2 | 39:21 59:24 |
| **traveling** | 4:22 5:1,8,19 | **vs** 1:6 | 83:7 | 60:17 70:9 |
| 55:23 | 5:24 7:18 | | **we're** 6:5,19 | 70:12 76:23 |
| **tried** 5:20 40:4 | 9:20 26:14 | **W** | 7:1 8:21 9:12 | **work** 16:1,5 |
| 73:19 | 38:6 52:7,8 | **wait** 66:14 | 15:10 30:12 | 17:8,25 |
| **true** 86:8 87:5 | 61:20 | 81:7 83:5 | 55:9 56:22 | 18:12,22 |
| **Trump** 23:5 | **understandi...** | **waiting** 60:1 | 61:1,2 67:12 | 19:6,7 21:20 |
| 26:15 37:17 | 11:5 36:21 | **waive** 4:11 8:4 | 79:11 83:12 | 23:5 26:2 |
| 49:3,4,7 | 47:23 52:6 | 79:18 80:20 | **we've** 34:20 | 29:5 34:23 |
| 50:13,16 | 52:10,16 | **want** 13:3 | 61:12 | 43:2,19 50:7 |
| 51:2 | 57:24 | 20:15,15 | **week** 20:23 | 51:7 54:1,13 |
| **trust** 30:8 | **Understood** | 26:11 32:21 | 45:22,25 | 54:18 83:11 |
| 38:24 | 11:16 | 33:17 34:11 | **weeks** 81:2 | **worked** 16:10 |
| **truth** 14:2,2,2 | **unilaterally** | 34:23 38:18 | **welcome** 7:4 | 20:18 21:1,6 |
| 38:12,17,22 | 6:15 13:7 | 38:21 40:5 | **went** 20:18,22 | 21:11 22:2 |
| 39:4 47:11 | **unit** 23:6,9,16 | 43:15,18 | 20:22 29:19 | 22:15 27:25 |
| **truthful** 38:14 | 26:16 49:4 | 58:19 62:2 | 49:14 59:16 | 28:12 53:24 |
| **try** 41:1 52:9 | 50:14,16 | 67:24 69:14 | 62:15 | 55:8 73:22 |
| 61:14 62:3 | 57:2 | 70:20,21 | **weren't** 65:19 | **working** 15:21 |
| 63:24 | **unnecessarily** | 79:19 80:16 | 66:1 | 16:17,20 |
| **trying** 9:15 | 34:12 | 80:19 81:7 | **whatnot** 83:8 | 17:12 20:8 |
| 19:13 31:23 | **upcoming** | 83:11 | **whatsoever** | 20:24 25:7 |
| 39:8 50:10 | 81:4 | **wanted** 18:16 | 38:14 39:25 | 40:1 75:8 |
| 67:17 | **upset** 32:9 | 25:25 51:19 | 41:24 62:11 | **works** 69:6 |
| **Tuesday** 63:23 | 35:19,22,24 | 51:22 52:2 | **wife** 4:18 | **worries** 22:16 |
| **Twice** 14:14 | 36:1,3,15,15 | 53:1,18 | **witness** 4:7 | 79:16 |
| **two** 5:21 31:19 | 38:5 | 66:19 70:24 | 7:25 9:21 | **worthless** |
| 36:10 41:9 | **use** 9:10 21:16 | 72:9 77:10 | 11:14,18,20 | 64:16 |
| 43:11 50:22 | 39:15 43:1 | **wants** 11:20 | 12:11 13:6,6 | **wouldn't** 24:19 |
| 55:24 57:4 | 43:21 44:10 | 15:8 40:6 | 13:21 14:1 | 47:16 51:25 |
| 59:19 62:8 | 44:24 | **warned** 36:10 | 28:20,25 | 65:14 |
| 69:22,23 | **usually** 49:12 | **warning** 36:5 | 29:25 33:12 | **Wow** 39:19 |
| 70:1 | | **wasn't** 21:5 | 33:12,13,20 | **wrap** 57:19 |
| **typing** 81:17 | **V** | 38:13 45:25 | 57:15,23 | 77:6 78:24 |
| | **vacation** 29:23 | 46:6 61:7 | 80:2 83:6 | **writing** 62:25 |
| **U** | 36:6 | 62:16 66:7 | 85:7 | **written** 77:24 |
| **Uh-huh** 42:19 | **verify** 15:20 | 66:12,21 | **witness'** 13:18 | **wrong** 31:17 |
| 45:7,25 | **Videoconfer...** | 67:6 69:12 | 28:15 | 31:21 38:23 |
| 48:14 51:1 | 1:18 2:1 | **waste** 33:3 | **witnessed** | 66:17,20 |
| **ultimately** 44:3 | **visiting** 55:24 | **way** 5:11 6:18 | 27:9 | **wrote** 62:11 |
| **unaware** 32:24 | 55:25,25 | 6:19 8:18,21 | **witnesses** | 64:12 |

Henderson Legal Services, Inc.

Jones, Carmen                                    June 17, 2021

15

**X**

**Y**

**yeah** 6:2 21:5
  23:18 25:14
  27:16 28:14
  29:19 30:12
  30:22 35:11
  35:15 40:10
  43:4 44:10
  44:13 45:12
  54:20 56:8
  57:6 59:18
  59:18 60:16
  65:8 68:15
  69:4 70:10
  80:10
**year** 18:5,6
  23:11 46:17
  50:19,24
  55:24 57:4
**years** 14:15,18
  17:9 21:6,12
  22:15 23:22
  23:25 24:3,3
  24:22 25:2
  27:25 28:12
  30:13,22
  38:15,25
  50:1 53:2,9
  53:24 55:9
  56:3,4 57:3
  63:18 73:22
  74:7,17,21
  75:4
**yesterday**
  32:24

**Z**

**Zelle** 18:23
  19:3
**Zelle's** 19:3
**Zoom** 4:24
  5:11 14:8
  34:19 64:23

**0**

**1**

**1** 3:13,20
  25:19 27:3
  31:25 36:19
  36:22 37:13
  46:5 48:5,19
  54:21,25
  57:9,16 59:1
  59:3,4 64:6
  72:7,13,16
  72:17,21
  77:14,16,17
**1.QCD.recor...**
  25:21
**10750** 2:3
**11/13/21** 85:13
**11th** 41:15
  42:16
**14** 3:5
**15** 17:17 18:19
  19:14,23
**15th** 17:14,20
  17:23 19:6
  20:2 21:2
  29:21 36:16
  43:3,7,17
  49:7 53:25
**16th** 13:9
**17** 1:15 17:16
**1708** 2:8
**17111** 2:7
**17th** 13:10
  17:11
**18th** 20:25
  37:18 48:13
**1A** 3:14
**1st** 17:4

**2**

**2** 3:15,21 40:9
  41:15 59:7

85:5

71:12,19,22
72:3,4,7,8,9
72:11,23
76:10,20,21
77:2
**2:16** 69:9,25
  76:24
**2:20** 1:16
**2:54** 13:9
**20** 14:17 23:11
  87:19
**2010** 17:10,11
  17:16
**2015** 18:15
**2017** 17:16
**2018** 23:9,12
  23:13
**2020** 16:18
  17:14,17,20
  17:23 18:15
  19:6,14,23
  20:3,7,12,16
  21:13 28:16
  37:18 43:3,7
  49:7 53:25
**2021** 1:15
  41:16 65:5
  67:10 69:9
  69:25 85:8
  86:14
**2021-009769...**
  1:6
**20210106967**
  32:1
**21** 17:4 44:13
  44:20
**22nd** 28:16
  29:1
**23** 32:1
**24** 13:11,12
**25** 3:20 18:13
  18:18,20
  19:8
**25th** 63:24
  64:12 65:5

67:10 81:24
  82:8
**26** 70:6
**2808** 32:2
**28th** 16:16
  81:25 82:9
**29th** 85:7
  86:14

**3**

**3** 3:16 76:12
**305)444-1565**
  2:4
**32344** 32:1
**33160** 2:8
**33168** 2:3
**3rd** 69:9,9,24
  69:25 76:24

**4**

**4** 3:17 76:12
**4:11** 1:16 84:5
**41** 3:21 10:18
**41-375** 10:21
  12:1,9
**41-378** 10:22

**5**

**5/25/21** 3:13
**5/26/21** 3:16
  3:17
**50** 19:7,8,10
  24:2,3,14
**503** 23:6,9,16
  26:16 37:17
  49:4 50:14
  50:16 51:2
**5th** 41:17 73:6

**6**

**6/3/21** 3:15
**60** 3:6
**64** 3:13
**6th** 2:3

**7**

**72** 3:14
**76** 3:15,16,17

**8**

**8:20** 42:16
**8:30** 41:16
**8th** 68:14

**9**

**90** 23:4,4
**954)683-1072**
  2:9

**From:** **Michael King** michael@kingsgardeninc.com
**Subject:** Re: Engagement Letter Cannafornia, LLC (King, Paul)
**Date:** March 16, 2020 at 9:16 PM
**To:** Paul King paul@cannafornia.co
**Cc:** Sophia King sophiaking06@gmail.com

I'll split all payments with you - when you win all
I will Want is money back. You can have everything else

Respectfully,



**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGardenInc.com

> On Mar 16, 2020, at 6:06 PM, Paul King <paul@cannafornia.co> wrote:
>
> Hey dude it's 25k you sure about this guy?
>
> ---------- Forwarded message ---------
> From: **Tonya Daley** <tdaley@bollaw.com>
> Date: Mon, Mar 16, 2020 at 5:58 PM
> Subject: Engagement Letter Cannafornia, LLC (King, Paul)
> To: paul@cannafornia.co <paul@cannafornia.co>
> CC: Stephen Z. Boren <sboren@bollaw.com>, Anu Lundberg <alundberg@bollaw.com>
>
>
> Dear Mr. King,
>
>
> Please find attached our Engagement Letter for your review and signature. Please do review it carefully, sign where indicated, and return it to us in whatever manner is most convenient for you. Please let us know if you would prefer for us to send you the Engagement Letter via DocuSign.
>
>
> Additionally, you will see in the Engagement Letter that we typically request a financial retainer; in this instance we request a retainer in the amount of $25,000.00. You may remit payment by check, ACH, or wire transfer. Below are the wire instructions for our Client Trust Account, should you wish to remit payment by wire transfer:
>
>
> Account Name: Boren, Osher & Luftman, LLP Client Trust Account
>
> Bank Name: First Republic Bank
>
> Bank Address: 1888 Century Park East, Los Angeles, CA  90067
>
> Account #: 80000880527
>
> Routing #: 321081669
>
>
> The Firm requires a signed Engagement Letter and payment of the financial retainer to commence our representation of you. Once we receive your signed Engagement Letter, we will return a fully executed version of the Engagement Letter to you for your files.

Please let us know if you have any questions. We look forward to working with you.

Best,

Tonya

Tonya Daley

Office Coordinator

Boren, Osher & Luftman, LLP

222 N. Pacific Coast Highway, Suite 2222

El Segundo, California 90245

• T: (310) 322-2021 ext. 244  • F: (310) 322-2228

web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

--
Sincerely,
Paul King
<2020-03-16 Engagement Letter Cannafornia LLC (King Paul).pdf>

**Subject**: Wire transfer email
**From**: "Steven F. Kuehl" <skuehl@bollaw.com>
**To**: "Amaliza@disantolaw.com>" <Amaliza@disantolaw.com>
**Cc**: "Stephen Z. Boren" <sboren@bollaw.com>, Paul King Cannafornia <paul@cannafornia.co>
**Date Sent**: Thursday, April 2, 2020 1:38:57 PM GMT-04:00
**Date Received**: Thursday, April 2, 2020 1:38:58 PM GMT-04:00

Hi Amy,

We were looking at the ledger and the emails and could not find an email instruction for the $496k wire transfer to Jane, Inc. on 8/14/2019.  Do you have one?

Thanks!

Steve

Steven F. Kuehl, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 242  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

**From:** **Sophia King** sophiaking06@gmail.com
**Subject:** Re: Wire to Jane Inc.
**Date:** April 2, 2020 at 12:37 PM
**To:** Steven F. Kuehl skuehl@bollaw.com
**Cc:** Paul King Cannafornia paul@cannafornia.co

Happy 😋 Thursday, Steve! Hope all is well! I double checked Amy's ledger again but found nothing RE $496K. I will send you another email later on today - unless you tell me: stop 🌮💃🏻💃🏻💃🏻 with new findings. Thank you for helping out!!! Stay Healthy!!! 🙏🏼

Sent from my iPhone

> On Apr 1, 2020, at 8:04 PM, Steven F. Kuehl <skuehl@bollaw.com> wrote:
>
> Thanks Sophia! I appreciate you checking.
>
> Sent from my iPhone

Thank you!!!

skuehl@bollaw.com

Thanks!  The wire was sent on August 14, 2019.  But DR kept checking in July to see if funds had come in from DuMoulin Black to Amy Maliza and out from Amy Maliza's client trust account.

As a result, I believe it was sometime between July 1, 2019 and August 14, 2019.

sophiaking06@gmail.com

skuehl@bollaw.com

skuehl@bollaw.com

Hi Sophia,

You have access to DR's Cannafornia emails, right?  Would you mind searching them for "$496,017" or "$496"?  I am trying to find the instruction from DR to Amy Maliza authorizing a wire of $496,017 to Jane Inc.

Thanks!!!

Steven F. Kuehl, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 242  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

**From:** **Steven F. Kuehl** skuehl@bollaw.com  📎
**Subject:** Wire instructions to Amy Maliza for $496k wire to Jane Inc.
**Date:** April 1, 2020 at 9:26 PM
**To:** Paul King paul@cannafornia.co, Sophia King sophiaking06@gmail.com
**Cc:** Stephen Z. Boren sboren@bollaw.com

Paul,

We are looking for the wire instructions from DR to Amy Maliza for the $496k wire.  One issue is that the emails we have from Amy Maliza do not have attachments.

Can you check the attached email from DR to Amy to see if it had an attachment?

Thanks,

Steve

Steven F. Kuehl, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 242   • F: (310) 322-2228
web:  www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

Jane Inc
(00026...).MSG

**From:** **Stephen Z. Boren** sboren@bollaw.com 📎
**Subject:** FW: Cannafornia, LLC
**Date:** March 24, 2020 at 3:34 PM
**To:** Paul King paul@cannafornia.co, Steven F. Kuehl skuehl@bollaw.com, Michael King michael@kingsgardeninc.com

Paul –

Can you check the attached ledger and confirm that the only transaction which you did not approve was the one to Jane for $496,107 on 8/14/19?

Thanks,
Steve


Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 223  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*


**From:** Amy Maliza <Amaliza@disantolaw.com>
**Sent:** Tuesday, March 24, 2020 7:41 AM
**To:** Stephen Z. Boren <sboren@bollaw.com>
**Cc:** Paul King <paul@cannafornia.co>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** RE: Cannafornia, LLC

Hi Steve,

Paul has asked me to send you the attached ledger of all funds transferred in and out of our escrow account on behalf of Cannafornia Holdings, Inc.
I have also gone through my email and found 75 emails confirming that Paul was cc'd on each of Dimitriy's wire requests and, after Paul asked me to confirm all wires with him, separately confirmed them.  I am not sure if you need those or of the best way to send them to you?

I am happy to help in any way I can.  Please let me know if there is anything else you need from me.

**Amy K. Maliza, Esq.**
**di Santo Law | Partner**

**F**LORIDA
**429 Lenox Ave, Suite 417 Miami Beach FL 33139**
**+1 305.587.2699**



**NEW YORK**

609 Greenwich Street, 4th Floor, New York, NY 10014

**Admitted in New York and Florida**

*This message is intended to be confidential and may be legally privileged. It is intended solely for the addressee. If you are not the addressee, please delete this message from your system and notify us immediately. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is prohibited and may be unlawful.*

**From:** Stephen Z. Boren <sboren@bollaw.com>
**Sent:** Monday, March 23, 2020 2:43 PM
**To:** Amy Maliza <Amaliza@disantolaw.com>
**Cc:** Paul King <paul@cannafornia.co>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** RE: Cannafornia, LLC

Amy –

Let's use my firm's dial in number – 310-322-2021 Ext. 302.

I look forward to speaking with you at 5:00 p.m. EST/ 2:00 P.M. PST.

Thanks,
Steve


Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 223  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*


**From:** Amy Maliza <Amaliza@disantolaw.com>
**Sent:** Monday, March 23, 2020 11:42 AM
**To:** Stephen Z. Boren <sboren@bollaw.com>
**Cc:** Paul King <paul@cannafornia.co>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** RE: Cannafornia, LLC

5pm EST works for me. Do you want to call me or do we need a dial-in?

**From:** Stephen Z. Boren <sboren@bollaw.com>

**Sent:** Monday, March 23, 2020 2:40 PM
**To:** Amy Maliza <Amaliza@disantolaw.com>
**Cc:** Paul King <paul@cannafornia.co>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** RE: Cannafornia, LLC

Unfortunately, I have a conference call at that time. Are you available at 5:00 p.m. EST or any time thereafter?

Thanks,
Steve

Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 223 • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

**From:** Amy Maliza <Amaliza@disantolaw.com>
**Sent:** Monday, March 23, 2020 11:38 AM
**To:** Stephen Z. Boren <sboren@bollaw.com>
**Cc:** Paul King <paul@cannafornia.co>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** RE: Cannafornia, LLC

Hi Steve,

I am available at 4pm ET today. Does that work for you?

**Amy K. Maliza, Esq.**
**di Santo Law l Partner**

**FLORIDA**
**429 Lenox Ave, Suite 417 Miami Beach FL 33139**
**+1 305.587.2699**



**NEW YORK**
**609 Greenwich Street, 4th Floor, New York, NY 10014**

**Admitted in New York and Florida**
*This message is intended to be confidential and may be legally privileged. It is intended solely for the addressee. If you are not the addressee, please delete this message from your system and notify us immediately. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is prohibited and may be unlawful.*

**From:** Stephen Z. Boren <sboren@bollaw.com>
**Sent:** Monday, March 23, 2020 2:35 PM
**To:** Amy Maliza <Amaliza@disantolaw.com>
**Cc:** Paul King <paul@cannafornia.co>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** Cannafornia, LLC

Hi Amy,

My firm has been retained by Paul King (who is copied on this email) and Cannafornia, LLC. We are in the process of investigating potential claims against certain former employees of Cannafornia and would like to speak with you at your earliest convenience.

Please let me know your availability for a phone call this afternoon.

Thanks,
Steve

Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 223  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*



ZIP

Cannafornia
Escrow...A).xlsx

**From:** matt@cannafornia.co
**Subject:** RE: Wire transfers this morning
**Date:** April 1, 2020 at 4:53 PM
**To:** Paul King paul@cannafornia.co, Stephen Z. Boren sboren@bollaw.com, Steven F. Kuehl skuehl@bollaw.com

I checked with Paul, on July 12, 2019 a stock purchase agreement was sent from Dimitri to Amy, Paul never saw it or signed it, but his signature is on it. This email chain below references a wire transfer that I believe is pursuant to that stock purchase agreement. It's a wire transfer where nothing is mentioned and Dimitri seems to be being careful about not spelling out exactly what Amy is supposed to do. Amy either figured it out, was complicit, or they had a phone conversation.



**Matt Stevens**
Vice-President of Compliance and Senior Legal Counsel

**Address**  26800 Encinal Road, Salinas, CA 93908, USA
**Mobile**  (714) 280-7097 **Email**  Matt@cannafornia.co
**Website**  www.cannafornia.co

**From:** Paul King <paul@cannafornia.co>
**Sent:** Wednesday, April 1, 2020 1:50 PM
**To:** Stephen Z. Boren <sboren@bollaw.com>; Steven F. Kuehl <skuehl@bollaw.com>; Matt Stevens <matt@cannafornia.co>
**Subject:** Fwd: Wire transfers this morning

never copied on this chain by amy

---------- Forwarded message ---------
From: **Dimitriy Romantsoff** <dromantsoff@cannafornia.co>
Date: Wed, Apr 1, 2020 at 1:49 PM
Subject: Fwd: Wire transfers this morning
To: Paul King <paul@cannafornia.co>

---------- Forwarded message ---------
From: **Dimitriy Romantsoff** <dromantsoff@cannafornia.co>
Date: Fri, Jul 19, 2019 at 7:15 AM
Subject: Re: Wire transfers this morning
To: Amy Maliza <Amaliza@disantolaw.com>

You made the wire to 2000BB before. The wire instructions are attached.

**Dimitriy Romantsoff**
Board Advisor at Cannafornia

**Address**  26800 Encinal Road, Salinas, CA 93908, USA
**Mobile**  (305) 978-7922 **Email**  dromantsoff@cannafornia.co
**Website**  www.cannafornia.co

On Jul 19, 2019, at 7:13 AM, Amy Maliza <Amaliza@disantolaw.com> wrote:

Will do. There was one recipient without wire instructions. Shall I send a check?

On Fri, Jul 19, 2019 at 10:12 AM -0400, "Dimitriy Romantsoff" <dromantsoff@cannafornia.co> wrote:

Good morning Amy,

Please send me the wire confirmations once it's done.

Thank you,

*Cannafornia*

**Dimitriy Romantsoff**
Board Advisor at Cannafornia

**Address**  26800 Encinal Road, Salinas, CA 93908, USA
**Mobile**  (305) 978-7922  **Email**  dromantsoff@cannafornia.co
**Website**  www.cannafornia.co

--

*Cannafornia*

**Paul King**
Founder & CEO at Cannafornia

**Address**  26800 Encinal Road, Salinas, CA 93908, USA
**Mobile**  (786) 200-3429  **Website**  www.cannafornia.co

**From:** **Stephen Z. Boren** sboren@bollaw.com 📎
**Subject:** RE: FW: Completed: dSL Escrow Agreement - Cannafornia Holdings (00025342xC0B4A)-4
**Date:** April 2, 2020 at 2:33 PM
**To:** Paul King paul@cannafornia.co, Steven F. Kuehl skuehl@bollaw.com

Paul –

In comparing your email and Amy's email I note that you are referring to an email exchange on August 2 and she is referring to one on August 14.  The documents are different including the places to wire funds. Do you have a record of docusigning the document sent by Amy on August 14?  Her email indicates that it was sent to you and signed by you at 3:26 p.m.

Please advise as there are several differences between the documents.

Thanks,
Steve


Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 223  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*


**From:** Paul King <paul@cannafornia.co>
**Sent:** Thursday, April 02, 2020 10:58 AM
**To:** Stephen Z. Boren <sboren@bollaw.com>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** Fwd: FW: Completed: dSL Escrow Agreement - Cannafornia Holdings (00025342xC0B4A)-4

Looks like I did sign this but my version never had any instructions with it.



---------- Forwarded message ---------
From: **Stephen Z. Boren** <sboren@bollaw.com>
Date: Wed, Mar 25, 2020 at 9:22 AM
Subject: FW: Completed: dSL Escrow Agreement - Cannafornia Holdings (00025342xC0B4A)-4
To: Paul King <paul@cannafornia.co>, Michael King <michael@kingsgardeninc.com>, Steven F. Kuehl <skuehl@bollaw.com>

Paul –

Please review the attached that was signed by you.

Thanks,
Steve


Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 223  • F: (310) 322-2228
web:  www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*


**From:** Amy Maliza <Amaliza@disantolaw.com>
**Sent:** Monday, March 23, 2020 3:15 PM
**To:** Amy Maliza <Amaliza@disantolaw.com>
**Subject:** FW: Completed: dSL Escrow Agreement - Cannafornia Holdings (00025342xC0B4A)-4


**From:** Paul King <paul@cannafornia.co>
**Sent:** Friday, August 2, 2019 10:24 AM
**To:** Amy Maliza <Amaliza@disantolaw.com>; Dimitri Romantsoff <dromantsoff@cannafornia.co>
**Subject:** Fwd: Completed: dSL Escrow Agreement - Cannafornia Holdings (00025342xC0B4A)-4

Amy please see attached

---------- Forwarded message ---------
From: **DocuSign via DocuSign** <dse_na2@docusign.net>
Date: Fri, Aug 2, 2019 at 10:23 AM
Subject: Completed: dSL Escrow Agreement - Cannafornia Holdings (00025342xC0B4A)-4
To: Paul King <Paul@cannafornia.co>

Your document has been completed.

VIEW COMPLETED DOCUMENT

All signers completed dSL Escrow Agreement - Cannafornia Holdings
(00025342xC0B4A)-4

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access
code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
FFDBC0F5D3564231A1DD338C1F31E2A02

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether
you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a
professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document,
please reach out to the sender by emailing them directly.

If you are having trouble signing the document, please visit the Help with Signing page on our
Support Center.

Download the DocuSign App

This message was sent to you by Paul King who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

\--
Sincerely,
Paul King
\--
Sincerely,
Paul King

**From:** matt@cannafornia.co
**Subject:** RE: Wire instructions to Amy Maliza for $496k wire to Jane Inc.
**Date:** April 2, 2020 at 9:28 AM
**To:** Paul King paul@cannafornia.co, Stephen Z. Boren sboren@bollaw.com
**Cc:** Sophia King sophiaking06@gmail.com, Steven F. Kuehl skuehl@bollaw.com



Yep, I actually got an email from them on Dinara's claim last night. No settlement conference or hearing has been set yet.



**Matt Stevens**
Vice-President of Compliance and Senior Legal Counsel

**Address**  26800 Encinal Road, Salinas, CA 93908, USA
**Mobile**  (714) 280-7097  **Email**  Matt@cannafornia.co
**Website**  www.cannafornia.co

**From:** Paul King <paul@cannafornia.co>
**Sent:** Wednesday, April 1, 2020 7:02 PM
**To:** Matt Stevens <matt@cannafornia.co>; Stephen Z. Boren <sboren@bollaw.com>
**Cc:** Sophia King <sophiaking06@gmail.com>; Steven F. Kuehl <skuehl@bollaw.com>
**Subject:** Re: Wire instructions to Amy Maliza for $496k wire to Jane Inc.

Matt you handled the labor claim for Dinara right ?

On Wed, Apr 1, 2020 at 7:01 PM Stephen Z. Boren <sboren@bollaw.com> wrote:

Thanks Paul.  Also, follow up with Lance of my office on the employment issue when you have a minute.  There are deadlines to respond to Labor Board claims so I want to make sure you connect with him.

Steve

Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 223  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

**From:** Paul King <paul@cannafornia.co>
**Sent:** Wednesday, April 01, 2020 6:35 PM
**To:** Steven F. Kuehl <skuehl@bollaw.com>
**Cc:** Sophia King <sophiaking06@gmail.com>; Stephen Z. Boren <sboren@bollaw.com>
**Subject:** Re: Wire instructions to Amy Maliza for $496k wire to Jane Inc.

I didn't look at her dropbox but they are in my google drive that I shared with the attachments

On Wed, Apr 1, 2020 at 6:34 PM Steven F. Kuehl <skuehl@bollaw.com> wrote:

Thanks Paul.  No rush.

I reviewed the emails that Amy sent to us which was purportedly everything between her and DR.  However, many of the emails refer to attachments but did not come with attachments.

**From:** Paul King <paul@cannafornia.co>
**Sent:** Wednesday, April 1, 2020 6:33 PM
**To:** Steven F. Kuehl <skuehl@bollaw.com>
**Cc:** Sophia King <sophiaking06@gmail.com>; Stephen Z. Boren <sboren@bollaw.com>
**Subject:** Re: Wire instructions to Amy Maliza for $496k wire to Jane Inc.

Hi Steven, I'll check when I'm back on laptop in a couple hours but it should also be in the google drive folder I set up.

If I don't hear from you I'll look at it in a few hours.

On Wed, Apr 1, 2020 at 6:26 PM Steven F. Kuehl <skuehl@bollaw.com> wrote:

Paul,

We are looking for the wire instructions from DR to Amy Maliza for the $496k wire.  One issue is that the emails we have from Amy Maliza do not have attachments.

Can you check the attached email from DR to Amy to see if it had an attachment?

Thanks,

Steve

Steven F. Kuehl, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 242  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

--
Sincerely,
Paul King

--
Sincerely,
Paul King

--
Sincerely,
Paul King

**From:** **Sophia King** sophiaking06@gmail.com
**Subject:** Re: Wire to Jane Inc.
**Date:** April 2, 2020 at 12:37 PM
**To:** Steven F. Kuehl skuehl@bollaw.com
**Cc:** Paul King Cannafornia paul@cannafornia.co

Happy 😺 Thursday, Steve! Hope all is well! I double checked Amy's ledger again but found nothing RE $496K. I will send you another email later on today - unless you tell me: stop 🛑 🤚 🤚 🤚 with new findings. Thank you for helping out!!! Stay Healthy!!! 🙏

Sent from my iPhone

> On Apr 1, 2020, at 8:04 PM, Steven F. Kuehl <skuehl@bollaw.com> wrote:
>
> Thanks Sophia! I appreciate you checking.
>
> Sent from my iPhone

☺

## Thank you!!!

☃

skuehl@bollaw.com

Thanks!  The wire was sent on August 14, 2019.  But DR kept checking in July to see if funds had come in from DuMoulin Black to Amy Maliza and out from Amy Maliza's client trust account.

As a result, I believe it was sometime between July 1, 2019 and August 14, 2019.

sophiaking06@gmail.com

skuehl@bollaw.com

skuehl@bollaw.com

Hi Sophia,

You have access to DR's Cannafornia emails, right?  Would you mind searching them for "$496,017" or "$496"?  I am trying to find the instruction from DR to Amy Maliza authorizing a wire of $496,017 to Jane Inc.

Thanks!!!

Steven F. Kuehl, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
• T: (310) 322-2021 ext. 242  • F: (310) 322-2228
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

**From:** Stephen Z. Boren sboren@bollaw.com
**Subject:** RE: Cannafornia
**Date:** July 27, 2020 at 1:39 PM
**To:** Paul King paul@cannafornia.co, Michael King michael@kingsgardeninc.com, Sophia King sophiaking06@gmail.com

Paul  -

I understand your concern.

The problem presented is that you have multiple pieces of litigation in two different states, a D.A. lawsuit and an SEC investigation occurring simultaneously.  Mark is working on the criminal investigation and the SEC investigation on your behalf so he also needs answers to certain questions.

One of the main issues that crosses all of the cases and investigations is an explanation of how the condos in Florida were purchased and why money went from Amy Maliza's account to 1401 in 2019.

Thanks,
Steve


Stephen Z. Boren, Esq.
Boren. Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
telephone: (310) 322-2021 ext. 223
e-mail: sboren@bollaw.com
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren. Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*


**From:** Paul King <paul@cannafornia.co>
**Sent:** Monday, July 27, 2020 10:33 AM
**To:** Michael King <michael@kingsgardeninc.com>; Sophia King <sophiaking06@gmail.com>; Stephen Z. Boren <sboren@bollaw.com>
**Subject:** Re: Cannafornia

Stephen,

I can't afford to keep piling on the legal fees, that's the issue.

Every time we talk it's super expensive so we're trying to limit that.


On Mon, Jul 27, 2020 at 10:30 AM Stephen Z. Boren <sboren@bollaw.com> wrote:

I think we loop in Mark now.

If you have the tax returns, please send them over.

Do you have any documents showing monies advanced by Paul to Cannafornia in 2018?

I will talk to you at 11 a.m.

Thanks,
Steve


Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
telephone: (310) 322-2021 ext. 223
e-mail: sboren@bollaw.com
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*


**From:** Sophia King <sophiaking06@gmail.com>
**Sent:** Monday, July 27, 2020 9:51 AM
**To:** Stephen Z. Boren <sboren@bollaw.com>
**Cc:** Michael King <michael@kingsgardeninc.com>; Paulie King <paul@cannafornia.co>; Steve Kuehl <stevekuehl82@gmail.com>
**Subject:** Re: Cannafornia

Hello, Stephen! BEFORE we talk to Mark, let me get Income tax returns from Marina Coppens, our FL accountant and Horace Inbraham, our CA accountant. What do you think? 😊 Please call me directly at 305.401.4723, if needed! Thank you! Sincerely, Sophia

On Mon, Jul 27, 2020 at 9:41 AM Stephen Z. Boren <sboren@bollaw.com> wrote:

> Mike, Paul, Sophia and Mark –
>
> I think we need to have a conversation this morning to discuss a couple of issues which effect the pending litigation in Florida and California, the criminal investigation, the SEC and the D.A.

Is everyone available at 11 a.m.?

Thanks,
Steve


Stephen Z. Boren, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
telephone: (310) 322-2021 ext. 223
e-mail: sboren@bollaw.com
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*


--
Please feel free to call or email me 24/7!

Sincerely,



**Sophia Lyalya King**
**President**
CENTURY 21 1st Class Realty
17070 Collins Ave., Suite 259
Sunny Isles Beach, Florida 33160
Office: (305) 949-0266
**Cell: (305) 401-4723**
Fax: (305) 394-6080
Email: Sophia.King@CENTURY21.com
www.Century21-1stClassRealty.org

**Click here for information on New Construction Developments**

*Paul King, Broker/Owner*
*Voted one of "Top 30 under 30" in America & #1 in Florida!*
Top 30 under 30 - Realtor.com (Click for details)


--
Sincerely

Sincerely,
Paul King

**From:** **Richard Epstein** Richard.Epstein@gmlaw.com  🖉
**Subject:** RE: King et al. v. Romantsoff et al. / Substitutions of ATtorney
**Date:** September 23, 2021 at 11:15 PM
**To:** Paul King paulkingceo@gmail.com

Greenspoon Marder are no longer your lawyer.  Your inquiry is to be directed to the lawyers who succeeded Greenspoon Marder.


Richard W. Epstein

# GreenspoonMarder LLP 4O
*— CELEBRATING FORTY YEARS TOGETHER —*

200 East Broward Boulevard
Suite 1800
Fort Lauderdale, Florida 33301
Telephone:  954.491.1120
Direct Facsimile:  954.343.6958
Mobile:  954.214.5624


**From:** Paul King <paulkingceo@gmail.com>
**Sent:** Thursday, September 23, 2021 9:41 PM
**To:** Richard Epstein <Richard.Epstein@gmlaw.com>
**Subject:** Fwd: King et al. v. Romantsoff et al. / Substitutions of ATtorney

But Turken doesn't exist does he Richard

---------- Forwarded message ---------
From: **Jeremy J. Osher** <josher@bollaw.com>
Date: Thu, Sep 23, 2021 at 9:32 PM
Subject: King et al. v. Romantsoff et al. / Substitutions of ATtorney
To: paul@cannafornia.co <paul@cannafornia.co>
CC: Jeremy J. Osher <josher@bollaw.com>


Mr. King,

Please see the attached substitutions of attorney which were signed by you on October 30, 2020 and were filed in the *King v. Romantsoff* action on November 2, 2021.  All documents along with our entire client files were provided to the attorney who substituted into the action on behalf of you and your entities, James Turken at Greenspoon Marder. Please refrain from [google.com] contacting Mr. Boren further.

Thanks,

Jeremy J. Osher, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222 [google.com]
El Segundo, California 90245 [google.com]

El Segundo, California 90245 [google.com]
Telephone: (310) 322-2021 ext. 225
email: josher@bollaw.com
web: www.bollaw.com [bollaw.com]

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

GREENSPOON MARDER LLP LEGAL NOTICE
The information contained in this transmission may be attorney/client privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply e-mail.

Unless specifically indicated otherwise, any discussion of tax issues contained in this e-mail, including any attachments, is not, and is not intended to be, "written advice" as defined in Section 10.37 of Treasury Department Circular 230.

A portion of our practice involves the collection of debt and any information you provide will be used for that purpose if we are attempting to collect a debt from you.

**From:** **Sophia King** sophiaking06@gmail.com  📎
**Subject:** Fwd: FW: Proposed Amended Agreement
**Date:** May 24, 2021 at 6:57 PM
**To:** Paulie King  paul@cannafornia.co

Please see attached

---------- Forwarded message ----------
From: <cesar@dominguezassociateslaw.com>
Date: Mon, May 24, 2021 at 8:43 AM
Subject: FW: Proposed Amended Agreement
To: Paul King <paul@cannafornia.co>
Cc: Sophia King <sophiaking06@gmail.com>

Paul, please sign this tolling agreement.

## Cesar Dominguez  J.D./M.B.A.
## Law Offices of Dominguez & Associates, P.A.
## 2000 Ponce de Leon/ Suite 600
## Coral Gables, FL 33134
## Phone: 305-529-6273
## Fax: 305-260-6346

### cesar@dominguezassociateslaw.com

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LAW OFFICE OF DOMINGUEZ & ASSOCIATES, P.A. reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity.

CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

**From:** cesar@dominguezassociateslaw.com <cesar@dominguezassociateslaw.com>
**Sent:** Sunday, May 23, 2021 8:14 PM
**To:** 'Xavier A. Franco' <xfranco@mcper.com>
**Subject:** FW: Proposed Amended Agreement

Xavier,

You are referring to the attached amended tolling agreement correct?

## Cesar Dominguez  J.D./M.B.A.

**Law Offices of Dominguez & Associates, P.A.**
2000 Ponce de Leon/ Suite 600
Coral Gables, FL 33134
Phone: 305-529-6273
Fax: 305-260-6346

cesar@dominguezassociateslaw.com

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LAW OFFICE OF DOMINGUEZ & ASSOCIATES, P.A. reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity.


CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

**From:** Xavier A. Franco <xfranco@mcper.com>
**Sent:** Thursday, May 20, 2021 2:36 PM
**To:** cesar@dominguezassociateslaw.com
**Subject:** RE: Proposed Amended Agreement

Cesar, I am resending because there was a typo in the signature block of the First Amendment to the Tolling Agreement.

Xavier A. Franco

McArdle, Perez & Franco P.L.

255 Alhambra Circle, STE 925 | Coral Gables, FL 33134

T 305.442.2214 | F 305.442.2291

www.mcper.com | xfranco@mcper.com

**From:** Xavier A. Franco
**Sent:** Thursday, May 20, 2021 12:23 PM
**To:** cesar@dominguezassociateslaw.com
**Subject:** RE: Proposed Amended Agreement

Cesar, here are the documents that need to be executed by your clients.  First, there is the Second Amendment to the Settlement Agreement.  I made no additional changes to the last version I sent you, beyond reformatting.  The Second document is the First Amendment to the Tolling Agreement, which extends the tolling period.  The only changes to this Agreement were formatting and also a typo in the last paragraph where I referred to the "Second Amendment" when it should have said the "First Amendment".

Please have your client sign the "Second Amendment to the Settlement Agreement" on behalf of the all of the "First Parties" and I will have my clients sign on behalf of all of the "Second Parties".  Also, please have your clients execute the "First Amendment to Tolling

Agreement" on behalf of California New Wave I, LLC, Cannafornia Holdings, Inc., 1401 Investments 500, LLC, 803 Investments, Inc. and Paul King Individually.  I will have my client, Gia Investments, LLC also execute that document.

Thanks,

Xavier A. Franco

McArdle, Perez & Franco P.L.

255 Alhambra Circle, STE 925 l Coral Gables, FL 33134

T 305.442.2214 l F 305.442.2291

www.mcper.com l xfranco@mcper.com

**From:** Xavier A. Franco
**Sent:** Wednesday, May 19, 2021 3:56 PM
**To:** cesar@dominguezassociateslaw.com
**Subject:** RE: Proposed Amended Agreement

Cesar, I apologize I have been in deposition.  Here it is tracked and clean.  Please approve and I will reach out to the mediator to see if he can furnish it to the parties through docusign for execution.

Best,

Xavier A. Franco

McArdle, Perez & Franco P.L.

255 Alhambra Circle, STE 925 l Coral Gables, FL 33134

T 305.442.2214 l F 305.442.2291

www.mcper.com l xfranco@mcper.com

**From:** cesar@dominguezassociateslaw.com <cesar@dominguezassociateslaw.com>
**Sent:** Wednesday, May 19, 2021 11:28 AM
**To:** Xavier A. Franco <xfranco@mcper.com>
**Subject:** RE: Proposed Amended Agreement

i Xavier,

Thanks for the email and the documents.  Upon review of the proposed affidavit, I found it too harsh and would like for you to review the attached changes, that I believe helps your client, while not hurting mine.

Best regards,

**Cesar Dominguez  J.D./M.B.A.**

Law Offices of Dominguez & Associates, P.A.
2000 Ponce de Leon/ Suite 600
Coral Gables, FL 33134
Phone: 305-529-6273
Fax: 305-260-6346

cesar@dominguezassociateslaw.com

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LAW OFFICE OF DOMINGUEZ & ASSOCIATES, P.A. reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity.

CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

**From:** cesar@dominguezassociateslaw.com <cesar@dominguezassociateslaw.com>
**Sent:** Tuesday, May 18, 2021 1:00 PM
**To:** 'Xavier Franco' <xfranco@mcper.com>; 'Roman Temkin' <romantemkin73@icloud.com>
**Cc:** 'Paul King' <paul@cannafornia.co>
**Subject:** RE:

Gentlemen,

I'm ready to work with Xavier to get this addendum done.  Please send me the revised document.

Best regards,

**Cesar Dominguez  J.D./M.B.A.**
**Law Offices of Dominguez & Associates, P.A.**
**2000 Ponce de Leon/ Suite 600**
**Coral Gables, FL 33134**
**Phone: 305-529-6273**
**Fax: 305-260-6346**

cesar@dominguezassociateslaw.com

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LAW OFFICE OF DOMINGUEZ & ASSOCIATES, P.A. reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity.

CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

**From:** Paul King <paul@cannafornia.co>
**Sent:** Tuesday, May 18, 2021 11:49 AM
**To:** Roman Temkin <romantemkin73@icloud.com>; cesar@dominguezassociateslaw.com
**Cc:** Xavier Franco <xfranco@mcper.com>
**Subject:** Re:


Ok sounds good. Cesar is here


On Tue, May 18, 2021 at 7:48 PM Roman Temkin <romantemkin73@icloud.com> wrote:

> Hi Paul,
> Again, I agreed to extend till July 2nd. I don't change my decisions. But!!!!!!!! PLEASE!!!! Ask your attorney to work with Xavier.
>
> Best Regards Roman.
>
> > On May 18, 2021, at 11:33 AM, Paul King <paul@cannafornia.co> wrote:
> >
> > Hello Xavier,
> >
> > I heard about the defamation hearing this morning.
> >
> > Roman and I had agreed by email to postpone until July 2nd so I do not understand your position.
> >
> > Roman, let me know what you want to do. I'm fine with battling too, even though I have enough at the moment. But if that's what you wish, so be it.
> > --
> > Sincerely,
> > Paul King

--

Sincerely,
Paul King




PDF

First
Amend...ent.pdf



# Hello Everyone,

I hope this email finds you well as we have some news to share.

On March 1st, 2020, it became clear that we had a problem with the first major group of investors that had become partners in Cannaforia. Since then, we've been battling on many fronts.

On that day, our very own Spiro received a phone call from one of the newly-exposed and freshly-fired investors promising Spiro, "I'm going to bury Paul King and bury the company."

And so, an 11.5 months long battle ensued where my life and career were threatened and the only certainty was that a new trap was on its way with my name on the gift receipt.

There are many stories from the past 11.5 months that we can look back on to see how we transformed from a young and trusting naive company into one of

10/4/21, 10:07 AM      PAUL KING, AN INDIVIDUAL... ET AL. VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL. | Court Records - UniCourt

**UniCourt** ☰

Home / State Courts / California / Los Angeles County Superior Courts / PAUL KING, AN INDIVIDUAL;, ET AL. VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL.

This case was last updated from **Los Angeles County Superior Courts** on 07/17/2021 at 03:17:47 (UTC).   ⟳ Update This Case

# PAUL KING, AN INDIDVIDUAL;, ET AL. VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL.

## Case Summary

On 04/13/2020 **PAUL KING, AN INDIDVIDUAL** filed a Property - Other Property Fraud lawsuit against **DIMITRIY ROMANTSOFF, AN INDIVIDUAL**. This case was filed in Los Angeles County Superior Courts, Stanley Mosk Courthouse located in Los Angeles, California. The Judges overseeing this case are MICHAEL L. STERN and GREGORY KEOSIAN. The case status is Pending - Other Pending.

Case Details   Parties   **Documents**   Dockets

## Case Details

### Case Number:

\*\*\*\*\*\*\*8712

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

**I AGREE**






PAUL KING, AN INDIVIDUAL... ET AL VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL | Court Records - UniCourt

## Case Status:
Pending - Other Pending

## Case Type:
🏛 Property - Other Property Fraud

## Court:
Los Angeles County Superior Courts

## Courthouse:
Stanley Mosk Courthouse

## County, State:
Los Angeles, California

## ⚖ Judge Details

### Presiding Judges

MICHAEL L. STERN                    GREGORY KEOSIAN

## 👤 Party Details

### Plaintiffs and Cross Defendants

BIG HUGS HOLDINGS INC. A CANADIAN          CALIFORNIA NEW WAVE III A CALIFORNIA          CALIFORNIA NEW WAVE VII A CALIFORNIA
CORPORATION                                LIMITED LIABILITY                             LIMITED LIABILITY COMPANY

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

LIMITED ~ BILITY COMPANY

LIMITED LIABILITY ~ MPANY;

LIMITED LIABILITY COMPANY

CALIFORNIA NEW WAVE VIII A
CALIFORNIA LIMITED LIABILITY
COMPANY;

CALIFORNIA NEW WAVE IV A CALIFORNIA
LIMITED LIABILITY COMPANY;

**Defendants and Cross Plaintiffs**

2000 BISCAYNE BOULEVARD LLC A
DELAWARE LIMITED LIABILITY COMPANY

JANE INVESTMENTS LLC A DELAWARE
LIMITED LIABILITY COMPANY

SERVERCHUKOV ROMAN AN INDIVIDUAL

GIA INVESTMENTS LLC A DELAWARE
LIMITED LIABILITY COMPANY

JANE INC. A FLORIDA CORPORATION

CROSS ATLANTIC BUILDERS LLC A
FLORIDA LIMITED LIABILITY COMPANY

TEMKIN ROMAN AN INDIVIDUAL

ROMANTSOFF DIMITRIY AN INDIVIDUAL
AKA DMITRY ROMANTSOV

DAULBAEV TIMUR AN INDIVIDUAL

21 More Parties Available ⌄

👤 Attorney/Law Firm Details

**Plaintiff and Cross Defendant Attorneys**

BOREN STEPHEN ZACHARY

KUEHL STEVEN FREDERICK

KUEHL STEVEN F.

BOREN STEPHEN Z.

TURKEN JAMES HENRY

**Defendant and Cross Plaintiff Attorneys**

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

10/4/21, 10:07 AM
PAUL KING, AN INDIDVIDUAL...ET AL. VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL. | Court Records - UniCourt

**Court Documents**

Complaint

4/13/2020: Complaint

Download

Request for Dismissal

4/20/2021: Request for Dismissal

Download

Minute Order - MINUTE ORDER (HEARING ON

2/23/2021: Minute Order - MINUTE ORDER (HEARIN

Download

Reply - REPLY TO OPPOSITION TO

2/16/2021: Reply - REPLY TO OPPOSITION TO

Download

Substitution of Attorney

11/2/2020: Substitution of

Notice of Case Management Conference

10/27/2020: Notice of

Minute Order - MINUTE ORDER (COURT ORDER R

10/21/2020: Minute Order

Transfer In Case

4/13/2020: Transfer In

I AGREE

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

10/4/21, 10:07 AM

PAUL KING, AN INDIVIDUAL... ET AL. VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL. : UniCourt Records – UniCourt



Other – – NOTICE RE CHANGE OF VENUE
10/9/2020: Other – – NOTICE OF CHANGE O

Proof of Personal Service
10/9/2020: Proof of Personal Service

Proof of Personal Service
10/9/2020: Proof of Personal Service

Certificate – CERTIFICATE OF ELECTRONIC
10/9/2020: Certificate – CERTIFICATE OF

Minute Order
10/9/2020: Minute Order

Proof of Personal Service
10/9/2020: Proof of Personal Service

Request for Judicial Notice – REQUEST FOR
10/9/2020: Request for Judicial Notice – REQUES

Other – – STIPULATION TO CONTINUE HEARING
10/9/2020: Other – – STIPULATION TO

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

https://unicourt.com/case/ca-la23-paul-king-an-individual-et-al-vs-dimitriy-romantsoff-an-individual-et-al-601185

5/14



Other - - EVIDENTIARY
OBJECTIONS
10/9/2020: Other - -
EVIDENTIARY
Complaint

⊕ Download

Cross-Complaint

10/15/2020: Cross-
Complaint

⊕ Download

**89 More Documents Available**
View All Documents ∨

**Docket Entries**

08/26/2021

Hearing   08/26/2021 at 10:00 AM in Department 61 at 111 North Hill Street, Los Angeles, CA 90012; Hearing on Motion to Quash Business Records Subpoena to Non-Party Sprint Corporation

08/19/2021

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

**Hearing**   08/17/2021 at 10:00 AM in Department 61 at 111 North Hill Street, Los Angeles, CA 90012; Hearing on Motion to Quash for Lack of Personal Jurisdiction

07/19/2021

**Hearing**   07/19/2021 at 10:00 AM in Department 61 at 111 North Hill Street, Los Angeles, CA 90012; Case Management Conference

06/29/2021

**Docket**   at 10:00 AM in Department 61, Gregory Keosian, Presiding; Case Management Conference - Not Held - Continued - Court's Motion

06/24/2021

**Docket**   Proof of Service (not Summons and Complaint); Filed by PAUL KING, an individual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

06/22/2021

**Docket**   at 10:00 AM in Department 61, Gregory Keosian, Presiding; Hearing on Motion to Quash (for Lack of Personal Jurisdiction) - Not Held - Rescheduled by Party

06/17/2021

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

10/4/21, 10:07 AM

PAUL KING, AN INDIVIDUAL...ET AL. VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL. | Court Records - UniCourt

06/16/2021

**Docket**   at 10:00 AM in Department 61, Gregory Keosian, Presiding; Hearing on Motion to be Relieved as Counsel - Held

06/16/2021

**Docket**   Notice of Ruling (Ruling Re Attorney Blake L. Osborn's Motion to be Relieved as Counsel for Plaintiffs and Cross-Defendants); Filed by Clerk

~~~~~~~~~~~~~~~~~~~~~~~~

**97 More Docket Entries**

**View All Docket Entries** ⌄

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10/09/2020

**Docket**   Proof of Personal Service; Filed by PAUL KING, an individual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

10/09/2020

**Docket**   Proof of Personal Service; Filed by PAUL KING, an individual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

10/09/2020

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

10/4/21, 10:07 AM        PAUL KING, AN INDIDVIDUAL...ET AL VS DIMITRY ROMANTSOFF, AN INDIVIDUAL...ET AL | Court Records - UniCourt

9/14

**10/09/2020**

Docket    Proof of Personal Service; Filed by PAUL KING, an indidvidual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

**10/09/2020**

Docket    Proof of Personal Service; Filed by PAUL KING, an indidvidual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

**10/09/2020**

Docket    Proof of Personal Service; Filed by PAUL KING, an indidvidual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

**10/09/2020**

Docket    Proof of Personal Service; Filed by PAUL KING, an indidvidual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

**04/13/2020**

Docket    Complaint; Filed by PAUL KING, an indidvidual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

**04/13/2020**

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

04/13/2021

Docket   Civil Case Cover Sheet; Filed by PAUL KING, an individual; (Plaintiff); BIG HUGS HOLDINGS INC., a Canadian corporation (Plaintiff); CANNAFORNIA HOLDINGS INC., a Delaware corporation (Plaintiff) et al.

## Tentative Rulings

**Case Number:** 20STCV38743   **Hearing Date:** February 24, 2021   **Dept:** 61

**Case Number:** BC698168   **Hearing Date:** February 24, 2021   **Dept:** 61

Defendants San Dimas Fitness, LLC, Murreita Fitness and Health, LLC, and Moreno Valley Fitness, Inc.'s Motion for Terminating Sanctions is GRANTED.

Defendants to provide notice.

## MOTION FOR TERMINATING SANCTIONS

The court may impose terminating sanctions, include an order striking pleadings, and order dismissing an action, or an order rendering judgment by default against a party, for conduct that is a misuse of the discovery process. (Code Civ. Proc., § 2023.030.) This conduct include "[f]ailing to respond or to submit to an authorized method of discovery," and "[d]isobeying a court order to provide discovery." (Code Civ. Proc., § 2023.010.)

Ultimate discovery sanctions are justified where there is a willful discovery order violation, a history of abuse, and evidence showing that less severe sanctions would not produce compliance with discovery rules. (*Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1516.) Dismissal is a drastic measure, and terminating sanctions should only be ordered when there has been previous noncompliance with a rule or order and it appears a less severe sanction would not be effective. (*Link v. Cater* (1998) 60 Cal.App.4th 1315, 1326.) "[A] penalty as severe as dismissal or default is not authorized where noncompliance with discovery is caused by an inability to comply rather than willfulness or bad faith." (*Brown v. Sup. Ct.* (1986) 180 Cal.App.3d 701, 707.)

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

10/4/21, 10:07 AM        PAUL HARTMAN, AN INDIVIDUAL...ET AL. VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL...ET AL. | Court Records - UniCourt

precise ti      he deposition was to begin in order to state that he wc      not attend the deposition and that he was ready to sett      e case. (Hartman Decl. ¶ 5.) When counsel told Reese they would bring his failure to attend to the court's attention, Reese threatened to sue the attorneys and insurance adjusters on this case.

Defendants previously filed a motion for terminating or issue sanctions, grounded on Plaintiff's failure to provide verified discovery responses despite a prior court order, and a failure to proceed with an independent medical examination ordered by the court. This court found Plaintiff's conduct worthy of sanction, and granted the motion by deeming requests for admission previously served upon Plaintiff to be admitted.

Defendants thereafter filed another motion for terminating sanctions against Plaintiff based on his meritless objections to deposition questions, which this court denied on the grounds that Reese's conduct violated no court order, that a motion to compel answers to those questions was pending, and the conduct at issue could be addressed there. In that order, the court stated:

[T]he court warns Reese that a continuing failure to comply with this court's discovery orders places his case in jeopardy, and terminating sanctions, i.e. dismissal of his case, will be imposed if his misconduct continues. If the court grants Defendants' upcoming motion to compel answers to the deposition questions at issue in this motion, the court expects Reese to comply with the order.

(6/23/20 Order.) On August 19, 2020, this court found Plaintiff's objections were meritless and granted Defendants' motion to compel answers to deposition questions, including an order forbidding Plaintiff from recording the deposition on his phone and taking breaks while a question was pending. Plaintiff's failure to attend deposition follows on the heels of this order.

Terminating sanctions are appropriate. Plaintiff previously disobeyed court orders requiring him to provide discovery and to attend an independent medical examination, which were the basis for an earlier sanctions order. In denying Defendants' last motion for sanctions, this court warned Plaintiff that he would be expected to comply with any order made by the court in response to Defendants' motion to compel deposition answers. Despite this warning, and despite previous sanctions, Plaintiff has once again failed to comply. Plaintiff has repeatedly and willfully violated court orders, and lesser sanctions have proven unworkable. Plaintiff has failed to file any opposition explaining why terminating sanctions ought not to be imposed.

The motion for terminating sanctions is GRANTED.

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

**Latest   es where CROSS ATLANTIC BUILDERS LLC A FLORIDA LIMITED LIABILITY COMPANY is a litigant**

DELUXE WATERPROOFING & CAULKING INC VS PEARL HOUSE LLC

Florida Dade Court System | Property | 2021-005983-CA-01 | 2021-03-11

CROSS ATLANTIC BUILDERS, LLC VS TRAINOR AIR CONDITIONING, INC.

Florida Dade Court System | Contract | 2020-010752-CA-01 | 2020-05-19

CROSS ATLANTIC BUILDERS, LLC VS GIOVANNI & SONS BY TTS, LLC ET AL

Florida Dade Court System | Contract | 2019-024766-CA-01 | 2019-08-20

**Latest cases where GIA INVESTMENTS LLC A DELAWARE LIMITED LIABILITY COMPANY is a litigant**

KINGS GARDEN INC. VS GIA INVESTMENTS LLC, ET AL.

Los Angeles County Superior Courts | Other | 20STCV16367 | 2020-04-29

GIA INVESTMENTS, LLC ET AL VS PAUL KING ET AL

Florida Dade Court System | Contract | 2020-008123-CA-01 | 2020-04-09

HAIM NUDELMAN VS G.I.A. INVESTMENTS, INC.

Florida Dade Court System | Personal Injury | 2019-019972-CA-01 | 2019-07-03

**Latest cases where Jane is a litigant**

Chimney v. Quiros et al

U.S. District Courts | Prisoner | 3:21-CV-00321 | 2021-03-11

Ukena v. Steines et al

U.S. District Courts | Civil Right | 3:20-CV-50026 | 2020-01-21

Vivo v. Watson et al

U.S. District Courts | Prisoner | 3:19-CV-00445 | 2019-03-26

**Latest cases represented by Lawyer WATKINS JARED**

LAKEWOOD ORTHOPAEDIC SURGICAL AND MEDICAL GROUP, A CALIFORNIA GENERAL PARTNERSHIP, ET AL. VS RAMY ELIAS, M.D., INC., A MEDICAL CORPORATION, ET AL.

Los Angeles County Superior Courts | Contract | 21STCV24847 | 2021-07-06

Murphy vs Smith

San Diego County Superior Courts | Personal Injury | 37-2019-00045771-CU-PA-CTL | 2019-08-29

Mary Collins Streightiff vs Hilton Grand Vacations Inc

San Diego County Superior Courts | Personal Injury | 37-2017-00048133-CU-PO-CTL |

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

10/4/21, 10:07 AM

PAUL KING, AN INDIVIDUAL... ET AL VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL. | Court Records - UniCourt

Why is _ s public record being published online?

## Company

Features

About

Careers

Pricing

Blog

Contact Us

## Resources

Court Coverage

Federal Court Records

State Court Records

Developer Hub

## Follow Us

in   linkedin

twitter

I AGREE

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

10/4/21, 10:07 AM

PAUL KING, AN INDIDVIDUAL... ET AL VS DIMITRIY ROMANTSOFF, AN INDIVIDUAL, ET AL | Court Records - UniCourt

General Disclaimer Terms of Service Cancellation and Refund Policy Privacy Policy Public Records Policy

© 2021 UniCourt Inc.

Follow Us On

in 🐦 f 🖨️

© 2021 UniCourt Inc.

UniCourt uses cookies to improve your online experience, for more information please see our Privacy Policy. By continuing to use this website, you agree to UniCourt's General Disclaimer, Terms of Service, Cancellation and Refund Policy, Privacy Policy, and Public Records Policy. If you do not agree with these terms, then do not use our website and/or services.

I AGREE

**From:** **Paul King** paul@cannafornia.co 📎
**Subject:** Re:
**Date:** September 22, 2021 at 4:47 PM
**To:** Aryeh Kaufman aryeh@akaufmanlegal.com, Blake Osborn Blake.Osborn@gmlaw.com

Lying bastards



## UniCourt ☰

Case Details    Parties    **Documents**    Dockets

# Docket Entries

## 08/26/2021

**Hearing** 08/26/2021 at 10:00 AM in Department 61 at 111 North Hill Street, Los Angeles, CA 90012; Hearing on Motion to Quash Business Records Subpoena to Non-Party Sprint Corporation
Read Less

## 08/19/2021

**Hearing** 08/19/2021 at 10:00 AM in Department 61 at 111 North Hill Street, Los Angeles, CA 90012; Hearing on Demurrer - with...
Read More

## 08/17/2021

**Hearing** 08/17/2021 at 10:00 AM in Department 61 at 111 North Hill Street, Los Angeles, CA 90012; Hearing on Motion to Quas...
Read More

Search     Update     Share

23

On Wed, Sep 22, 2021 at 4:46 PM Paul King <paul@cannafornia.co> wrote:
  Next step is reporting you to the bar.

On Wed, Sep 22, 2021 at 12:56 PM Paul King <paul@cannafornia.co> wrote:
  Clearly the case with Russians is NOT stayed and is ongoing in la. --
  Sincerely,
  Paul King
  --
  Sincerely,
  Paul King

**From:** **Paul King** paul@cannafornia.co
**Subject:**
**Date:** September 28, 2021 at 5:40 PM
**To:** James Turken james.turken@gmlaw.com,  Julia Stepanova Julia.Stepanova@gmlaw.com,  Blake Osborn
Blake.Osborn@gmlaw.com

Mr. Turken,

Apparently you're my attorney, even though I never speak to you and according to other attorneys the case is stayed, though it seems
to be ongoing in la!

any feedback as to whats going on?

--



**Paul King**

Founder & CEO at Cannafornia

**Address**  26800 Encinal Road, Salinas, CA 93908, USA
**Mobile**  (786) 200-3429  **Website**  cannafornia.world

**From:** **Michael King**  michael@kingsgardeninc.com
**Subject:** Kings Garden Shareholder Update
**Date:** March 4, 2021 at 11:42 AM
**To:** Michael King  michael@kingsgardeninc.com
**Bcc:** paul@cannafornia.co

Dear Shareholders,

We have received multiple requests in regards to a liquidity event. Please understand that the company has been in many discussions over the last 6 months and continues to pursue these conversations. The conclusion thus far is that we do not intend to go public in Canada and we are investigating the process for listing on the OTC, which we have been told can take 10 to 16 months to complete (although there is no guarantee a listing will be completed).

With that said, we have received multiple requests to buy back shares. Kings Garden is offering to consider buying back up to 15% of all those shareholders holding both Preferred and Common Shares. This is a limited time offer. The repurchase price will be the amount invested plus 10% annual simple interest on such amount from the day of investment. If holders of more than 15% of the Preferred and Common shares want to participate in the buy-back, Kings Garden will prorate the number of shares per shareholder based on the total number of Common shares which are requested to be bought back. If the buy-back is not fully subscribed, the FnF round of shareholders will be able to take advantage of this buy-back.

We will need to receive an answer from you by March 11th if you wish to sell your shares. We expect to complete the buy-back no later than the end of March.

Please understand that the buy-back is in lieu of paying dividends going forward.

Thank you and God Bless!

--
Respectfully,


**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGardenInc.com

7:39

60



Michael



They were offered money back :)

Hey, we have an investor buying shares. He is only buying preferred shares which is for all "money invested" people. You have 50 shares. I can see if I can get you 100k if you want. Let me know - we need to finalise by 11th.



Q W E R T Y U I O P

A S D F G H J K L

Z X C V B N M

123        space        return

**From:** **Michael King**  michael@kingsgardeninc.com
**Subject:** Shares
**Date:** March 5, 2021 at 2:00 PM
**To:** Paul King  paul@cannafornia.co

Hey, we have an investor buying shares. He is only buying preferred shares which is for all "money invested" people. You have 50 shares. I can see if I can get you 100k if you want. Let me know - we need to finalise by 11th. That's when it closes.

Respectfully,


**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGarden.com

**From:** **Michael King**  michael@kingsgardeninc.com
**Subject:** Deadline for Share Sale
**Date:** March 11, 2021 at 7:03 PM
**To:** Michael King  michael@kingsgardeninc.com
**Bcc:** paul@cannafornia.co

Dear shareholder,

Please note that the deadline to notify us ends tomorrow.
Funding will take place on Monday.

Thank you!

--
Respectfully,

**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGardenInc.com

**From:** **Michael King** michael@kingsgardeninc.com
**Subject:** closing today
**Date:** March 19, 2021 at 10:23 AM
**To:** Paul King paul@cannafornia.co

fyi - there was a balance of funds available... can get you 350k...

today is dealdline

--
Respectfully,

**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGardenInc.com

**From: Sophia King** sophiaking06@gmail.com
**Subject:** Fwd: Request for Mediation
**Date:** April 6, 2021 at 8:18 PM
**To:** Paulie King paul@cannafornia.co

FYI

---------- Forwarded message ----------
From: **Michael King** <michael@kingsgardeninc.com>
Date: Tue, Apr 6, 2021 at 8:16 PM
Subject: Fwd: Request for Mediation
To: Sophia King <sophiaking06@gmail.com>

:))

---------- Forwarded message ----------
From: **Michael Cindrich** <mike@michaelcindrich.com>
Date: Tue, Apr 6, 2021 at 4:37 PM
Subject: Request for Mediation
To: michael@kingsgardeninc.com <michael@kingsgardeninc.com>

Michael,

I hope all is well.  I was recently contacted by your brother Paul regarding an apparent dispute between the two of you concerning Kings Garden. Paul is seeking to file a lawsuit against you and I indicated that I would not represent him since you and I have a prior business relationship.  I did, however, offer to mediate this dispute.  As you are aware, litigation is extremely time-consuming, costly, and stressful.  It would benefit the two of you to seek mediation prior to moving forward with litigation.  Please let me know if you would like to schedule a call to discuss this further.

Regards,

**Michael E. Cindrich**

**Law Offices of Michael E. Cindrich APC**

**225 Broadway, Suite 2100**

**San Diego, CA 92101**

**Phone: (619) 262-2500**

**Fax: (619) 819-7342**

**www.michaelcindrich.com**

CONFIDENTIALITY NOTICE:
This e-mail message and any attachments are only for the use of the intended recipient and may contain sensitive, privileged, or confidential information. If you are not the intended recipient, any disclosure, distribution or other use of this e-mail message or attachments is prohibited. Any reproduction or redistribution for the purpose of public disclosure is forbidden without written permission by the sender. If you have received this e-mail message in error, please delete and notify the sender immediately.

--
Respectfully,

**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGardenInc.com
--
Please feel free to call or email me 24/7!

Sincerely,

**Sophia Lyalya King**
**Realtor Associate**
CENTURY 21 King Realty
2434 Hollywood Blvd
Hollywood, FL 33020
**Cell: (305) 401-4723**
Office: (305) 651-6161
Email: sophiaking06@gmail.com
www.Century21-1stClassRealty.org

CENTURY 21
King Realty

**Click here for information on New Construction Developments**

Fax: (305) 394-6080
Ema

**From:** **Darren Carrigan** dcarrigan@anahitic.ca 📎
**Subject:** Fwd: Information about Paul King (Cannafornia)
**Date:** April 11, 2021 at 6:37 PM
**To:** Paul King paul@cannafornia.co

---------- Forwarded message ---------
**From:** **Michael King** <michael@kingsgardeninc.com>
Date: Sun., Apr. 11, 2021, 5:48 p.m.
Subject: Information about Paul King (Cannafornia)
To: <dcarrigan@anahitic.ca>

Good Darren,

My name is Michael King. I am the co-founder of Kings Garden (a licensed California cannabis operator). Paul King is my younger brother. It has been brought to my attention now on several occasions that Paul has and continues to engage in illegal activity. Ultimately this puts the company and your investment at high risk. He currently has two DA cases, SEC case and a multitude of civil lawsuits and California and Florida.

Additionally, below you will find information on a property he purchased in Florida. This property was purchased in his name, however, funds from Cannafornia and its shareholders were diverted from the company for this purchase. It was paid for by the company. Subpoena of bank statements will prove this. He continues to use funds from the company to fund his personal project. Property information is in the attached docs. I believe there are pending lawsuits in regards to Paul purchasing condos in Miami with company funds as well. I have more paperwork if you need it.

I am reaching out because Paul has a substance (drug) abuse problem, is involved in many lawsuits (criminal and civil) - which are making him reckless. This includes the information I provided above. I understand there is another group that is interested in removing him from the company in order to save their investment. I can put you in touch if you're interested.

In regards to me - he is putting my name and my company at risk by running around and trying to raise money for him by claiming he is Kings Garden abs it's for Kings Garden. I want nothing to do with him or his business. I'm reaching out simply to let you know that I have nothing to do with this and want nothing from any of this. Thanks for your time.

Respectfully,

**Michael King**
Founder
Chairman & CEO

+1.347.996.7844
Michael@KingsGardenInc.com

KingsGarden.com



**ATTORNEYS AT LAW**

**NOTICE OF ESCROW DEPOSIT**

DATE: September 22, 2020

**RE: Purchase of 17550 Davenport Road, Winter Garden, FL 34787**

To Whom It May Concern:

The undersigned purchaser(s) notify(ies) you that he, she, or they have entered into a Purchase Agreement for the purchase of the above property and deliver herewith a second deposit of $400,000.00 in accordance with the Purchase Agreement.

Purchaser(s) acknowledge(s) that: (i) Kelley Kronenberg, P.A. (the "Escrow Agent") may be required to deposit and invest the escrowed funds in savings or time deposits (with or without interest) in institutions insured by an agency of the United States, pursuant to the Escrow Agreement between the Escrow Agent and Paul King; and (ii) all obligations of the Escrow Agent are set forth in the Escrow Agreement.

Name(s) of Purchaser(s): **Paul King**

## RECEIPT

Receipt is acknowledged of the above deposit, subject to clearance of said funds.

**DATE OF RECEIPT:**                      **KELLEY KRONENBERG, P.A.**

September 22, 2020                      By: ___/s/ Lauren K. Einhorn, Esq.___

---

**From: Paul King** paul@cannafornia.co
**Subject:**
**Date:** September 3, 2020 at 5:16 PM
**To:** razbuton@icloud.com, rtulepan@nadg.com

raz adden pdf - signed using Adobe Fill & Sign

### Extension Addendum to Contract

The following date and/or time period(s) of the Contract for Residential Sale and Purchase  Residential Contract for Sale and Purchase, Vacant Land Contract, or Commercial Contract with the Effective Date of **June 12, 2020**
between **Razbuton, Inc.** ("**Seller**")
and **Paul King, or his assigns** ("**Buyer**")
concerning the Property located at **17550 Davenport Road, Winter garden, FL 34787**
is hereby extended  (check whichever apply.)

❑ **Closing Date.  Seller** and **Buyer** agree to extend the Closing Date until

❑ Financing Period. Seller and Buyer agree to extend the Financing Period for an additional ____ days or until ____

❑ Inspection Period. Seller and Buyer agree to extend the Inspection Period for an additional ____ days or until ____

❑ Title Cure Period. Seller and Buyer agree to extend the Cumulative Period to Cure Period for an additional ____ days or until ____

❑ Short Sale Approval Deadline. Seller and Buyer agree to extend the Approval Deadline for an additional ____ days or until ____

❑ Feasibility Study Period. Seller and Buyer agree to extend the Feasibility Study Period for an additional ____ days or until ____

☒ Due Diligence Period. Seller and Buyer agree to extend the Due Diligence Period for an additional ___ days or until **September 14, 2020**.

This extension will be on the same terms and conditions as stated in the original contract/receipt.
*The second Deposit of $400,000 shall be due on September 16, 2020, (5 days after completion of due diligence).*

All other non-conflicting terms of the contract remain in full force and effect.

MARU ERICKSON   9/4/2020          Paul King          9/3
Seller                Date          Buyer              Date
Razblunn_Inc                       Paulkann

   9/4/2020       
Seller                Date          Buyer              Date



10_19_20_extens
ion_to_...ed.pdf

2nd
Adden...ing.pdf

contract
signed.pdf



102,600 SF    92,777 SF

For Paul King

12:09

**Roman**
online

I think it was him who sent our attorney information about your land in Florida

To make us angry and start fighting again

**FW: Information about Paul King (Cannafornia)**

Guys,

Do you know this person – Pavel Korolev? He's been sending the same email to many of the attorneys at our firm.



If legit, this appears to be for a different property?



❮ All Inboxes                                        ∧   ∨



**Jared Watkins**                               Thursday
**To:** Dmitry  Roman   **Cc:** Nabil & 3 more...

## FW: Information about Paul King (Cannafornia)

Guys,

Do you know this person – Pavel Korolev? He's been sending the same email to many of the attorneys at our firm.

If legit, this appears to be for a different property?

Please advise.

Jared


**From:** Pavel Korolev <paschka.korolev@yandex.ru>
**Sent:** Thursday, April 8, 2021 3:15 PM
**To:** Jared Watkins <jared@cypressllp.com>
**Subject:** Information about Paul King (Cannafornia)

Please be advised that Paul King diverted Cannafornia funds to acquire a property in Florida for his personal use, and is buying it/bought it under his personal name.

The funds came in from his Cannafornia account or

         

345 of 384



Delete All                    Mikee ›                    Cancel

stopping.... I don't need to sit here and out up with this shit and Im supposed to wait around for him to make problems for me?

I already told you that nobody cares about me

Here is the deal... he is not stopping.
If he doesn't stop it goes to DA and SEC. so he can stop and I'm not going to do anything.  If he doesn't understand how to stop then I know what to do

Bury me first

Or I will just kill myself not to witness this

You just said - I didn't do anything ... but you know you did







**Mikee**

Again – he doesn't exist to me.  Understand me???

If he does anything stupid to harm me, my family, my company, etc – I will stop at nothing to burry him.  You understand me??

> Bury me first – I mean it

I'm not the one you should be texting.

> And you are the first one who wrote to the lawyers

> He was just talking to the lawyer

And I'll just be talking to the DA and SEC if I have to. I'm not gonna say this again. He does anything. And I

    iMessage   

       

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

**COURT OF APPEAL – SECOND DIST.**

# FILED

## Jun 11, 2021

DANIEL P. POTTER, Clerk

Z.Clayton          **Deputy Clerk**

| | |
|---|---|
| MICHAEL KING et al., | B312704 |
| Petitioners, | (Super. Ct. No. 21STCV15487) |
| v. | (William Fahey, Judge) |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | TEMPORARY STAY ORDER AND ORDER |
| PAUL KING et al., | |
| Real Parties in Interest. | |

THE COURT:

We have read and considered the petition for writ of mandate filed May 27, 2021.

The petition alleges that petitioners timely filed a statement of disqualification under Code of Civil Procedure section 170.6 (peremptory challenge) against Judge William F. Fahey on Monday, May 10, 2021. The notice of all-purpose case assignment had been served on April 23, 2021.

If counsel for the superior court wishes to bring any additional relevant facts to this court's attention, counsel may do so by serving and filing a letter in this court on or before June 24, 2021. Real parties in interest may file a response to the petition by the same date if they wish to do so.

In the interim, all further proceedings in this matter before Judge Fahey are hereby stayed pending further order of this court. Notwithstanding the stay, however, Judge Fahey may vacate his May 11, 2021 order denying the peremptory challenge if, upon further consideration, he determines that it was timely filed.

LAVIN, J., Acting P. J.          EGERTON, J.          KALRA, J.*

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

KINGS GARDEN, INC.
MICHAEL KING,
CHARLES KIELEY, and
LAURI KIBBY,

      Plaintiffs,

v.

PAUL KING, and
CANNAFORNIA HOLDINGS, INC.,

      Defendants.

_____/

CASE NO:

## COMPLAINT

Plaintiffs Kings Garden, Inc. ("Kings Garden"), Michael King ("Michael"), Charles Kieley ("Kieley") and Lauri Kibby ("Kibby") (collectively, "Plaintiffs") sue and file this Complaint against the Defendants, Paul King ("Paul") and Cannafornia Holdings, Inc. ("Cannafornia Holdings") (collectively, "Defendants") and allege as follows:

## SUMMARY

Defendant Paul King, a Miami resident, has taken a giant leap off the deep end as legal (criminal and civil) troubles mount against him. He has turned on his family – more specifically his older brother Michael King – his brother's business partners, and their company, Kings Garden. Paul is falsifying records and documents, filing a false police report, hacking e-mail accounts of Kings Garden's investors, using false and stolen identities, impersonating Kings Garden's investors and bankers, and straight-out telling lies to attack Michael, his partners and their business, among

other bad acts.  Paul's downward spiral included the attempted extortion of his own brother for millions of dollars.  Michael refused to be extorted, and, after Paul threatened to steal "half of the company and half of [Michael's] assets" if Paul did not get his illegal payday, Michael filed a police report to document the extortion.  Michael's personal concerns and all the Plaintiffs' business concerns have been realized, as illustrated by the course of Paul's bad acts described in this Complaint.  Paul's reckless and unlawful actions and his use of his Cannafornia Holdings business to perpetrate those bad acts have caused damages to the Plaintiffs that could exceed $5,000,000.

## GENERAL / JURISDICTION

1.    This is an action for money damages in excess of the jurisdictional requirements, exclusive of interest, attorneys' fees and costs.

2.    Venue in this action is proper in Miami-Dade County, Florida as Defendant resides in Miami-Dade County, Florida, Paul's false police report was filed in the County, and Defendants' actions have damaged Plaintiffs in the County.

3.    Plaintiff Kings Garden is a Nevada corporation with its principal offices in California.

4.    Plaintiff Michael is an individual that is *sui juris*.

5.    Plaintiff Kieley is an individual that is *sui juris*.

6.    Plaintiff Kibby is an individual that is *sui juris*.

7.    Michael is the CEO of Kings Garden; Kieley the COO; and Kibby the CFO.

8.    Defendant Paul is an individual residing in Miami-Dade County, FL and is *sui juris*.

9.    Defendant Cannafornia Holdings is a foreign entity operated by Defendant Paul King in California and in Florida, including in Miami-Dade County.

2

10.     Cannafornia Holdings, through its executive and owner, Defendant Paul King, has taken actions in Florida to harm the Plaintiffs and continues to take actions here in Florida to harm Plaintiffs.

11.     Paul has gotten himself into significant legal (civil and criminal) trouble and is attempting to harm his brother, Michael, who would not be extorted by Paul and would not participate in Paul's personal legal (civil and criminal) problems.

12.     Based on available information, the Monterey District Attorney seeks a Seven Million ($7,000,000.00) dollar fine against Paul and Cannafornia Holdings for, among other things, failure to obtain proper permits and licenses. *See People of the State of California v. Paul King et. al*, Monterey County Superior Court Case No 20CV001507.

13.     Based on available information, the United States Securities and Exchange Commission (SEC) is conducting an inquiry into potential violations of the Federal securities laws by Paul and Cannafornia Holdings. *See In the Matter of Cannafornia Holdings, Inc*. (MD-03935).

14.     Based on available information, the United States Fish and Wildlife Department brought claims against Paul and Cannafornia Holdings for violations, which he settled for $100,000. *See* CDFW Case No. AD2024270.

15.     Based on available information, the Superior Court of California issued a Search Warrant related to and is further pursuing Paul for state tax evasion, including related to Cannafornia Holdings.

16.     During Paul's downward spiral, he attempted to extort his brother Michael into giving him millions of dollars.  Michael refused, and to protect himself and his business interests later filed a police report to document the extortion ("Michael's Police Report").  A true and correct copy of Michael's Police Report is attached hereto as Exhibit A.

3

17.     On April 11, 2021, Paul wrote that he was going to start his attack on Michael, whom Paul called a "Sociopath" and openly threatened that he was going to "expose" him.  Not only did he write this to Michael, but he made sure to include Michael's wife, their mother, their father and their aunt.

18.     Paul was aware that spreading false information, including falsely stating that Michael is a convicted felon, was going to significantly impact Plaintiffs, as they operate in a highly regulated industry and Michael is the CEO of Kings Garden.

19.     In April 2021, Michael became aware that Paul was telling a third party that Michael needed to give Paul money, otherwise he was going to tell Kings Garden's shareholders that Michael was 'cooking the books', stealing from the company, and selling illegal products from Kings Garden (violating business regulations and licenses).

20.     In April 2021, Paul took another step in the execution of his pattern of illegal conduct that includes his extortion threat, this time filing a police report that falsely claims Michael committed fraud and grand theft ("Paul's False Police Report"). A true and correct copy of Paul's False Police Report is attached hereto as Exhibit B.

21.     On or about May 15, 2021, Paul sent an email to third parties, including shareholders of Kings Garden, claiming Plaintiffs were participating in "deliberately neglecting facts" in an "attempt to misdirect shareholders" and "frivolously spending scarce shareholder funds toward their own self-interest" (collectively, the "Email Statements"). A true and correct copy of a group of the Email Statements are compiled and attached hereto as Exhibit C.

22.     Paul and Cannafornia Holdings used false pretenses and improper methods that, on information and belief, included hacking a Kings Garden's investor, misappropriating Kings Garden's confidential information, and using such information to inflict harm on Plaintiffs.

4

23.   In May 2021, Paul published to the internet sites Medium, Squarespace and Substack, the home address and other property addresses of Michael, Kieley and Kibby.  Paul made claims that these individuals were "diverting much of the upside of Kings Garden's success" to their real estate purchases, that Michael "must have forged [someone]'s signature and stolen the money" and that Michael was convicted of the felony of first degree grand theft (collectively, the "Internet Statements").  A true and correct copy of exemplary Internet Statements are attached hereto as Exhibits D and E.

24.   In one of the Internet Statements, besides claiming misappropriation by Michael, Paul states that Michael's family home "is believed to have millions in cash and diamonds…." *See* Exhibit E.  Michael lived at that home with his wife and three young children.  Paul put all five of their lives at jeopardy by writing that there were millions of dollars at cash at the home. This invites violence and robbery to their home.

25.   Upon information and belief, Defendants have published further untrue and inaccurate information about Plaintiffs.

26.   Plaintiffs recently learned of a YouTube Channel in which Defendants have posted edited videos of Michael, regarding Kings Garden, and placed defaming and untrue comments regarding both ("YouTube Statements").

27.   Many of the YouTube Statements are made to appear as attacks directed at Kings Garden's shareholders and other industry professionals.

28.   The Email Statements, Internet Statements and YouTube Statements (collectively, the "Statements") made and posted by Defendants are clear that Plaintiffs are the persons and company to whom they are referring.

5

29.   The Statements were published on more than one occasion to millions of third parties worldwide including, but not limited to Plaintiffs' business associates, investors, shareholders, customers, vendors and acquaintances.

30.   It is clear that the Statements are intended to portray Plaintiffs in a false and negative light to bring harm and ridicule upon Plaintiffs' reputation and relationships.

31.   Kings Garden has recently learned that numerous business partners are concerned about the Statements, and this will directly impact on-going business.

32.   Plaintiffs will be seeking punitive damages against Defendants in light of these actions and the fact that Defendants put the lives of Michael King's family at risk by publishing that there were "millions in cash and diamonds" at the home. *See Fl. Stat. § 768.72.*

33.   The actions of Paul and Cannafornia Holdings appear to be sufficient to plead Racketeer Influenced and Corrupt Organization claim ("RICO") against them. Based on discovery, Plaintiffs will contemplate amending to bring the RICO and punitive damages part of their claims.

34.   All conditions precedent to the filing of this action have occurred, been performed or have been waived.

## COUNT I
### Defamation *Per Se*

Plaintiffs sue Defendants and repeat and reallege the allegations contained in paragraphs 1 through 34, and further allege:

35.   Defendants published the Statements about Plaintiffs including, but not limited to, the false statements about improperly diverting company funds and forging signatures and the false statement that Michael is a convicted felon.

6

36.    The Statements are false, inaccurate and untrue and are intended to portray Plaintiffs in a false and negative light to bring harm and ridicule upon Plaintiffs' reputation, including business relationships and shareholders.

37.    Paul's blitz of false information is significant in light of the fact that the Plaintiffs are within a highly regulated industry and Michael is the CEO of Kings Garden.

38.    The Statements were published on more than one occasion to millions of third parties worldwide, including but not limited to Plaintiffs' investors, professionals, business associates, vendors, customers and acquaintances.

39.    Defendants acted knowingly, recklessly, and/or with wanton disregard in publishing the Statements and had no reasonable basis to make such Statements.

40.    Defendants maliciously, willfully or negligently published, or caused to be published, the Statements to third parties in total disregard of Plaintiffs' rights, privacy, truth and safety.

41.    Defendants owed Plaintiffs a reasonable duty of care to investigate the truthfulness of the Statements.

42.    The Statements made by Defendants were unprivileged and were made with malice, ill will and bad intent towards Plaintiffs and to cause harm and damage to Plaintiffs.

43.    As the writings contained allegations of criminality of Plaintiffs, the Statements are *defamation per se* and were intended by Defendants to injure the Plaintiffs and their reputation in the community, as well as personal and business dealings.

44.    As a direct and proximate result of Defendants' false publications, Plaintiffs have been and will be damaged, including injury to reputation, shame, humiliation, mental anguish, and hurt feelings, which entitles Plaintiffs to recover damages against Defendants.

45.   The Statements have caused Plaintiffs to suffer distrust, ridicule and scorn in the community as a result of publication of the Statements.

WHEREFORE, Plaintiffs demand a judgment for damages against Defendants Paul King and Cannafornia Holdings, including actual, special and consequential damages, taxable costs, and for such other and further relief the Court deems just and proper.

## COUNT II
### Public Disclosure of Private Facts

Plaintiffs sue Defendants and repeat and reallege the allegations contained in paragraphs 1 through 34, and further allege:

46.   Defendants published on-line and by e-mail private facts about the individual Plaintiffs' personal affairs and the handling of business affairs of Kings Garden, including in the Statements.

47.   The Statements are highly offensive as they portray Plaintiffs as, among other things, frauds, persons who mismanage and waste corporate assets, a forger, a felon, and/or liars.

48.   The Statements consist of private information about Plaintiffs' living arrangements, business affairs, family and assets.

49.   Paul's blitz of false information, including the false statement that Michael is a convicted felon, is significant in light of the fact that the Plaintiffs are within a highly regulated industry and Michael is the CEO of Kings Garden.

50.   The Statements were published on more than one occasion to potentially millions of third parties worldwide, including but not limited to, Plaintiff's business associates, investors, vendors and acquaintances.

8

51.    Defendants published that Michael had "millions in cash and diamonds" at the home of his family, including his wife and three kids. These statements were made to the public without regard to the safety of Michael's wife and kids.

52.    In making the Statements in the public forum, Defendants intentionally, willfully and maliciously offended Plaintiffs' right to privacy.

53.    The Statements are unprivileged and not of a public concern.

54.    Plaintiffs have been damaged by Defendants actions related to private information being disclosed to the public.

WHEREFORE, Plaintiffs demand a judgment for damages and injunction against Defendants Paul King and Cannafornia Holdings, including actual, special and consequential damages, taxable costs, and for such other and further relief the Court deems just and proper.

## COUNT III
## Tortious Interference

Plaintiffs sue Defendants and repeat and reallege the allegations contained in paragraphs 1 through 34, and further allege:

55.    Plaintiffs have material and beneficial business relationships that are being directly affected by the Statements and continued threats by Defendants.

56.    Defendants knew of these relationships and purposefully directed many of the Statements at Kings Garden's shareholders, investors and professional relationships, including the claims of the individual Plaintiffs' misuse of corporate funds and management of the business.

57.    The Statements are impacting the regular business operations of Kings Garden.

9

58.     Paul's blitz of false information, including that Michael is a convicted felon, is significant in light of the fact that the Plaintiffs are within a highly regulated industry and Michael is the CEO of Kings Garden.

59.     Most recently, Kings Garden has been advised that several companies, Falcon Brands and Matada, are limiting their relationship, including ceasing purchases, in light of the information found in the Statements.

60.     Defendants knew that the Statements would impact the Plaintiffs' business and personal relationships.

61.     Defendants knew that posting that Michael had "millions in cash and diamonds" at the home of his family, including his wife and daughter, would adversely impact the family's safety and relationship.

62.     Defendants have intentionally interfered with Plaintiffs' relationships.

63.     Defendants' actions are without justification and have caused damages to Plaintiffs.

WHEREFORE, Plaintiffs demand a judgment for damages and an injunction against Defendants Paul King and Cannafornia Holdings, including actual, special and consequential damages, taxable costs, and for such other and further relief the Court deems just and proper.

May 21, 2021                                         *Respectfully Submitted,*

                                                    By:_____
                                                    Jason R. Buratti, Esq.
                                                    Florida Bar Number 73756
                                                    Buratti P.A.
                                                    17111 Biscayne Boulevard Unit 1708
                                                    Aventura, Florida 33160
                                                    Tel. (954) 683-1072
                                                    E-Mail/Fax: Jason@BurattiLaw.com
                                                    2d: ks@BurattiLaw.com

10

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of Plaintiffs' Complaint is being served on Defendants PAUL KING and CANNAFORNIA HOLDINGS, INC. on this 21st day of May, 2021 via Service of Process at the address(es) listed below:

Paul King
801 South Miami Avenue
Apartment 1401
Miami, Florida 33131

Paul King
26800 Encinal Road
Salinas, California 93908

Cannafornia Holdings, Inc.
26800 Encinal Road
Salinas, California 93908

Cannafornia Holdings, Inc.
(Officer/Director/Registered Agent, Paul King)
801 South Miami Avenue
Apartment 1401
Miami, Florida 33131

Cannafornia Holdings, Inc.
via Officer/Director/Registered Agent, Paul King
3411 Silverside Road
Tatnall Building, Suite 1
Wilmington, Delaware 19810

By: *Kimberly Stratos*
Kimberly Stratos

11

# EXHIBIT 'A'

## INCIDENT/INVESTIGATION REPORT

| Agency Name | | | | Case |
|---|---|---|---|---|
| | | | | 21-01101 |

| COLLINS AVE, Sunny Isles Beach FL | | Case Rptd | Premise Type | | |
|---|---|---|---|---|---|
| | | NO | Restaurant | | 12/01/2020 16:01 |
| Information - Police | (Com) | Weapon / Tools | NOT APPLICABLE | | 03/04/2021 13:01 Tue |
| #2 Crime Incident | | Entry | Exit | | |
| | | Weapon / Tools | | | |
| #3 Crime Incident | | Entry | Exit | | |
| | | Weapon / Tools | | | |
| | | Entry | | | |

**MO**

| Injury | | Domestic N |
|---|---|---|
| Victim of Crime # | | Relationship To Offender |

| # | Name (Last, First, Middle) | | Injury | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10 | KING, PAUL MICHAEL | | Victim of Crime # | DOB 05/26/1984 Age 36 | Race W | Sex M | Relationship To Offender | Resident Status Resident |
| 3613 MIAMI AVE - 1401 MIAMI, FL 33131 | | | | | | Home Phone | | 786-797-6072 |
| | | | | | Business Phone 786-200-3429 | Mobile Phone | | |

| Type: INDIVIDUAL | | Injury | | | | | |
|---|---|---|---|---|---|---|---|
| KING, MICHAEL | | Victim of Crime # | DOB 06/20/1978 Age 42 | Race W | Sex M | Relationship To Offender | Resident Status |
| COLLINS AVE - 3203 SUNNY ISLES BEACH, FL 33160 | | | | | | Home Phone | 347-996-7844 |

Incident Report

Beach Police Department

| Name Code# | Name (Last, First, Middle) | | | | | |
|---|---|---|---|---|---|---|
| IO | 2 | EKLARSH, MARK | | | | |
| Address | 3107 STIRLING RD Apt. 207, DANIA BEACH FL 33312 | | | | | |
| Empl/Addr | | | | | | |

INVESTIGATION REPORT

| UCR | Status | S = Stolen | R = Recovered | D = Damaged | Z = Seized | B = Burned | C = Counterfeit / Forged | F = Found | | |
|-----|--------|------------|---------------|-------------|------------|------------|---------------------------|-----------|--|--|
| | | Quantity | | Type Measure | | | | | Case # 21-01101 | |
| | | | | | | Suspected Type | | | | |
| | | | | | | | | | Up to 3 types of activity | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Assisting Officers | | | | | | | | | | |

MONS (NO BIAS)

# EXHIBIT 'B'

**INCIDENT/INVESTIGATION REPORT**

Case#: 21-009257

Premise Type: *Home Of Victim-other*

Weapon / Tools: *NOT APPLICABLE*

# Victims: 1   Type: INDIVIDUAL

**V1** Victim/Business Name (Last, First, Middle): **KING, PAUL MICHAEL**

Victim of Crime #: 1   DOB: 05/26/1994   Age: 26   Race: W   Sex: M

Relationship To Offender:

Resident Status: Resident   Domestic: N

Home Address: **801 S MIAMI AVE - 1401, Miami, FL 33131-**

Home Phone: 786-797-6072

CODES: V = Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

Supervisor: MONTESINO, M. (UNIF. SUPV) (0075)   04/14/2021   05/19/2021 14:29

Incident Report Additional Name List

OCA: 21-00027

| | | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|---|
| VI | 1 | KING, SOPHIA LYALYA | | 11/17/1956 | 64 | W | F |

Address 15811 COLLINS AVE Apt. 1106, SUNNY ISLES BEACH, FL

Empl/Addr

H: 305-401-4723
B: - -
Mobile #: - -

# INCIDENT/INVESTIGATION REPORT

Case # 21-00927

D = Damaged   S = Stolen   B = Burned   C = Counterfeit / Forged   F = Found

| | Quantity | Type Measure | | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:   NONE (NO BIAS)

**NARRATIVE**

VI-1 (P. KING) reports that his brother (M.KING), OF-1, fraudulently filed a quit claim deed for the incident location on 12-22-2020 which transferred ownership from the victim to the offender without the victim's permission or knowledge. According to VI-1, his brother committed the same crime against others in the past and knows how to file quit claim deeds fraudulently through Miami Dade County. A review of the documents on the county website shows the home (valued in excess of $800,000.00) was quit claimed from the victim to the offender for a sum of $100.00 on 12-22-2020 and was filed in the county property appraisers site in February of 2021. A copy of the allegedly fraudulent quit claim deed is submitted with this report. VI-1 has already obtained legal counsel to pursue a civil resolution to this matter, but he would also like to pursue the matter against his brother criminally.

It should be noted, one on the "witnesses" on the quit claim deed in question is Sofia King. Sofia King is the mother of both the victim and the offender. I did not speak to Sofia King, but according to the victim, Sofia told him that the offender "forced her" to witness the document. No further.

# Incident Report Suspect List

**_____ Department**

OCA: *21-00927*

| (Middle) | | Also Known As | | Home Address |
|---|---|---|---|---|
| _____ MICHAEL | | | | 18975 COLLINS AVE - 3203 |
| | | | | SUNNY ISLES BEACH, FL 33160 |
| Business Address | | | | 347-996-7844 |

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State |
|---|---|---|---|---|---|---|---|---|---|---|
| 06/20/1978 | 42 | W | M | | 600 | 220 | | | LGT | K520540782200 FL |

Scars, Marks, Tattoos, or other distinguishing features

| Reported Suspect Detail | Suspect Age | | Race | Sex | Eth | Height | | Weight | | SSN |
|---|---|---|---|---|---|---|---|---|---|---|
| Weapon Type | Feature | Make | | Model | | | Color | Caliber | Dir of Travel | |
| | | | | | | | | | Mode of Travel | |
| Veh Yr/Make/Model | | Drs | Style | | Color | | Lic/St | | VIN | |
| | | | | | | | Physical Char | | | |

Note

# EXHIBIT 'C'

| From: | Andrei <andreimuraviev44@gmail.com> |
|---|---|
| Sent: | Saturday, May 15, 2021 5:55 AM |
| To: | lauri@kingsgardeninc.com |
| Subject: | Concerned Shareholders |



# <u>Concerned Shareholders Warn that Kings Garden Continues to Mislead</u>

***Palm Springs, California, May 15, 2021 – Kings Garden Inc. ("Kings Garden" or the "Company").***

The Concerned Shareholders of Kings Garden (KG Shareholders") are disappointed that the entrenched board of directors of Kings Garden (the "Board") continue to mislead shareholders with inaccurate and distracting "statements" while deliberately neglecting important facts. In a ***<u>Shareholder Update</u>*** issued by Michael King, Chairman and CEO on March 4, 2021, the incumbent directors have yet again demonstrated their plan to selectively disclose certain information in a transparent attempt to misdirect shareholders into selling shares for a significantly discounted price due to alleged lengthy timelines to go public.

The March 4 Shareholder Update is directly contradictory to a ***<u>May 13, 2020</u>*** Shareholder Update. Rather than address legitimate shareholder concerns

and avoid lengthy and expensive lawsuits, the Board has instead attempted to discredit the Concerned Shareholders in order to retain their lucrative positions in the face of non-performance.

As evidenced by public court records, two shareholder disputes were settled in April 2021 after incurring 7 figure legal fees plus the 7 figure payouts, at the direct expense of Kings Garden shareholders. The Concerned Shareholders expect the Company to continue to spend hundreds of thousands of shareholder dollars in ongoing legal battles, specifically orchestrated by the Board for the sole purpose of not having to open their books and records to their Concerned Shareholders.

Given Kings Garden's continued promises over many years for liquidity events, the Concerned Shareholders are stunned that the Board would issue updates contradictory to the promises made when the Company was soliciting investments.

The Concerned Shareholders urge the incumbent directors to stop frivolously spending scarce shareholder funds towards their own self-interest, to open their books and records to shareholders, and to remove and replace the three Board Members / operators, Michael King, Lauri Kibby and Charles Kieley. The shareholder update from March 4, 2021 offering investors much different

2

terms than when they invested is yet another example of poor and self-interested management.

Despite the Board's misleading "positive" spin on news, Kings Garden has no institutional coverage or support, a dwindling real estate portfolio value, disenfranchised stakeholders, and inexcusable expenses including egregious director and executive compensation.

Copyright © 2021 Concerned Shareholders. All rights reserved.
You are receiving this email because you opted in via our website.

**Our mailing address is:**
Kings Garden Shareholders
Nicosia, Lefkosia 1066
Cyprus

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list

3

| | |
|---|---|
| **ɔm:** | Andrei <andreimuraviev44@gmail.com> |
| **_nt:** | Saturday, May 15, 2021 2:16 PM |
| **To:** | lauri@kingsgardeninc.com |
| **Subject:** | Michael King's First Degree Grand Theft — Felony Conviction in Miami-Dade County |

# Michael King's First Degree Grand Theft — Felony Conviction in Miami-Dade County

***Palm Springs, California, May 15, 2021 — Kings Garden Inc. ("Kings Garden" or the "Company").***

The Bureau of Cannabis Control states that any partner or owner of a licensed cannabis facility in California must report within 48 hours any criminal conviction or civil judgment against any partners or owners.

According to Miami-Dade criminal records, Michael Buyanovsky King (later changed to King) was convicted of first-degree grand theft-a felony offense punishable by imprisonment. The conviction stated that Michael King illegally transferred the proceeds from the sale of a condominium in the Trump Towers to himself rather than to his clients account. Michael King was made to pay the victim restitution of $800,000 and flew from California to Florida to turn himself in. King made the payment and was released from jail hours after his arrest.

1

**Click Here for the story**

Copyright © 2021 Concerned Shareholders. All rights reserved.
You are receiving this email because you opted in via our website.

**Our mailing address is:**
Kings Garden Shareholders
Nicosia, Lefkosia 1066
Cyprus

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

# EXHIBIT 'D'

# How did Michael King get so rich?

May 17

From co-owning a struggling Crossfit gym in 2015, by 2019 Michael King was worth $50M with $30M in real estate, according to estimates



The Kings Garden team — when they're not discussing what house they're buying next, they're posing for photos at the facility (Photo Taken from @michaelking_kg instagram)

While investors are being offered a 10% return, it appears that CEO, CFO and COO are diverting much of the upside of Kings Gardens' success

According to a background search, Michael Kings' personal properties include:



▬▬▬▬▬ CA 90069

▬▬▬▬▬ isles beach, fl 33160

▬▬▬▬▬ CA 92270

▬▬▬▬▬ CA 92270

▬▬▬▬▬ s, CA 92262-6167

At times, CEO Michael King spreads the wealth with his partners:

▬▬▬▬▬ PALM SPRINGS, CA 92262-1606 (RIVERSIDE COUNTY) Owner: MICHAEL KING Owner: MARIANNA KING Owner: CHARLES KIELEY Owner: COURTNEY KIELEY

And generously, King even allows them to buy their own real estate:

**Charles Kieley real estate holdings**



▬▬▬▬▬ CA 92672

▬▬▬▬▬ CA 92270

**Lauri Kibby real estate holdings**

▬▬▬▬▬ CA 90049

▬▬▬▬▬ CA 92262

# Michael King's First Degree Grand Theft — Felony Conviction in Miami-Dade County

‹



## Kings Garden settles two lawsuits in April



# EXHIBIT 'E'

## Michael King's First Degree Grand Theft — Felony Conviction in Miami-Dade County



Andrei Muravyev
6 Image



*Why The Security? Michael King's West Hollywood Compound which he purchased for $12.8M in cash in 2019 — Shareholders are growing increasingly concerned that King may have diverted Company funds from the sale of Company owned real estate for his sole benefit.*

King, who lives in Palm Springs and family lives in Miami, has around the clock security at his Los Angeles home — paid for by Kings Garden Shareholders — and concerned investors are wondering what the security is there to protect. King is believed to have millions in cash and diamonds in the compound.



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Cannabis Entrepreneurs' Family Fighting Spills Into Court

By **Diana Novak Jones**

Law360 (May 24, 2021, 9:44 PM EDT) -- A simmering dispute between brothers and cannabis entrepreneurs Michael and Paul King ratcheted up after Michael filed a lawsuit in Florida state court Friday alleging Paul was trying to hurt his business with false claims of theft and fraud.

Michael King and other executives at California cannabis company King's Garden accuse Paul King and his company Cannafornia of attempting to extort King's Garden through a barrage of emails, YouTube postings, and websites accusing Michael and his colleagues of looting their own company.

The suit claims Paul King hacked into a King's Garden investor's account and used confidential information about the company to smear it. He created websites to host his allegations of fraud and posted the home addresses of Michael King and other King's Garden executives, claiming they had cash and diamonds, the suit says.

"Michael lived at that home with his wife and three young children," the suit said. "Paul put all five of their lives at jeopardy by writing that there were millions of dollars at [sic] cash at the home."

The fighting between the brothers seems to have begun in earnest in April, according to court records. It spans several lawsuits, with more potentially on the horizon, records show.

In April, the pair exchanged lawsuits in state courts across the country.

First, Michael sued Paul in California state court, claiming he never repaid hundreds of thousands Michael lent him to cover the legal costs of litigation against **some former Cannafornia business partners.**

A few days later, Paul sued Michael in Florida, claiming Michael forged Paul's signature on a quit claim deed for Paul's apartment at the Trump Royale building in Miami, according to court records.

Now, Michael King's latest lawsuit against his brother alleges the pair's fighting also involved a false police report, emails that purported to come from investors, and doxxing.

The suit accuses Paul King of defamation, public disclosure of private facts and interference with King's Garden. Paul King's campaign of disinformation targeted King's Garden's business partners and is having an impact on the company's ability to function, the suit says.

Michael King says he will seek punitive damages against his brother, and estimates he's done at least $5 million in damage to the business. There is a possibility that a Racketeer Influenced and Corrupt Organizations Act claim could be added to the suit as well, depending on what discovery reveals, Michael King's attorney, Jason Buratti of Buratti PA, told Law360 on Monday.

In an email on Monday, Paul King said he hadn't seen the suit until Law360 provided it.

"Defamation is hard to prove if everything is true," he said.

The latest lawsuit comes a few days after Paul King sent a letter to King's Garden demanding Michael King resign as CEO of the company or face a lawsuit alleging he has used the company as his "personal piggy bank," according to documents reviewed by Law360.

A draft copy of that complaint seen by Law360 claims Paul King is an investor in King's Garden, and Michael King's alleged conduct cost him millions of dollars.

Asked about those allegations against Michael King, Buratti told Law360, "I'm not aware of any lawsuit being filed to this effect."

"Paul King's statements are untrue and part of the basis of the Florida action," he said.

In an email on Monday, Michael King said there are more lawsuits coming in California.

He sent a letter to the company's investors over the weekend, he said.

"As promised, we acted quickly in order to stop these attacks on the company," he wrote.

Michael King and King's Garden are represented by Jason Buratti of Buratti PA.

Counsel information for Paul King was not immediately available.

The case is Michael King and King's Garden et al. v. Paul King and Cannafornia Holdings Inc., case number 2021-012141-CA-01, in the Circuit Court of the 11th Judicial Circuit for Miami-Dade County.

--Editing by Janice Carter Brown.

All Content © 2003-2021, Portfolio Media, Inc.



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# 'Cannabis King' Owes $203K For Urgent Work, Ore. Firm Says

By **Emilie Ruscoe**

Law360 (August 2, 2021, 8:46 PM EDT) -- A Portland, Oregon-headquartered law firm sued a cannabis entrepreneur in California state court, claiming he owes it more than $200,000 in unpaid legal fees and costs.

In the suit, Emerge Law Group claimed that Monterey County, California, resident Paul King owes it money for work it scrambled to perform for him on tight deadlines to battle eviction and enforcement proceedings in California state court.

On Monday, King told Law360 via email that the case was in mediation but did not comment further.

In its July 21 suit, the firm claimed that King, who has been referred to in cannabis trade media as the "California Cannabis King," retained Emerge in April to handle a set of suits his companies were facing that the firm described as unlawful detainer, or eviction, proceedings. Those suits accused his companies of failing to pay rent between October 2020 and February 2021 for greenhouses, warehouse and office space his companies lease.

And in June, Emerge became King's counsel on a civil enforcement case that Monterey County's district attorney brought against him in state court. Details about that case weren't included in its suit.

According to Emerge's complaint, King told its lawyers in April that there was "particular urgency" in the unlawful detainer actions, and indeed several of those matters had answer briefs due the very next day. All of those cases also involved "a complicated array of facts," and at the request of the landlord who filed them, trials for them were scheduled for just three weeks after Emerge became King's counsel, the firm's complaint said.

Emerge said it also invested "a considerable investment of time" in amending a complaint in one civil action King faced, noting that the cannabis entrepreneur viewed the eviction cases as enterprise-threatening and asked that the firm "pursue all available avenues and strategies" to fight them. He also asked its lawyers to "engage in extensive, costly discovery" in those matters, according to the firm.

"Throughout the representation, defendants, through King, heaped praise on the Emerge team, informing [Emerge partner Timothy L. Alger] on several occasions that Alger was the best lawyer he had ever had," the firm noted.

King had full visibility into the work that was going into the cases, Emerge said, noting that its attorneys worked "many times late into the night and on weekends" to meet the deadlines, and that King never pushed back on the firm's approach to managing the cases.

The firm emphasized that when it agreed to represent King, it told him he would need to pay his legal bills "in real time" because of the expected intensity of the work. King has paid the firm $40,000 in retainer fees and a little over $22,000 in "real time" payments so far, it said, but owes much more.

In June, Emerge told King it had no choice but to stop representing him, claiming that at the time it sued him, he owed nearly $203,000, including about $15,700 in out-of-pocket expenses the firm

took on litigating his case, and which doesn't include interest.

The firm accused King of breaching their contract and sought for him to pay for services it already provided. Emerge described King and his companies as "former clients," but also described King as having an open book account with the firm.

Alongside King, the complaint names five companies, including four LLCs that King is described as the managing member of, and Cannafornia Holdings Inc., a company King allegedly heads.

The complaint also included 10 unnamed "Doe" defendants as stand-ins for companies and individuals whose names may be added in the future, and claims that there's a "unity of interest and ownership between each of the defendants such that any individuality and separateness between each of them ceased."

The case has been assigned to Superior Court Judge Stephanie George.

King has also been embroiled in litigation in California and Florida state court with some of his **former business partners** and in separate **disputes with his brother**, Michael King.

Representatives for Emerge declined to comment Monday.

Emerge is represented in-house by Timothy L. Alger and Delia Rojas.

Counsel information for King and the other defendants wasn't immediately available Monday.

The case is Emerge Law Group vs. King, case number 30-2021-01211551, in the Superior Court of the State of California, County of Orange.

--Editing by Adam LoBelia.

All Content © 2003-2021, Portfolio Media, Inc.

BACKGROUND

**NEW JERSEY**

# U.S. accuses Holmdel couple of Russian money-laundering

By DAVID VORACOS
BLOOMBERG NEWS

NEWARK — A Monmouth County couple used forgery and fraud to launder millions of dollars for a powerful Russian Mafia group, U.S. prosecutors alleged in a lawsuit seeking to seize more than $1 million of the cash.

Lev and Sophia Buyanovsky, of Holmdel, set up bank accounts in the names of other people to launder money for the Moscow-based Solntsevskaya Mafia, the U.S. attorney's office in Newark alleged in the suit. The civil case, filed under seal, was mistakenly made available to the public at the federal courthouse in Newark, prosecutors said.

"Using forged signatures to obtain power of attorney for these accounts, the Buyanovskys moved millions of dollars, including not only illicit profits on behalf of the Solntsevskaya Mafia, but also proceeds of other illegal schemes," Assistant U.S. Attorney Peter G. O'Malley wrote in the lawsuit.

The Buyanovskys' attorney, Paul Fishman, denied the claims.

Prosecutors often use asset forfeitures in criminal prosecutions to attack the economic infrastructure of groups run by mobsters, drug dealers and terrorists. Russian criminal groups have fanned out across the United States in the past two decades from Brighton Beach, Brooklyn, where many first emigrated, authorities say, and engage in money laundering, counterfeiting, securities fraud, drug dealing, vice crimes and motor-fuel tax evasion.

ture of $1.097 million in six U.S. accounts allegedly opened in the name of a Latvian woman who has never been to the United States, the government suit said. FBI agents searched the Buyanovskys' house on Oct. 31, 2000, as part of a continuing criminal investigation, court papers said.

**Russian emigres**

Fishman said the Buyanovskys have been in the United States for more than a decade. He declined to discuss Lev Buyanovsky's businesses or the transactions alleged in the suit.

The Buyanovskys were born in Russia and later lived in New York. In 1994, they bought a four-bedroom, four-bathroom house with a backyard pool on a one-acre plot in Holmdel. Children's bicycles and two basketball hoops sat by a three-car garage when a reporter visited the home last week.

Lev Buyanovsky, 45, a muscular man with a thick, black moustache, answered the door in pants and no shirt. Shaving cream covered his face as he stood under a large chandelier in the front hallway.

"Unfortunately, I can't talk about it," he said. "It's not over yet. It's been one year, and nothing's happened as far as I know."

In perhaps the most publicized case of alleged Russian money laundering, former Bank of New York executive Lucy Edwards and her husband, Peter Berlin, were accused in 1999 of transferring $7 billion from Russia through accounts at the bank.

The Bank of New York is de-

where reporters review lawsuits, from Oct. 31 to Nov. 5. The second page said it should be sealed to protect "the identity and safety of witnesses as well as the ongoing investigation of this and related matters."

O'Malley declined to comment, other than to say the papers shouldn't have been publicly available.

The U.S. says the Buyanovskys are associates of a crime syndicate reputedly run by Sergei Mikhailov with 2,000 members worldwide. Mikhailov was acquitted in Switzerland on money laundering charges in December 1998.

The lawsuit alleges that the Buyanovskys used a variety of ruses. It said they set up two "front" companies at their house, Chemical Trading International and Interform USA. The suit said that such companies, which may conduct legitimate business, often are a vehicle for laundering money from illegal activities.

The couple also set up at least 29 banking accounts in Russia, Germany, Luxembourg and the U.S., including some in their own names or the names of their companies, the suit said. The couple used false pretenses to obtain personal information about people and forged their signatures, powers of attorney and account-opening documents, the suit said.

Citing "reliable confidential informants," O'Malley wrote that Lev Buyanovsky had defrauded a Russian business enterprise and deposited the proceeds at Commerzbank AG in Germany.

WARRANT TYPE: ARREST WARRANT
AWPS#: 17000294
COURT CASE NUMBER:

CASE TYPE: FELONY
REFILE INDICATOR:
DIVISION:

TO ALL AND SINGULAR SHERIFFS OF THE STATE OF FLORIDA, GREETINGS:
YOU ARE HEREBY COMMANDED TO IMMEDIATELY ARREST THE DEFENDANT AND BRING HIM OR
HER BEFORE ME, A JUDGE IN THE 11TH JUDICIAL CIRCUIT OF FLORIDA, TO BE DEALT
WITH ACCORDING TO LAW:

DEFENDANT'S NAME: KING
                  LAST                    MICHAEL        BUYANOVSKY
                                          FIRST          MIDDLE          TTL

AKA(S):
STR/APT/CITY/ST/ZIP: 1160 N FEDERAL HWY     / 921  / FT LAUDERDALE / FL/ 333041412
DOB: 06/20/1978  RACE: W  SEX: M  HEIGHT: 600  WEIGHT: 190  HAIR: BLK  EYES: BRO
SOC SEC #: XXX-XX-XXXX      CIN #:            SID #:
SCARS, MARKS, TATTOOS:                                     FBI #: 631698LB8
DRIVERS LICENSE #: K520-540-78-220-0    STATE: FL         IDS #: 3139426
VEH TAG #: PEJ8W         STATE: FL    MAKE: MERC   MODEL: ML3   YEAR: 9  COLOR: BLACK
COMMENTS:

PROBATION:
*******************************************************************************
BEFORE ME PERSONALLY CAME GLANSBERG, MITCHELL       (AFFIANT) WHO, BEING DULY
SWORN, STATES THAT THE DEFENDANT ** KING, MICHAEL BUYANOVSKY **, DID COMMIT THE
ACTS STATED IN THE ATTACHED STATEMENT OF FACTS. BASED UPON THIS SWORN STATEMENT
OF FACTS, I FIND PROBABLE CAUSE THAT ** KING, MICHAEL BUYANOVSKY ** DID COMMIT
THE CRIME(S) OF:
F  1  812.014(2)(A)      GRAND THEFT 1ST DEGREE/100K>    $15,000


IN DADE COUNTY, FLORIDA, CONTRARY TO FLORIDA STATUTES AND AGAINST THE PEACE AND
DIGNITY OF THE STATE OF FLORIDA.
POLICE CASE #: 1600953          AGENCY: SUNNY ISLES BEACH
ASSISTANT STATE ATTORNEY: OLSON, KATHRYN
                                                    UNIT: 058

                            EXTRADITE INFORMATION
EXTRADITION CODE: 1 - FELONY - FULL EXTRADITION UNLESS OTHERWISE NOTED IN MIS FIEL
EXTRADITION MAY BE CONFIRMED WITH THE METRO-DADE POLICE DEPARTMENT, DADE COUNTY
** IN ANY EVENT, DEFENDANT WILL BE ARRESTED IF FOUND IN THE STATE OF FLORIDA **

SWORN TO BY AFFIANT GLANSBERG, MITCHELL
SO ORDERED THIS 5 DAY OF May      2017.    COURT ID 089-      169

_____                              $15,000
                                                            BOND AMOUNT
JUDGE IN THE 11TH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY FLA
(   ) FIRST APPEARANCE JUDGE MAY NOT MODIFY CONDITION OF RELEASE _____
      (RULE 3.131(D)(1)(D))
*******************************************************************************
(   ) TO ANSWER UNTO THE STATE OF FLORIDA ON AN INFORMATION OR INDICTMENT
      FILED AGAINST HIM OR HER BY THE STATE ATTORNEY FOR THE CHARGE(S) OF:
(   ) UPON ORDER OF A JUDGE IN THE ELEVENTH  JUDICIAL CIRCUIT OF FLORIDA FOR
      FAILURE TO APPEAR IN COURT TO ANSWER THE PENDING CHARGE(S) FOR THE
      CHARGE(S) OF:
HARVEY RUVIN,  CLERK OF THE COURT

BY _____          _____
              DEPUTY CLERK                              DATE

# IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

STATE OF FLORIDA          )

COUNTY OF MIAMI DADE      )

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT

Before me, _____, a Judge of the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, personally appeared Detective Mitchell Glansberg, Badge# 0169 of the Sunny Isles Beach Police Department, who being by me first duly sworn, deposes and says that he has probable cause to arrest MICHAEL KING, (hereinafter KING) for one count of Grand Theft in the First Degree in violation of Florida Statute § 812.014 (2)(a)1. KING is a white male, date of birth 06/20/1978, last known address 1160 N FEDERAL HWY APT 921 FORT LAUDERDALE, FL 33304-1412.  Because this Affidavit is being submitted for the limited purpose establishing probable cause, your Affiant has not included every aspect, fact, or detail of this investigation.

## AFFIANT TRAINING AND EXPERIENCE

Your Affiant, Detective Mitchell S. Glansberg, Badge# 0169 of the Sunny Isles Beach Police Department, has been a police officer for over 31 years and has been assigned to the Sunny Isles Beach Police Department's Criminal Investigations Unit for the past ten (10) months. Your affiant has held criminal investigative assignments in the Criminal Investigations Division throughout his 30 year career.  You affiant has investigated over 500 cases.  Your Affiant has investigated the facts and circumstances surrounding Sunny Isles Beach Police Case No. 16-00953 and states the following:

## SUMMARY

Through investigation, Your Affiant has determined that KING directed the sale of a condominium, 15811 Collins Avenue, Unit 3101, Sunny Isles, Beach, Florida, owned by Alexey Sorokin (hereinafter the victim) without his approval or knowledge. KING then received the proceeds of the sale of the condominium via his company, 5M Investment Services, LLC. The funds have since been significantly depleted through transactions unrelated to the victim. The victim is a Russian foreign national who was in Russia during the sale of his condominium.

1

Affiant's Initials 
ASA's Initials
Judge's Initials

<u>INVESTIGATION</u>

On November 12th, 2016, Your Affiant began an Investigation after receiving a Real Estate Fraud/ Grand Theft complaint from the victim. In approximately December 2011, the victim selected a condominium located at 15811 Collins Avenue, Unit 3101, in Sunny Isles Beach, Florida (hereinafter the condominium) to purchase. The victim subsequently returned to Russia. Before leaving the United States, the victim executed a Limited Nondurable Power of Attorney authorizing Sophia King, a licensed real estate agent and owner of International Sales Team of America a Real Estate Corporation (hereinafter IST), located at 17070 Collins Avenue, Suite 259, to act as his "Attorney in Fact" in the purchase of the condominium. Sophia King is the mother of KING. On March 21, 2011, Sophia King, representing the victim, executed all the closing documents and completed the purchase of the condominium.

Shortly thereafter, the victim decided to sell the condominium and contacted Ms. King to assist in the sale. On April 14, 2011, the victim entered into a listing agreement with IST for a term of one (1) year. The victim was under the belief that IST, under the direction of Ms. King and KING, was marketing and showing the property and that all offers would be conveyed to the victim so that he may approve or reject the offers. This did not occur.

In early 2012, attorney Daniel Wurtenberger was contacted by KING to represent the victim in sale of his property. Mr. Wurtenberger testified that KING told him the victim had recently left the country and needed his representation to complete the sale of the condominium. Mr. Wurtenberger received the executed closing documents from KING. Mr. Wurtenberger testified that KING told him the proceeds from the sale should be wired to a bank account in the name of 5M Investment Services, LLC. Mr. Wurtenberger testified that he told KING that he need confirmation from the victim. KING provided an email address of "alexsormail@mail.ru" for the victim. On June 29, 2012, Mr. Wurtenberger emailed a disbursement letter to "alexsormail@mail.ru" and received back a signed copy. Mr. Wurtenberger had previously received the victim's identification in the form of a passport and visa from "alexsormail@mail.ru" and this individual also identified himself as the victim. Subquently, later that day, Mr. Wurtenberger testified that he wired $780,931.63, the proceeds of the sale of the condominium, from his escrow account to PNC Bank account in the name of 5M Investment Services, LLC pursuant to the disbursement letter.

2

Affiant's Initials 
ASA's Initials
Judge's Initials

A subpoena was issued for the PNC Bank Account in the name of 5M Investment Services, LLC. Bank statements from PNC Bank reveal an incoming wire for $780,931.63 on June 29, 2012. On June 28, 2012, the balance in the account was $7,188.38. By December 2012, the balance was down to $136,258.83. Review of the withdrawals reveals purchases made on behalf of KING, his wife Marianna King, and various checks written to KING, Paul King, KING's brother, and IST. According to the Florida Secretary of State, 5M Investment Services, LLC was originally incorporated by Marianna King in 2010. On September 11, 2014, the Articles of Organization were amended replacing Marianna King as managing member with KING and Paul King.

The victim's signature was forged on all closing documents and fraudulently notarized. Sophia King and KING had access to the victim's passport and other pertinent information from the original purchase of the property in March 2011. The victim was completely unaware of Aveida, LLC's interest in the property, did not execute the Purchase and Sale Agreement, was unaware of the pending sale, did not authorize the execution of any of the conveyance documents or any other closing documents and did not obtain any proceeds from the sale of the property. Additionally, the victim was not even present in the U.S. at the time of the closing. As a result of the forged conveyance documents, on June 29, 2012, the transaction closed, the property was conveyed to Aveida, LLC, and the money was wired, pursuant to disbursement instructions provided. The outstanding mortgage held by BAC Florida Bank in the amount of $853,533.33 was paid off, and the balance of $190,000 to the IRS in the ordinary course of the sale.

Between June 2012 and April 2014, emails and text messages between the victim and KING overtly show that the victim was intentionally misled by KING as to the status of the property. KING continued to misrepresent to the victim that the property had not been sold, or that potential buyers were interested, in order to keep the victim at bay for as long as possible. In fact, up until the victim's arrival in the U.S. in April of 2014, which was the first time he had been in the United States since December 2010, the victim was under the impression that he still owned the property.

Efforts to locate the defendant has been met with negative results. The suspect has left the State of Florida.

3



Affiant's Initials
ASA's Initials
Judge's Initials

Based upon the above, your affiant has probable cause to believe that MICHAEL KING has committed the crime of one (1) count of Grand Theft Over $100,000 in violation of Florida Statute § 812.014(2)(A).

**WHEREFORE** Your Affiant respectfully requests a warrant be issued for the arrest of **MICHAEL KING,** for the offense as set forth above.

Detective Mitchell Glansberg
Sunny Isles Beach Police Department
ID # (89-0169)
AFFIANT

SWORN TO AND SUBSCRIBED before me this the _____ 15 _____ day of _____ May _____ 2017 _____

JUDGE OF THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT OF FLORIDA

4

Affiant's Initials
ASA's Initials
Judge's Initials

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2016-033252-CA-01
SECTION: CA21
JUDGE: David C. Miller

**STANISLAV ZASLAVSKIY**

Plaintiff(s)

vs.

**MICHAEL KING et al**

Defendant(s)

_____/

## PARTIAL SUMMARY JUDGMENT

THIS CAUSE having come on to be heard before the Court, at a hearing on July 23, 2021 at 8:30 AM, on Plaintiff, Stanislav Zaslavskiy's Motion for Summary Judgment as to Breach of Contract ("Plaintiff's Motion for Summary Judgment"), filed on June 11, 2021, against Defendant, Michael King, and the Court having received and reviewed the pleadings and supporting documentation from the Plaintiff, having reviewed the record, Defendant's Response in Opposition to Summary Judgment, heard arguments of counsel, and being otherwise duly advised in the premises herein, the Court finds that:

1. Plaintiff, STANISLAV ZASLAVSKIY ("Plaintiff") was the debtor in the parties' relationship.

2. Defendant, MICHAEL KING ("Defendant") was the creditor in the parties' relationship.

3. On June 14, 2013, Plaintiff entered into a pre-construction agreement for the purchase of a condominium unit located at 17201 Biscayne Blvd., Unit 1804, North Miami Beach, FL 33162 ("Unit 1804"). The purchaser's interest under the

agreement was eventually assigned to Marina Palm Group 1804, Inc., a Florida corporation ("Marina 1804"), which was owned and controlled by Plaintiff.

4. On June 14, 2013, Plaintiff entered into a pre-construction agreement for the purchase of a condominium unit located at 17201 Biscayne Blvd., Unit 1506, North Miami Beach, FL 33162 ("Unit 1506"). The purchaser's interest under the agreement was eventually assigned to Marina Palm Group 1506, Inc., a Florida corporation ("Marina 1506"), which was owned and controlled by Plaintiff.

5. On or about December 7, 2013, Plaintiff entered into a contract to purchase with Marina Palms Yacht Club, LLC, for Boat Slip #097 ("Boat Slip").

6. Plaintiff deposited funds of $332,000.00 for Unit 1506, funds of $279,200.00 for Unit 1804 and $120,000.00 for the Boat Slip, respectively ("Marina Palms Deposits"), for a total of $731,200.00.

7. On January 21, 2015, Plaintiff and Defendant executed the following enumerated documents (hereinafter collectively referred to as "Loan Documents"): Balloon Promissory Note in the amount of $223,875.00 made by to Marina Palm Group 1506, Inc. ("Marina 1506") and Plaintiff to Defendant.Balloon Promissory Note in the amount of $223,875.00 made by Marina Palm Group 1804, Inc. ("Marina 1804") and Plaintiff to Defendant.Mortgage from Marina 1506 and Plaintiff, individually, to Defendant.Mortgage from Marina 1804 and Plaintiff, individually, to Defendant.Corporate Resolution authorizing the sale of Plaintiff's shares in Marina 1804 to Defendant.Corporate Resolution authorizing the sale of Plaintiff's shares in Marina 1506 to Defendant.Limited Power of Attorney from Plaintiff appointing Defendant as Plaintiff's attorney-in-fact regarding Unit 1506.Limited Power of Attorney from Plaintiff appointing Defendant as Plaintiff's attorney-in-fact regarding Unit 1804.Stock Purchase Agreement selling the shares of Marina 1506 and the Boat Slip. ("Stock Purchase").

8. Pursuant to the Loan Documents, Defendant was to lend Plaintiff $447,750.00, at a minimum, with an increase of the loan amount available through the terms and

conditions of the Stock Purchase Agreement, providing for a loan up to $542,625.00 ("Loan Funds").

9. The Marina Palms Deposits were to serve as collateral under the Loan Documents.

10. Rather than securing the shares, the Loan Documents acted to immediately transfer all of Plaintiff's interests in Marina 1804 Marina 1506 and the Boat Slip to Defendant, which gave Defendant immediate control over the corporations, which owned the Marina Palms Deposits.

11. The Loan Funds were either to be given to Plaintiff directly and/or used to contract to purchase Unit 1403 at the Ritz Carlton Development in Sunny Isles Beach, Florida ("Unit 1503 at the Ritz").

12. RCSIB Unit 1403 Corp., an entity created and controlled by Defendant, per the Loan Documents, had entered into a Reservation Agreement with Sunny Isles Venture LLC, the developer, for Unit 1403 at the Ritz for the amount of $212,500.00.

13. On or about late March or early April of 2015, Defendant suggested to Plaintiff that – instead of continuing with the contract to purchase of Unit 1403 at the Ritz – he should contract to purchase Unit 2903 at the Armani Casa Project in Sunny Isles Beach, Florida ("Unit 2903 at the Armani Casa Project"), since the Armani Casa Project was better and more profitable. Defendant opposed these facts in Defendant's Affidavit and in the Statement of Facts.

14. Plaintiff agreed to proceed with Defendant's plan to change the use of the Loan Funds to contract to purchase Unit 2903 at the Armani Casa Project. Defendant in its Affidavit stated it was Plaintiff's plan to have Korneev as the named purchaser on the Contract.  This fact is controverted by Korneev's Reservation Agreement executed months prior to the parties dealings.

15. On April 20, 2015, Defendant requested the Cancellation of Reservation for Unit 1403 at the Ritz.

16. On April 23, 2015, Defendant sent Plaintiff an email correspondence titled "Armani", regarding the new amounts needed for the purchase of Unit 2903 at the Armani Casa Project.

17. Defendant proposed modified terms increased the loan amount to a total in the aggregate of $571,375.00 to accommodate the deposit for the contract to be obtained on Unit 2903 at the Armani Casa Project, due to its higher purchase price than Unit 1403 at the Ritz.  Defendant provided a calculation and advised that the new monthly payment amount subject to the Loan Documents was $11,427.50 (the "Modified Terms").

18. Plaintiff agreed to the Modified Terms as stated on the April 23, 2015, email from Defendant, and performed under the terms by making payment of the increased amount, as directed by the Defendant.

19. Up until August of 2015 and through July of 2015, Plaintiff had made all timely payments under the Loan Documents and the Modified Terms, in the total amount of $54,091.50.

20. During the course of the litigation, Plaintiff discovered that on April 23, 2015 – the same date the parties entered into the Modified Terms – RDR Seashore LLC, the developer, and Sergey Korneev ("Korneev"), an unrelated third-party, entered into a Purchase Agreement for Unit 2903 in the Armani Casa Project, and not RCSIB 1403 Corp.

21. Plaintiff in his Deposition testimony repeatedly confirmed that he did not know or had any relationship with Korneev.

22. Defendant, in his Opposition filing included a Declaration from Sergey Korneev, which stated that Plaintiff did know Korneev since 2005, and that Plaintiff agreed that Korneev's name should be on the contract for the Armani.

23. No phone records, exact time periods, or any other admissible documents were attached in support of the Declaration.

24. Plaintiff presented a Reservation Agreement dated July 16, 2014, which predated the transaction between the parties, and was supported by a Declaration from the records custodian for First American Title Insurance Company.

25. This Reservation Agreement showed that Korneev reserved Unit 2903 at the Armani Casa months before the Plaintiff and Defendant even contemplated the transaction at issue.

26. The Court was required to read the Loan Documents *in pari materia* with each of the other documents to determine the structure of the transaction.

27. It was clear and express in the Promissory Notes that required Defendant to lend money to the Plaintiff.

28. It was also clear and express in Section 4 of the Stock Purchase Agreement provided Plaintiff's redemption rights in RCSIB 1403 Corp.

29. Section 6.3 of the Stock Purchase Agreement contained and integration clause which provided that, the "... Agreement may be amended supplemented or interpreted at any time only by written instrument executed by the each of the parties hereto".

30. There is no genuine dispute of material fact that there was no writing, nor an executed writing modifying the Loan Documents between the parties authorizing Korneev's name to be on the contract for Unit 2903 of the Armani Casa.

31. Because Unit 2903 of the Armani Casa was not in the name of RCSIB 1403 Corp., Plaintiff had no redemption rights under the Stock Purchase Agreement.

32. Based on the foregoing, the Court finds that Defendant was in breach of the Loan Documents for failing to ensure RCSIB 1403 Corp., was the purchaser for Unit 2903 at the Armani Casa, after the cancellation of the prior contract for Unit 1403 at the Ritz Carlton, which was in the corporation's name.

33. Plaintiff was not in breach of any of the Loan Documents at the time the breach by the Defendant occurred.

34. This Court finds that there are no disputed issues of material fact as to the breach of the Loan Documents by the Plaintiff as presented by Plaintiff in its Motion.

35. Plaintiff met his burden of proof, pursuant to Fla R. Civ P. 1.510, as to the breach of contract by the Defendant, and the burden having shifted to Defendant, failed to meet his burden of proof as detailed in the opposition.  The statements in both the Declaration and Affidavit were  insufficient to create a disputed material fact to prevent entry of summary judgment.

It is hereby ORDERED AND ADJUDGED:

1. That Plaintiff's Motion to for Summary Judgment as to Count III of the Complaint for Breach of Contract against Defendant, Michael King, is GRANTED in Part as to Liability on Count III of the Complaint for Breach of Contract.

2. That Plaintiff's Motion for Summary Judgment is DENIED without prejudice, as to the amount of damages claimed and the amount of the award of attorney's fees and costs, the determination of which shall be subject to further hearing by this Court.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 24th day of September, 2021.

2016-033252-CA-01 09-24-2021 2:42 PM

Hon. David C. Miller

**CIRCUIT COURT JUDGE**

Electronically Signed

> No Further Judicial Action Required on **THIS MOTION**
>
> CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

Ayla M. Walker Esq, Muchnicklawfirm@gmail.com

Eric J. Grabois, eric@graboislaw.com

Eric J. Grabois, service@graboislaw.com

Jeffrey Muchnick, jeffreymuchnick@gmail.com

John Cody German, cody.german@csklegal.com

John Cody German, lisa.butts@csklegal.com

Kraig S. Weiss, Notices@swlawcenter.com

Kraig S. Weiss, kweiss@swlawcenter.com

Paul K Silverberg, Notices@pkslegal.com

Paul K Silverberg, psilverberg@pkslegal.com

William Patrick Ayers, WF.FL.GARNISHMENT@BURR.COM

**Physically Served:**

# WARRANT



1100342213

**COMPLAINT/ARREST AFFIDAVIT**

**COMPLAINT/ARREST AFFIDAVIT - COURT COPY**

| DETS NUMBER | | POLICE CASE NO. |
|---|---|---|
| 130** *6243 | | PD170607215167 |

| SEAL OPERATION | | FELONY ☒ | MISD ☐ | TRAFFIC ☐ | JUV ☐ | MOVES ☐ | E-ONE ☐ | ROUT-N-DUI THE WARRANT | WARRANT | MOVES No Stale | No Stale | N.O. State | E-M-B NO | COURT CASE NO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | APPL-ANT ☒ | | | H.O. THE WARRANT | | | | | | 170145251 | | |

| ID-R NO. | | AGENCY CODE | | MUNICIPAL P.D. DEF. ID NO | | MERS ARCHIVE ARCH NO | | STUDENT ID NO | | GANG RELATED | FRAUD RELATED |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3139426 | | 030 | | | | 1181982 | | | | NO | NO |

| DEFENDANTS NAME LAST FIRST MIDDLE | | | | AP HO UNIT ST. STREET NAME | | SIGNAL |
|---|---|---|---|---|---|---|
| KING, MICHAEL BUYANOVSKY | | | | | | |

| DOB MM/DD/YYYY | AGE | RACE | SEX | HISPANIC ETHNICITY | HEIGHT | WEIGHT | HAIR COLOR | HAIR LENGTH | HAIR STYLE | EYES | GLASSES | FACIAL HAIR | TEETH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/20/1978 | 38 | W | M | NO ANG | 6'00 | 225 | BRO | MED | WAV | BRO | NO | UNS | NOR |

| SCARS TATTOOS UNIQUE PHYSICAL FEATURES (Location, Type, Description) | | PLACE OF BIRTH (City, State/Country) |
|---|---|---|
| | | FL US |

| LOCAL ADDRESS | | PHONE | CITIZENSHIP |
|---|---|---|---|
| | | | US |

| PERMANENT ADDRESS (Street, Apt. Number) | CITY | State / Country | Zip | PHONE | OCCUPATION |
|---|---|---|---|---|---|
| 5694 MISSION CENTER ROAD 602-276 | SAN DIEGO | CA | US | 92108 | LABORER |

| SCHOOL OR BUSINESS ADDRESS (Street, Apt. Number) | | City | Area / County | PHONE | ADDRESS SOURCE |
|---|---|---|---|---|---|
| | | | | | VERBAL |

| DRIVERS LICENSE NUMBER STATE | SOCIAL SECURITY NO | WEAPON SEIZED | Defendant CONCEALED WEAPON PERMIT | INDICATION OF Alcohol Influence N / Drug Influence N |
|---|---|---|---|---|
| CA-Y2741957 | 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 | NO | NONE | |

| ARREST DATE | ARREST TIME | ARREST LOCATION | GRID |
|---|---|---|---|
| 06/07/2017 | 09:45 | TGK 7200 SW 42ND ST MIAMI, FL 33155 | 1594 |

| CO-DEFENDANT NAME | | DOB | IN CUSTODY ☐ / AT LARGE ☐ | FELONY ☐ / DV | JUVENILE ☐ / MISDEMEANOR ☐ |
|---|---|---|---|---|---|
| CO-DEFENDANT NAME | | DOB | IN CUSTODY ☐ / AT LARGE ☐ | FELONY ☐ / DV | JUVENILE ☐ / MISDEMEANOR ☐ |
| CO-DEFENDANT NAME | | DOB | IN CUSTODY ☐ / AT LARGE ☐ | FELONY ☐ / DV | JUVENILE ☐ / MISDEMEANOR ☐ |

| JUV only | Relation | Name | Street | Zip | Phone | Contacted? |
|---|---|---|---|---|---|---|
| | | | | | | |

| CHARGES | CHARGE AS | CNTS | FL STATUTE NUMBER | VIOL OF SECT | CODE OF | UCR | DV | WARRANT TYPE OR TRAFFIC CITATION |
|---|---|---|---|---|---|---|---|---|
| 1. /-WARRANT TYPE: ARREST WARRANT AW | | | | | | | | F17009470 AW |
| 2. | | | | | | | | |
| 3. | | | | | | | | |
| 4. | | | | | | | | |

The undersigned certifies and swears that he/she has just and reasonable grounds to believe, and does believe that the above named Defendant committed the following violation of law.

On the 07 day of JUNE 2017 at 09:45 at (TGK) 7200 NW 41ST ST MIAMI FL 33166

WARRANT #/COURT CASE#: F17009470 , WARRANT DATE: 05/15/2017, TOTAL BOND: 15000.00
DC#: 17-01786, VERIFIED BY: JP,
REF CHARGE/BOND AMT: GRAND THEFT 1ST DEGREE, BOND $15,000.00

| HOLD FOR OTHER AGENCY VERIFIED BY | HOLD FOR BOND HEARING DO NOT BOND ☐ OUT (Officer: Must Appear at Bond Hearing) | ☐ I understand that should I willfully fail to appear before the court as required by this notice to appear I may be held in contempt of court and a warrant for my arrest shall be issued. Furthermore, I agree that notice concerning the time, date and place of all court hearings should be sent to the above address. I agree that it is my responsibility to notify Clerk of the Court, Juveniles Notify Juvenile Division anytime that my address changes. |
|---|---|---|
| I SWEAR THAT THE ABOVE STATEMENT IS TRUE AND CORRECT | SWORN TO AND SUBSCRIBED BEFORE ME THE UNDERSIGNED AUTHORITY THIS 07 DAY OF JUNE 2017 | ☐ You need not appear in court but must comply with the instructions on the reverse side hereof. |

REMBISZ, D: Court ID: 030-04304 05031

DIXON, J: Court ID: 030-03859 05031

Officer Information

| | | | | | |
|---|---|---|---|---|---|
| REMBISZ, DANIEL | | NO | 030/05031 | 04304 | 2 |

COMPLAINT/ARREST AFFIDAVIT - SAO COPY



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
New York District Office
26 Federal Plaza
New York, NY 10278

U.S. Citizenship
and Immigration
Services

August 3, 2017

A203-148-201
MSC-11-005-17334

Dmitry Romantsov
2109 W 7ᵗʰ St, 3ʳᵈ Fl
Brooklyn, NY 11223-3735

**DECISION**

Dear Dmitry Romantsov:

Thank you for submitting Form I-485, Application to Register Permanent Residence or Adjust Status, to U.S. Citizenship and Immigration Services (USCIS) under section 245 of the Immigration and Nationality Act (INA).

After a thorough review of your application and supporting documents, and your testimony during your interview, unfortunately, we must inform you that we are denying your application for the following reason(s).

Generally, to qualify for adjustment under INA 245, an applicant must:

- Be inspected and admitted or paroled into the United States;
- Be eligible to receive an immigrant visa;
- Be admissible to the United States for permanent residence; and
- Have an immigrant visa immediately available at the time the application is filed.

**Statement of Facts and Analysis, Including Ground(s) for Denial**

You filed Form I-485 based on being the beneficiary of an immigrant petition.

USCIS received your Form I-485 on October 1, 2010, and on March 16, 2011, you appeared for an interview to determine your eligibility for adjustment of status. During the interview and review of your application with an Immigration Services Officer, you testified that the information on your Form I-485, along with any amendments made during the adjustment interview, and supporting documents were true and correct.

The granting of adjustment of status to that of a lawful permanent resident is a discretionary benefit. See section 245(a) of the INA. Mere eligibility is not the only factor considered in adjustment of status. Adverse factors may preclude a favorable exercise of discretion by USCIS. An applicant must demonstrate eligibility for adjustment of status as a matter of law and in the exercise of discretion. Generally, favorable factors such as family ties, hardship, and length of

residence in the United States can be considered in the favorable exercise of administrative discretion.

In your case, USCIS has determined that you are eligible for adjustment of status. However, USCIS has also determined that your case presents significant adverse factors which show that discretion should not be exercised in your favor. These factors include there is an outstanding warrant for your arrest in Russia for failure to return of funds in foreign currency from abroad, dereliction of duty of a Fiscal Agent committed on an especially large scale, fraud committed on an especially large scale, premeditated bankruptcy, illegal drawing up, misappropriation/embezzlement and illegal credit obtaining.

You have provided to USCIS evidence of factors to be considered in your favor. These factors include your United States citizen wife, your United States citizen son, and the fact that you have not committed any crimes while present in the United States.

After careful review of all the facts, USCIS has determined that the favorable factors listed above do not warrant a favorable exercise of discretion in light of the adverse factors. The multiple pending charges in Russia are extremely egregious.On September 14, 2015, a request for evidence (RFE) was issued. Included in this RFE was a request for information about pending, outstanding Russian criminal charges. Specifically, the RFE requested a police background clearance from Moscow, Russia, and certified copies of the arresting officer's report and/or criminal information or indictment, court disposition(s) of all criminal cases filed against you, including the record showing sentence imposed/time served and proof of completion. This included charges filed before the Leninskiy District Court of Cheboksary, Moscow, Russia against your for: 1) failure to return funds in foreign currency from abroad, 2) dereliction of duty of a Fiscal Agent committed onan especially large scale, 3) fraud committed on an especial large scale, 4) premeditated bankruptcy, 5) illegal drawing up, 6) misappropriation and embezzlement and 7) illegal credit obtained. In response to this RFE, you submitted the requested documents and your attorney submitted a statement claiming that the charges pending in Russia are purely political and therefore should not be held against you. USCIS has considered your explanation but does not find it to be credible. You failed to provide sufficient evidence to substantiate your claim that these are purely political offenses. These pending charges are serious in nature and relate to fraudulent and deceitful activity. Thus, you have not met the burden of demonstrating to USCIS that you warrant a favorable exercise of discretion. Therefore, USCIS denies your application after consideration of all the available evidence.

The evidence of record shows that, when you filed your application, you were lawfully present in the United States as a B-2 nonimmigrant. Your period of admission as a B-2 nonimmigrant has expired. You are not authorized to remain in the United States and should make arrangements to depart as soon as possible. Failure to depart may result in your being found ineligible for immigration benefits and inadmissible to the United States in the future. See section 212(a)(9)(B) of the INA.

You may not appeal this decision. However, if you believe that the denial of your Form I-485 is in error, you may file a motion to reopen or a motion to reconsider using Form I-290B, Notice of Appeal or Motion. You must submit Form I-290B within 30 calendar days of service of this decision (33 days if the decision was mailed). If USCIS does not receive the motion to reopen or reconsider within the required period, this decision will become final. See Title 8, Code of

2

Federal Regulations (8 CFR), sections 103.5 and 103.8(b).  Note: You must follow the most current filing instructions for Form I-290B, which can be found at www.uscis.gov.

To access Form I-290B or if you need additional information, please visit the USCIS Web site at www.uscis.gov or call our National Customer Service Center toll free at 1-800-375-5283.  You may also contact the USCIS office having jurisdiction over your current place of residence.

Sincerely,

John E. Thompson
Acting District Director
New York District

cc: Gennadi Sedikov, Esq.
    Law Offices of Immigration Advocates, P.A.
    1920 E Hallandale Beach Blvd, Ste 508
    Hallandale Beach, FL 33009-4723

3

# Attachment
## (Applicable Law/Regulations)

INA 245

ADJUSTMENT OF STATUS OF NONIMMIGRANT TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

(a) The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if

(1) the alien makes an application for such adjustment,

(2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and

(3) an immigrant visa is immediately available to him at the time his application is filed.

8 CFR 245.1

(a) General. Any alien who is physically present in the United States, except for an alien who is ineligible to apply for adjustment of status under paragraph (b) or (c) of this section, may apply for adjustment of status to that of a lawful permanent resident of the United States if the applicant is eligible to receive an immigrant visa and an immigrant visa is immediately available at the time of filing of the application. A special immigrant described under section 101(a)(27)(J) of the Act shall be deemed, for the purpose of applying the adjustment to status provisions of section 245(a) of the Act, to have been paroled into the United States, regardless of the actual method of entry into the United States.

8 CFR 103.5

(a) Motions to reopen or reconsider in other than special agricultural worker and legalization cases—

(1) When filed by affected party—

(i) General. Except where the Board has jurisdiction and as otherwise provided in 8 CFR parts 3, 210, 242 and 245a, when the affected party files a motion, the official having jurisdiction may, for proper cause shown, reopen the proceeding or reconsider the prior decision. Motions to reopen or reconsider are not applicable to proceedings described in § 274a.9 of this chapter. Any motion to reconsider an action by the Service filed by an applicant or petitioner must be filed within 30 days of the decision that the motion seeks to reconsider. Any motion to reopen a proceeding before the Service filed by an applicant or petitioner, must be filed within 30 days of the decision that the motion seeks to reopen, except that failure to file before this period expires, may be excused in the discretion of the Service where it is demonstrated that the delay was reasonable and was beyond the control of the applicant or petitioner.

(ii) Jurisdiction. The official having jurisdiction is the official who made the latest decision in the proceeding unless the affected party moves to a new jurisdiction. In that instance, the new official having jurisdiction is the official over such a proceeding in the new geographical locations.

(iii) Filing Requirements—A motion shall be submitted on Form I-290B and may be accompanied by a brief. It must be:

(A) In writing and signed by the affected party or the attorney or representative of record, if any;

(B) Accompanied by a nonrefundable fee as set forth in § 103.7;

4

(C) Accompanied by a statement about whether or not the validity of the unfavorable decision has been or is the subject of any judicial proceeding and, if so, the court, nature, date, and status or result of the proceeding;

(D) Addressed to the official having jurisdiction; and

(E) Submitted to the office maintaining the record upon which the unfavorable decision was made for forwarding to the official having jurisdiction.

(iv) Effect of motion or subsequent application or petition. Unless the Service directs otherwise, the filing of a motion to reopen or reconsider or of a subsequent application or petition does not stay the execution of any decision in a case or extend a previously set departure date.

(2) Requirements for motion to reopen. A motion to reopen must state the new facts to be proved in the reopened proceeding and be supported by affidavits or other documentary evidence. A motion to reopen an application or petition denied due to abandonment must be filed with evidence that the decision was in error because:

(i) The requested evidence was not material to the issue of eligibility;

(ii) The required initial evidence was submitted with the application or petition, or the request for initial evidence or additional information or appearance was complied with during the allotted period; or

(iii) The request for additional information or appearance was sent to an address other than that on the application, petition, or notice of representation, or that the applicant or petitioner advised the Service, in writing, of a change of address or change of representation subsequent to filing and before the Service's request was sent, and the request did not go to the new address.

(3) Requirements for motion to reconsider. A motion to reconsider must state the reasons for reconsideration and be supported by any pertinent precedent decisions to establish that the decision was based on an incorrect application of law or Service policy. A motion to reconsider a decision on an application or petition must, when filed, also establish that the decision was incorrect based on the evidence of record at the time of the initial decision.

(4) Processing motions in proceedings before the Service. A motion that does not meet applicable requirements shall be dismissed. Where a motion to reopen is granted, the proceeding shall be reopened. The notice and any favorable decision may be combined.


8 CFR 103.8


(b) Effect of service by mail. Whenever a person has the right or is required to do some act within a prescribed period after the service of a notice upon him and the notice is served by mail, 3 days shall be added to the prescribed period. Service by mail is complete upon mailing.


8 CFR 212.5(e)


(1) Automatic. Parole shall be automatically terminated without written notice

(i) upon the departure from the United States of the alien, or

(ii) if not departed, at the expiration of the time for which parole was authorized, and in the latter case the alien shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required.

(2)(i) On notice. In cases not covered by paragraph (e)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director or chief patrol agent in charge of the area in which the alien is located, the Deputy Executive Associate Commissioner for Detention and Removal, or the Director of the Office of Juvenile Affairs, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of

5

parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 240 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director, chief patrol agent, the Deputy Executive Associate Commissioner for Detention and Removal, or the Director of the Office of Juvenile Affairs the public interest requires that the alien be continued in custody.


8 CFR 274a.14

(a) Automatic termination of employment authorization.
(1) Employment authorization granted under § 274a.12(c) of this chapter shall automatically terminate upon the occurrence of one of the following events:
(i) The expiration date specified by the Service on the employment authorization document is reached;
(ii) Exclusion or deportation proceedings are instituted (however, this shall not preclude the authorization of employment pursuant to § 274a.12(c) of this part where appropriate); or
(iii) The alien is granted voluntary departure.
(2) Termination of employment authorization pursuant to this paragraph does not require the service of a notice of intent to revoke; employment authorization terminates upon the occurrence of any event enumerated in paragraph (a)(1) of this section. However, automatic revocation under this section does not preclude reapplication for employment authorization under § 274a.12(c) of this part.
(b) Revocation of employment authorization--
(1) Basis for revocation of employment authorization. Employment authorization granted under Sec. 274a.12(c) of this chapter may be revoked by the district director:
(i) Prior to the expiration date, when it appears that any condition upon which it was granted has not been met or no longer exists, or for good cause shown; or
(ii) Upon a showing that the information contained in the application is not true and correct.
(2) Notice of intent to revoke employment authorization. When a district director determines that employment authorization should be revoked prior to the expiration date specified by the Service, he or she shall serve written notice of intent to revoke the employment authorization. The notice will cite the reasons indicating that revocation is warranted. The alien will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence. The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.